UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re QUTOUTIAO, INC. SECURITIES LITIGATION | Master File No.: 1:20-cv-06707 (SHS) <br><br> <u>CLASS ACTION</u> <br><br> JURY TRIAL DEMANDED |
| This Document Relates To : <br><br> ALL ACTIONS. | |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ................................................................................. 1

II.     STATEMENT REGARDING PLAINTIFF'S INVESTIGATION ................................. 7

III.    JURISDICTION AND VENUE ............................................................................... 8

IV.     PARTIES .............................................................................................................. 9

        A.      Lead Plaintiff ............................................................................................ 9

        B.      Defendants ............................................................................................... 9

                1.      Qutoutiao ....................................................................................... 9

                2.      The Insider Defendants ................................................................. 9

                3.      The Director Defendants .............................................................. 12

                4.      The Underwriter Defendants ....................................................... 13

V.      CLAIMS ASSERTED IN THIS COMPLAINT ...................................................... 17

VI.     DEFENDANTS' ILLEGAL ACTS ........................................................................ 20

        A.      Relevant Background Concerning Qutoutiao ....................................... 20

        B.      Qutoutiao Sold Advertisements that Were Illegal under Chinese Law, which
                Propelled Company Revenues and the ADS Price Higher; this Fraud Was Not
                Disclosed to Investors. ........................................................................... 23

                1.      Qutoutiao depended on advertising revenue to fuel its growth and
                        artificially lift its ADS price. .................................................... 23

                2.      Instead of complying with Chinese law and preventing the placement
                        of nonconforming advertisements, QTT actively took steps to evade
                        government regulations and encouraged the placement of illegal ads
                        on its platform. .......................................................................... 26

                3.      In July 2020, Qutoutiao's use of illegal advertisements is confirmed;
                        as a result, the Company's revenues plummeted in 3Q20. ............. 31

                4.      Investors purchased QTT because of its rapid revenue growth, which
                        was a façade. .............................................................................. 34

        C.      Defendants' Class Period Financial Statements Violated GAAP and Obscured
                Qutoutiao's True Financial Performance and Prospects. ......................... 37

1.   Accounting policies and principles applicable to Qutoutiao ......................... 37

2.   Dianguan Acquisition benefitted Liang who had a special relationship with Defendant Tan and should have been disclosed. .................................... 39

3.   Transactions involving Mengtui, Fangce, and Shihui Miao should have been dislosed as related to and benefitting Defendant Tan. .................. 41

4.   QTT's 2017 and 2018 consolidated revenues in its SEC filings are materially higher than the total 2017 and 2018 revenues its subsidiaries reported in their SAMR filings. ....................................................................... 43

5.   QTT failed to disclose contingent liabilities from its violation of China's laws and regulations related to the placement of illegal ads on its platform. ............................................................................................................. 45

VII.   THE 1934 ACT CLAIMS.................................................................................. 45

A.   Materially False and Misleading Statements and Omissions During the Class Period ......................................................................................................... 46

1.   Initial Public Offering (September 14, 2018). ................................. 47

2.   Third Quarter 2018 Financial Results (November 12, 2018). ........................ 55

3.   Fourth Quarter 2018 Financial Results (March 5-6, 2019)............................ 60

4.   Secondary Public Offering (April 3, 2019)...................................... 63

5.   Fiscal Year 2018 Financial Results (April 11, 2019). .................................... 69

6.   First Quarter 2019 Financial Results (May 20-21, 2019). ............................. 80

7.   Second Quarter 2019 Financial Results (September 4-5, 2019)..................... 82

8.   Third Quarter 2019 Financial Results (December 3, 2019)............................ 86

9.   Fourth Quarter 2019 Financial Results (March 18, 2020)............................. 87

10.   Fiscal Year 2019 Financial Results (April 23, 2020) ..................................... 90

11.   First Quarter 2020 Financial Results (June 4, 2020) ................................... 103

12.   Second Quarter 2020 Financial Results (September 21-22, 2020).............. 106

B.   Additional Allegations of Scienter......................................................................... 109

1.   Qutoutiao and the Insider Defendants......................................................... 109

2.      The Underwriter Defendants ..................................................................... 113

C.      Loss Causation ..................................................................................................... 120

1.      Qutoutiao's March 29 and April 3, 2019 Partial Disclosures ..................... 122

2.      The December 10, 2019 Wolfpack Report Partial Disclosure ..................... 122

3.      Qutoutiao's March 18, 2020 Partial Disclosure .......................................... 123

4.      The July 15, 2020 CCTV Exposé Partial Disclosure ................................... 124

5.      Qutoutiao's December 16, 2020 Class Period Ending Disclosure .............. 125

VIII.   PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET .............................. 125

IX.     INAPPLICABILITY OF SAFE HARBOR .................................................................. 127

X.      CLASS ALLEGATIONS .............................................................................................. 127

XI.     THE 1933 ACT CLAIMS ............................................................................................. 129

A.      Materially False and Misleading Statements and Omissions in the
        IPO Documents ..................................................................................................... 131

B.      Materially False and Misleading Statements and Omissions in the
        SPO Documents ..................................................................................................... 139

XII.    CLAIMS FOR RELIEF ................................................................................................ 145

COUNT I ............................................................................................................................ 145

COUNT II ........................................................................................................................... 149

COUNT III .......................................................................................................................... 150

COUNT IV .......................................................................................................................... 153

COUNT V ........................................................................................................................... 155

XIII.   PRAYER FOR RELIEF ............................................................................................... 157

XIV.    JURY TRIAL DEMANDED ........................................................................................ 157

"*. . . and so, the China Hustle continues. . .*"[1]

## I.    SUMMARY OF THE ACTION

1.    Lead Plaintiff James Pappas ("Lead Plaintiff" or "Mr. Pappas") brings this federal securities action on behalf of himself and as a class action on behalf of all persons or entities who (a) purchased or otherwise acquired Qutoutiao, Inc. ("Qutoutiao," "QTT" or the "Company") American Depositary Shares ("ADSs") pursuant or traceable to the Registration Statement and Prospectus issued in connection with the Company's September 2018 initial public offering ("IPO") (collectively, "IPO Documents"); (b) purchased or otherwise acquired Qutoutiao ADSs pursuant or traceable to Registration Statement and Prospectus issued in connection with the Company's April 2019 secondary public offering ("SPO") (collectively, "SPO Documents") (together with the IPO Documents, "Offering Documents"); and/or (c) purchased or otherwise acquired Qutoutiao securities between September 14, 2018 and December 16, 2020, both dates inclusive (the "Class Period"), against Qutoutiao, various corporate individual Insider Defendants and Director Defendants (as defined below), and the Company's Underwriters (as defined below) (collectively, "Defendants"), alleging fraud-based claims under the Securities Exchange Act of 1934 (the "1934 Act") and, entirely separately, strict liability-based claims under the Securities Act of 1933 (the "1933 Act").

2.    Qutoutiao means "fun headlines" in Chinese. Yet for investors who purchased shares of QTT, headlines generated by the Company's crashing share price have been anything but fun. At the time of QTT's IPO, shares were priced at $7 each and the Company raised approximately $85.8 million. The share price, which had been artificially inflated from the outset

---

[1] QTT: Fake Revenue, Non-Existent Cash, Undisclosed Related Parties, WOLFPACK RESEARCH (December 10, 2019) (the "Wolfpack Report"), https://wolfpackresearch.com/research/qtt-fakerevenues-fakecash-undisclosedrelatedparties/.

due to the fraud and/or false statements described below, quickly increased to more than $15 per share. And when QTT announced its SPO just seven months later, it priced 3.3 million additional shares at $10 per share. Subsequently, when the truth about Defendants' materially false, misleading, and incomplete statements (detailed below) was revealed to the market, QTT's share price declined precipitously – dropping to less than $2/share by the end of 2020. By the commencement of this action, Qutoutiao's ADSs closed at $2.42 per share on September 17, 2020, a fraction of the artificially inflated price during the Class Period. As a result, the Class lost hundreds of millions of dollars.

3.      Qutoutiao's collapse is hardly surprising given the facts unearthed by Lead Plaintiff's investigation. Qutoutiao touts itself as the "No. 2 mobile content aggregator in China." The smartphone application Qutoutiao ("QTT App") aggregates "articles and short videos from professional media and freelancers" and presents those "customized feeds to users." Qutoutiao makes money "by providing advertising services" and pushing those advertisements to individuals consuming the aggregated content.

4.       In the Offering Documents and throughout the Class Period, Defendants painted a rosy picture of Qutoutiao's business model which featured fast growing revenue derived almost entirely from advertising sales. Those representations were materially false and misleading, and investors purchasing QTT shares reasonably relied on these misrepresentations to their detriment.

5.      The Offering Documents described Qutoutiao as having "rapidly" increasing net revenues. The Company's revenues increased from $8.8 million in 2016 to $78.1 million in 2017 to $439.6 million in 2018. In short, QTT was a company on the move, with revenue-generating "success" that was attributable to numerous "key competitive strengths."

6.      According to Defendants, the secret sauce for QTT's success was the Company's

strategic targeting of consumers who lived in "tier-3 and below cities in China because of the enormous opportunities in the underserved market."[2]  These users, the Company claimed, were key to the Company's success because they "have a slower pace of life and spend more time on the Internet," while at the same time "enjoy fast increasing disposable income and lower financial pressures thanks to lower housing prices." The Offering Documents claimed the Company was able to capture this lucrative and growing market because the QTT App's "light entertainment-oriented and easily digestible content is designed to resonate with such users and provides us with a significant advantage to capture this underserved market."

7.      The proprietary business model QTT touted and the resulting revenue growth were vital to the Company's future. At the time of the IPO and thereafter, QTT was spending significant sums of money. The Company even conducted a secondary follow-on offering (the SPO) to raise capital just seven months after its IPO. Nonetheless, QTT's lucrative advertising model was generating substantial revenue growth that demonstrated the Company's ability to expend capital effectively and reach long-term, sustainable profitability.

8.      But Defendants' statements to investors were false. Qutoutiao's momentous year-over-year revenue growth did ***not*** arise from a strategy of aggregating content that uniquely appealed to an underserved but growing user base living in lower tier Chinese cities. Rather, Qutoutiao was generating its enormous revenue by serving those consumers with advertisements that were ***illegal*** under Chinese law. Because the advertisements were illicit, they were an untenable revenue source supporting a doomed business model. The meteoric revenue growth that QTT touted to investors was unsustainable. The prospect of long-term profitability, as signaled by the revenue growth, was illusory. Indeed, the Company's placement of illegal advertisements on

---

[2] Third and fourth-tier cities are typically smaller, provincial cities in China.

the QTT App was not an unintended consequence of an otherwise successful and sustainable business model. Rather, the placement of these illegal advertisements *was* QTT's business model.

9.      In July 2020, an annual television broadcast on Chinese state TV called attention to QTT's illegal advertisements. That scrutiny forced the Company to curtail its illicit practices. The effects were drastic. Qutoutiao's revenue immediately plummeted from $204 million in the second quarter of 2020 to just $166.5 million in the third quarter of 2020 – a drop of more than 18% over a single quarter.

10.     Thus, as described herein, Defendants duped investors into believing that QTT had come up with a genius business model that was driving remarkable revenue growth. In reality, Qutoutiao's success arose largely from skirting Chinese government-imposed regulations regarding permissible advertisements. QTT had not tapped into an underserved market of consumers who lived in lower-tier cities. It had tapped into an underserved market of illegal ad placements.

11.     As the Offering Documents made clear, compliance with Chinese advertising laws was critical: "Under PRC [People's Republic of China] advertising laws and regulations, we are obligated to monitor the advertising content shown on our mobile applications to ensure that such content is true, accurate and in full compliance with applicable laws and regulations." The Offering Documents even noted that violation of Chinese advertising law could subject QTT to "penalties, including fines, confiscation of our advertising income, orders to cease dissemination of the advertisements and orders to eliminate the effect of illegal advertisement." But QTT's Offering Documents explained that the placement of uncompliant advertising content on the Company's platform was a risk factor that QTT was working to *mitigate*.

12.     In reality, at the time of its Offerings and throughout the Class Period, QTT was

doing the exact opposite of what had been promised to investors. Despite the significant risks posed, the Company was actively ***integrating*** noncompliant advertising content, and the accompanying revenue streams, into its business:

- QTT initially used Baidu (China's version of Google) as its advertising agent to place advertisements on QTT's platform. Baidu was an unrelated third-party and provided oversight of the content and quality of the advertisements to ensure compliance with Chinese law. In February 2018, just months before the IPO, QTT replaced Baidu with an in-house "advertising agent" called Shanghai Dianguan Internet Technology Co. Ltd. ("Dianguan"). As it was controlled by QTT, Dianguan allowed QTT to bypass third-party oversight of the content, quality, and legal compliance of the advertisements. QTT then freely placed on its platform more advertisements that did not comply with Chinese government regulations.

- Dianguan employed two different teams to manage the advertising content that would be placed on the QTT App and served to consumers. One team dealt with established and compliant advertisers (*i.e.* legal advertisements) such as Tencent, Alibaba and Jinri. The second team dealt with unqualified advertisers whose advertisements would skirt or violate Chinese regulations (*i.e.* illegal advertisements).

- As acknowledged in the Offering Documents, Qutoutiao targeted consumers from third and fourth-tier Chinese cities (smaller, provincial cities). But contrary to Defendants' statements in the Offering Documents, the Company did not target these consumers because they spent more "time on the Internet" or because these consumers enjoyed "fast increasing disposable income." Rather, QTT targeted these consumers because the third and fourth-tier cities were not subject to the same regulatory scrutiny of advertisements that occurred in the larger cities. This lack of regulatory scrutiny allowed QTT to bombard mobile users in the lower tier cities with non-compliant and illegal advertisements, which significantly added to the Company's revenue stream.

Those significant and active steps to add noncompliant advertisements to QTT's platform confirms that this improper conduct was purposeful, not a mistake.

13.     Of course, the Offering Documents did not explain or otherwise reveal Qutoutiao's steps to increase the placement of non-conforming advertisements. Rather, the Offering Documents were larded with false and misleading statements:

- The Offering Documents stated that QTT targeted mobile users in third and fourth-tier Chinese cities because these users spent more time on the Internet and had increasing amounts of disposable income. This was false: as described, these users were targeted because of the lack of regulatory scrutiny in those regions, which allowed QTT to push nonconforming and illegal advertisements onto their phones.

- The Offering Documents stated that QTT's use of Dianguan (as opposed to Baidu) would allow it to "enhance [its] platform's monetization capabilities." In reality, the "enhanced" monetization depended on Dianguan, as an internal ad placement service controlled by QTT, allowing the placement of the illegal and nonconforming advertisements that Baidu had restricted.

- As part of the risk factor analysis, the Offering Documents told investors that QTT could be subject to penalties and "other administrative actions" through the placement of illegal or nonconforming advertisements. But Defendants assured investors that the Company's proprietary "artificial intelligence" could "monitor and identify objectionable visual content with a high degree of accuracy" and flag "suspicious content for manual review." This assurance was highly misleading and disingenuous, because either the advertiser or the QTT employee who was responsible for the flagged ad had the ability to and did manually place the ad on the QTT App.[3]

14.     Defendants continued these material misrepresentations, half-truths, and omissions throughout the Class Period:

- In its 2018 20-F annual report, filed on April 11, 2019, the Company reiterated that it was targeting users in "lower tier cities" because they tend to have a "slower pace of life and spend more time on the Internet." The Company made similar statements in its 2019 20-F annual report, filed on April 23, 2020. As explained above, QTT targeted those users because of the ability to evade regulatory scrutiny in those regions.

- In its September 4, 2019 announcement of its second quarter 2019 ("2Q19") financial results, the Company stated that its ad revenue dramatically increased because of its ability to "monetize user traffic," amongst other reasons. The Company neglected to mention that this monetization arose from its placement of illegal advertisements.

- On June 4, 2020, the Company released its first quarter 2020 ("1Q20") financial results, which touted that net revenues had increased "26.2% year-over-year." While the announcement quoted Defendant Tan as explaining that this growth occurred because of the Company's "ongoing effort in enhancing the core capabilities of [its] advertising platform," just one month later, the revenue growth was revealed to be a lie (as described below).

15.     On July 15, 2020, China's state-controlled broadcaster, CCTV, aired a television show documenting the use of improper ads on QTT's platform (the "CCTV Exposé").[4]  The CCTV

---

[3] Beyond the placement of illegal advertisements, the Company's Offering Documents also misstated the amount of total revenue received by the Company and failed to fully disclose the Company's transactions with related parties. These issues are discussed below.

[4] As part of its repertoire, CCTV produces "investigative" programs that cater to the public interest. One major instance of these CCTV programs is China's annual consumer rights gala, *i.e.* the

Exposé resulted in the temporary suspension of the QTT App from Chinese app stores. On these revelations, the price of QTT's ADSs fell more than 24%. Further, the CCTV Exposé forced QTT to finally come clean and enact remedial measures to halt its illegal practices. As a result, on December 16, 2020, QTT had to report that its revenue for the third quarter of 2020 had *plummeted*, dropping 19.7% year-over-year with a remarkable 23.1% drop in advertising revenue. The year-over-year growth justifying investors' interest was gone, replaced with a revenue decline. As QTT conceded, this significant revenue drop, which caused the ADS price to fall by another 24%, was due to the "**remedial measures undertaken by [QTT] in response to the report by [CCTV] on certain advertisements**." Simply put, Qutoutiao had been caught with its hand in the cookie jar. And the stark drop in revenue following the Company's corrective actions unequivocally confirms that—contrary to its Offering Documents and other Class Period statements—the use of non-conforming advertisements had been central to QTT's plan for revenue growth. Defendants' false and material misstatements caused a significant decline in the value of QTT's securities and resulted in millions of dollars in losses to investors.

## II.   STATEMENT REGARDING PLAINTIFF'S INVESTIGATION

16.   Mr. Pappas, by his attorneys, on behalf of himself and on behalf of all others similarly situated, makes these allegations based upon personal knowledge as to his own acts and on information and belief as to all other matters. Lead Plaintiff bases this information and belief on, among other things, the investigation conducted by counsel, which includes a review and analysis of: U.S. Securities and Exchange Commission ("SEC") filings by QTT; State

---

CCTV Exposé. In 2020, the COVID-19 pandemic caused the gala to be delayed from March 15 (world consumer rights day in China) to July 15. Sarah Cook, *China Central Television: A Long-standing Weapon in Beijing's Arsenal of Repression*, THE DIPLOMAT (Sept. 25, 2019), https://thediplomat.com/2019/09/china-central-television-a-long-standing-weapon-in-beijings-arsenal-of-repression/.

Administration for Market Regulation ("SAMR"), the successor of SAIC ("State Administration for Industry and Commerce in China") and the State Food and Drug Administration, filings by QTT's subsidiaries and other entities in China; press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning QTT in the U.S. and in China; independent interviews with former QTT employees in China conducted by investigators on behalf of Plaintiff; a consultant regarding the accounting of publicly traded companies; and other publicly available information. Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to Defendants or are exclusively within their custody or control. Lead Plaintiff's investigation indicates substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### III.    JURISDICTION AND VENUE

17.    Counts One and Two arise under §§ 10(b), 20(a) of the 1934 Act, 15 U.S.C. § 78j(b), § 78t(a); Rule 10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5

18.    Counts Three, Four and Five arise under §§ 11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§ 77k(a), 77o(a).

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the 1933 Act, 15 U.S.C. § 77v, and Section 27 of the 1934 Act, 15 U.S.C. § 78aa, because this is a civil action arising under the laws of the United States.

20.    Venue is proper in this District pursuant to Section 22 of the 1933 Act, 15 U.S.C. § 77v, Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Specifically, substantial events giving rise to the claims alleged herein occurred in this District, including: (i) many of the false and misleading statements were made in or issued from this District; (ii) many of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, were made or issued from this District; and (iii) the Company contracted

with an ADS Depositary with headquarters in this District to effectuate the registration and delivery of Qutoutiao ADSs on the NASDAQ.

21.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## IV.     PARTIES

### A.     <u>Lead Plaintiff</u>

22.     Mr. Pappas purchased or acquired Qutoutiao securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations alleged herein. In addition, Mr. Pappas purchased Qutoutiao ADSs pursuant or traceable to the Company's false and/or misleading IPO Documents and was damaged thereby.

### B.     <u>Defendants</u>

#### 1.     Qutoutiao

23.     Defendant Qutoutiao is incorporated under the laws of the Cayman Islands with its principal executive offices located in Shanghai, China. Qutoutiao's ADS shares trade on the NASDAQ exchange under the symbol "QTT." Formerly known as Qtech Ltd., the Company changed its name to Qutoutiao Inc., in July 2018, just months before its IPO.

#### 2.     The Insider Defendants

24.     Defendant Eric Tan ("Tan") is the co-founder of Qutoutiao and has served as the Company's Chief Executive Officer ("CEO") since May 20, 2019. On or about February 13, 2019, Tan filed a Form 13G with the SEC, indicating that he owned more than 27 million Class B ordinary shares of QTT (approximately 38.1% of the Company's total outstanding ordinary shares).

25.     At all relevant times, Defendant Tan was the Executive Chairman of the Board of Directors. During the Class Period, Defendant Tan  signed and/or had ultimate authority over the Company's: (i) IPO Documents filed with the SEC; (ii) third quarter 2018 earnings release ("3Q18 Earnings Release") exhibited to a Form 6-K filed with the SEC; (iii) fourth quarter 2018 earnings release ("4Q18 Earnings Release") exhibited to a Form 6-K filed with the SEC; (iv) SPO Documents filed with the SEC; (v) 2018 annual report filed with the SEC on Form 20-F ("2018 20-F"); (vi) first quarter 2019 earnings release ("1Q19 Earnings Release") exhibited to a Form 6-K filed with the SEC; (vii) second quarter 2019 earnings release ("2Q19 Earnings Release") exhibited to a Form 6-K filed with the SEC; (viii) third quarter 2019 earnings release ("3Q19 Earnings Release") exhibited to a Form 6-K filed with the SEC; fourth quarter 2019 earnings release ("4Q19 Earnings Release") exhibited to a Form 6-K filed with the SEC; (ix) 2019 annual report filed with the SEC on Form 20-F ("2019 20-F"); (x) first quarter 2020 earnings release ("1Q20 Earnings Release") exhibited to a Form 6-K filed with the SEC; and (xi) second quarter 2020 earnings release ("2Q20 Earnings Release") exhibited to a Form 6-K filed with the SEC. Defendant Tan also participated in and made statements during the Company's Class Period earnings conference calls.

26.     Defendant Lei Li ("L. Li") is the co-founder of Qutoutiao and was a director and CEO of the Company until May 2019, when Defendant Tan announced Defendant Li's resignation during the Company's May 20, 2019 earnings investor conference call. Defendant Li signed and/or had ultimate authority over the Company's: (i) IPO Documents filed with the SEC; (ii) SPO Documents filed with the SEC; and (iii) 2018 20-F filed with the SEC.

27.     Defendant Jingbo Wang ("Wang") was a director and the Company's Chief Financial Officer ("CFO") until January 22, 2020, at which time Qutoutaio announced Wang

would be stepping down for "personal reasons." During the Class Period, Defendant Wang signed and/or had ultimate authority over the Company's: (i) IPO Documents filed with the SEC; (ii) 3Q18 Earnings Release exhibited to a Form 6-K filed with the SEC; (iii) 4Q18 Earnings Release exhibited to a Form 6-K filed with the SEC; (iv) SPO Documents filed with the SEC; (v) 2018 20-F filed with the SEC; (vi) 1Q19 Earnings Release exhibited to a Form 6-K filed with the SEC; and (vii) 2Q19 Earnings Release exhibited to a Form 6-K filed with the SEC. Defendant Wang also participated in and made statements during the Company's Class Period earnings conference calls.

28.   Defendant Xiaolu Zhu ("Zhu") has been the Company's CFO since January 22, 2020. During the Class Period, Defendant Zhu, signed and/or had ultimate authority over the Company's: (i) 3Q19 Earnings Release exhibited to a Form 6-K filed with the SEC; (ii) 4Q19 Earnings Release exhibited to a Form 6-K filed with the SEC; (iii) 2019 20-F filed with the SEC; (iv) 1Q20 Earnings Release exhibited to a Form 6-K filed with the SEC; and (v) 2Q20 Earnings Release exhibited to a Form 6-K filed with the SEC. Also, as CFO, Defendant Zhu participated in and made statements during the Company's 2020 earnings conference calls.

29.   The Insider Defendants, because of their positions with the Company, possessed the power and authority to control the contents of all filings Qutoutiao made with the SEC, as well as the press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Insider Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Insider Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were

then materially false and/or misleading. The Insider Defendants are liable for the false statements pleaded herein.

### 3.    The Director Defendants

30.    Defendant Shaoqing Jiang ("Jiang") was a director of the Company, and a member of the Audit Committee and Compensation Committee until September 2019 when Qutoutiao announced his resignation in a September 16, 2019 press release exhibited to a Form 6-K filed with the SEC. Defendant Jiang signed or authorized the signing of the Company's Offering Documents filed with the SEC.

31.    Defendant Jianfei Dong ("Dong") was, at all relevant times, a director and Co-President of the Company. Defendant Dong signed or authorized the signing of the Company's Offering Documents filed with the SEC.

32.    Defendant Oliver Yucheng Chen ("Chen") was, at all relevant times, a director of the Company. Chen also served as the Company's Chief Strategy Officer from August 2018 to February 2020. Defendant Chen signed or authorized the signing of the Company's Offering Documents filed with the SEC.

33.    Defendant Yongbo Dai ("Dai") was a director of the Company beginning in November 2018. Dai signed or authorized the signing of the Company's SPO Documents filed with the SEC.

34.    Defendant James Jun Peng ("Peng") was, at all relevant times, a director of the Company. Peng was a member of the Company's Audit Committee, Nominating and Corporate Governance Committee, and Chair of the Compensation Committee. Defendant Peng signed or authorized the signing of the Company's SPO Documents filed with the SEC.

35.    Defendant Feng Li ("F. Li") was, at all relevant times, a director of the Company. F. Li was Chair of the Audit Committee, and a member of the Company's Compensation

Committee and Nominating and Corporate Governance Committee. Defendant F. Li signed or authorized the signing of the Company's SPO Documents filed with the SEC.

36.     The Defendants named in this section, in addition to Defendants Tan, L. Li, and Wang (collectively, "the Director Defendants"), each participated in the preparation of, and signed and/or authorized the signing of, the Company's IPO and/or SPO Documents. Defendant Qutoutiao and the Director Defendants are strictly liable for the materially false and/or misleading statements and/or omissions in or incorporated into the Offering Documents.

### 4.     The Underwriter Defendants

37.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a multinational investment bank and financial services corporation that provides a broad range of financial services to consumers and corporate customers. Citigroup is incorporated under the laws of the State of Delaware and maintains its principal executive offices at 388 Greenwich Street, New York, NY 10013. Defendant Citigroup served as an underwriter for the Company's IPO and SPO.

38.     Defendant Deutsche Bank Securities Inc. ("Deutsche") is a financial services institution which provides a wide array of commercial and investment banking services to corporate and institutional clients along with private and business clients. Services include sales, trading, and origination of debt and equity; mergers and acquisitions; risk management products, such as derivatives; corporate finance, wealth management, retail banking, brokerage and research, fund management, and transaction banking. Deutsche is incorporated under the laws of Germany and maintains its United States corporate headquarters at 60 Wall Street, New York, NY 10005. Defendant Deutsche served as an underwriter for the Company's IPO and SPO.

39.     Defendant China Merchants Securities (HK) Co., Ltd. ("China Merchants") is a China-based company, principally engaged in financial services. China Merchants offers securities brokerage, securities investment consulting, securities underwriting, and other services, including

investment management. China Merchants maintains its principal executive offices at 48/F, One Exchange Square, Central, Hong Kong. Defendant China Merchants served as an underwriter for the Company's IPO.

40.     Defendant UBS Securities LLC ("UBS") provides investment banking services worldwide, including equities sales and trading, fixed income products, and treasury products; UBS offers financial services to individual and institutional investors. UBS is incorporated under the laws of the State of Delaware and maintains its principal executive offices at 1285 Avenue of the Americas, New York, NY 10019. Defendant UBS served as an underwriter for the Company's IPO.

41.     Defendant Keybanc Capital Markets, Inc. ("Keybanc") provides investment advisory services. KeyBanc offers investment advice, portfolio management, securities, and other financial services. Defendant KeyBanc is incorporated under the laws of the State of Ohio and maintains its principal executive offices at 127 Public Square, 4th Floor Cleveland, OH 44114. Defendant KeyBanc served as an underwriter for the Company's IPO.

42.     Defendant CLSA Limited ("CLSA") is a capital markets and investment group focused on alternative investment, asset management, corporate finance and capital markets, securities and wealth management for corporate and institutional clients around the world. CLSA was founded in Hong Kong and maintains its principal executive offices at 18/F, One Pacific Place, 88 Queensway, Hong Kong. Defendant CLSA served as an underwriter for the Company's SPO.

43.     Defendant Haitong International Securities Company Limited ("Haitong") is an international financial institution providing a full spectrum of financial products and services as corporate finance, wealth management, asset management, institutional client services and investment business for corporate, institutional retail and high-net worth clients worldwide.

Haitong was founded in Hong Kong and maintains its principal executive offices at 22/F Li Po Chun Chambers, 189 Des Voeux Road Central, Hong Kong. Defendant Haitong served as an underwriter for the Company's SPO.

44.      Defendant Jefferies Group LLC ("Jefferies") operates as an investment banking firm, servicing customers worldwide. Jefferies provides equity capital markets, debt capital markets, mergers and acquisitions, restructuring and recapitalization, and other strategic advisory services. Defendant Jefferies is incorporated under the laws of the State of Delaware and maintains its principal executive offices at 520 Madison Avenue, New York, NY 10022. Defendant Jefferies served as an underwriter for the Company's SPO.

45.      Defendant Lighthouse Capital International Inc. ("Lighthouse"), also known as Guangyuan Capital or Guangyuan Ziben, operates as a boutique investment bank. Lighthouse is a China-based company that maintains its principal executive offices at Room 3801, China Life Finance Centre, No. 88 Yincheng Rd., Shanghai, 200120. Defendant Lighthouse served as an underwriter for the Company's SPO.

46.      Each Underwriter Defendant agreed to purchase Qutoutiao securities (*see infra*) and was given the option to purchase up to an aggregate of 1,800,000 additional ADSs in the IPO and 1,500,000 ADSs in the SPO. The Underwriter Defendants each served as a financial advisor for and assisted in the preparation and dissemination of the Company's materially false and/or misleading Offering Documents.

47.     The below chart sets forth the number of securities the Underwriter Defendants agreed to purchase in the IPO:

| Underwriters | Number of ADSs |
|---|---|
| Citigroup Global Markets Inc. | 3,945,000 |
| Deutsche Bank Securities Inc. | 5,745,000 |
| China Merchants Securities (HK) Co., Ltd. | 525,000 |
| UBS Securities LLC | 1,485,000 |
| KeyBanc Capital Markets Inc. | 300,000 |
| **Total** | **12,000,000** |

48.     The below chart sets forth the number of securities the Underwriter Defendants agreed to purchase in the SPO:

| Underwriters | Number of ADSs |
|---|---|
| Citigroup Global Markets Inc. | 4,000,000 |
| Deutsche Bank Securities Inc. | 4,300,000 |
| CLSA Limited | 600,000 |
| Haitong International Securities Company Limited | 100,000 |
| Jefferies LLC | 900,000 |
| Lighthouse Capital International Inc. | 100,000 |
| **Total** | 10,000,000 |

49.     The Underwriter Defendants are primarily investment banks which specialize, *inter alia*, in underwriting public offerings of securities. As the underwriters of the IPO and/or SPO, the Underwriter Defendants earned lucrative underwriting fees for their participation.

50.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable but materially false and/or misleading information about the Company, its business, products, plans, assets, and financial prospects, or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated under those laws.

51.     The Underwriter Defendants served as financial advisors, assisted Qutoutiao and

16

the Director Defendants in preparation and dissemination of the IPO Documents and/or SPO Documents and had ultimate authority over the content of the Offering Documents. The Underwriter Defendants' names were prominently displayed on the first page of the IPO prospectus and/or the SPO prospectus. As a result, the Underwriters were negligent for stating that the Offering Documents were prepared accurately and in accordance with the rules and regulations governing their preparation. They also purported to conduct an adequate and reasonable investigation into the business, operations, products, assets, and plans of the Company, an undertaking known as a "due diligence" investigation. During their due diligence, the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, assets, and growth prospects. A reasonable investigation into the truthfulness and accuracy of the Offering Documents, including the statements incorporated by reference, would have revealed that the Offering Documents contained false and/or misleading statements and/or omissions, as alleged herein. None of the Underwriter Defendants made a reasonable investigation into the truthfulness and accuracy of the IPO and/or SPO Documents.

## V.    CLAIMS ASSERTED IN THIS COMPLAINT

52.    As discussed in detail below, Lead Plaintiff asserts two separate sets of claims.

53.    Counts One and Two assert securities fraud-based claims under §§ 10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. In addition to Qutoutiao, the 1934 Act Defendants include the Insider Defendants and the Underwriter Defendants (collectively, the "1934 Act Defendants").

54.    Lead Plaintiff's 1934 Act claims arise out of a fraudulent or deliberately reckless course of business conduct whereby, throughout the Class Period, the 1934 Act Defendants knew or recklessly disregarded that: (i) the statements and omissions they made, as alleged herein, were

materially false and misleading; (ii) their statements would adversely affect the integrity of the market for Qutoutiao securities; and (iii) their statements would deceive investors into purchasing shares of Qutoutiao securities at artificially inflated prices, including in the Company's $85 million IPO which closed on September 18, 2018 and $31 million SPO which closed on April 5, 2019.

55.     Specifically, the 1934 Act Defendants knowingly or recklessly made materially false and misleading public statements and omissions that: (i) concealed the fact that Qutoutiao was not able to generate sufficient revenue to meet its revenue targets unless it allowed unqualified advertisers to advertise on the QTT App, which it accomplished by broadcasting advertisements to consumers from lower-tier Chinese cities; (ii) misstated the true benefits of, and reasons for, replacing the Company's third-party advertising agent, Baidu, with a related party, Dianguan, and that the reason for bypassing that third-party's oversight of the content and quality of advertisements was to generate revenue from risky advertisements; (iii) failed to disclose that the Company had created two separate teams for dealing with advertisers: one team dealt with qualified advertisers (whose advertisements were largely compliant with applicable Chinese regulations and thus low-risk), and a second team dealt with unqualified advertisers. The team reviewing the unqualified advertisers (which was disbanded after the July 2020 CCTV Exposé) outsourced nearly all of its advertisement screening to contractors who conducted minimal due diligence on their clients; (iv) as a result, the Company placed on the QTT App risky advertisements whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or which linked to illegal online gambling platforms; (v) as a result, the Company would face increasing regulatory scrutiny and reputational harm; (vi) as a result, the Company's advertising revenue was reasonably likely to decline; (vii) the Company reported RMB 620 million more in consolidated revenue to the SEC than its subsidiaries did in

total to the SAMR; and (viii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects, were materially misleading and/or lacked a reasonable basis.

56.     Counts Three, Four, and Five assert strict liability, non-fraud claims, under §§ 11, 12(a)(2) and 15 of the 1933 Act. The 1933 Act claims arise out of negligently made materially false and misleading statements and omissions in the Offering Documents issued in connection with the Company's IPO and SPO (the "Offerings"). Lead Plaintiff's 1933 Act claims are not based on any allegation of deliberate or intentional misconduct, and Lead Plaintiff expressly disclaims any reference or reliance upon fraud allegations for such claims. In addition to Qutoutiao, the 1933 Act Defendants include the Director Defendants and the Underwriter Defendants (collectively, the "1933 Act Defendants").

57.     As set forth herein, each of the Defendants named under the 1933 Act claims negligently made materially false and misleading public statements and omissions in the Offering Documents that: (i) mischaracterized Qutoutiao's targeting of users in Tier-3 and Tier-4 cities as due to their having more time and disposable income to spend on the internet when in fact, advertisers wanted to run non-compliant ads in those cities because regulators were more lenient and users were less aware of their rights in those cities; (ii) inaccurately described the benefits of, and reasons for, replacing the Company's third-party advertising agent, Baidu, with Dianguan by not disclosing that the change allowed the Company to avoid the oversight Baidu had been providing which had prevented it from selling more non-compliant ads; (iii) misleadingly touted the Company's advertising revenue without disclosing that a significant number of ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (iv) misleadingly touted the

Company's 2017 and 2018 revenue without disclosing that the aggregate revenue of its subsidiaries was at least RMB 187.6 million and RMB 620 million less, respectively; (v) negligently promoted the Company's ability to monetize user traffic without disclosing that such monetization required it to set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to sell non-compliant ads; and (vi) failed to adequately warn investors that certain "Risk Factors" listed in the Offering Documents had already materialized at the time of the Offerings as the Company was violating the applicable advertising laws and regulations by running non-compliant ads so it would inevitably face increasing regulatory scrutiny, reputational harm and decreased revenue when the truth became known.

## VI.    DEFENDANTS' ILLEGAL ACTS

### A.    <u>Relevant Background Concerning Qutoutiao</u>

58.    Founded in 2016, Qutoutiao operates mobile platforms that distribute and share entertainment content in China. In June 2016, the Company launched its flagship product, the mobile application Qutoutiao ("fun headlines" in Chinese) (the "QTT App"), which aggregates articles and videos from content providers, including professional media and freelancers, and presents these customized feeds to users in the application. The Company also offers Midu (first launched in 2018 as Midu Novels and a year later as Midu Lite), a mobile literature application that offers users free literature that is paid for by advertisements.[5]

59.    As explained in the Company's IPO Prospectus, since its inception, Qutoutiao has strategically targeted users from smaller, more provincial cities in China (third or fourth-tier cities), purportedly because they tend to spend more time on the Internet (given limited offline entertainment options), and have interests and content preferences that differ with users located in

---

[5] *Corporate Profile*, QUTOUTIAO INC., https://ir.qutoutiao.net/corporate-profile (last visited Jan. 4, 2021).

first-tier and second-tier cities. Qutoutiao claims that these factors have given rise to significant demand by consumers who live in these third and fourth-tier cities for the Company's mobile entertainment content, which has contributed to the Company's explosive revenue growth.

60.    To entice individuals to use its application, which competes with other mobile applications such as ByteDance and TikTok, Qutoutiao created a program that rewards users with points (convertible into cash) in exchange for consuming more content and helping to expand the application's user base. In short, the more content that an application user consumes, the more that user is paid by the Company; likewise, the user is paid if the user convinces his or her friends to use the application.[6]

61.    The success of QTT has always depended on its ability to collect advertising revenue. As the Company explained in its IPO Prospectus: "We currently generate revenue primarily by providing advertising services. We plan to explore additional monetization opportunities as we grow our user base and introduce additional content formats, such as literature, casual gaming and live streaming." To that end, the Company noted that its revenues, the vast majority of which were advertising revenues, had increased rapidly in the years prior to the IPO, going from $8.8 million in 2016 to $78.1 million in 2017, and from $12.6 million in the six months ending June 30, 2017 to $108.5 million during the same period in 2018. During this same time period, net losses also increased, going from $4.3 million in the six months ending June 30, 2017 to $49.7 million in the six months ending June 30, 2018.

62.    On September 11, 2018, Qutoutiao filed its final amendment to the Registration Statement with the SEC on Form F-1/A, which forms part of the IPO Documents. The Company's

---

[6] Rita Liao, *China's Qutoutiao is burning millions of dollars to take on TikTok parent*, TECHCRUNCH (Mar. 12, 2019, 7:20 AM), https://techcrunch.com/2019/03/12/qutoutiao-takes-on-tiktok/.

IPO Registration Statement was declared effective on September 13, 2018, and the next day the Company filed its Prospectus on Form 424B4 with the SEC. During the IPO, the Company sold 13.8 million ADSs at a price of $7.00 per share. The Company received proceeds of approximately $85.8 million from the IPO, net of underwriting discounts and commissions. The proceeds from the IPO were purportedly to be used for expanding and enhancing the Company's content offerings, for product development and technology infrastructure, and for general corporate purposes, including marketing and promotion of its products and branding and potential acquisitions and investments.

63.     Due, at least in part, to the picture of rapidly increasing growth painted in the Offering Documents, Qutoutiao's IPO in September 2018 ended up as the best-performing IPO of the year as its ADSs more than doubled in value from their offering price on its first trading day on September 14, 2018. After pricing its ADSs at $7, the Company's ADSs closed at $15.97 on their first trading day – the Class Period high. This 128% surge in QTT shares "minted a new billionaire from" China – Defendant Tan.[7]

64.     Just seven months later, on March 29, 2019, Qutoutiao announced a SPO of its ADSs, representing Class A ordinary shares, pursuant to a Registration Statement on Form F-1, under which the public would be able to purchase 10,000,000 of Qutoutiao ADSs at an artificially inflated price. On April 1, 2019, the Company filed its first and final amendment to its SPO Registration Statement, Form F-1/A, which forms part of the SPO Documents. The SPO Registration Statement was declared effective shortly thereafter. On April 3, 2019, Qutoutiao filed

---

[7] Russell Flannery, *China Mobile Content Aggregator Qutoutiao's IPO Mints New Billionaire*, FORBES (Sept. 16, 2018, 11:48 PM EDT), https://www.forbes.com/sites/russellflannery/2018/09/16/china-mobile-content-aggregator-qutoutiaos-ipo-mints-new-billionaire/?sh=59743c814923.

its SPO Prospectus on Form 424B4 with the SEC. Qutoutiao closed its SPO on April 5, 2019.

65.     During this secondary offering, the Company sold 3.3 million ADSs, while several Principal Shareholders sold nearly 6.7 million ADSs, at a price of $10 per share. The Company received proceeds of approximately $31.0 million from the SPO, net of underwriting discounts, commissions, and estimated offering expenses, with the remaining monies from the sale of 6.7 million shares going to the Principal Shareholders. The proceeds from the SPO were purportedly to be used for general corporate purposes.

66.     Notably, while the Company's IPO offering materials contained a 180-day lock-up provision prohibiting Qutoutiao officers, directors and major shareholders from selling any shares until March 13, 2019, the Company conducted its SPO almost immediately after the lock-up period ended such that Principal Shareholders were able to sell their shares at prices which, as set forth below, had been inflated due to the fraud set forth in the Company's Offering Documents. This enabled the Principal Shareholders to pocket proceeds of nearly $67 million. None of this money went to QTT.[8]

### B.     Qutoutiao Sold Advertisements that Were Illegal under Chinese Law, which Propelled Company Revenues and the ADS Price Higher; this Fraud Was Not Disclosed to Investors.

#### 1.     Qutoutiao depended on advertising revenue to fuel its growth and artificially lift its ADS price.

67.     At the time of its IPO, and for the remainder of the Class Period, Qutoutiao was not a profitable company. In fact, QTT's net losses were rapidly increasing. Accordingly, the promise

---

[8] While QTT is not required to disclose which insiders sold shares because it is a foreign private issuer exempt from Section 16(b) of the Securities Act, in 2019 Defendant Tan purchased a home for $37 million in Orange County, California. *See* James McClain, *Chinese Tech Billionaire Buys $37 Million Newport Harbor Mansion*, VARIETY (Oct. 30, 2019, 5:29 AM PT), https://variety.com/2019/dirt/moguls/chinese-tech-billionaire-buys-37-million-newport-harbor-mansion-1203388732/.

of QTT, and the reason that investors purchased the ADSs during the Class Period (as described in more detail below), was because of the Company's rapid revenue growth, which, investors believed, would eventually lead to profits. As described above, QTT's offering documents make clear that the majority of the Company's revenues come from advertising. In fact, of the $108 million in revenues earned by QTT in the first half of 2018, $101 million came from advertising.

68.     QTT recognized the risks that were inherent from the fact that nearly all of its revenue came from advertising. As QTT noted in its IPO Prospectus, a "decline in [QTT's] advertising revenue could harm [QTT's] business." Further, the Prospectus noted, Chinese law imposed special obligations on QTT to monitor the advertisements placed on its platform. QTT was obligated "to monitor the advertising content shown on our mobile applications to ensure that such content is true, accurate and in full compliance with applicable laws and regulations." Any "advertisement that contains false or misleading information to deceive or mislead consumers shall be deemed false advertising." Violations of China's laws and regulations could subject QTT to "penalties, including fines," and other punishment, which would have a "material and adverse effect on [QTT's] business, results of operations and financial condition."

69.     China is particularly wary of advertisements targeting what it calls the "Black Five." Article 19 of the Advertising Law of the People's Republic of China states that certain advertising platforms "shall not publish advertisements for medical treatment, drugs, medical devices, and health food in disguised form of introducing health and health knowledge." Such advertisements are considered the "black five types of advertisements" ("Black Five"), and typically include breast enhancement products, weight loss products, and height enhancement

products that represent them as health information.[9] Likewise, the 2016 Interim Administrative Measures for Internet Advertising stipulates that "[a]dvertisements for special commodities or services that are subject to examination [] according to laws and administrative regulations, such as medical, pharmaceuticals and health food, shall not be published without examination. Internet advertising should be identifiable and marked as 'advertising' so that consumers can identify it as advertising. Users shall not be deceived to click on the advertising content."

70.     During the Class Period QTT was even warned by Chinese regulators about its purported placement of illegal advertisements. In that regard, Chinese regulators will, at times, summon business executives or department heads to a regulator's office for a meeting, remind them of particular regulations, and criticize specific behavior. This is known as "having a talk" (yuetan, 约谈). While these "talks" may remain private for minor issues, for issues that are more serious or that attract the attention of the regulator's national office, the regulator will sometimes publicize the meeting after the fact to "name and shame" the company as well as warn other companies about illegal behavior. Written rectification orders or other penalties may or may not accompany these "talks."

71.     On June 18, 2019, just months into the Class Period, the Shanghai Municipal Market Supervision Bureau ("Shanghai Regulator") summoned Qutoutiao and another online news aggregator "for a talk," stating that a preliminary investigation had found "severely illegal advertisements" on their platforms, and "sternly warned" the companies about their behavior.[10] Specifically, the Shanghai Regulator found multiple instances of "seductive headlines" such as

---

[9] *Advertising Law of the People's Republic of China*, CHINESE GOVERNMENT NETWORK (Apr. 25, 2015, 8:20 AM), http://www.gov.cn/zhengce/2015-04/25/content_2853642.htm.

[10] *Shanghai Municipal Market Supervision Bureau interviewed Qutoutiao, Huitoutiao and related advertising alliances*, CHINA CONSUMER NETWORK (June 24, 2019), https://www.ncnews.com.cn/xfzpt/zhyw/201906/t20190624_1446925.html.

"Lose 90 jin [45 kilograms]! Watch oils drain away before your eyes! Try for free," that led to landing pages with much more modest claims as well as of the unauthorized use of famous brand names in China, such as the names of Alipay or WeChat, or the use of celebrities' names to lend credibility to advertisements. The Shanghai Regulator demanded a stricter pre-advertisement review process to better prevent false and illegal advertisements on its platform, requiring Qutoutiao to strengthen its examination and regulation of advertisements before they were published and to work to "earnestly safeguard the legitimate rights and interests of consumers."

72.    In short, the need to comply with Chinese legal regulations for advertisements was a well-recognized risk factor for the Company.

**2.    Instead of complying with Chinese law and preventing the placement of nonconforming advertisements, QTT actively took steps to evade government regulations and encouraged the placement of illegal ads on its platform.**

73.    Instead of complying with Chinese government regulations, as it was required to do in order to operate a legal business, the Company actively sought to evade Chinese restrictions by: 1) using its own in-house advertising agent (Dianguan) that could allow QTT to completely control the placement of advertisements on its software and 2) intentionally targeting consumers in lower tier, provincial Chinese cities because it knew that regulators were less likely to scrutinize advertisements for compliance that were targeted to those end users.

**i.  The Replacement of Baidu with Dianguan, QTT's internal ad placement service.**

74.    From the Company's inception, Baidu, a Chinese internet giant that is similar to Google, was Qutoutiao's primary advertising agent, meaning that Baidu sold advertising on QTT to other companies, and provided QTT with the resultant revenue from those advertisement sales. Baidu accounted for 69.9% and 43.7% of QTT's net revenues in 2016 and 2017, respectively.

75.    However, as of December 31, 2017, the Company terminated its agreements with

Baidu and "other third-party advertising agents."[11] This was done under the pretext of decreasing costs and "enhance[ing] [its] platform's monetization capabilities," as the Company articulated in its Prospectus. To replace Baidu, Qutoutiao acquired Dianguan, which allegedly operated a "programmatic advertising system." According to QTT, this acquisition allowed it to reduce its "reliance on third-party advertising platforms such as Baidu."[12]

76.     However, by terminating its relationship with Baidu, QTT now had the ability to control the placement of advertisements on its platform. Baidu, as a third-party advertising agent, had control over the distribution of advertising traffic on its clients' platforms, and it used its algorithms to ensure that the advertisements it places on applications such as QTT are compliant with Chinese regulations.[13] By replacing Baidu with Dianguan, QTT could now bypass those controls and decide for itself what advertisements it would accept on its platform. In short, by acquiring Dianguan, QTT was no longer bound by Baidu's controls, and instead could decide for itself what advertisements it would display to users.

77.     Further confirming that the only real value that the Dianguan acquisition had for QTT was the ability to control the placement of ads, was the fact that Dianguan's *only* customer prior to the acquisition was QTT. In addition, Dianguan had been formed just four months prior to its acquisition by QTT and, as discussed below, Dianguan's owner was a party related to Defendant Tan, who controlled QTT.[14]

78.     On the surface, the Dianguan acquisition appeared to yield positive results for QTT: Dianguan accounted for 78.2% of Qutoutiao's revenue in the first six months of 2018, which had

---

[11] Qutoutiao Inc., Annual Report (Form 20-F), p. 57, F-17 (Apr. 11, 2019).
[12] Qutoutiao Inc., Registration Statement, (Form F-1), p. 83 (August 17, 2018).
[13] Qutoutiao Inc., Annual Report (Form 20-F), p. F-17 (Apr. 11, 2019).
[14] Business Information, Shanghai Dianguan Network Technology Co., Ltd., Tianyancha, https://www.tianyancha.com/company/3095343408 (last visited Jan. 15, 2021).

increased to $108.5 million, a 569% increase from 2017 the same period in 2017.[15] However, it is clear that this revenue explosion was due primarily to increased placement of illegal ads by QTT which, as described below, fueled its revenue growth.

### ii. QTT placed illegal and non-conforming ads on its mobile applications.

79.     Central to QTT's strategy of rapidly growing its revenues was the intentional placement of non-conforming, and, in many cases, illegal advertisements on its mobile applications.

80.     *First*, a former employee who was a content editor at Qutoutiao from April 2017 to May 2018 ("Former Content Editor") told investigators that the Company's advertisement screening procedure was not very strict, so that even if advertisements contained some unhealthy content, *e.g.* ads that contained "softcore pornography" (软色情) or "played edge ball" (打擦边球) – meaning that the advertisements challenged existing rules while seeking to avoid punishment,[16] they would not be screened out of QTT's platform as long as they were not, on their face, illegal or violate state policy. The Former Content Editor also stated that from the early stages of Qutoutiao's expansion in 2016 until it was added to a Cyberspace Administration of China ("CAC") watchlist in or about May 2018, the Company had taken some "extreme" measures to attract traffic, including using vulgar or "controversial content" or "softcore pornography."

81.     *Second*, a former Qutoutiao employee who was a sales director of Dianguan from March 2019 to May 2020 (the "Former Sales Director") told investigators that the Company employed two different teams to manage its advertising content. These teams operated

---

[15] "RMB" refers to Chinese Yuan.
[16] The term "playing edge ball" is often used to connote people (or companies) who try to gain profit at the edge of the law or regulation while avoiding punishment.

independently. While one team mainly dealt with well-known and qualified advertisers like Tencent, Alibaba, and Jinri Toutiao, who were largely compliant and provided low-risk advertisements, the other team mainly dealt with unqualified advertisers whose advertisements were "risky" (有一定风险). This second team was disbanded after the Company's practice of promoting illegal advertisements was exposed on Chinese state-TV in July 2020, as described below. While the Former Sales Director did not deal with unqualified advertisers, the Former Sales Director learned about how the Company dealt with those advertisers from co-workers while still working for the Company. Most of the time, the team dealing with unqualified advertisers did not screen or scrutinize the content of advertisements before they were published, and instead outsourced that due diligence to outside contractors. The Former Sales Director explained that Qutoutiao outsourced riskier advertisements to approximately 40–50 other contractors, who often immediately opened accounts for any advertiser without conducting the proper due diligence.

82.     The Former Sales Director stated that the risky advertisements included gambling and fraudulent investment scheme advertisements, whereby users were led to WeChat groups that directly defrauded its victims – commonly known as a "pig slaughter" (杀猪局) scam in China, which refers to a scam whereby a victim at first successfully wins money through gambling, and then, once the victim gains confidence and bets a larger amount, the victim is defrauded. Another type of risky advertisement was for "three no" products (三无产品), which refer to products, such as health supplements, whose packaging does not include the name of the manufacturer, the production date, or a quality certification. Other types of illicit products that were advertised on QTT include games without proper copyright.

83.     Critically, according to the Former Sales Director, from the time the Company was founded to at least when the Former Sales Director left in May 2020, Qutoutiao altered its

advertisements based on different regions so as to avoid regulation. For example, the Company mainly directed risky advertisements to consumers in fourth-tier cities or even smaller places, as locals were less aware of their rights as consumers, and state regulators lived in first or second-tier cities, and were thus stricter in those more populous locales.[17]

84.     Corroborating the Former Sales Director is the interview of a manager at Guangzhou Tiantuo Network Technology Co. Ltd. (one of Qutoutiao's advertising agents) who, in a July 16, 2020 Chinese television article, confirmed that advertisers on the QTT App could limit the locations of where their advertisements could appear in order to evade regulators.[18] Advertisers thus could and did choose to not show their risky advertisements in first-tier cities, where regulators were more stringent.

85.     *Third*, according to a channel manager at Dianguan from June 2019 to September 2020 ("Former Channel Manager"), since the Company's inception, while Qutoutiao used artificial intelligence to first screen advertisements – if an ad containing content that "played edge ball" (打擦边球) was screened out, either the advertiser or the employees who were responsible for those

---

[17] QTT was not the only content aggregator that specifically targeted consumers in lower tier Chinese cities to evade regulators. In March 2018, the People's Daily, the Chinese Communist Party's leading newspaper, reported that a whistleblower had accused aggregator Jinri Toutiao (a competitor of QTT) of "false advertising" that would "specifically target" second and third-tier cities because regulators there were more lenient. *See, "Today's Toutiao" is finally on "Toutiao"! Ignoring the supervision and starting this "black business"! 240 million users*, CCTV FINANCE (Mar. 29, 2018, 11:02 PM), http://finance.people.com.cn/n1/2018/0329/c1004-29897407.html. And in September 2018, Fengyu Network Technology had noted that "Black Five advertisements" on iQiyi, one of the largest online video sites in the world, were most common – and often only shown – in third-tier cities. Flower Zijian, *Iqiyi has a large number of black five types of ads: visible to users in cities below the third tier*, PHOENIX TECHNOLOGIES (Sept. 14, 2018, 12:04 PM), https://www.ithome.com/html/it/383152.htm.

[18] *"Qutoutiao" repeatedly appeared illegal advertisements, and the black industry chain of "set of households" surfaced*, CCTV FINANCE (July 16, 2020, 9:58 PM), http://news.cctv.com/2020/07/16/ARTIDLkFhXoaiBPgP2SjKH4E200716.shtml.

ads were able to employ a second manual review, which would allow those non-conforming advertisements to be put onto the platform. The Former Channel Manager explained that ads that "played edge ball" included ones containing "softcore pornography" or pictures of people in strapless tops or hotpants as well as online novels that were being used without permission.

> ### 3. In July 2020, Qutoutiao's use of illegal advertisements is confirmed; as a result, the Company's revenues plummeted in 3Q20.

86.     Confirming that QTT's business model relied on the placement of illegal non-conforming advertisements is the fact that after Chinese television exposed QTT's unscrupulous practices on national Chinese TV, QTT was forced to crack down and eliminate non-conforming advertisements from its platform. This resulted in a massive decrease in advertising revenue.

87.     On April 24, 2020, in response to the growing number of sensationalized media posts about the COVID-19 pandemic, the Cyberspace Administration of China (CAC) announced that it was cracking down on the proliferation of illegal and misleading information on media aggregation platforms.[19] The CAC specifically named Qutoutiao as an offender but stated that the Company had begun the self-examination and self-correction process. The CAC also announced that, effective immediately, it was implementing a rectification campaign focused on eliminating "malicious online marketing accounts" and it was dealing with any websites that had a substantial negative impact on society.

88.     On July 15, 2020, China Central Television (CCTV), China's state-controlled broadcaster, aired its annual high-profile consumer rights show. That evening, the hosts of the CCTV Exposé told viewers that Qutoutiao had allowed unqualified companies to publish advertisements on its platform that were illegal under Chinese law, including medical

---

[19] *The Cyberspace Administration of China launched a special rectification action to crack down on malicious online marketing accounts*, CHINA NETCOM (Apr. 24, 2020, 3:25 PM), http://www.cac.gov.cn/2020-04/24/c_1589274589221739.htm.

advertisements that exaggerated treatment effects such as an advertisement offering free weight-loss products valued at $14,300 that would help users lose more than 30 pounds a month. In addition, links in some of the Company's advertisements directed users to illegal online gambling platforms. Due to this exposure, major Android app stores in China quickly removed the QTT App from the stores. In addition, it was reported that the Apple app store had placed the QTT App under revision and that it was temporarily unavailable for download.[20]  On this news, Qutoutiao's share price fell over 24% to close at $2.79 per share on July 17, 2020, after two days of unusually heavy trading. By July 18, 2020, 228 complaints had been filed on Black Cat Complaints – a Chinese consumer rights protection group – regarding the proliferation of false advertisements on the QTT App.[21] The QTT App was not restored to major Android-based app stores until July 31, 2020.

89.     As Jeremy Bowman at The Motley Fool pointed out in a July 16, 2020 article, the price of Qutoutiao ADSs "fell after it was accused of running improper ads," including "misleading ads on its site."[22]  While the Company immediately apologized and promised to do a better job of screening ads on its platform, it assured investors that the Company's fundamentals were still sound – including its positive revenue growth.

90.     On December 16, 2020, the bottom fell out for QTT. QTT reported its third quarter 2020 ("3Q20") financial results, which incorporated the time period including and after the CCTV Exposé on QTT's unscrupulous practices. The results were devastating. While the company had reported net revenues of $204 million in the second quarter of 2020 ($195.1 million from

---

[20] *Qu Toutiao has been removed from the Android App Store. Apple App Store is temporarily not available for download*, SINA TECHNOLOGY (July 17, 2020, 9:03 AM), http://www.techweb.com.cn/cloud/2020-07-17/2797437.shtml.

[21] Fan Mei Ge, *Qutoutiao's advertising chaos was exposed by CCTV 315*, NEW INVESTOR NETWORK (July 18, 2020, 8:13 AM), http://stock.eastmoney.com/a/202007181560759458.html.

[22] Jeremy Bowman, *Why Qutoutiao Stock Tumbled Today*, THE MOTLEY FOOL (July 16, 2020, 2:21 PM), https://www.fool.com/investing/2020/07/16/why-qutoutiao-stock-tumbled-today.aspx.

advertising), net revenues in the third quarter were only $166.4 million ($156.5 million from advertising). On a year-over-year comparison with 3Q19, net revenues had fallen a remarkable 19.7%, and advertising revenues had fallen 23.1%. In addition, the number of consumers using QTT's application had also fallen. Combined monthly average users (MAUs) was 120.5 million in 3Q20, while it was 136.5 million in 2Q20. Combined daily average users (DAUs) was 39.7 million in 3Q20, while it was 43 million in 2Q20. In short, revenues had plummeted, and the number of individuals using the platform had fallen as well. For a company that never turned a profit, these results were highly problematic.

91.     As QTT readily admitted, the reason for the stunning revenue drop was because QTT had been complicit in allowing illegal advertisements to be placed on its website: "The year-over-year decrease in our advertising and marketing revenues was *primarily* due to the remedial measures undertaken by us in response to the report by China Central Television on certain advertisements placed by third-party advertising agents on [the QTT App], such as removing misleading or inappropriate advertisements from our applications, and the temporary removal of [the QTT App] from several major Android-based app stores in China from July 16, 2020 to July 31, 2020, which caused decreases in our average MAUs, average DAUs and average daily time spent by DAU." The Company also predicted that revenue would continue to decrease: "For the fourth quarter of 2020, the Company currently expects net revenues to be between RMB1,230 million and RMB1,250 million, representing a decrease of 25% to 26% year-over-year." As the market absorbed this news, the Company's share price fell 24% to close at $1.90 per share on December 22, 2020, after four days of unusually heavy trading volume.

92.     Mr. Bowman at the Motley Fool noted on December 17, 2020 that QTT "has been struggling to recover after [CCTV] accused Qutoutiao of selling suspicious ads with false

information at a high-profile consumer rights show back in July" and that the removal of the QTT App "from several major Android app stores for two weeks in July, in the aftermath of CCTV's accusations…led to a sharp downturn in the business during the July through September quarter."[23]

93.     In sum, QTT's business model had been predicated on the placement of illegal advertisements, which fueled rapid revenue growth and enticed investors to purchase its ADS. After QTT was publicly shamed in July 2020, it finally clamped down on its unscrupulous practices, losing valuable revenue. But until December 2020, Defendants never disclosed to investors that a substantial amount of QTT's revenue was generated from illegal advertisements paid for by shady unqualified advertisers which did not comply with applicable Chinese regulations and that they were managing the risk of losing that revenue by reducing the chance of getting caught by state regulators by placing those advertisements in lower tier Chinese cities.

### 4.     Investors purchased QTT because of its rapid revenue growth, which was a façade.

94.     QTT has never been profitable. However, QTT has reported net revenues that increased (year-over-year ("YOY")) every quarter from its inception through 2Q20:

| Date | Quarter | QTT Revenue Guidance Range | Actual Revenue | Percentage Change YOY |
|---|---|---|---|---|
| 11/12/18 | 3Q18 | RMB 1,200 to RMB 1,250 billion | RMB 997.3M | +520.3% |
| 03/05/19 | 4Q18 | RMB 1,100 to RMB 1,120 million | RMB 1,327.0M | +426.1% |
| 05/20/19 | 1Q19 | RMB 1,380 to RMB 1,420 million | RMB 1,118.8M | +373.3% |
| 09/04/19 | 2Q19 | RMB 1,380 to RMB 1,420 million | RMB 1,385.9M | +187.9% |
| 12/03/19 | 3Q19 | RMB 1,600 to RMB 1,620 million | RMB 1,406.9M | +44.0% |
| 03/18/20 | 4Q19 | RMB 1,400 to RMB 1,420 million | RMB 1,658.4M | +25.0% |
| 06/04/20 | 1Q20 | RMB 1,410 to RMB 1,430 million | RMB 1,411.8M | +26.2% |
| 09/21/20 | 2Q20 | RMB 1,130 to RMB 1,150 million | RMB 1,441.0M | +4.0% |
| 12/16/20 | 3Q20 | RMB 1,230 to RMB 1,250 million | RMB 1,130.0M | -19.7%[24] |

---

[23] Jeremy Bowman, *Why Qutoutiao Stock Dipped Today*, THE MOTLEY FOOL (Dec. 17, 2020, 4:47 PM), https://www.fool.com/investing/2020/12/17/why-qutoutiao-stock-dipped-today/.

[24] Press Release, Qutoutiao Inc. Reports Third Quarter 2018 Unaudited Financial Results, GLOBE NEWSWIRE (Nov. 12, 2018). Press Release, Qutoutiao Inc. Reports Fourth Quarter and Fiscal Year

95.     Analysts covering QTT relied on this remarkably strong revenue growth to recommend the purchase of QTT ADS. As the website "Simply Wall Street" wrote on August 21, 2020: "Qutoutiao isn't currently profitable, so most analysts would look to revenue growth to get an idea of how fast the underlying business is growing. Shareholders of unprofitable companies usually expect strong revenue growth.… In the last year Qutoutiao saw its revenue grow by 50%. That's well above most other pre-profit companies."[25]

96.     Indeed, until the third quarter of 2020, analysts following Qutoutiao focused on the Company's revenue increases despite having high losses every quarter and missing other financial metrics:

- 11/12/18: "Qutoutiao misses by $0.31, beats on revenue"[26]

- 3/5/19: "Qutoutiao misses by $0.03, beats on revenue"[27]

- 5/20/19: "Qutoutiao misses by $0.02, beats on revenue"[28]

---

2018 Unaudited Financial Results, GLOBE NEWSWIRE (Mar. 5, 2019). Press Release, Qutoutiao Inc. Reports First Quarter 2019 Unaudited Financial Results, GLOBE NEWSWIRE (May 20, 2019). Press Release, Qutoutiao Inc. Reports Second Quarter 2019 Unaudited Financial Results, GLOBE NEWSWIRE (Sept. 4, 2019). Press Release, Qutoutiao Inc. Reports Third Quarter 2019 Unaudited Financial Results, GLOBE NEWSWIRE (Dec. 3, 2019). Press Release, Qutoutiao Inc. Reports Fourth Quarter and Fiscal Year 2019 Unaudited Financial Results, GLOBE NEWSWIRE (Mar. 18, 2020). Press Release, Qutoutiao Inc. Reports First Quarter 2020 Unaudited Financial Results, GLOBE NEWSWIRE (June 4, 2020). Press Release, Qutoutiao Inc. Reports Second Quarter 2020 Unaudited Financial Results, GLOBE NEWSWIRE (Sept. 21, 2020). Press Release, Qutoutiao Inc. Reports Third Quarter 2020 Unaudited Financial Results, GLOBE NEWSWIRE (Dec. 16, 2020).

[25] *Qutoutiao (NASDAQ:QTT) Share Prices Have Dropped 42% In The Last Year*, SIMPLY WALL ST. (Aug. 21, 2020), https://simplywall.st/stocks/us/media/nasdaq-qtt/qutoutiao/news/qutoutiao-nasdaqqtt-share-prices-have-dropped-42-in-the-last-year.

[26] Mamta Mayani, *Qutoutiao misses by $0.31, beats on revenue*, SEEKING ALPHA (Nov. 12, 2018, 5:36 AM ET), https://seekingalpha.com/news/3408367-qutoutiao-misses-0_31-beats-on-revenue.

[27] Jignesh Mehta, *Qutoutiao misses by $0.03, beats on revenue*, SEEKING ALPHA (Mar. 5, 2019, 4:04 PM ET), https://seekingalpha.com/news/3439969-qutoutiao-misses-0_03-beats-on-revenue.

[28] Jignesh Mehta, *Qutoutiao misses by $0.02, beats on revenue*, SEEKING ALPHA (May 20, 2019, 4:06 PM ET), https://seekingalpha.com/news/3465437-qutoutiao-misses-0_02-beats-on-revenue.

- 9/4/19: "Qutoutiao EPS misses by $0.05, beats on revenue"[29]

- 12/3/19: "Qutoutiao EPS misses by $0.14, beats on revenue"[30]

- 3/18/20: "Qutoutiao EPADS beats by $0.03, beats on revenue"[31]

- 6/4/20: "Qutoutiao EPS beats by $0.03, beats on revenue"[32]

- 9/21/20: "Qutoutiao EPS beats by $0.02, beats on revenue"[33]

97.    Yet these revenue increases, as reflected in the documents filed with the SEC, were

a façade because they incorporated illegal advertisement revenue and therefore the growth was not

real, organic growth. As explained above, the Company knowingly sold advertisements that were

illegal under Chinese law. The revenue that the Company obtained from these illegal

advertisements was material, as it allowed the Company to claim that revenues were rapidly

growing. Investors relied on this purported revenue growth in making decisions on whether or not

to purchase QTT. Yet the statements put out by QTT, which touted this revenue growth, were false

and materially misleading because they failed to disclose that the revenue growth included, and

was in fact contingent upon, the knowing placement of illegal advertisements, which constituted a

significant portion of its revenues. Once forced to disclose this to investors in December 2020, it

---

[29] Pranav Ghumatkar, *Qutoutiao EPS misses by $0.05, beats on revenue*, SEEKING ALPHA (Sept. 4, 2019, 4:15 PM ET), https://seekingalpha.com/news/3497124-qutoutiao-eps-misses-0_05-beats-on-revenue.

[30] Mamta Mayani, *Qutoutiao EPS misses by $0.14, beats on revenue*, SEEKING ALPHA (Dec. 3, 2019, 6:02 AM ET), https://seekingalpha.com/news/3523246-qutoutiao-eps-misses-0_14-beats-on-revenue.

[31] Niloofer Shaikh, *Qutoutiao EPADS beats by $0.03, beats on revenue*, SEEKING ALPHA (Mar. 18, 2020, 5:44 AM ET), https://seekingalpha.com/news/3552784-qutoutiao-epads-beats-0_03-beats-on-revenue.

[32] Niloofer Shaikh, *Qutoutiao EPS beats by $0.03, beats on revenue*, SEEKING ALPHA (June 4, 2020, 5:36 AM ET), https://seekingalpha.com/news/3580311-qutoutiao-eps-beats-0_03-beats-on-revenue.

[33] Manshi Mamtora, *Qutoutiao EPS beats by $0.02, beats on revenue*, SEEKING ALPHA (Sept. 21, 2020, 4:14 PM ET), https://seekingalpha.com/news/3615907-qutoutiao-eps-beats-0_02-beats-on-revenue.

became apparent that QTT's legitimate revenue stream, and its accompanying growth, was non-existent. Because of that, QTT's ADS price fell dramatically.

      **C.**    **Defendants' Class Period Financial Statements Violated GAAP and Obscured Qutoutiao's True Financial Performance and Prospects.**

      **1.**    **Accounting policies and principles applicable to Qutoutiao**

98.    Generally Accepted Accounting Principles ("GAAP") are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured. GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB").

99.    The SEC requires that public companies present financial statements in accordance with GAAP. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.

100.    As a publicly traded company, SEC Staff Accounting Bulletin: No. 99 – Materiality ("SAB 99") guides Qutoutiao's application of materiality. Materiality is based on whether a reasonable person's decision-making process, relying upon QTT's public statements, would have been changed or influenced by the inclusion or correction of the information at issue. According to SAB 99, qualitative and quantitative factors should be considered in determining materiality.

101.    The FASB Amendments to Statements of Financial Accounting Concepts No. 9 ("Concept No. 9") issued in August 2018 clarified the concept of materiality. Concept No. 9 states that "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the

inclusion or correction of the item."

102.    Qutoutiao was required, under GAAP and SEC Regulation S-X, to make specific

disclosures pertaining to related party transactions because they are material.

103.    SEC Regulation S-X requires:

> (1) **Related party transactions…*should be [identified and the amounts] stated on the face of the balance sheet, statement of comprehensive income, or statement of cash flows***.
>
> (2) In cases where separate financial statements are presented for the registrant, certain investees, or subsidiaries, any intercompany profits or losses resulting from transactions with related parties and not eliminated and the effects thereof shall be disclosed.

17 C.F.R. § 210.4-08(k).[34]

104.    In addition, FASB Accounting Standards Codification ("ASC") 850 applies to

related parties.[35] Related parties cannot be presumed to be acting at arm's length because of the

special inherent relationship between them. See ASC 850-10-50-5. Because this special

relationship can create a conflict of interest that can benefit related parties, withholding

information about material related party transactions makes financial statements unreliable and

prevents the true picture of an entity from being represented. Thus, "[i]nformation about

---

[34] Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

[35] According to GAAP, related parties include the following:
- Affiliates of the entity.
- Principal owners of the entity and members of their immediate families.
- Management of the entity and members of their immediate families.
- Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests.
- Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests. (ASC 850-10-20).

transactions with related parties that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their significance." (ASC 850-10-10-1).

105.    FASB ASC 850, requires companies to disclose the following for related party transactions:

- The nature of the relationships involved;
- A description of the transactions, including transactions where no amounts or nominal amounts are involved, for each of the reporting periods where income statements are presented; additionally, other information deemed necessary to gain an understanding of the effects of the transactions on the financial statements should be disclosed;
- The dollar amounts of the transactions for each of the reporting periods where income statements are presented along with the effects of any change in the method of establishing the terms of the transactions when compared to the method used in the preceding reporting period; and
- Amounts due to or from related parties as of each financial statement date and, if not otherwise apparent, the terms and manner of settlement related to those amounts.

106.    Furthermore, when a "reporting entity and one or more other entities are under common ownership or management control and the existence of that control could result in operating results or financial position of the reporting entity significantly different from those that would have been obtained if the entities were autonomous," ASC 850 requires companies to disclose "the nature of the control relationship … even though there are no transactions between the entities." (850-10-50-6).

### 2.    Dianguan Acquisition benefitted Liang who had a special relationship with Defendant Tan and should have been disclosed.

107.    In February 2018, Qutoutiao purchased Dianguan for CNY 15 million.[36] QTT's IPO Prospectus, SPO Prospectus, 2018 20-F, and 2019 20-F each had an entire section of "Related Party Transactions," which included "Transactions with Companies Controlled by or Affiliated with Mr. Tan." However, these filing neglected to note that Dianguan, QTT's advertising agent,

---

[36] Qutoutiao Inc., Annual Report (Form 20-F) (Apr. 11, 2019).

was a related party prior to its acquisition by QTT.

108.    Xiang "Sean" Liang ("Liang") had founded Dianguan four months prior to the acquisition by QTT, was its director on record from February 13, 2018 through December 29, 2018, and was its legal representative through December 29, 2018.

109.    At the same time, Liang also had a close business relationship with Defendant Tan, the co-founder and executive chairman of QTT. In addition to his role at Dianguan, Liang was also the director of domestic investment at a company which was the executive partner of a company that Defendant Tan has been the majority investor in since February 26, 2018. Specifically, Tan holds 64.5% of the equity in Nantong WooFoo Jinxin Equity Investment Fund Partnership ("Woofoo Equity") and Liang was the Director of Domestic Investment at its executive partner, Nantong Woofoo Jinxin Investment Management Co. Ltd.[37]

110.    In addition, in 2016 Liang was the investment director of another company that Defendant Tan held 99% of the equity of (Tan's sister held the other 1% equity): Shanghai Taiyun Investment Management Co. Ltd. (branded as "Taiyun Capital").[38] Liang is still listed as an investment assistant on Taiyun Capital's page on ITJuzi, a Chinese website that tracks technology companies.[39] In fact, in July 2018, Defendant Tan simultaneously held the positions of business consultant for Taiyun Capital and chairman of Qutoutiao.[40] According to SAMR records, Tan's sister, Tan Siping ("Siping") is a legal representative and director of Taiyun Capital.

---

[37] Investment Team, WOOFOO CAPITAL, http://www.woofoocapital.com/#page3 (last visited Jan. 11, 2021).

[38] *Introduction and Contact Information for Taiyun Capital*, IT ORANGE, https://www.itjuzi.com/investfirm/1938 (last visited Jan. 5, 2021).

[39] *Id.*

[40] *Want to make money from news? You might regret*, SOHU (July 17, 2018, 9:16 AM) https://www.sohu.com/a/241611324_100116800.

111.    Accordingly, because Liang and Tan's business relationship was so intertwined such that Dianguan would have been prevented from "fully pursuing its own separate interest," Dianguan and QTT were related parties. This relationship, which would have shed light on revenues generated from transactions with Dianguan prior to its acquisition and the reasons for acquiring Dianguan and replacing Baidu, required disclosure to the Company's investors, but it was not.

### 3. Transactions involving Mengtui, Fangce, and Shihui Miao should have been dislosed as related to and benefitting Defendant Tan.

112.    QTT also failed to disclose that one of its top advertisers, Mengtui ("Meng Push" or "Mengtui App"), is a party related to Tan.[41] Specifically, the copyright and website operating licenses for the Mengtui App are held by Shanghai Tujin Network Technology Co. Ltd. ("Tujin"). Tujin's 80% shareholder is Shanghai Bimeng Information Technology Co. Ltd. ("Bimeng"). Siping was the legal representative and director of Bimeng until October 23, 2018. Bimeng is also wholly owned by Shanghai Bige Information Technology Co. Ltd. ("Bige"), of which Tan is the 99% owner and his wife, He Yuning is the 1% owner.[42] Further, Bige's official company website as listed on Qichacha, www.bigbaser.com, leads to a venture capital website that lists Tan as Bige's founder and Bige's CEO, Liu Hui, holds positions at several other companies controlled by Tan.[43] The website also lists Mengtui, Shihui Miao, and Qujianpan (Qu Keyboard) among QTT's products. Furthermore, other media outlets, including Eastmoney Finance, place Mengtui under the category of Qutoutiao's official products.[44]

---

[41] According to the Wolfpack Report, approximately 26.2% of the advertisements on QTT that they analyzed originated with the Mengtui App.

[42] *See* Wutong Holding Group Co., Ltd.- Brief report on changes in equity, CNINF *(Nov. 30, 2018),* https://q.stock.sohu.com/newpdf/201833723048.pdf.

[43] *Team Page*, BIGBASER.COM, https://www.bigbaser.com/#/about/team (last visited Jan. 7, 2021).

[44] *Qu Toutiao President Liu Anyi: The value of Qu Toutiao is underestimated*, TIMES FINANCE, (Dec. 4, 2019, 4:25 PM), http://finance.eastmoney.com/a/201912041312870921.html.

113.    QTT also failed to disclose that the advertising income it received from Publisher Shanghai Fangce Network Technology Co. Ltd. ("Fangce"), is related party income from companies related to Tan as it is managed and substantially owned by one of Tan's close associates, Liu Hiu.[45] Specifically, Liu Hiu is Fangce general manager and owns 65% of Fangce's parent company, Tianjin Yingnuo Asset Management Co. Ltd. ("Yingnuo"). Liu Hui is also a director of Shenzhen Falide Technology Co. Ltd. ("Foodleader"), where Tan serves as chairman and owns a 53.8% stake through Taiyun Capital's ownership of Foodleader.

114.    QTT further failed to disclose that the advertising income it received from Shihui Miao ("Shihui Miao App") is related party income from companies related to Tan as its licenses and rights are owned by companies that Tan owns and that his sister represents.[46] Specifically, its website operating licenses and software authorship rights are owned by Shanghai Xihu Culture Communications Co. Ltd. ("Xihu"), which is 100% owned by Bige, which, as noted above, is 100% owned by Tan and his wife. Further, Siping is Xihu's legal representative and its current supervisor on record, Xia Biyun ("Xia"), is also the current supervisor on record at Tan's companies Bige and Bimeng. This was partially disclosed in the 2018 F-1 Registration Statement as a 20% equity interest in Shanghai Jifen Culture Communication Co. Ltd ("Jifen"), one of Qutoutiao's Chinese entities. Xihu also developed the Shihui Miao App.[47]

115.    The Mengtui App and the Shihui Miao App are both part of QTT's product matrix and while they "have different relationships with the main [QTT App]" in order to attract traffic

---

[45] According to the Wolfpack Report, approximately 0.3% of the advertisements on QTT that they analyzed originated with Fangce.

[46] According to Wolfpack Report, approximately 3.0% of the advertisements on QTT that they analyzed originated with the Shihui Miao App.

[47] Ma Cheng, *Giants' "Sinking Anxiety": After Tencent and Ali entered the game, JD.com bought into QuTouTiao*, ALL WEATHER TMT (Apr. 25, 2019, 9:52 AM), https://awtmt.com/articles/3518477.

and maintain a high level of user activity, they are both so intertwined with the QTT App that they were not likely to grow at a sustainable rate on their own.[48] Accordingly, the Company's transactions with the Mengtui App and the Shihui Miao App should have all been disclosed due to the intertwined nature of their relationship with the QTT App and the financial benefit that Defendant Tan ultimately derived from them.

### 4. QTT's 2017 and 2018 consolidated revenues in its SEC filings are materially higher than the total 2017 and 2018 revenues its subsidiaries reported in their SAMR filings.

116.    In the IPO Documents, the 2018 20-F and the 2019 20-F, Defendants reported 2017 and 2018 consolidated revenue of RMB 517.1 million and RMB 3.02 billion, respectively. But the Company's wholly owned subsidiaries and other consolidated entities in China – its only entities which generate revenue – reported revenue totaling only RMB 329.5 million for 2017 and RMB 2.4 billion for 2018 based on the face of their SAMR filings with the Chinese government. Nowhere in Qutoutiao's SEC filings are these differences (RMB 187.6 million for 2017 and RMB 620 million for 2018) explained.

117.    The SAMR is the Chinese government registrar for official documents like articles of incorporation, legal persons, registered capital, and company ownership. Qutoutiao's Chinese subsidiaries and other consolidated entities must annually file with the SAMR a "Company Annual Inspection Report," which includes financial statements such as balance sheets and income statements. Companies must file this report in order to renew their annual business licenses. The SAMR is the Chinese government registrar for official documents like articles of incorporation, legal persons, registered capital, and company ownership. SAMR filings only reflect business in activities in mainland China (PRC), they do not include revenue that is generated overseas or assets

---

[48] Han Zhipeng, *The original funny headline "Life Renewal" game*, SOHU (Oct. 11, 2019, 9:09 AM), https://www.sohu.com/a/346169737_118788.

that are held outside PRC. SAMR filings also reflect stand-alone balances for each entity and employ different accounting principles than U.S. GAAP, so it is not uncommon to have differences between a company's SAMR and SEC filings. GAAP requires intercompany transactions to be eliminated. Therefore, to the extent any intercompany revenues were included in any of the SAMR filings, they would be eliminated in preparing QTT's consolidated financial statements and thus could only result in a further reduction of the total revenues reported in the SAMR filings.

118.    Although Qutoutiao is incorporated in the Cayman Islands, it does not appear to generate revenue outside of mainland China. Accordingly, the revenue presented in its subsidiaries' SAMR filings is all the revenue that can be reported in its consolidated financial statements filed with the SEC. Those subsidiaries include Jifen, Shanghai Big Rhinoceros Horn Information Technology Co. Ltd. ("Big Rhino"), Shanghai Tuile Information Technology Co. Ltd. ("Tuile"), Shanghai Xike Information Technology Service Co. Ltd. ("Xike"), Dianguan, Shanghai Zhicao Information Technology Co. Ltd. ("Zhicao"), Shanghai Quyun Internet Technology Co. Ltd. ("Quyun"), Shanghai DragonS Information Technology Co. Ltd. ("DragonS"), Beijing Supreme Pole International Sports Promotion Co. Ltd. ("Supreme Pole"), Beijing Churun Internet Technology Co. Ltd. ("Churun"), Beijing Qukandian Internet Technology Co. Ltd. ("Qukandian"), Tianjin Quwen Internet Technology Co. Ltd. ("Quwen"), and Anhui Zhangduan Internet Technology Co. Ltd. ("Zhangduan") (collectively, "Chinese Subsidiaries").

119.    The total revenue from these Chinese Subsidiaries, based on the face of their SAMC Filings, is RMB 2.40 billion. However, RMB 308.01 million in revenue that Dianguan earned from Jifen (its only customer during 2018) and possibly other intra-company revenue should be deducted (*i.e.*, eliminated) as an intercompany transaction. In addition, RMB 43.43 million should be deducted to eliminate revenues recorded by the consolidated entities (QTT VIEs and

subsidiaries) with the parent company during 2018. Accordingly, the total revenue from the Chinese Subsidiaries is RMB 329.5 million for 2017 and RMB 2.05 billion for 2018.

120.    Qutoutiao reported consolidated revenue of RMB 517.1 million for 2017 and RMB 3.02 billion for 2018 in its SEC filings, leaving RMB 187.6 million (or 36% of the reported revenue) unaccounted for in 2017 and RMB 970.67 million (or 32% of the reported revenue) unaccounted for in 2018, respectively.

> **5.      QTT failed to disclose contingent liabilities from its violation of China's laws and regulations related to the placement of illegal ads on its platform.**

121.    As stated above, instead of complying with Chinese government regulations, the Company actively sought to evade Chinese restrictions and run illegal advertisements. The Company's actions exposed it to possible substantial fines and penalties in the future, when its conduct would become known. GAAP defines such a circumstance as a loss contingency, which is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." (ASC 450-20-20).

122.    Because there was "at least a reasonable possibility" that fines and penalties may have been incurred, GAAP required QTT to disclose the nature of the aforementioned loss contingency and provide "[a]n estimate of the possible loss or range of loss or a statement that such an estimate cannot be made" in the notes to its financial statements. (450-20-50-3-4). QTT did not do that in its financial statements.

## VII.    THE 1934 ACT CLAIMS

123.    Lead Plaintiff asserts securities fraud-based claims under §§ 10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against the 1934 Act Defendants.

124.     Throughout the Class Period, the 1934 Act Defendants knowingly or recklessly made materially false and misleading public statements and omissions that: (i) Qutoutiao was not able to generate sufficient revenue to meet its targets unless it allowed unqualified advertisers to advertise on the QTT App, which it accomplished by targeting consumers who lived in lower tier Chinese cities; (ii) the true benefits of, and reasons for, replacing the Company's third-party advertising agent, Baidu, with a related party, Dianguan, and bypassing that third-party's oversight of the content and quality of advertisements was to generate revenue from risky advertisements; (iii) the Company had created separate teams for dealing with qualified advertisers, whose advertisements were largely compliant with applicable Chinese regulations and thus low-risk, and unqualified advertisers, and that the "high-risk" team (which was disbanded after the CCTV Exposé) outsourced nearly all of its advertisement screening to contractors who conducted minimal due diligence on their clients; (iv) as a result, the Company would place on the QTT App, risky advertisements whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or which linked to illegal online gambling platforms; (v) as a result, the Company would face increasing regulatory scrutiny and reputational harm; (vi) as a result, the Company's advertising revenue was reasonably likely to decline; (vii) the Company was reporting RMB 620 million more in revenue to the SEC than its subsidiaries did in aggregate to the SAMR; and (viii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects, were materially misleading and/or lacked a reasonable basis.

### A.     Materially False and Misleading Statements and Omissions During the Class

**Period**[49]

1.     **Initial Public Offering (September 14, 2018).**

125.     On September 14, 2018, Qutoutiao issued a press release announcing the pricing of its IPO and that Defendants Citigroup, Deutsche, China Merchants and UBS would be acting as "joint bookrunners" for the Offering, and Defendant KeyBanc would be acting as co-manager. That same day, Qutoutiao filed its IPO Prospectus on Form 424B4 with the SEC (together with the IPO Registration Statement, forming the IPO Documents). The Insider Defendants signed and/or authorized the signing of the IPO Documents.

126.     The IPO Documents contained multiple material misstatements regarding the Company's strategy of targeting users in lower tier cities in China, stating in relevant part that:

> *Since our inception, we have strategically targeted users from tier-3 and below cities in China because of the enormous opportunities in this underserved market.* As of the end of 2017, tier-3 and below cities had a population of 1,027 million each owning 0.5 mobile device on average (compared to a population of 363 million each owning 1.3 mobile devices on average in tier-1 and 2 cities), suggesting significant potential for further mobile penetration, according to the Analysys [sic] Report. *Mobile users in tier-3 and below cities tend to have a slower pace of life and spend more time on the Internet given limited offline entertainment venues. Moreover, they often enjoy fast increasing disposable income and lower financial pressures thanks to lower housing prices. These factors contribute to a significant need for mobile entertainment content while also create strong monetization potential.*

127.     The statements contained in ¶ 126 supra were materially false and misleading because the "enormous opportunities" and "strong monetization potential" in Tier-3 and lower cities had much less to do with the high number of users in those cities having more time and disposable income to spend on the internet and far more to do with the high number of unqualified advertisers who wanted to run non-compliant ads in those cities because regulators were more lenient and users were less aware of their

---

[49] The particular portions of the statements alleged to be false or misleading are bold and italicized herein.

rights as consumers in those cities.

128.    The IPO Documents also touted that the Company's "***net revenues have increased rapidly*** from RMB58.0 million (US$8.8 million) in 2016 to RMB517.1 million (US$78.1 million) in 2017, and further from RMB107.3 million (US$16.2 million) in the six months ended June 30, 2017 to RMB717.8 million (US$108.5 million) in the same period in 2018." The majority of this revenue was derived from advertising, as the Company stated in the IPO Documents:

> Baidu, which is our largest customer and operates a third-party advertising platform, contributed 69.9%, 43.7%, 75.8% and 12.1% of our net revenues in 2016 and 2017 and the six months ended June 30, 2017 and 2018, respectively. Baidu also accounted for 92.6%, 59.8% and 30.5% of our accounts receivable as of December 31, 2016 and 2017 and June 30, 2018, respectively. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. We expect this system will allow us to reduce our reliance on third-party advertising platforms such as Baidu.*** Prior to our acquisition of this advertising agent in February 2018, we engaged such advertising agent to serve as our sales agent in selling our advertising solutions to other second-tier advertising agents and end advertisers***. In 2017 and the six months ended June 30, 2018, 26.2% and 78.2% of our net revenues, respectively, were generated through this advertising agent. These second-tier advertising agents and end advertisers are our customers as they select our mobile applications to place their advertisement and our performance obligation is to provide the underlying advertising display services to them.***

129.    The statements contained in ¶ 128 *supra* were materially false and misleading because: (i) the increase in net revenues, specifically advertising and marketing revenues, was primarily due to the increase in ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) the Company acquired an advertising agent in February 2018 to reduce the oversight Baidu had been providing which had prevented non-compliant ads from running; (iii) any enhancement in the Company's ability to monetize user traffic was actually primarily related to its increased ability to sell non-compliant ads; (iv) in order to meet the Company's "performance obligation" to

its end advertiser customers, it set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to sell non-compliant ads; and (v) the Company materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. Even after the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

130.    In addition, the IPO Documents note that the Company "currently generate[s] most of [its] revenue from advertising," so to "Enhance [its] Monetization Capabilities:"

> *We intend to enhance our advertising solutions by strengthening the performance of our proprietary programmatic advertising system*. We believe our strategic move to reduce the utilization of third-party advertising platforms and focus on expanding our advertising customer base and advertising agents directly will further boost our advertising revenue.

131.    With regard to "Monetization," the IPO Documents specifically state that:

> *Our advertising technology aims to maximize our revenue potential by rewarding the more relevant advertisement with a more prominent position, despite the potentially lower price bid of such advertisement.* We actively monitor the advertisements placed to help ensure their relevance.

> Customers for our programmatic advertising system are comprised of advertising agents and end advertisers. *We have our own sales personnel who are responsible to support and monitor the performances of advertising agents and to attract advertising customers to use our programmatic advertising system directly.* We enter into standard agreements with advertising agents generally for a term of one year. *Our advertising agents are responsible for identifying end advertisers, confirming payments and setting up accounts on our programmatic advertising system for advertising customers. We provide ongoing training to advertising agents to familiarize them with the functionalities and capabilities of our programmatic advertising system. These advertising agents are responsible for collecting and submitting the relevant documentation and licenses from advertising customers for our approval to open an account on our programmatic*

> ***advertising system, and are also liable for any infringement of third-party rights or violation of regulatory requirements caused by advertisements placed by their end advertisers.***

132.    The statements contained in ¶¶ 130-131 *supra* were materially false and misleading because: (i) the Company's enhancing or maximizing of its ability to monetize user traffic was actually primarily related to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; (ii) the Company's sales personnel's responsibilities were different for qualified versus unqualified advertisers in order to be able to sell non-compliant ads; (iii) regardless of the terms of its agreements with advertising agents, the Company would also face increasing regulatory scrutiny and reputational harm from any ads that violated the relevant regulatory requirements; and (iv) Qutoutiao materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. Even after the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

133.    The IPO Documents specifically tout Qutoutiao's mission "to deliver quality and relevant content to users, and content sourcing, management and recommendation" as "core focuses of [its] operations," including with regard to advertising and content screening technology:

- **Advertising. *Our advertising technology enables advertising customers to bid for audience and automatically deliver relevant, targeted promotional links to users.*** Our system rewards more relevant advertisements with more prominent positions, despite the potentially lower priced bids of such advertisements. Our audience segmentation technology helps ensure the relevance of advertisements shown to users by analyzing their interests through browsing activity, viewed content and commenting history. In addition, we have the ability to predict click-through rates for advertisements using logistic

regression, gradient boosting decision tree and linear and nonlinear modeling algorithms. Enhanced precision of these click-through rate projections can help maximize the cost effectiveness of customers' advertising budgets.

- **Content Screening Technology.** Our text screening system screens information based on pre-set keywords. *We utilize artificial intelligence to identify inappropriate or objectionable content from images, speeches and videos, significantly increasing efficiency over manual review. We also apply deep learning methods to analyze complex visual content. Through big data and continuous training, our system is able to monitor and identify objectionable visual content with a high degree of accuracy. The screening system automatically declines content that did not meet the standards of our platform and flags suspicious content for manual review by our content management team.*

134.     The statements contained in ¶ 133 *supra* were materially false and misleading because: (i) misleading or illegal ads were being delivered as part of the "relevant, targeted promotional links to users;" (ii) different processes and procedures were being applied to advertising content such that any declined ads could be manually allowed on the QTT App; and (iii) Qutoutiao materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. Even after the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

135.     Furthermore, while the 1934 Act Defendants list numerous "Risk Factors" in the IPO Documents, they failed to adequately warn investors that certain "Risk Factors" had already materialized at the time of the IPO.

136.     First, the IPO Documents warned that "[a]dvertisements on our mobile applications may [] subject us to penalties and other administrative actions:"

Under PRC advertising laws and regulations, we are obligated to monitor the advertising content shown on our mobile applications to ensure that such content is true, accurate and in full compliance with applicable laws and regulations. . . . However, *for the determination of the truth and accuracy of the advertisements, there are no implementing rules or official interpretations, and such a determination is at the sole discretion of the relevant local branch of the State Administration for Market Regulation, or the SAMR (successor of SAIC and the State Food and Drug Administration), which results in uncertainty in the application of these laws and regulations*.

\* \* \*

We cannot assure you that all the advertisements shown on our mobile applications are true, accurate, appropriate and in full compliance with applicable laws and regulations. *For example, advertisers on our mobile applications, or their agents, may use measures that are designed to evade our monitoring, such as providing inauthentic material that does not match the actual advertisement, or supplying advertising which is superficially compliant but nevertheless is linked to one or more webpages that feature noncompliant advertising content. In addition, our employees responsible for reviewing advertisements may not fully understand the relevant laws and regulations or may be inappropriately influenced by the advertisers. In each case, we may still be held responsible for noncompliant advertising content.* We include clauses in most of our advertising contracts requiring that all advertising content provided by advertising customers must comply with relevant laws and regulations. *Pursuant to the contracts between us and the relevant advertising agents or advertising customers, they are liable for all damages to us caused by their breach of such representations. However, there can be no assurance that we will be able to successfully enforce our contractual rights.*

*Violation of these laws and regulations may subject us to penalties, including fines, confiscation of our advertising income, orders to cease dissemination of the advertisements and orders to eliminate the effect of illegal advertisement. If an illegal advertisement featured on our mobile applications were to have excessive negative effects, our brand and reputation may be harmed, and PRC governmental authorities may pursue more severe penalties and administrative actions against us. PRC governmental authorities may even force us to terminate our advertising operation or revoke our licenses in circumstances involving serious violations. Such penalties may have a material and adverse effect on our business, results of operations and financial condition.*

137.   The statements contained in ¶ 136 *supra* were materially false and misleading because the Company: (i) had set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to be able to sell non-compliant ads; (ii) was

already violating the applicable advertising laws and regulations and thus the ramifications were not a matter of if, but when; and (iii) materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

138.    Second, the IPO Documents warned that because "[w]e generate a substantial majority of our revenues from advertising[,] [a] decline in our advertising revenue could harm our business:"

> We generated almost all of our revenues from advertising services in 2016, 2017, and the six months ended June 30, 2018. When we first commenced our business, we collaborated with various third-party advertising platforms to place advertisements on our mobile applications. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. This system will serve to power our advertising solutions while reducing the use of third-party advertising platforms.*** In 2017 and the six months ended June 30, 2018, 26.2% and 78.2%, respectively, of our net revenues were generated through this advertising agent. We have limited experience in operating the programmatic advertising system and in acquiring our own advertising agents and advertising customers. We may not be able to establish our own sales personnel to effectively and efficiently acquire and retain advertising agents and advertising customers. The effectiveness of our programmatic advertising system may not perform as expected and achieve widespread acceptance by advertising customers.

> Our advertising customers for our programmatic advertising system are comprised of advertising agents and end advertisers. . . . ***If we fail to retain existing advertising customers or ensure that their advertising spend with us remains at similar or increased levels or attract new advertising customers to advertise on our platform, our business, results of operations and financial condition may be materially and adversely affected.***

139.    The statements contained in ¶ 138 *supra* were materially false and misleading

because: (i) the Company acquired an advertising agent in February 2018 to reduce the oversight Baidu had been providing which had prevented non-compliant ads from running; (ii) any enhancement in the Company's ability to monetize user traffic was actually primarily related to its increased ability to sell non-compliant ads; and (iii) a material number of the Company's customers were unqualified advertisers who were purchasing non-compliant ads and thus the revenue generated from those customers inevitably would decrease when, not if, the non-compliant ads became public.

140.     Lastly, with regard to the Company's related party transactions, the IPO Documents disclosed with regard to the "Transactions with Companies Controlled by or Affiliated with Mr. Tan:"

> ***In 2016, we paid RMB5.0 million (US$0.8 million) to Youxuan Information Technology (Shanghai) Co., Ltd., a company controlled by Mr. Eric Siliang Tan, our co-founder and executive chairman, to cooperate on a potential business project.*** Such project was subsequently canceled and the entire amount was refunded back to us in 2017.
>
> ***We paid Shanghai Yinnuo Management Consulting Co., Ltd., or Yinuo Management, a company controlled by Mr. Eric Siliang Tan, service fees in the amount of RMB3.0 million (US$0.5 million), RMB16.8 million (US$2.5 million) and RMB6.9 million (US$1.0 million) in 2016, 2017 and the six months ended June 30, 2017, respectively.*** Such service fees relate to costs charged by Yinuo Management to provide us with financial accounting support, office space and certain other administrative support. Amounts due to Yinuo Management in connection with these service fees as of December 31, 2016 was RMB3.0 million (US$0.5 million). No amount was due to Yinuo Management in connection with these service fees as of December 31, 2017. We have since developed all relevant functions internally and leased office space for our operations that were previously provided by Yinnuo Management and we currently do not expect to pay service fees to Yinuo Management for such functions or office space in the future.
>
> ***We received RMB5.3 million (US$0.8 million) in service fees from AdIn Media (Shanghai) Co., Ltd., or AdIn Media, a company in which Mr. Eric Siliang Tan indirectly owns a minority interest and in which he is a key management personnel, in the six months ended June 30, 2018.*** Such fees related to agent and platform service provided to AdIn Media by facilitating advertising customers to display advertisements with AdIn Media. As of June 30, 2018, an amount of

RMB6.7 million (US$1.0 million) was due to AdIn Media in connection with such services provided, which represent the service fee collected from advertising customers but not yet paid to AdIn Media.

**We also received RMB1.2 million (US$0.2 million) in service fees from AdIn Media in the six months ended June 30, 2018 relating to advertising serviced provided by us to AdIn Media.** As of June 30, 2018, the remaining balance of such service fees was RMB0.9 million (US$0.1 million).

141.    The statements contained in ¶ 140 *supra* were materially false and misleading because: (i) the transactions with companies controlled by or affiliated with Tan also include transactions involving the Mengtui App, Fangce and the Shihui Miao App based on Tan's ownership stakes in Taiyun Capital and Bige; and (ii) the Dianguan Acquisition should have been listed as a related party transaction based on Liang's special relationship with Tan through companies in which Tan is a majority investor or owner, including Woofoo Equity and Taiyun Capital.

### 2.    Third Quarter 2018 Financial Results (November 12, 2018).

142.    On November 12, 2018, Qutoutiao announced its third quarter 2018 financial results in a press release ("3Q18 Earnings Release"), that was later filed as Exhibit 99.1 to a Form 6-K signed by Defendant Wang, touting its revenue growth:

- **Net revenues increased by 520.3%** to RMB977.3 million (US$142.3million) from RMB157.6 million **in the third quarter of 2017, and by 103.0%** from RMB481.4 million **in the previous quarter**.

* * *

**Advertising revenues** were RMB896.5 million (US$130.5 million) i**n the third quarter of 2018, an increase of 472.3%** from RMB156.7 million **in the same period of 2017, primarily due to increases in the Company's average DAUs, average daily time spent per DAU and the Company's ability to monetize user traffic**.

143.    The statements contained in ¶ 142 *supra* were materially false and misleading because: (i) the increase in net revenues, specifically advertising and marketing revenues, was primarily due to the increase in ads whose claims could not be substantiated and thus were considered false

advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) the Company's increased ability to monetize user traffic was primarily related to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; and (iii) Qutoutiao and Wang materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

144.    The 3Q18 Earnings Release also quoted Defendant Tan:

> *Average DAUs increased 229.0% year-over-year to 21.3 million in the quarter, which demonstrates our ability to attract and serve users, especially those from lower-tier cities in China.*
>
> *We see significant potential in this market* and our goal is to become a major gateway to the mobile internet for users from lower-tier cities and a key access-point for businesses that want to tap into such users. *To achieve this goal, we will continue to improve the quality and breadth of our content, refine our content recommendation technology and selectively expand into new content formats that appeal to our target users, all with the aim of enhancing our user experience.*

145.    Later that same day, the Company held its third quarter 2018 financial earnings conference call ("3Q18 Earnings Call") to discuss its quarterly results with analysts. During the call, Defendant Tan again reassured participating analysts of Qutoutiao's ability to sustainably grow, stating that:

> *We continue to see strong growth in mobile users from lower-tier cities in China with our innovative business model and extensive experience in this market segment.* At year end [ph] we are well positioned to capitalize on such growth. Our goal is to become a major gateway to the mobile internet for users

from lower-tier cities and the key access point for businesses that want to tap into these users.

> In the fourth quarter of 2018 *we will continue to focus on improving the quality and breadth of our content…and selectively expanding into new content categories to further enhance the user experience*.

146.     Defendant Wang also touted the Company's revenue growth during the 3Q18 Earnings Call, stating, in relevant part:

> [Qutoutiao's] *net revenue has grown more than 100% from Q1 to Q2 and grew more than 100% gain from Q2 to Q3* reaching RMB977 million. *This was driven by both DAU growth and improved monetization efficiency.* Our net revenues for DAU per day or ARPU grew from RMB0.23 in Q1 to RMB0.43 in Q2 and further to RMB0.50 in Q3. *Thanks to our high-quality traffic and increasing sophistication of our proprietary advertising platform.*[50]

147.     An Investor Relations Officer speaking on behalf of Qutoutiao added during the 3Q18 Earnings Call, "[o]f the net revenues [Qutoutiao's] *Advertising revenues* were RMB896.5 million *an increase of 472.3%* from RMB156.7 million *in the same period of 2017 primarily due to the increases in our average DAUs, average daily time spent per DAU and our ability to monetize our traffic.*"

148.     The statements contained in ¶¶ 144-147 *supra* were materially false and misleading because: (i) the "significant potential" in lower-tier cities was primarily due to the high number of unqualified advertisers who wanted to run non-compliant ads in those cities as a result of regulators being more lenient and users being less aware of their rights as consumers in those cities; (ii) Qutoutiao prioritized the "businesses that want to tap into" users from lower-tier cities over the users and the "user experience" as demonstrated by its creation of separate teams specifically to deal with qualified versus unqualified advertisers, the latter of which was disbanded after the CCTV Exposé, and its selling of ads which were misleading consumers or sending them to illegal gambling

---

[50] Qutoutiao defines ARPU as net revenues per DAU per day.

platforms; (iii) the increase in net revenues, specifically advertising revenues, was due to the increase in ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms, not the "high-quality traffic and increasing sophistication of our proprietary advertising platform;" (iv) the Company's increased ability to monetize user traffic was primarily related to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; and (v) Qutoutiao, Tan and Wang materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

149.    In response to a question from Citigroup analyst Alicia Yap regarding the potential effects of China's macroeconomic on Qutoutiao's advertising customer budgets, Defendant Tan stated:

> So we do see a slowdown of the macroeconomics in China as indicated by many of our peers as well. However, we are less impacted by that while ***we are less impacted than many of our peers because our traffic focus on lower tier city audiences which is in high demand as many of our peers are trying to penetrate this specific segment***.
>
> ***We also do see more and more advertisers, spending their marketing and advertising dollar in this segment***.

150.    Defendant Tan further stated in response to a question from TH Capital analyst Tian Hou about which part of the economy Qutoutiao is providing advertising to, and whether it is a growing or declining part of China's economy responded:

*[O]ur advertisers are performance advertisers who are looking to reach the lower tier city users.* Right? So even though the macro economy doesn't seem to be very positive, currently *these performance advertisers are still looking to spend advertising budget if they can obtain the ROI that they are seeking*. And also know that, this group of people, tier 3 and below city users continue to be very strong…So overall given that ecommerce sector is one of our largest advertiser spend category *this is also helping us in terms of achieving our growth as well*.

151.    Defendant Wang stated in response to a question from Deutsche Bank analyst Hanjoon Kim regarding Qutoutiao's ability to monetize its users and the Company's expected revenue per DAU and the growth of its ARPU curve:

*3Q the ARPU was already up quite a bit from Q2 of 0.43, Q3 was 0.50* and we do expect Q4 to be generally in line with Q3 in terms of ARPU and I think given the macro backdrop as many of you already mentioned this is in my view pretty positive result *and this was achieved through, number one more advertisers bidding here* and number two the addition of newer advertisement format as you've mentioned, we do apps and also interactive apps.

And *lastly also because more and more businesses are realizing the value of lower tier city population and they are trying to tap into this group of users*, and that's why we feel that we are less impacted by this general macro slowdown than many of our peers, so we still feel pretty comfortable of our guidance for Q4.

152.    The statements contained in ¶¶ 149-151 *supra* were materially false and misleading because: (i) the Company's "performance advertisers" included unqualified advertisers who wanted to run non-compliant ads in lower tier cities because regulators were more lenient and users were less aware of their rights as consumers in those cities; (ii) the fact that "more advertisers" were trying to spend more in lower tier cities was primarily due to unqualified advertisers wanting to run non-compliant ads in those cities because regulators were more lenient and users were less aware of their rights as consumers in those cities; and (iii) Qutoutiao, Tan and Wang materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations despite the slowing macroeconomy in China. After the Company's risky advertisements came to light

during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation

and revenue was impacted until the end of the Class Period, when it was forced to disclose that its

revenue did not grow YOY for the first time in its history as a result of its "remedial measures"

which included "removing misleading or inappropriate" ads from the QTT App.

### 3. Fourth Quarter 2018 Financial Results (March 5-6, 2019).

153.    On March 5, 2019, Qutoutiao announced its fourth quarter 2018 financial results in

a press release ("4Q18 Earnings Release"), that was later filed as Exhibit 99.1 to a Form 6-K signed

by Defendant Wang, touting its revenue growth:

- ***Net revenues increased 426.1% year-over-year*** to RMB1,327.0 million
  (US$193.0 million), ***exceeding the high end of the Company's guided range***
  at RMB1,250.0 million*.*

*\* \* \**

***Advertising and marketing revenues*** were RMB1,247.9 million (US$181.5
million) in the fourth quarter of 2018, an ***increase of 399.4%*** from RMB249.9
million ***in the same period of 2017, primarily due to increases in the Company's
user base, time spent and ability to monetize user traffic.***

154.    The statements contained in ¶ 153 *supra* were materially false and misleading because:

(i) the increase in net revenues, specifically advertising and marketing revenues, was primarily due

to the increase in ads that could not be substantiated and thus were considered false advertisements

under applicable regulations or provided links to illegal online gambling platforms; (ii) the

Company's increased ability to monetize user traffic was primarily related to its increased ability

to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; and (iii)

Qutoutiao and Wang materially misrepresented the strength of the Company's business model and

ability to generate growing, sustainable revenues without selling risky advertisements that violated

applicable Chinese regulations. After the Company's risky advertisements came to light during the

CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue

was impacted until the end of the Class Period, when it was forced to disclose that its revenue did

not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

155.    The following day, on March 6, 2019, the Company held its fourth quarter 2018 financial earnings conference call ("4Q18 Earnings Call") to discuss its quarterly results with analysts. During the call, Defendant Tan addressed Qutoutiao's monetization capabilities, stating, in relevant part, "**the quality of our advertisers has consistently improved since we went public**."

156.    In addition, when analyst Alicia Yap of Citigroup noted that "the ARPU per DAU per day declined sequentially" and asked "how is the ARPU per day per DAU on the Qutoutiao app given your time spent actually is improving from the 56 minutes to 63 minutes" later during the 4Q18 Earnings Call, Defendant Wang responded, in relevant part:

> On the technical side, number of advertisers, the algorithm, the effect of the algorithm, marketing engine, that's all improving. But *on the regulation side and also on the internal quality control side, we are now much more strict in terms of the quality of advertisers and also the quality of the promotional materials.* So that kind of balances out the improvements on the technical side and resulted in a stable ARPU.

157.    The statements contained in ¶¶ 155-156 *supra* were materially false and misleading because: (i) that "the quality of advertisers" and "promotional materials" improved did not stop the Company from running non-compliant ads on advertisers' behalf in lower tier cities because regulators were more lenient and users were less aware of their rights as consumers in those cities; (ii) Qutoutiao managed the risk of getting caught selling ads which were misleading consumers or sending them to illegal gambling platforms by having separate teams deal with qualified versus unqualified advertisers, the latter of which was disbanded after the CCTV Exposé; and (iii) Qutoutiao, Tan and Wang materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light

during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

158.    Then, in response to a question from analyst Zesheng Lu of UBS inquiring as to whether the slowdown of the advertising market posed any threat to Qutoutiao's revenue growth in the first half of the year during the 4Q18 Earnings Call, Defendant Tan stated that:

> [W]e do see some macro headwind in 2019 advertising market, especially on the brand advertisers side. In particular, the consumer brands especially foreign brands are more affected.
>
> However, brand advertisers only account for about 5% of the total advertising revenue. So we are less affected on that front. ***The vast majority of our advertisers are performance advertisers. When the economy is under challenge, they actually need to sell more, so they have more sales budget to spend*** so we think their situation is slightly different.
>
> On the macro side, we, as we said, we see some challenges for the full year. But recently, we have also seen some improving signs, for example, subscriber environment and the capital markets, including – and also consumer spending in China.
>
> So for us, we only account for about 1% of total advertising market in China, and ***we are growing very rapidly***. So we believe that we are relatively insulated from the top down factors.

159.    The statements contained in ¶ 158 *supra* were materially false and misleading because: (i) the ads that the Company's advertisers needed to sell more of primarily were ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) the Company's "performance advertisers" included unqualified advertisers who wanted to run non-compliant ads in lower tier cities because regulators were more lenient and users were less aware of their rights as consumers in those cities; (iii) the Company's rapid growth was primarily related to its increased

ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; and (iv) Qutoutiao, Tan and Wang materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations despite the slowing macroeconomy in China. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

### 4. Secondary Public Offering (April 3, 2019).

160.    On March 29, 2019, Qutoutiao issued a press release announcing its proposed follow-on SPO, and named Defendants Citigroup, Deutsche, CLSA, Jefferies, Haitong and Lighthouse as "joint bookrunners." On April 3, 2019, Qutoutiao filed its SPO Prospectus on Form 424B4 with the SEC (together with the SPO Registration Statement, forming the SPO Documents). The Insider Defendants signed and/or authorized the signing of the SPO Documents.

161.    The SPO Documents contained multiple material misstatements regarding the Company's strategy of targeting users in lower tier cities in China, stating in relevant part:

> ***Since our inception, we have strategically targeted users from lower tier cities in China because of the enormous opportunities in this underserved market.*** As of the end of 2017, lower tier cities had a population of 1,027 million each owning 0.5 mobile device on average (compared to a population of 363 million each owning 1.3 mobile devices on average in tier-1 and 2 cities), suggesting significant potential for further mobile penetration, according to the Analysys [sic] Report. ***Mobile users in lower tier cities tend to have a slower pace of life and spend more time on the Internet given limited offline entertainment venues. Moreover, they often enjoy fast increasing disposable income and lower financial pressures due to lower housing prices. These factors have given rise to a significant need for mobile entertainment content while also creating high monetization potentials.*** Users from lower tier cities tend to have different interests and preferences in comparison to users from tier-1 and tier-2 cities. Qutoutiao's

light entertainment-oriented and easily digestible content is designed to resonate with such users and provides us with a significant advantage to capture this underserved market.

162.    The statements contained in ¶¶160-161 *supra* were materially false and misleading because the "enormous opportunities" and "high monetization potentials" in lower tier cities had much less to do with the high number of users in those cities having more time and disposable income to spend on the internet and far more to do with the high number of unqualified advertisers who wanted to run non-compliant ads in those cities because regulators were more lenient and users were less aware of their rights as consumers in those cities.

163.    The SPO Documents also touted that the Company's "***net revenues have increased rapidly*** from RMB58.0 million [(US$8.8 million)] in 2016 to RMB517.1 million [(US$78.1 million)] in 2017, and further to RMB3,022.1 million (US$439.6 million) in 2018." The majority of the Company's revenue came from advertising, as the SPO Documents stated, in relevant part:

> Baidu, which used to be our largest customer and operates a third-party advertising platform, contributed 69.9%, 43.7% and 4.2% of our net revenues in 2016, 2017 and 2018, respectively. Baidu also accounted for 59.8% and 8.8% of our accounts receivable as of December 31, 2017 and 2018, respectively. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. We expect this system will allow us to reduce our reliance on third-party advertising platforms such as Baidu.*** Prior to our acquisition of this advertising agent in February 2018, we engaged such advertising agent to serve as our sales agent in selling our advertising and marketing solutions to other second-tier advertising agents and end advertisers. ***These second-tier advertising agents and end advertisers are our customers as they select our mobile applications to place their advertisement and our performance obligation is to provide the underlying advertising display services to them.***

164.    The statements contained in ¶ 163 *supra* were materially false and misleading because: (i) the increase in net revenues, specifically advertising and marketing revenues, was primarily due to the increase in ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms;

(ii) the Company acquired an advertising agent in February 2018 to reduce the oversight Baidu had been providing which had prevented non-compliant ads from running; (iii) any enhancement in the Company's ability to monetize user traffic was actually primarily related to its increased ability to sell non-compliant ads; (iv) in order to meet the Company's "performance obligation" to its end advertiser customers, it set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to sell non-compliant ads; and (v) the Company materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. Even after the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

165.     Further, the SPO Documents contained substantially the same statements as the IPO Documents about the Company's abilities to "Enhance [its] Monetization Capabilities" and how Qutoutiao plans to achieve such improved "Monetization" through advertising, which are quoted more fully in ¶ 128. These statements remained materially false or misleading for the reasons discussed in ¶ 129. The SPO Documents also contained substantially the same statements as the IPO Documents about Qutoutiao's mission "to deliver quality and relevant content to users, and content sourcing, management and recommendation" as "core focuses of [its] operations," as related to advertising and content screening technology, which are quoted more fully in ¶ 133. These statements remained materially false or misleading for the reasons discussed in ¶ 134.

166.     Furthermore, while the 1934 Act Defendants list numerous "Risk Factors" in the

SPO Documents, they failed to adequately warn investors that certain "Risk Factors" had already materialized at the time of the SPO.

167.   First, the SPO Documents warned that because "[w]e generate a substantial majority of our revenues from advertising and marketing[,] [a] decline in our advertising and marketing revenues could harm our business:"

> We generated a substantial majority of our revenues from advertising and marketing services in 2016, 2017 and 2018. When we first commenced our business, we collaborated with various third-party advertising platforms to place advertisements on our mobile applications. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. This system will serve to power our advertising and marketing solutions while reducing the use of third-party advertising platforms.*** We have limited experience in operating the programmatic advertising system and in acquiring our own advertising agents and advertising customers. We may not be able to establish our own sales personnel to effectively and efficiently acquire and retain advertising agents and advertising customers. The effectiveness of our programmatic advertising system may not perform as expected and achieve widespread acceptance by advertising customers.

> Our advertising customers for our programmatic advertising system are comprised of advertising agents and end advertisers. . . . ***If we fail to retain existing advertising customers or ensure that their advertising spend with us remains at similar or increased levels or attract new advertising customers to advertise on our platform, our business, results of operations and financial condition may be materially and adversely affected***.

168.   The statements contained in ¶ 167 *supra* were materially false and misleading because: (i) the Company acquired an advertising agent in February 2018 to reduce the oversight Baidu had been providing which had prevented non-compliant ads from running; (ii) any enhancement in the Company's ability to monetize user traffic was actually primarily related to its increased ability to sell non-compliant ads; and (iii) a material number of the Company's customers were unqualified advertisers who were purchasing non-compliant ads and thus the revenue generated from those customers inevitably would decrease when, not if, the non-compliant ads became public.

169.    Second, the SPO Documents contained substantially the same statement as the IPO Documents regarding the Company's warning that "[a]dvertisements on [the Company's] mobile applications may subject us to penalties and other administrative actions[,]," which is quoted more fully in ¶ 136. This statement remained materially false or misleading for the reasons discussed in ¶ 137.

170.    Third, the SPO Documents warned that "[n]on-compliance with law on the part of third parties with which we conduct business could disrupt our business and adversely affect results of our operation and financial condition:"

> Third parties with which we conduct business, such as content providers, advertising agents, advertising customers and merchandise suppliers, may be subject to regulatory penalties or punishments because of their regulatory compliance failures or may be infringing upon other parties' legal rights, which may, directly or indirectly, disrupt our business. ***Although we conduct review of legal formalities and certifications before entering into contractual relationships with third parties, and take measures to reduce the risks that we may be exposed to in case of any non-compliance by third parties, we cannot be certain whether such third party has violated any regulatory requirements or infringed or will infringe any other parties' legal rights.*** For example, content providers may submit copyrighted content that they have no right to distribute. While our content management system screens content for potential copyright infringements, we may not be able to identify all instances of copyright infringement. In the event we deliver content that violates the copyrights of a third party, we may be required to pay damages to compensate such third party. Even though we have the contractual right to seek indemnification from the relevant content provider for such payment, there can be no assurance that we will be able to enforce such right. As a result, our business, results of operations and financial condition could be materially and adversely affected. Similarly, advertising content of advertising customers may also not be in full compliance with applicable laws and regulations that may have an adverse effect as to our business, results of operations and financial condition. See "— Advertisements on our mobile applications may subject us to penalties and other administrative actions."

171.    The statement contained in ¶ 170 *supra* was materially false and misleading because: (i) the measures the Company had taken to reduce its risk included setting up separate teams with different processes and procedures for qualified versus unqualified advertisers and placing riskier

ads in lower tier cities where there was less regulatory scrutiny; (ii) even though the Company had measures in place to decline non-compliant ads, the advertiser or the employees who were responsible for those ads could contact the reviewing department for a second manual review and allow the ads on the QTT App manually; and (iii) the Company was already aware or recklessly disregarded that certain advertisers had already violated regulatory requirements or infringed other parties' legal rights. Until July 2020, investors were in the dark about a substantial amount of Qutoutiao's revenue that was being generated from ads by unqualified advertisers which were not compliant with the applicable Chinese regulations or that they were managing the risk of losing that revenue by reducing the chance that they would get caught by state regulators, rather than by simply not putting risky advertisements on the QTT App.

172.   When acknowledging the Company's related party transactions, the SPO Documents stated with regard to the "Transactions with Companies Controlled by or Affiliated with Mr. Tan:"

> ***In 2016, we paid RMB5.0 million (US$0.8 million) to Youxuan Information Technology (Shanghai) Co., Ltd., a company controlled by Mr. Eric Siliang Tan, our co-founder and executive chairman, to cooperate on a potential business project.*** Such project was subsequently canceled and the entire amount was refunded back to us in 2017.
>
> ***We paid Shanghai Yinnuo Management Consulting Co., Ltd., or Yinnuo Management, a company controlled by Mr. Eric Siliang Tan, service fees in the amount of RMB3.0 million and RMB16.8 million in 2016 and 2017, respectively.*** Such service fees relate to costs charged by Yinnuo Management to provide us with financial accounting support, office space and certain other administrative support. Amounts due to Yinnuo Management in connection with these service fees as of December 31, 2016 was RMB3.0 million. No amount was due to Yinnuo Management in connection with these service fees as of December 31, 2017. We have since developed all relevant functions internally and leased office space for our operations that were previously provided by Yinnuo Management and we currently do not expect to pay service fees to Yinnuo Management for such functions or office space in the future.
>
> ***We received RMB29.6 million (US$4.3 million) in service fees from AdIn Media (Shanghai) Co., Ltd., or AdIn Media, a company in which Mr. Eric Siliang***

***Tan indirectly owns a minority interest and in which he is a key management personnel, in 2018.*** Such fees related to agent and platform service provided to AdIn Media by facilitating advertising customers to display advertisements with AdIn Media. We also received fees in the amount of RMB4.5 million (US$0.6 million) for providing advertising services to AdIn Media in 2018. As of December 31, 2018, Mr. Tan was no longer a key management personnel of AdIn Media, and thus AdIn Media ceased to be our related party.

173.    The statements contained in ¶ 172 *supra* were materially false and misleading because: (i) the transactions with companies controlled by or affiliated with Tan also include transactions involving the Mengtui App, Fangce and the Shihui Miao App based on Tan's ownership stakes in Taiyun Capital, and Bige; and (ii) the Dianguan Acquisition should have been listed as a related party transaction based on Liang's special relationship with Tan through companies in which Tan is a majority investor or owner, including Woofoo Equity and Taiyun Capital.

### 5.    Fiscal Year 2018 Financial Results (April 11, 2019).

174.    On April 11, 2019, Qutoutiao filed with the SEC its annual report for its fiscal year of 2018 on Form 20-F ("2018 20-F"). The 2018 20-F was signed by Defendant Tan certifying that "[Qutoutiao] meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized [Defendant Tan] to sign this annual report on its behalf."

175.    The Company's 2018 20-F made materially false and/or misleading statements and omissions about its strategy of targeting users in lower tier cities in China, stating in relevant part:

> ***Since our inception, we have strategically targeted users from lower tier cities in China because of the enormous opportunities in this underserved market with significant potential for further mobile penetration. Mobile users in lower tier cities tend to have a slower pace of life and spend more time on the Internet given limited offline entertainment venues. Moreover, they often enjoy fast increasing disposable income and lower financial pressures due to lower housing prices. These factors have given rise to a significant need for mobile entertainment content while also creating high monetization potentials.*** Users from lower tier cities tend to have different interests and preferences in comparison to users from tier-1 and tier-2 cities. Qutoutiao's light entertainment-oriented and easily digestible content is designed to resonate with such users and provides us

with a significant advantage to capture this underserved market.

* * *

***Our rapidly increasing and engaged user base has provided us with strong monetization potentials.*** We currently generate revenue primarily by providing advertising and marketing services. We place advertisements on the main pages, topic pages as well as content pages of our mobile applications. When we first commenced our business, we collaborated with various third-party advertising platforms to place advertisements on our mobile applications. We later engaged an advertising agent who operates a programmatic advertising system to serve as our sales agent in selling our advertising and marketing solutions to other advertising agents and end advertisers. ***To enhance our platform's monetization capabilities, we acquired the advertising agent in February 2018. We will utilize the programmatic advertising system of such advertising agent to power our advertising and marketing solutions.***

176.    The statements contained in ¶¶ 174-175 *supra* were materially false and misleading because: (i) the "enormous opportunities" and "high" or "strong," "monetization potentials" in lower tier cities had much less to do with the high number of users in those cities having more time and disposable income to spend on the internet and far more to do with the high number of unqualified advertisers who wanted to run non-compliant ads in those cities because regulators were more lenient and users were less aware of their rights as consumers in those cities; (ii) detailing how the Company was enhancing its ability to monetize user traffic, without disclosing that any enhancement was actually primarily related to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; and (iii) Qutoutiao materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

177.    The 2018 20-F also touted that the Company's "***net revenues ha[d] increased***

***rapidly*** from RMB58.0 million in 2016 to RMB517.1 million in 2017, and further to RMB3,022.1

million (US$439.6 million) in 2018." The majority of this revenue derived from advertising as the

Company stated in the 2018 20-F:

> Baidu, which used to be our largest customer and operates a third-party
> advertising platform, contributed 69.9%, 43.7% and 4.2% of our net revenues in
> 2016, 2017 and 2018, respectively. Baidu also accounted for 59.8% and 8.8% of
> our accounts receivable as of December 31, 2017 and 2018, respectively. ***To
> enhance our platform's monetization capabilities, we acquired an advertising
> agent in February 2018 that operates a programmatic advertising system. We
> expect this system will allow us to reduce our reliance on third-party advertising
> platforms such as Baidu.*** Prior to our acquisition of this advertising agent in
> February 2018, we engaged such advertising agent to serve as our sales agent in
> selling our advertising and marketing solutions to other second-tier advertising
> agents and end advertisers. ***These second-tier advertising agents and end
> advertisers are our customers as they select our mobile applications to place their
> advertisement and our performance obligation is to provide the underlying
> advertising display services to them.***

178.    The statements contained in ¶ 177 *supra* were materially false and misleading

because (i) the Company's "rapidly" increased revenues were based on a significant number of

ads whose claims could not be substantiated and thus were considered false advertisements under

applicable regulations or provided links to illegal online gambling platforms; (ii) the Company

acquired an advertising agent, Dianguan, to reduce the oversight Baidu had been providing which

had prevented non-compliant ads from running; (iii) any enhancement in the Company's ability to

monetize user traffic was actually primarily related to its increased ability to sell non-compliant

ads; (iv) in order to meet the Company's "performance obligation" to its end advertiser customers,

it set up separate teams with different processes and procedures for qualified versus unqualified

advertisers in order to sell non-compliant ads; and (v) Qutoutiao materially misrepresented the

strength of its business model and ability to generate growing, sustainable revenues without selling

risky advertisements that violated applicable Chinese regulations. After the Company's risky

advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

179.    With regard to the Company's "Monetization" capabilities, the 2018 20-F further stated, in relevant part:

> When we first commenced our business, we collaborated with various third-party advertising platforms to fill advertisement space on our mobile applications. We later engaged advertising agents to serve as our sales agents in selling our advertising and marketing solutions toother advertising agents and end advertisers. *To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. This system will serve to power our advertising and marketing solutions while reducing the use of third-party advertising platforms.*
>
> Our programmatic advertising system utilizes a bidding system for advertising customers to bid for the targeted audience on our platform. *Our programmatic advertising system considers a wide range of parameters to determine which advertisement to show, including price bid, predicted click-through rate and content relevance, to dynamically maximize our revenue potential. Our advertising technology aims to maximize our revenue potential by rewarding the more relevant advertisement with a more prominent position, despite the potentially lower price bid of such advertisement.* We actively monitor the advertisements placed to help ensure their relevance.
>
> Customers for our programmatic advertising system are comprised of advertising agents and end advertisers. *We have our own sales personnel who are responsible to support and monitor the performances of advertising agents and to attract advertising customers to use our programmatic advertising system directly.* We enter into standard agreements with advertising agents generally for a term of one year. *Our advertising agents are responsible for identifying end advertisers, confirming payments and setting up accounts on our programmatic advertising system for advertising customers. We provide ongoing training to advertising agents to familiarize them with the functionalities and capabilities of our programmatic advertising system. These advertising agents are responsible for collecting and submitting the relevant documentation and licenses from advertising customers for our approval to open an account on our programmatic advertising system, and are also liable for any infringement of third-party rights*

*or violation of regulatory requirements caused by advertisements placed by their end advertisers.*

180.    The statements contained in ¶¶178-179 *supra* were materially false and misleading because: (i) the Company's enhancing or maximizing of its ability to monetize user traffic was actually primarily related to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; (ii) the Company's sales personnel's responsibilities were different for qualified versus unqualified advertisers in order to be able to sell non-compliant ads; (iii) regardless of the terms of its agreements with advertising agents, the Company would also face increasing regulatory scrutiny and reputational harm from any ads that violated the relevant regulatory requirements; and (iv) Qutoutiao materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

181.    The 2018 20-F specifically touted Qutoutiao's mission "to deliver quality and relevant content to users, and content sourcing, management and recommendation" as "core focuses of [its] operations," including with regard to advertising and content screening technology:

- **Advertising.** ***Our advertising technology enables advertising customers to bid for audience and automatically deliver relevant, targeted promotional links to users.*** Our system rewards more relevant advertisements with more prominent positions, despite the potentially lower priced bids of such advertisements. Our audience segmentation technology helps ensure the relevance of advertisements shown to users by analyzing their interests through browsing activity, viewed content and commenting history. In addition, we have the ability to predict click-through rates for advertisements using logistic regression, gradient boosting decision tree and linear and nonlinear modeling

algorithms. Enhanced precision of these click-through rate projections can help maximize the cost effectiveness of customers' advertising budgets.

- **Content Screening Technology.** Our text screening system screens information based on pre-set keywords. ***We utilize artificial intelligence to identify inappropriate or objectionable content from images, speeches and videos, significantly increasing efficiency over manual review. We also apply deep learning methods to analyze complex visual content. Through big data and continuous training, our system is able to monitor and identify objectionable visual content with a high degree of accuracy. The screening system automatically declines content that did not meet the standards of our platform and flags suspicious content for manual review by our content management team.***

182.   The statements contained in ¶ 181 *supra* were materially false and misleading because: (i) misleading or illegal ads were being delivered as part of the "relevant, targeted promotional links to users;" (ii) different processes and procedures were being applied to advertising content such that any declined ads could be manually allowed on the QTT App; and (iii) Qutoutiao materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

183.   Lastly, the 2018 20-F disclosed the "Transactions with Companies Controlled by or Affiliated with Mr. Tan" as follows:

> ***In 2016, we paid RMB5.0 million (US$0.8 million) to Youxuan Information Technology (Shanghai) Co., Ltd., a company controlled by Mr. Eric Siliang Tan, our co-founder and executive chairman, to cooperate on a potential business project.*** Such project was subsequently canceled and the entire amount was refunded back to us in 2017.
>
> ***We paid Shanghai Yinnuo Management Consulting Co., Ltd., or Yinnuo Management, a company controlled by Mr. Eric Siliang Tan, service fees in the***

***amount of RMB3.0 million and RMB16.8 million in 2016 and 2017, respectively.*** Such service fees relate to costs charged by Yinnuo Management to provide us with financial accounting support, office space and certain other administrative support. ***Amounts due to Yinnuo Management in connection with these service fees as of December 31, 2016 was RMB3.0 million.*** No amount was due to Yinnuo Management in connection with these service fees as of December 31, 2017. We have since developed all relevant functions internally and leased office space for our operations that were previously provided by Yinnuo Management and we currently do not expect to pay service fees to Yinnuo Management for such functions or office space in the future.

> ***We received RMB29.6 million (US$4.3 million) in service fees from AdIn Media (Shanghai) Co., Ltd., or AdIn Media, a company in which Mr. Eric Siliang Tan indirectly owns a minority interest and in which he is a key management personnel, in 2018.*** Such fees related to agent and platform service provided to AdIn Media by facilitating advertising customers to display advertisements with AdIn Media. We also received fees in the amount of RMB4.5 million (US$0.6 million) for providing advertising services to AdIn Media in 2018. As of December 31, 2018, Mr. Tan was no longer a key management personnel of AdIn Media, and thus AdIn Media ceased to be our related party.

184.   The statements contained in ¶ 183 *supra* were materially false and misleading because: (i) the transactions with companies controlled by or affiliated with Tan also include transactions involving the Mengtui App, Fangce and the Shihui Miao App based on Tan's ownership stakes in Taiyun Capital, and Bige; and (ii) the Dianguan Acquisition should have been listed as a related party transaction based on Liang's special relationship with Tan through companies in which Tan is a majority investor or owner, including Woofoo Equity and Taiyun Capital.

185.   Furthermore, while the 2018 20-F discussed several "Risk Factors," the 1934 Act Defendants failed to adequately warn investors that certain "Risk Factors" had already materialized at the time of the annual report.

186.   First, the 2018 20-F warned that "[a]dvertisements on our mobile applications may subject us to penalties and other administrative actions:"

> We cannot assure you that all the advertisements shown on our mobile applications are true, accurate, appropriate and in full compliance with applicable

laws and regulations. ***For example, advertisers on our mobile applications, or their agents, may use measures that are designed to evade our monitoring, such as providing inauthentic material that does not match the actual advertisement, or supplying advertising which is superficially compliant but nevertheless is linked to one or more webpages that feature noncompliant advertising content. In addition, our employees responsible for reviewing advertisements may not fully understand the relevant laws and regulations or may be inappropriately influenced by the advertisers. In each case, we may still be held responsible for noncompliant advertising content.*** We include clauses in most of our advertising contracts requiring that all advertising content provided by advertising customers must comply with relevant laws and regulations. ***Pursuant to the contracts between us and the relevant advertising agents or advertising customers, they are liable for all damages to us caused by their breach of such representations. However, there can be no assurance that we will be able to successfully enforce our contractual rights.***

187.   The statements contained in ¶ 186 *supra* were materially false and misleading because the Company: (i) had set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to be able to sell non-compliant ads; (ii) was already violating the applicable advertising laws and regulations and thus the ramifications were not a matter of if, but when; and (iii) materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

188.   Second, the 2018 20-F warned that because "[w]e generate a substantial majority of our revenues from advertising and marketing[,] [a] decline in our advertising and marketing revenue could harm our business:*"*

We generated a substantial majority of our revenues from advertising and marketing services in 2016, 2017 and 2018. When we first commenced our business, we collaborated with various third-party advertising platforms to place

advertisements on our mobile applications. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. This system will serve to power our advertising solutions while reducing the use of third-party advertising platforms.*** We have limited experience in operating the programmatic advertising system and in acquiring our own advertising agents and advertising customers. We may not be able to establish our own sales personnel to effectively and efficiently acquire and retain advertising agents and advertising customers. The effectiveness of our programmatic advertising system may not perform as expected and achieve widespread acceptance by advertising customers.

Our advertising customers for our programmatic advertising system are comprised of advertising agents and end advertisers. . . . ***If we fail to retain existing advertising customers or ensure that their advertising spend with us remains at similar or increased levels or attract new advertising customers to advertise on our platform, our business, results of operations and financial condition may be materially and adversely affected.***

189.    The statements contained in ¶ 188 *supra* were materially false and misleading because: (i) the Company acquired an advertising agent in February 2018 to reduce the oversight Baidu had been providing which had prevented non-compliant ads from running; (ii) any enhancement in the Company's ability to monetize user traffic was actually primarily related to its increased ability to sell non-compliant ads; and (iii) a material number of the Company's customers were unqualified advertisers who were purchasing non-compliant ads and thus the revenue generated from those customers inevitably would decrease when, not if, the non-compliant ads became public.

190.    Third, the 2018 20-F warned that "[n]on-compliance with law on the part of third parties with which we conduct business could disrupt our business and adversely affect results of our operation and financial condition:"

Third parties with which we conduct business, such as content providers, advertising agents, advertising customers and merchandise suppliers, may be subject to regulatory penalties or punishments because of their regulatory compliance failures or may be infringing upon other parties' legal rights, which may, directly or indirectly, disrupt our business. ***Although we conduct review of legal formalities and certifications before entering into contractual relationships with third parties, and take measures to reduce the risks that we may be exposed***

*to in case of any non-compliance by third parties, we cannot be certain whether such third party has violated any regulatory requirements or infringed or will infringe any other parties' legal rights.*

191.    The statement contained in ¶ 190 *supra* was materially false and misleading because: (i) the measures the Company had taken to reduce its risk included setting up separate teams with different processes and procedures for qualified versus unqualified advertisers and placing riskier ads in lower tier cities where there was less regulatory scrutiny; (ii) even though the Company had measures in place to decline non-compliant ads, the advertiser or the employees who were responsible for those ads could contact the reviewing department for a second manual review and allow the ads on the QTT App manually; and (iii) the Company was already aware or recklessly disregarded that certain advertisers had already violated regulatory requirements or infringed other parties' legal rights. Until July 2020, the 1934 Act Defendants never disclosed to investors that a substantial amount of Qutoutiao's revenue was being generated from ads by unqualified advertisers which were not compliant with the applicable Chinese regulations or that they were managing the risk of losing that revenue by reducing the chance that they would get caught by state regulators, rather than by simply not putting risky advertisements on the QTT App.

192.    Additionally, the 2018 20-F included certifications under Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Wang and L. Li that: (1) "*this report does not contain any untrue statement of a material fact or omit to state material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;" (2) "*the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report*;" and (3) that these Defendants were "responsible for

establishing and maintaining disclosure controls and procedures."

193.     The 2018 20-F also included certifications under Section 906 of SOX by Defendants Wang and L. Li that, "***the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company***."

194.     The statements contained in ¶¶ 192-193 *supra* were materially false and misleading because: (i) Qutoutiao was not able to generate sufficient revenue to meet its targets unless it allowed unqualified advertisers to advertise on the QTT App due to its strategy of targeting lower tier cities in China; (ii) the true benefits of, and reasons for, replacing the Company's third-party advertising agent with a related party, Dianguan, and bypassing that third-party's oversight of the content and quality of advertisements was to generate revenue from risky advertisements; (iii) the Company had created separate teams for dealing with qualified advertisers, whose advertisements were largely compliant with applicable Chinese regulations and thus low-risk, and unqualified advertisers, and that the "high-risk" team (which was disbanded after the CCTV Exposé) outsourced nearly all of its advertisement screening to contractors who conducted minimal due diligence on their clients; (iv) as a result, the Company would place on the QTT App, risky advertisements whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or which linked to illegal online gambling platforms; (v) as a result, the Company would face increasing regulatory scrutiny and reputational harm; (vi) as a result, the Company's advertising revenue was reasonably likely to decline; (vii) the Company was reporting RMB 620 million more in revenue to the SEC than its subsidiaries did in aggregate to the SAMR; and (viii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects, were materially misleading and/or lacked a reasonable basis. After the Company's risky advertisements came to light during the CCTV

Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

### 6. First Quarter 2019 Financial Results (May 20-21, 2019).

195. On May 20, 2019, Qutoutiao announced its first quarter 2019 financial results in a press release ("1Q19 Earnings Release"), that was later filed as Exhibit 99.1 to a Form 6-K signed by Defendant Wang, touting its revenue growth:

- **Net revenues** *increased 373.3% year-over-year* to RMB1,118.8 million (US$166.7 million), *within the Company's guided range* between RMB1,100.0 million and RMB1,120 million.

* * *

*Advertising and marketing revenues* were RMB1,087.2 million (US$162.0 million) in the first quarter of 2019, *a significant increase of 371.3%* from RMB230.7 million *in the first quarter of 2018, primarily due to increases in the Company's user base, time spent and ability to monetize user traffic*.

196. The statements contained in ¶ 195 *supra* were materially false and misleading because: (i) the increase in net revenues, specifically advertising and marketing revenues, was primarily due to the increase in ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) the Company's increased ability to monetize user traffic was primarily related to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; and (iii) Qutoutiao and Wang materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue

was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

197.    In addition, the 1Q19 Earnings Release quoted Defendant Tan as stating, "[f]or Qutoutiao, *one of our initiatives to further differentiate content is the 'Trusted Source Program' that offers high quality and reliable information on health-related topics*."

198.    The statement contained in ¶ 197 *supra* was materially misleading because the Company's "Trusted Source Program" lulled users into trusting content on the QTT App, particularly health-related content, leading them to click on misleading and non-compliant health-related ads. Qutoutiao was thus materially misrepresenting the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

199.    The following day, May 21, 2019, the Company held its first quarter 2019 financial earnings conference call ("1Q19 Earnings Call") to discuss its quarterly results with analysts. During the call, in response to a question by analyst Zhijing Liu of UBS regarding revenue guidance and competition, Defendant Wang stated, in relevant part:

> [O]n the revenue guidance, I'd like to say that so far in 2019 in terms of the advertising market, the demand side has been a little soft and given the overall macro environment. On the other hand there has been a lot of incremental supply from various companies and therefore putting a lot of pressure on pricing. For the rest of 2019 I think there is still a lot of uncertainty on the overall – in terms of the overall market condition. ***But we are pretty sure that our own operating efficiency***

*was steadily improved on the video platform side and also on the algorithm side. That will mitigate some of the pricing pressure.*

200.     In addition, in response to a question by analyst Xueru Zhang of 86Research about

QTT's key advertising categories, Defendant Tan stated during the 1Q19 Earnings Call:

> Comparatively e-commerce has been stronger but the overall market pricing is still under a lot of pressure overall for all categories. So I think what we can do is really on the platform side, *so we cannot control the market pricing but what we can do is to improve our own billing platform and also the targeting algorithm*. In that regard we think we are in a better position compared with many competitors exactly because we are a younger platform. For a more mature platform they have been operating for a very long time. All the internal optimization has been pushed to the limit. So what affects their pricing is really the market. *For us the optimization is far from perfect and therefore we think on optimization in the coming months we'll make up a lot of shortfall from the market pricing pressure*.

201.     The statements contained in ¶¶ 199-200 *supra* were materially misleading because

despite the Company's steadily improving "operating efficiency" and optimization of its platform

and targeting algorithm, a material number of risky ads were still being placed on the QTT App

manually. Qutoutiao and Tan were thus materially misrepresenting the strength of the Company's

business model and ability to generate growing, sustainable revenues without selling risky

advertisements that violated applicable Chinese regulations. After the Company's risky

advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge

just how much its reputation and revenue was impacted until the end of the Class Period, when it

was forced to disclose that its revenue did not grow YOY for the first time in its history as a result

of its "remedial measures" which included "removing misleading or inappropriate" ads from the

QTT App.

### 7.     Second Quarter 2019 Financial Results (September 4-5, 2019).

202.     On September 4, 2019, Qutoutiao announced its second quarter 2019 financial

results in a press release ("2Q19 Earnings Release"), that was later filed as Exhibit 99.1 to a Form

6-K signed by Defendant Wang, touting its revenue growth:

- ***Net revenues increased 187.9% year-over-year*** to RMB1,385.9 million (US$201.9 million), ***within the Company's guided range*** between RMB1,380 million and RMB1,420 million.

* * *

***Advertising and marketing revenues*** were RMB1,358.0 million (US$197.8 million) in the second quarter of 2019, ***a significant increase of 209.2%*** from RMB439.2 million ***in the second quarter of 2018, primarily due to increases in the Company's user base, time spent and ability to monetize user traffic***.

203.    The statements contained in ¶ 202 *supra* were materially false and misleading because: (i) the increase in net and advertising revenues was primarily due to the increase in ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) the Company's increased ability to monetize user traffic was primarily related to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; and (iii) Qutoutiao and Wang materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

204.    In addition, the 2Q19 Earnings Release quoted Defendant Tan as stating, "[o]n the Qutoutiao side, ***we continue to improve our content quality and enhance our compliance standards and capabilities which are well recognized by regulators***."

205.    Defendant Tan expanded on his statements about compliance the following day, September 5, 2019, during the Company' second quarter 2019 financial earnings conference call ("2Q19 Earnings Call") with analysts:

As we all know, compliance requirements for Internet content have tightened up considerably this year. ***We have one of the best track records in compliance among all the sizeable newsfeed players in the space as we have put in significant efforts from the very beginning in building our content compliance teams and capabilities***.

> ***Last month, we expanded our compliance personnel by adding a team based in Tianjin, which will strengthen our content review and monitoring. We have recently been granted the Internet news license, which is the first for a nonstate-owned company since 2017 and the first and only one in Shanghai, representing an official recognition of our efforts in content quality and compliance as well as our leading market position.***

206.    The statements contained in ¶¶ 204-205 *supra* were materially false and misleading because: (i) any enhancement or strengthening of the Company's "compliance standards and capabilities" did not include disbanding the team dealing with unqualified advertisers or stopping the manual override of ads being flagged and rejected as non-compliant that allowed such ads to still be placed on the QTT App; (ii) from its inception, the Company's "content compliance teams" had been allowing non-compliant ads to run and had only begun tightening its control of ad screening and removing some vulgar content after the state-run media outlet, The Paper, became a shareholder in July 2019; and (iii) that the Company was granted an Internet news license that had to do with The Paper becoming a shareholder and the improvements it agreed to make with regard to its complaint, not based on its prior efforts in compliance. Until July 2020, the 1934 Act Defendants never disclosed to investors that a substantial amount of Qutoutiao's revenue was being generated from ads by unqualified advertisers which were not compliant with the applicable Chinese regulations or that they were managing the risk of losing that revenue by reducing the chance that they would get caught by state regulators, rather than by simply not putting risky advertisements on the QTT App.

207.    Defendant Tan also discussed Qutoutiao's growth and the optimization of its ad platform during the 2Q19 Earning Call:

The overall digital advertising market is experiencing weakness this year due to the supply/demand imbalance and the weak macro conditions. Despite a much tougher operational environment, *we're delivering one of the fastest growth rates in the industry*.

We continue to diversify our monetization avenues by growing contributions from casual games and live streaming, which have been increasing their share of group revenues.

*Looking longer term, as we are far from realizing our monetization potential, our focus undoubtedly continues to be optimizing the efficiency of our ad platform*, which will drive structurally higher ARPU.

208.   Defendant Wang added:

*We have significant potential to further drive our monetization by improving the efficiency of our proprietary advertising platform, which we built last year*.

As the business grows, which diversifies our advertising inventories through the investment in technology and the accumulation of data, we will be able to enhance the bidding system and the targeting algorithms to close that gap between us and the established players.

*In the meantime, we are deepening our existing customer relationships as we build better understanding of our customers and deliver better results as well as expanding into more advertiser industries to better match the ever-diversifying ad inventories that are being added onto our platform.*

209.   The statements contained in ¶¶ 207-208 *supra* were materially false and misleading because: (i) the Company's fast growth was primarily due to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; (ii) despite optimizing the efficient of the Company's ad platform, a material number of risky ads were still being placed on the QTT App manually; and (iii) Qutoutiao, Tan and Wang materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations despite the slowing macroeconomy in China. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included

"removing misleading or inappropriate" ads from the QTT App.

### 8.    Third Quarter 2019 Financial Results (December 3, 2019).

210.    On December 3, 2019, Qutoutiao announced its third quarter 2019 financial results in a press release ("3Q19 Earnings Release"), that was later filed as Exhibit 99.1 to a Form 6-K signed by Defendant Zhu, touting its revenue growth:

- ***Net revenues increased 44.0% year-over-year*** to RMB1,406.9 million (US$196.8 million), compared to RMB1,385.9 million in the previous quarter, ***and were above the Company's guidance***.

                                    * * *

***Advertising and marketing revenues*** were RMB1,381.6 million (US$193.3 million) in the third quarter of 2019, ***an increase of 54.1%*** from RMB896.5 million ***in the third quarter of 2018, primarily due to increases in the Company's user base, time spent and ability to monetize user traffic, and, to a lesser extent, the launch of our new integrated and customized marketing solution services to our customer***.

211.    Defendant Tan provided additional detail about the Company's new marketing solutions services as "stepping up the monetization efficiency of [its] proprietary advertising platform" later that day during its third quarter 2019 financial earnings conference call ("3Q19 Earnings Call") with analysts, stating, in relevant part:

> ***We're also stepping up the monetization efficiency of our proprietary advertising platform by transitioning into an OCPC system, which is supported by strong AI and data capabilities as well as close partnerships with our customers, built on mutual trust and our consistent delivery of value-added services***. In comparison to the traditional CPC system, it has the benefit of further de-risking advertising customers budgeting process by offering more precise and tailored traffic allocations taking into account customers overall return requirements.
>
> ***This allows customers to increase spending with even better results and allows us to accelerate the evolution of our ad tech, as we keep optimizing the process, enhancing our core competitive advantage and deepening our client relationships over time***.

212.    Following Defendant Tan's remarks, Defendants Wang and Zhu added with regard to the Company's growth and ability to monetize, "[s]equentially, however, ***we have seen growth***

*on a like-for-like basis, consistent with seasonal tailwinds and structural improvement in our ability to monetize*."

213.    The statements contained in ¶¶ 210-212 *supra* were materially false and misleading because: (i) the increase in net and advertising revenues and "growth on a like-for-like basis" was primarily due to the increase in ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) the Company's increased ability to monetize user traffic was primarily related to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; (iii) the Company's "stepping up [of] the monetization efficiency of [its] proprietary advertising platform" simply allowed more risky ads to be placed on the QTT App as more users deemed the risky ads to be relevant by clicking on them; and (iv) Qutoutiao, Tan, Zhu and Wang materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

### 9.    Fourth Quarter 2019 Financial Results (March 18, 2020)

214.    On March 18, 2020, Qutoutiao announced its fourth quarter 2019 financial results in a press release ("4Q19 Earnings Release"), that was later filed as Exhibit 99.1 to a Form 6-K signed by Defendant Zhu, touting its revenue growth:

- *Net revenues increased 25.0% year-over-year* to RMB1,658.4 million (US$238.2 million), compared to RMB1,406.9 million in the previous quarter, *and were above the high end of the Company's guided range*.

* * *

***Advertising and marketing revenues*** were RMB1,588.5 million (US$228.2 million) in the fourth quarter of 2019***, an increase of 27.3%*** from RMB1,247.9 million ***in the fourth quarter of 2018, primarily due to increases in the Company's user base and ability to monetize user traffic***.

215.    Defendant Tan is quoted in the 4Q19 Earnings Release as saying, "[w]e closed fiscal year 2019 with a strong fourth quarter with ***all key operating metrics trending in the positive direction on a quarter-to-quarter basis***."

216.    The statements contained in ¶¶ 214-215 *supra* were materially false and misleading because: (i) the increase in net and advertising revenues, a key operating metric, was primarily due to the increase in ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) the Company's increased ability to monetize user traffic was primarily related to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; and (iii) Qutoutiao and Zhu materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

217.    Later that day, the Company held its fourth quarter 2019 financial earnings conference call ("4Q19 Earnings Call") to discuss its quarterly results with analysts. During the call, Defendant Tan touted the Company's revenue growth and enhanced monetization efficiency:

> ***In the fourth quarter our revenues grew by 25% year-on-year*** despite marked headwinds and the negative impact of media suspension, which monthly

hurt the third quarter of 2019, but lasted into the first half of the first quarter. The gradual recovery from the suspension was partly by choice as we had taken the law as an opportunity to revamp product design and upgrade content, while recalibrating the long-term strategy.

> **Driving the growth was not just expanded user growth, user base, but also crucially an enhanced monetization engine as we have observed better ad conversion metrics which are structural in nature. The sequential improvement in ARPU was also reflective of the enhanced monetization efficiency.** Most of our adverts are performance based, which are better positioned as a subsector than the traditional brand based or impression-based segments.

218.    Defendant Zhu similarly touted Qutoutiao's revenue growth and enhanced

monetization efficiency during the 4Q19 Earnings Call:

> **Our revenues grew by 25% year-on-year** during the quarter to reach RMB 1,660 million which is also an 18% sequential improvement from the third quarter of 2019. **The growth has been driven by enhanced monetization efficiency** and the user base expansion with DAU averaging over 45 million during the quarter representing a 48% increase year-on-year.

* * *

> First, we expect monetization efficiency to further improve as our ongoing efforts and investments bear fruit. **Upgraded algorithms and OCTC offerings which as Eric [Tan] mentioned are some of the key step ups we achieved, which will enable us to increase the sophistication and the value add of our service to our advertising customers, aided by deeper understanding of our users and the availability of richer advertising content formats, through our various different product offerings.**

219.    Defendant Tan similarly stated in response to a question from Nelson Cheung

acting on behalf of analyst Alicia Yap of Citigroup during the question-and-answer portion of the

4Q19 Earnings call regarding the Company's revenue guidance:

> **So as long as we can offer superior ROIs for our customers' investment, the natural result would be increased budget on Qutoutiao. So we have seen healthy trends in terms of revenue growth and better monetization efficiency, starting from the latter half of Q4 2019 and this trend continued in Q1 before the coronavirus outbreak.**

220.    The statements contained in ¶¶ 217-219 *supra* were materially false and misleading

because: (i) the revenue growth was primarily due to the increase in ads whose claims could not be

substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) the Company's "enhanced" or "better" monetization efficiency simply allowed more risky ads to be placed on the QTT App as more users deemed the risky ads to be relevant by clicking on them; and (iii) Qutoutiao and Tan materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations despite the slowing macroeconomy in China. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

### 10.    Fiscal Year 2019 Financial Results (April 23, 2020).

221.    On April 23, 2020, Qutoutiao filed with the SEC a form 20-F, reporting its fiscal year 2019 earnings ("2019 20-F"). The 2019 20-F was signed by Defendant Tan certifying that "[Qutoutiao] meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized [Defendant Tan] to sign this annual report on its behalf."

222.    The Company's 2019 20-F made materially false and/or misleading statements and omissions about its strategy of targeting users in lower tier cities in China, stating in relevant part:

> ***Since our inception, we have strategically targeted users from lower tier cities in China because of the enormous long-term growth opportunities in this underserved market, given the significant underpenetration of mobile phones as well as the significant under-usage of mobile applications.*** We believe that mobile users in lower-tier cities tend to have a slower pace of life and spend more time on the Internet given limited offline entertainment venues. ***Moreover, they enjoy rapidly growing disposable income and bear much lower financial burden due to lower housing prices and living expenses. These factors have given rise to a significant need for mobile entertainment while also creating high monetization***

*potentials.* Users from lower-tier cities tend to have different interests and preferences in comparison to users from tier-1 and tier-2 cities. Qutoutiao's light entertainment-oriented and easily digestible content is designed to resonate with such users and provides us with a significant advantage to capture this underserved market.

* * *

*Our rapidly increasing and engaged user base has provided us with strong monetization potentials.* We currently generate revenue primarily by providing advertising and marketing services. We place advertisements on the main pages, topic pages as well as content pages of our mobile applications. When we first commenced our business, we collaborated with various third-party advertising platforms to place advertisements on our mobile applications and derived a large percentage of our revenues from a limited number of customers. *To reduce the concentration risk and to build our in-house advertising platform which was becoming necessary in order to support the rapid growth of our business, we acquired an advertising agent in February 2018 that operated a programmatic advertising system. Upon full integration with our internal resources and with continuous R&D investments, we have developed it into a technology driven system that has powered our advertising solutions while reducing the use of third-party advertising platforms.*

223.    The statements contained in ¶¶ 221-222 *supra* were materially false and misleading because: (i) the "enormous long-term growth opportunities" and "high" or "strong," "monetization potentials" in lower tier cities had much less to do with the high number of users in those cities having more time and disposable income to spend on the internet and far more to do with the high number of unqualified advertisers who wanted to run non-compliant ads in those cities because regulators were more lenient and users were less aware of their rights as consumers in those cities; (ii) detailing how the Company needed an "in-house advertising platform…to support the rapid growth of [its] business," without disclosing that the need was actually primarily related to the high number of advertisers it could sell non-compliant ads to after replacing Baidu with Dianguan in February 2018; and (iii) Qutoutiao materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation

and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

224.    The 2019 20-F also touted that the Company's **"*net revenues ha[d] increased rapidly* from RMB517.1 million in 2017 to RMB3,022.1 million in 2018, and further to RMB5,570.1 million (US$800.1 million) in 2019."** The majority of this revenue derived from advertising as the Company stated in the 2019 20-F:

> *After acquiring an advertising agent in February 2018 that operated a programmatic advertising system and developing it into our proprietary technology driven advertising platform through internal integration and continuous R&D investment, we managed to considerably reduce our reliance on third-party advertising platforms such as Baidu.* Prior to our acquisition of this advertising agent in February 2018, we engaged this advertising agent to serve as our sales agent in selling our advertising and marketing solutions to other second-tier advertising agents and end advertisers. *These second-tier advertising agents and end advertisers were and still are our customers as they have chosen our mobile applications to place their advertisement, and our performance obligation has been to provide the underlying advertising display services to them.*

225.    The statements contained in ¶ 224 *supra* were materially false and misleading because: (i) the Company's "rapidly" increased revenues were based on a significant number of ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) the Company acquired an advertising agent in February 2018 to reduce the oversight Baidu had been providing which had prevented non-compliant ads from running; (iii) in order to meet the Company's "performance obligation" to its end advertiser customers, it set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to sell non-compliant ads; and (iv) Qutoutiao materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the

CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

226.    With regard to the Company's "Monetization" capabilities, the 2019 20-F stated, in relevant part:

> As our business grew rapidly and substantially, it made perfect sense to start building our own distribution capabilities, i.e., an in-house advertising platform. ***The benefit of owning an in-house advertising platform is not only enhanced monetization efficiency as we can improve advertising technology for better matching of supply and demand which results in higher average revenue per user (ARPU), it also allows our business to become independent and obtain long-term viability.***
>
> The opportunity came in February 2018 when an advertising agent which operated a programmatic advertising system became available for sale, and we successfully acquired this agent. Before the acquisition in February 2018, the Group engaged certain advertising customers through this third-party advertising agent. At the time of acquisition, it had built up a good technical base as it owned several intellectual properties, which were valuable assets for us to further develop our proprietary advertising platform related technology. ***By integrating this system with our internal resources and continuous R&D investments, we have developed it into a fully-fledged and technology driven advertising exchange capable of not only monetizing internet media traffic generated in-house but also that originating from third-party media platforms.***
>
> Currently, our programmatic advertising system utilizes a bidding system for advertising customers to bid for the targeted audience on mainly our platform. ***Our programmatic advertising system considers a wide range of parameters to determine which advertisement to show, including price bid, predicted click-through rate, predicted user conversion metrics and content relevance, to dynamically maximize our advertising customer's return on investment (ROI) as well as our revenue potential. Our advertising technology aims to maximize our revenue potential by rewarding the more relevant advertisement with a more prominent position, despite the potentially lower price bid of such advertisement.*** We actively monitor the advertisements placed to help ensure their relevance.
>
> Customers for our programmatic advertising system are comprised of advertising agents and end advertisers. ***We have our own sales personnel who are responsible for supporting and monitoring the performance of advertising agents and to attract advertising customers to use our programmatic advertising system directly***. We enter into standard agreements with advertising agents generally for a

term of one year. ***Our advertising agents are responsible for identifying end advertisers, confirming payments and setting up accounts on our programmatic advertising system for advertising customers. We provide ongoing training to advertising agents to help them become familiarised [sic] with the functionalities and capabilities of our programmatic advertising system. These advertising agents are responsible for collecting and submitting the relevant documentation and licenses from advertising customers for our approval to open accounts on our programmatic advertising system, and are also liable for any infringement of third-party rights or violation of regulatory requirements caused by advertisements placed by their end advertisers.***

227.    In addition, the 2019 20-F noted with regard to the Company's ability to monetize in the "Key Factors Affecting [the Company's] Results of Operations," in relevant part:

Our expanding user base, which has been attracting an increasing number of advertising agents and advertising customers, has provided a solid basis for us to achieve a high monetization capability. ***To endeavor towards such a goal, we have taken concrete steps, such as improving the efficiency of our platform, to drive advertising conversion, which involves algorithm improvement driven by data collection and analytics and conversion to an oCPC system over the course of 2019***.

228.    The statements contained in ¶¶ 226-227 *supra* was materially false and misleading because: (i) the Company's enhancing or maximizing of its ability to monetize user traffic was actually primarily related to its increased ability to sell non-compliant ads after acquiring an advertising agent, Dianguan, to replace Baidu in February 2018; (ii) the Company's sales personnel's responsibilities were different for qualified versus unqualified advertisers in order to be able to sell non-compliant ads; (iii) regardless of the terms of its agreements with advertising agents, the Company would also face increasing regulatory scrutiny and reputational harm from any ads that violated the relevant regulatory requirements; and (iv) Qutoutiao materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the

Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

229.    The 2019 20-F specifically touted Qutoutiao's mission "to deliver quality and relevant content to users, and content sourcing, management and recommendation" as "core focuses of [its] operations," including with regard to advertising and content screening technology:

- **Advertising.** ***Our advertising technology enables advertising customers to bid for audience and automatically deliver relevant, targeted promotional links to users.*** Our system rewards more relevant advertisements with more prominent positions, despite the potentially lower priced bids of such advertisements. Our audience segmentation technology helps ensure the relevance of advertisements shown to users by analyzing their interests through browsing activity, viewed content and commenting history. In addition, we have the ability to predict click-through rates for advertisements using logistic regression, gradient boosting decision tree and linear and nonlinear modeling algorithms. Enhanced precision of these click-through rate projections can help maximize the cost effectiveness of customers' advertising budgets. Our oCPC system further takes into consideration customers' overall return requirements by assessing their desired end results in the context of their budgets and the availabilities of relevant advertising inventories, providing a wholistic solution to their marketing needs rather than a simple product amid their marketing strategy.

- **Content Screening Technology.** Our text screening system screens information based on pre-set keywords. ***We utilize artificial intelligence to identify inappropriate or objectionable content from images, speeches and videos, significantly increasing efficiency over manual review. We also apply deep learning methods to analyze complex visual content. Through big data and continuous training, our system is able to monitor and identify objectionable visual content with a high degree of accuracy. The screening system automatically declines content that does not meet the standards of our platform and flags suspicious content for manual review by our content management team.***

230.    The statements contained in ¶ 229 *supra* were materially false and misleading because: (i) misleading or illegal ads were being delivered as part of the "relevant, targeted promotional links to users;" (ii) different processes and procedures were being applied to advertising content such that any declined ads could be manually allowed on the QTT App; and

(iii) Qutoutiao materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

231.    Lastly, the 2019 20-F disclosed the "Transactions with Companies Controlled by or Affiliated with Mr. Tan" as follows:

> *We paid Shanghai Yinnuo Management Consulting Co., Ltd., or Yinnuo Management, a company controlled by Mr. Eric Siliang Tan, service fees in the amount of RMB16.8 million in 2017.* Such service fees related to costs charged by Yinnuo Management for financial accounting support, office space and certain other administrative support provided to us. No amount was due to Yinnuo Management in connection with these service fees as of December 31, 2017. We have since developed all relevant functions internally and leased office space for our operations that were previously provided by Yinnuo Management and we currently do not expect to pay service fees to Yinnuo Management for such functions or office space in the future.
>
> *We received RMB29.6 million in service fees from AdIn Media (Shanghai) Co., Ltd., or AdIn Media, a company in which Mr. Eric Siliang Tan indirectly owns a minority interest and in which he was a key management personnel, in 2018.* Such fees related to agent and platform service provided to AdIn Media by facilitating advertising customers to display advertisements with AdIn Media. We also received fees in the amount of RMB4.5 million for providing advertising and marketing services to AdIn Media in 2018. As of September 30, 2018, Mr. Tan was no longer a key management personnel of AdIn Media, and thus AdIn Media ceased to be our related party.
>
> *We provided advertising and marketing services to several companies controlled by Mr. Eric Siliang Tan, mainly Shanghai Tujin Internet Technology Co., Ltd., and charged service fees of RMB473.2 million (US$68.0 million) in the fiscal year ended December 31, 2019.*
>
> *We entered into a cost-per-impression (CPM) arrangement for advertisement placement by our advertising customers with Shanghai Mengjia Internet Technology Co., Ltd., or Shanghai Mengjia, a media platform company controlled by Mr. Eric Siliang Tan, in 2019.* The total service fee charged by

Shanghai Mengjia amounted to RMB35.6 million (US$5.1 million) for the fiscal year ended December 31, 2019.

> **We entered into a game cooperation agreement with Shanghai Ruiti Internet Technology Co., Ltd., or Shanghai Ruiti, a game developing company in which Mr. Eric Siliang Tan's controlled entity has significant influence on.** The total service fee we paid to Shanghai Ruiti in relation to the arrangement amounted to RMB6.8 million (US$1.0 million) for the fiscal year ended December 31, 2019.

232.    The statements contained in ¶ 231 *supra* were materially false and misleading because: (i) the transactions with companies controlled by or affiliated with Tan also include transactions involving the Mengtui App, Fangce and the Shihui Miao App based on Tan's ownership stakes in Taiyun Capital, and Bige; (ii) while the 2019 20-F disclosed that the Company "provided advertising and marketing services" to multiple "companies controlled by" Tan, only Tujin is identified without reference to the Mengtui App; and (iii) the Dianguan Acquisition should have been listed as a related party transaction based on Liang's special relationship with Tan through companies in which Tan is a majority investor or owner, including Woofoo Equity and Taiyun Capital.

233.    Furthermore, while the 2019 20-F discussed several "Risk Factors," the 1934 Act Defendants failed to adequately warn investors that certain "Risk Factors" had already materialized at the time of the annual report.

234.    First, the 2019 20-F warned that "[a]dvertisements on our mobile applications may subject us to penalties and other administrative actions:"

> We cannot assure you that all the advertisements shown on our mobile applications are true, accurate, appropriate and in full compliance with applicable laws and regulations. ***For example, advertisers on our mobile applications, or their agents, may use measures that are designed to evade our monitoring, such as providing inauthentic material that does not match the actual advertisement, or supplying advertising which is superficially compliant but nevertheless is linked to one or more webpages that feature noncompliant advertising content. In addition, our employees responsible for reviewing advertisements may not fully understand the relevant laws and regulations or may be inappropriately***

*influenced by the advertisers. In each case, we may still be held responsible for noncompliant advertising content.* We include clauses in most of our advertising contracts requiring that all advertising content provided by advertising customers must comply with relevant laws and regulations. *Pursuant to the contracts between us and the relevant advertising agents or advertising customers, they are liable for all damages to us caused by their breach of such representations. However, there can be no assurance that we will be able to successfully enforce our contractual rights.*

235.    The statements contained in ¶ 234 *supra* were materially false and misleading because the Company: (i) had set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to be able to sell non-compliant ads; (ii) was already violating the applicable advertising laws and regulations and thus the ramifications were not a matter of if, but when; and (iii) materially misrepresented the strength of its business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

236.    Second, the 2019 20-F warned that because "[w]e generate a substantial majority of our revenues from advertising and marketing[,] [a] decline in our advertising and marketing revenue could harm our business":

> We generated a substantial majority of our revenues from advertising and marketing services in 2017, 2018 and 2019. When we first commenced our business, we collaborated with various third-party advertising platforms to place advertisements on our mobile applications, and derived a large percentage of our revenues from a limited number of customers. *To reduce the concentration risk and to build our in-house advertising platform which was becoming necessary in order to support the rapid growth of our business, we acquired an advertising agent in February 2018 that operated a programmatic advertising system. Upon full integration with our internal resources and with continuous R&D investments, we have developed it into a technology driven system that has*

*powered our advertising solutions while reducing the use of third-party advertising platforms*. Given our short history, we have limited experience in operating the programmatic advertising system and in acquiring our own advertising agents and advertising customers. We may not be able to recruit sufficient sales personnel to effectively and efficiently acquire and retain advertising agents and advertising customers. The effectiveness of our programmatic advertising system may not perform as expected and achieve widespread acceptance by advertising customers.

Our advertising customers for our programmatic advertising system are comprised of advertising agents and end advertisers. . . . *If we fail to retain existing advertising customers or ensure that their advertising spend with us remains at similar or increased levels or attract new advertising customers to advertise on our platform, our business, results of operations and financial condition may be materially and adversely affected.*

237.    The statements contained in ¶ 236 *supra* were materially false and misleading because: (i) the Company acquired an advertising agent in February 2018 to reduce the oversight Baidu had been providing which had prevented non-compliant ads from running; (ii) any enhancement in the Company's ability to monetize user traffic was actually primarily related to its increased ability to sell non-compliant ads; and (iii) a material number of the Company's customers were unqualified advertisers who were purchasing non-compliant ads and thus the revenue generated from those customers inevitably would decrease when, not if, the non-compliant ads became public.

238.    Third, the 2019 20-F warned that "[n]on-compliance with law on the part of third parties with which we conduct business could disrupt our business and adversely affect results of our operation and financial condition:"

Third parties with which we conduct business, such as content providers, advertising agents, advertising customers and merchandise suppliers, may be subject to regulatory penalties or punishments because of their regulatory compliance failures or may be infringing upon other parties' legal rights, which may, directly or indirectly, disrupt our business. *Although we conduct review of legal formalities and certifications before entering into contractual relationships with third parties, and take measures to reduce the risks that we may be exposed to in case of any non-compliance by third parties, we cannot be certain whether such third party has violated any regulatory requirements or infringed or will*

*infringe any other parties' legal rights*.

239.     The statement contained in ¶ 238 *supra* was materially false and misleading because: (i) the measures the Company had taken to reduce its risk included setting up separate teams with different processes and procedures for qualified versus unqualified advertisers and placing riskier ads in lower tier cities where there was less regulatory scrutiny; (ii) even though the Company had measures in place to decline non-compliant ads, the advertiser or the employees who were responsible for those ads could contact the reviewing department for a second manual review and allow the ads on the QTT App manually; and (iii) the Company was already aware or recklessly disregarded that certain advertisers had already violated regulatory requirements or infringed other parties' legal rights. Until July 2020, the 1934 Act Defendants never disclosed to investors that a substantial amount of Qutoutiao's revenue was being generated from ads by unqualified advertisers which were not compliant with the applicable Chinese regulations or that they were managing the risk of losing that revenue by reducing the chance that they would get caught by state regulators, rather than by simply not putting risky advertisements on the QTT App.

240.     Fourth, the 2019 20-F warned that "[n]egative publicity about us, our services, operations and our management has adversely affected and may adversely affect our reputation and business in the future:"

> We have from time to time received negative publicity, including negative Internet and blog postings about us, our services, operations and our management. For example, a short seller recently published a report on December 10, 2019 with certain negative opinions on us, such as, our related party transactions, our products, our financial conditions and our acquisition decision, which could have a negative impact on our reputation, despite the fact ***that the short seller's claims were based on factual errors and misunderstanding of business and accounting rules, which we subsequently explained in a detailed public response***. On January 18, 2020, the same short seller published another report on us, containing mostly the same negative opinions regarding us, and ***we have reported in detail the unfounded allegations in this report to the audit committee of our board of directors***. Negative publicity could be the result of malicious intentions, direct or

indirect anti-competitive behaviours or, as in the above-mentioned case, agendas of short sellers. We may even be subject to government or regulatory investigation as a result of such third-party conduct or misconduct and may be required to spend significant time and incur substantial costs to defend ourselves against such third-party conduct or misconduct, and we may not be able to conclusively refute each of the allegations within a reasonable period of time, or at all. ***Our brand and reputation may be materially and adversely affected as a result of any negative publicity, which in turn may cause us to lose market share, users, advertising customers and other third parties we conduct business with. As a result, our financial position or operating results may be adversely affected and the price of the ADSs may decline***.

241.    The statements contained in ¶ 240 *supra* was materially false and misleading because: (i) not all of the claims in either of the Wolfpack Report were based on factual errors, a misunderstanding of the Company's business, or were unfounded, as subsequently demonstrated by the CCTV Exposé and the Company's disastrous 3Q20 financial results; (ii) the truth about the Company's actions that allowed misleading or illegal ads on the QTT App would have a greater materially adverse effect on the Company's brand and reputation than any negative publicity would; and (iii) the Company's inability to sell non-compliant ads after the CCTV Exposé would cause more lost customers, a greater adverse effect on the Company's financial position and operating results, and a larger decline in the price of the Company's ADSs than any negative publicity would.

242.    Additionally, the 2019 20-F included certification under Section 302 of SOX by Defendants Tan and Zhu that: (1) "***this report does not contain any untrue statement of a material fact or omit to state material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;" (2) "***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report***;"

and (3) that these Defendants were "responsible for establishing and maintaining disclosure controls and procedures."

243.     The 2019 20-F also included certification under Section 906 of SOX by Defendants Tan and Zhu that, "***the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company***."

244.     The statements contained in ¶¶ 242-243 *supra* were materially false and misleading because: (i) Qutoutiao was not able to generate sufficient revenue to meet its targets unless it allowed unqualified advertisers to advertise on the QTT App due to its strategy of targeting lower tier cities in China; (ii) the true benefits of, and reasons for, replacing the Company's third-party advertising agent with a related party, Dianguan, and bypassing that third-party's oversight of the content and quality of advertisements was to generate revenue from risky advertisements; (iii) the Company had created separate teams for dealing with qualified advertisers, whose advertisements were largely compliant with applicable Chinese regulations and thus low-risk, and unqualified advertisers, and that the "high-risk" team (which was disbanded after the CCTV Exposé) outsourced nearly all of its advertisement screening to contractors who conducted minimal due diligence on their clients; (iv) as a result, the Company would place on the QTT App, risky advertisements whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or which linked to illegal online gambling platforms; (v) as a result, the Company would face increasing regulatory scrutiny and reputational harm; (vi) as a result, the Company's advertising revenue was reasonably likely to decline; (vii) the Company was reporting RMB 620 million more in revenue to the SEC than its subsidiaries did in aggregate to the SAMR; and (viii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects, were materially misleading and/or lacked a

reasonable basis. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

**11.    First Quarter 2020 Financial Results (June 4, 2020).**

245.    On June 4, 2020, Qutoutiao announced its first quarter 2020 financial results in a press release ("1Q20 Earnings Release"), that was later filed as Exhibit 99.1 to a Form 6-K signed by Defendant Zhu, touting its revenue growth:

- ***Net revenues increased 26.2% year-over-year*** to RMB1,411.8 million (US$199.4 million), ***within the Company's guided range*** of RMB1,400 million and RMB1,420 million.

* * *

***Advertising and marketing revenues*** were RMB 1,364.0 million (US$192.6 million) in the first quarter of 2020, an ***increase of 25.5%*** from RMB1,087.2 million ***in the first quarter of 2019, primarily due to increases in the Company's user base, time spent and ability to monetize user traffic.***

246.    The 1Q20 Earnings Release also quoted Defendant Tan as stating:

We executed strongly ***in the first quarter of 2020 by growing our revenues over 26% year on year***, ***this is a strong testament to our commitment and ongoing effort in enhancing the core capabilities of our advertising platform***, especially given the unprecedented challenges facing our economy and the industry.

247.    The statements contained in ¶¶ 245-246 *supra* were materially false and misleading because: (i) the increase in net revenues, specifically advertising and marketing revenues, was primarily due to the increase in ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) the Company's increased ability to monetize user traffic was primarily related to its increased ability to sell non-compliant ads after replacing Baidu with Dianguan in

February 2018; (iii) any enhancement to "the core capabilities of [the Company's] advertising platform" simply allowed more risky ads to be placed on the QTT App as more users deemed the risky ads to be relevant by clicking on them; and (iv) Qutoutiao, Zhu and Tan materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

248.    Later that day, the Company held its first quarter 2020 financial earnings conference call ("1Q20 Earnings Call") to discuss its quarterly results with analysts. During the call, Defendant Zhu similarly touted Qutoutiao's revenue growth:

> Our **net revenues grew 26% year-on-year during the quarter** and reached RMB 1.410 billion, the exact figure of which is slightly **above the midpoint of our guided range**. The growth can be broken down to a 22% user base expansion in terms of DAU, which grew from 38 million to 46 million and a 4% improvement in monetization in terms of ARPU, which increased from RMB0.33 to RMB0.34.
>
> Given the extraordinary environment we are in this year, what we have achieved so far has not come easily. As Eric has already explained, **the increase in ARPU during these trying times are a testament to the investment that we have made in advancing our technological capabilities**. **This has given us an edge in delivering better results to our customers at a time when everyone is taking a more cautious approach towards marketing and are actively looking for more measurable advertising channels.**

249.    Later during the 1Q20 Earnings Call, Defendant Zhu reiterated the Company's technological edge with performance advertisers in response to a question analyst Vicky Wei of Citigroup regarding the Company's guidance and ability to capture advertising dollars that was different from its competitors:

So – but as we have said before, ***our strength in performance-based ads will help us to get through difficult times as our customers are increasingly looking for direct and more measurable results***.

250.     Defendant Tan detailed for the market precisely what the Company's technological edge was during the 1Q20 Earnings Call, stating in relevant part:

> Since we established our proprietary machine learning platform, we have been able to accelerate R&D on algorithms, which are fundamental to improving both user experience and monetization. ***Being able to process and test large quantities of data has meant a steepening of the learning curve for task-specific algorithms, which lead to much better tailored push of high-quality content as well as adverts***.
>
> ***This enables an overall upgrade of user experience because if both the actual content and the adverts can be interesting and relevant for the user and the interchange between the two is seamless and well timed***, the whole experience can feel very smooth and enjoyable as opposed to feeling intruded or interrupted. This makes a material difference in today's world where competition for Internet users' attention and time spent is fierce. Machine learning capabilities also underpin the development of our OCPC system which relies on the ability to estimate and manage performance metrics along the ad conversion value chain.
>
> ***In an OCPC system where the customer bids for results further downstream, taking on less ad performance risk, the full capability of the system is to translate the bid into variables further upstream and leverage the intelligence gathered from large quantities of data to more precisely allocate ad inventories to where they can deliver maximum ultimate utility. For the system to do a good job, it needs to be capable of analyzing and understanding each and every piece of ad inventory as well as follow intermediary links and steps leading to the fulfillment of the end customer request.***
>
> ***Essentially, the OCPC system plays the role of a super agent bidding on behalf of advertising customers, delivering optimal end results at lower and more stable costs. We have driven deeper coverage of customer spending with second degree OCPC realization which is now at 50% plus in comparison to 30% earlier this year.***

251.     The statements contained in ¶¶ 248-250 *supra* were materially false and misleading because: (i) the increase in net revenues was primarily due to the increase in ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) any advancement of the Company's "technological capabilities" simply allowed more risky ads to be placed on the QTT

App as more users clicked on such ads, deeming them relevant to the Company's proprietary machine learning advertising platform; and (iv) Qutoutiao, Zhu and Tan materially misrepresented the strength of the Company's business model and ability to generate growing, sustainable revenues without selling risky advertisements that violated applicable Chinese regulations. After the Company's risky advertisements came to light during the CCTV Exposé in July 2020, it still did not acknowledge just how much its reputation and revenue was impacted until the end of the Class Period, when it was forced to disclose that its revenue did not grow YOY for the first time in its history as a result of its "remedial measures" which included "removing misleading or inappropriate" ads from the QTT App.

### 12. Second Quarter 2020 Financial Results (September 21-22, 2020).

252.    On September 21, 2020, Qutoutiao announced its second quarter 2020 financial results in a press release ("2Q20 Earnings Release"), that was later filed as Exhibit 99.1 to a Form 6-K signed by Defendant Zhu, touting its revenue growth:

- ***Net revenues increased 4.0% year-over-year*** to RMB1,441.0 million (US$204.0 million), compared to RMB1,411.8 million in the first quarter of 2020, ***above the high end of the Company's guided range*** of RMB1,410 million and RMB1,430 million.

* * *

***Advertising and marketing revenues*** were RMB1,378.1 million (US$195.1 million) in the second quarter of 2020, an increase of 1.5% from RMB1,358.0 million in the second quarter of 2019, ***primarily due to an increase in the Company's average DAUs, partially offset by a decrease in average daily time spent by DAUs***.

253.    The following day, September 22, 2020, the Company held its second quarter 2020 financial earnings conference call ("2Q20 Earnings Call") to discuss its quarterly results with analysts. During the call, Defendant Zhu reiterated the Company's revenue growth:

***Our revenues for the second quarter*** was RMB1,441 million, which ***represents an increase of 4% year-on-year and some moderate sequential growth as well. This has been driven by user base expansion*** as our DAU has increased

by 11% year-on-year, albeit partially offset by the weaker ARPU which saw a 6% decline reflecting the difficult advertising markets and the generally weaker economy in the second quarter.

254.    Defendant Tan also assured investors of the strength of the Company's monetization efficiency and financial performance during the 2Q20 Earnings Call:

> ***We see enhanced monetization efficiency*** which has allowed us to drive down engagement costs while increasing ARPU. We feel encouraged by the strategic progress we have been making especially with respect to content and technology and we expect them to be the key pillars supporting our future developments.
>
> ***Our financial performance is also trending in the right direction*** which keeps us further confident that we are taking the right steps.

255.    Next, Defendant Tan fielded a question by analyst Vicky Wei of Citigroup regarding how long the CCTV impact will last:

> [T]he CCTV Reports caused the Qutoutiao application to be taken off the App stores for about two weeks. We have observed negative impacts on our business operations and financial performance due to this in Q3 and we are still evaluating the extent of such impacts. But as we have said, ***we have already seen a trend of recovery and we are seeing the growth and recovery will continue in Q4***.

256.    The statements contained in ¶¶ 252-255 *supra* were materially false and misleading because Qutoutiao, Zhu and Tan continued to materially misrepresent: (i) the strength of the Company's business model and ability to generate growing, sustainable revenues despite no longer being able to sell risky advertisements that violated applicable Chinese regulations; and (ii) the extent to which the CCTV Exposé would continue to impact the Company's business operations and financials.

257.    Next, Defendant Tan addressed the CCTV Exposé during the 2Q20 Earnings Call by stating, in relevant part:

> On July 16, 2020, China Central Television ("CCTV") reported in its Annual Consumer Rights Show ("3.15 Consumer Night") that certain advertisements placed by third-party advertising agents on Qutoutiao exaggerated the health benefits of certain food and diet products and promoted activities that

may involve online-gambling (the "CCTV Report", or "the Report").

> *In response to the issues raised by the Report, the Company promptly took appropriate measures such as immediate suspension of all employees involved in these advertisements, including the person in charge of advertising operations*, *stricter management of all third-party advertising agents, enhancement of content management capabilities in identifying misleading or inappropriate advertisements, and the launch of an easy-to-use and easy-to-find complaint channel on the home screen of Qutoutiao so that users can file their complaints with us on any advertisement placed on our app*. The Qutoutiao app was temporarily removed from several major Android-based app stores in China after the CCTV Report but was reinstated on July 31, 2020.

> *The Company has observed negative impacts on its business operation and financial performance due to the above incidents in the third quarter of 2020 and is still evaluating the extent of such impacts. The Company highly appreciates the importance of strict compliance with all applicable laws and regulations and believes the measures taken by the Company are critical to protect the interests of its users and investors in the long term.*

258. Defendant Tan further stated during the 2Q20 Earnings Call:

> It is our commitment to bring real value to our users and it is against our – that less than 100% compliant content should appear. The adding of these comes with some inherent risks that the player has to manage and which we are also truly aware of. *We have always closely followed rules and regulations of the industry and the country*.

259. And during the question-and-answer portion of the 2Q20 Earnings Call, Defendant Tan responded to a question from analyst Hans Chung of KeyBanc about the cause of the Company's materially lower revenue guidance by stating:

> So, regarding your first question on Q3 guidance, I think, as we have said in the prepared remarks, *both us and our advertising partners are quite cautious about the CCTV Reports and we took extraordinary measures to make sure that our content ads are compliant*. I would say that *we went above and beyond with the laws and regulations as well as industry practice would normally require in China*.

260. The statements contained in ¶¶ 257-259 *supra* were materially false and misleading because: (i) the Company was aware of the misleading or illegal ads long before the CCTV Exposé yet failed to disclose them to investors and took no "extraordinary" or just "appropriate" measures until CCTV outed them at its 3.15 Consumer Night; (ii) the Company failed to disclose that it was

not just suspending random, unconnected employees who were involved with misleading or illegal ads but an entire team known within the Company as focusing on unqualified advertisers with its own established processes and procedures for vetting ads that was different than those of the team focusing on qualified advertisers; (iii) Defendants were well aware but failed to disclose the extent of the impact on the Company's business operation and financial performance of disbanding the entire team dealing with unqualified advertisers and losing that revenue stream; and (iv) that the Company "highly appreciates the importance of strict compliance with all applicable laws and regulations" did not stop the Company from previously failing to strictly comply until finally forced to do so.

### B.  Additional Allegations of Scienter

#### 1.  Qutoutiao and the Insider Defendants

261.  As alleged herein, Qutoutiao and the Insider Defendants acted with scienter in that they either knew or recklessly disregarded the fact that the public documents and statements issued or disseminated in the name of the Company to the investing public were materially false and misleading, and that they substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Insider Defendants, by virtue of their receipt of information reflecting the true facts regarding Qutoutiao, their control over, and/or receipt and/or modification of Qutoutiao's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Qutoutiao, participated in the fraudulent scheme alleged herein.

262.  Indeed, the Offering Documents themselves stated that: "[the Company's] visionary and experienced management team has been essential in driving the growth of [its] business. [Qutoutiao's] co-founder and executive chairman, [Defendant Tan], together with [its]

co-founder, director and chief executive officer, [Defendant L. Li], are the foundational pillars of [the] company and have delivered strong business results leveraging their over 20 years of combined Internet industry experience. Other members of [the Company's] senior management team are also instrumental in growing [the Company's] business with their proven track record in their areas of expertise. Co-founders and majority of the senior management team members have worked together previously, further enhancing the stability and consistency of [Qutoutiao's] vision."

263.    As part of Qutoutiao's "visionary and experienced management team," the Insider Defendants failed to set an appropriate "tone at the top" of the Company to prevent non-compliant ads from being run on the QTT App, which led to increasing regulatory scrutiny during the Class Period and which then caused Qutoutiao reputational harm as well as a material decline in advertising revenue. According to the Former Channel Manager, the Company's culture under Defendant Tan's leadership was "aggressive," and had a "wolf spirit culture" (狼性文化) in which employees had aggressive targets and overtime work was considered normal. Similarly, the Former Sales Director described Tan's leadership style as "pursuing profits" (要求赚钱) and "aggressive" (激进) and the Company's performance evaluation system as consisting of "you-can-reach-it-if-you-jump goals" (正常指标), which were reachable but still challenging goals, and "leap goals" (跳一跳指标), which were nearly impossible to reach.

264.    Thus, given this aggressive, profit-driven culture, Qutoutiao and the Insider Defendants had actual knowledge or were reckless in not knowing that the Company was allowing non-compliant ads to run on the QTT App, and that as a result, the Company would face increasing regulatory scrutiny and reputational harm.

265.    For example, as discussed previously, public scrutiny of QTT and its competitors

due to its targeting of consumers in lower tier Chinese cities to evade regulators was evident from the beginning. In March 2018, the People's Daily reported that Jinri Toutiao, a competitor of Qutoutiao, had been accused of targeting second and third-tier cities with false advertising because regulators there were more lenient.[51] Likewise, on September 14, 2018, (the first day of the Class Period) Fengyu Network Technology ("Fengyu") received a citizen report that Black Five advertisements had been spotted on iQiyi, one of the largest online video sites in the world, but only in third-tier cities.[52] Fengyu also noted that Black Five advertisements had been seen on Qutoutiao – "mostly placed in third-tier cities and below."

266. Just a little over two months into the Class Period, on November 28, 2018, a CCTV reporter accused Qutoutiao of encouraging users to "surf the news and earn coins" while showing numerous advertisements containing vulgar content.[53] Specifically, Qutoutiao and other media platforms were not strictly adhering to the guidelines regarding advertiser quality and content in the 2016 "Interim Measures for the Administration of Internet Advertising," which states that certain special products and services may not be published without review, and that internet advertisements should be easily identifiable and clearly labeled so as not to trick users.[54]

---

[51] *"Today's Toutiao" is finally on "Toutiao"! Ignoring the supervision and starting this "black business"! 240 million users*, CCTV FINANCE (Mar. 29, 2018, 11:02 PM), http://finance.people.com.cn/n1/2018/0329/c1004-29897407.html.

[52] Flower Zijian, *Iqiyi has a large number of black five types of ads: visible to users in cities below the third tier*, PHOENIX TECHNOLOGIES (Sept. 14, 2018, 12:04 PM), https://www.ithome.com/html/it/383152.htm. Black five advertisements are advertisements concerning pharmaceuticals, medical devices, breast enhancement products, weight loss products, and height enhancement products. Pursuant to Article 19 of the Advertising Law of China, it is illegal to run advertisements for these products "in disguised form such as introducing health or health knowledge."  represent the information as "health information."

[53] Xibei, *What's the crux of the stubborn disease and cancerous "five black" advertising headlines?*, SOHU (July 19, 2020, 11:37 PM), https://www.sohu.com/a/408546792_99986883.

[54] *Platform to make money by brushing news: interesting headlines articles with vulgar content and eyeballs,* SOHU (Nov. 29, 2018, 4:31 PM), https://www.sohu.com/a/278591460_223764.

Subsequently, the Internet Society of China, a non-governmental organization that is supported by several Chinese government ministries and functions as a self-regulatory organization for internet firms, reprimanded Qutoutiao and urged it to make rectifications.

267.    Then, in a lawsuit filed by Yang Bin ("Yang") in January 2019 against Qutoutiao's Chinese entity Jifen, it came to light that Qutoutiao had begun displaying gambling advertisements on its platform at least two years prior.[55] Yang alleged that from clicking on a link found on Qutoutiao's platform, he spent CNY 1.15 million after entering a gambling website. The case was ultimately dismissed by the Chengdu Intermediate People's Court after Jifen successfully argued that, while it was Qutoutiao's network service provider, advertisements were automatically pushed out based on big data analyses, and due to the volume of advertisements, it could not review all advertisements before they were released.[56]

268.    On May 15, 2019, the Xinhua News Agency accused Qutoutiao and other online earning information applications of not having the proper internet news information services qualifications and criticized the platforms for primarily providing "news" that was curiosity-seeking, gossip, and other spam and that the platforms' approach to capturing users by claiming "watching the news can make money" was just an advertising stunt.[57]

269.    Then on June 18, 2019, the Shanghai Municipal Market Supervision Bureau ("Shanghai Regulator") summoned Qutoutiao and another online news aggregator "for a talk,"

---

[55] Jiang Yuqing, *The funny headline that relies on "poisonous blood" to continue life is different from Pinduoduo. Why is the fate different?*, BT FINANCE (July 20, 2020, 9:57 AM), https://tech.sina.com.cn/i/2020-07-20/doc-iivhuipn4001538.shtml.

[56] Civil Judgment of the First Instance of the Internet Infringement Liability Dispute between Yang Bin and Shanghai Jifen, *Yang Bin v. Shanghai Jifen Culture Commc'n Co., Ltd*. Chuan 0107 Minchu No. 6651 (Aug. 15, 2019), https://www.qixin.com/lawsuit/d27a20dd-8114-420d-924e-bdd1e083ee2e/5e170b10ebf5516c5400f411.

[57] Xibei, *What's the crux of the stubborn disease and cancerous "five black" advertising headlines?*, SOHU (July 19, 2020, 11:37 PM), https://www.sohu.com/a/408546792_99986883.

stating that a preliminary investigation had found "severely illegal advertisements" on their platforms, and "sternly warned" the companies about their behavior.[58] The Shanghai Regulator demanded a stricter pre-advertisement review process to better prevent false and illegal advertisements on its platform, requiring Qutoutiao to strengthen its examination and regulation of advertisements before they were published and to work to "earnestly safeguard the legitimate rights and interests of consumers."

270.    In addition, the Insider Defendants had actual knowledge or were reckless in not knowing that there were two separate and independent teams managing the Company's advertising content, one of which dealt with qualified advertisers who were largely compliant and ran low-risk advertisements and one of which dealt with unqualified advertisers whose advertisements were "risky." This is particularly true here because the team dealing with risky advertisements was disbanded by the Company after the July 2020 CCTV Exposé.

271.    Notably, while investors like Lead Plaintiff have suffered substantial damages as a result of the fraud alleged herein, Defendant Tan was able to purchase a $37 million mansion on Harbor Island in Newport Beach, CA in October 2019 – mere months after Principal Shareholders were able to sell their shares in the SPO at artificially inflated prices, pocketing proceeds of nearly $67 million.[59]

### 2.    The Underwriter Defendants

272.    It is well understood within the investment banking and financial communities that an underwriter's role (and duty) is to ensure that all material information is included in the offering

---

[58] *Shanghai Municipal Market Supervision Bureau interviewed Qutoutiao, Huitoutiao and related advertising alliances*, CHINA CONSUMER NETWORK (June 24, 2019), https://www.ncnews.com.cn/xfzpt/zhyw/201906/t20190624_1446925.html.

[59] James McClain, *Chinese Tech Billionaire Buys $37 Million Newport Harbor Mansion*, VARIETY (Oct. 30, 2019, 5:29 AM PT), https://variety.com/2019/dirt/moguls/chinese-tech-billionaire-buys-37-million-newport-harbor-mansion-1203388732/.

documents and that no material information is omitted that is needed to make the information provided therein not misleading. Moreover, that underwriter has an express duty to perform a reasonable due diligence investigation of the company for which they are selling securities, and to verify the accuracy of disclosure concerning the company's securities offerings.

273.    Further, the underwriter controls what information is in the Prospectus and it controls the dissemination of that information to potential investors. Thus, an underwriter such as the Underwriter Defendants named in this action, has ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Prospectus. It must either make full disclosure or not underwrite the offering if full disclosure is not provided.

274.    Any underwriter, such as the Underwriter Defendants named in this action, must know that investors expect the investment banks, whose names appear on the Prospectus, to perform a reasonable due diligence investigation of the issuing entity to ensure, to the best of their ability, that the Prospectus does not include any false or misleading statements of material information, nor omits any material information. The investment banks, by putting their names on the Prospectus, are communicating to investors that they have in fact undertaken a reasonable due diligence investigation and are making full disclosure of all material information in the Prospectus. Indeed, without having performed a reasonable due diligence investigation of the issuer, it would not be possible to make full disclosure.

275.    If an investment bank, based on its due diligence investigation of the issuer, believes that any of the information in the Prospectus is false or misleading, or omits material information, it has the authority and affirmative obligation to change the information, or if others refuse to change the information, then it should not underwrite the offering. But, if the investment bank allows its name (or names) to appear on the cover of the Prospectus, then it is communicating

to potential investors that it is satisfied, based on its reasonable due diligence investigation, that the Prospectus is accurate and not misleading.

276.    The Underwriter Defendants that underwrote the Company's IPO and/or SPO had control over the contents and dissemination of the IPO Prospectus and/or the SPO Prospectus. Their names are prominently featured on the cover of the Prospectus. The co-managing underwriters actively participated in creating the Prospectus, and investors expected that the Underwriter Defendants ensured that the Prospectus provided appropriate disclosure of all material information.

277.    The Underwriter Defendants had a duty to independently conduct a due diligence investigation of Qutoutiao for the Offerings. All of the Underwriter Defendants claim to have special expertise relevant to the underwriting of the Company's Offerings and investors reasonably relied upon such expertise to ensure that a thorough due diligence investigation of Qutoutiao was conducted and full disclosure of all material information was made in the Offering Documents.

278.    Specifically, the information the Underwriter Defendants provide to the public emphasizes their purported high standards and generally assures investors about the quality of their work. For example, Defendant Citigroup's website boasts:

> We provide world-class solutions that are as diverse as the needs of the corporates, institutions, governments, and individual investors we serve in 160 countries and territories. The breadth, depth, and strength of our underwriting, sales and trading, and distribution capabilities span asset classes and currencies, sectors and industries, covering a vast array of products.
>
> On trading floors located in over 80 countries, we work around the clock to enrich the relationships, products, liquidity, and technology that define our market-making presence in North America, Asia, Europe, the Middle East, Africa and Latin America.
>
> Our research and analysis offer the highest-quality corporate, sector, economic, and geographical insights - from equity and fixed income research to market and product analysis — helping individual and institutional clients navigate a complex

global marketplace.[60]

279.    Similarly, Defendant Deutsche addresses its researching responsibilities claiming its "mission is to deliver high-quality, independent analysis that helps investors understand markets."[61] Defendant Keybanc touts its successes as an investment bank, highlighting its "highly regard[ed] research" and "IPO specialization." Further, discussing Keybanc's researching strengths, its website states:

> Keybanc [], one of the nation's leading providers of investment research, combines deep domain expertise with an interconnected research approach to identify dynamic companies capitalizing on opportunities in changing industries. By bringing multiple points of view to a company, industry and thematic shift, clients benefit through early identification, deeper insights and better investment decisions. Additionally, we go beyond traditional fundamental equity research, and augment our differentiated channel checks and industry contacts with deep quantitative analysis.[62]

280.    Defendant Jefferies touts its relevant success stating that, "[s]ince 2016, Jefferies acted as bookrunner in one in every five IPOs priced in the U.S." and "[s]ince 2016, Jefferies has book-run over 175 IPOs raising over $55 billion in proceeds."[63] Defendant Jefferies' website goes on to highlight the company's expertise, commitment and capabilities related to investment banking:

**Sector Expertise**

- Deep sector knowledge in investment banking that enables us to:
    - Best position our clients' investment thesis to achieve the optimal valuation on their equity offerings

---

[60] About Us, CITIGROUP INC., https://www.citi.com/mss/about/ (last visited Jan. 15, 2021).
[61] Our mission, DEUTSCHE BANK AG, https://www.dbresearch.com/PROD/RPS_EN-PROD/Our_mission/RPS_MISSION.alias (last visited Jan. 15, 2021).
[62] Businesses & Institutions, KEYBANC CAPITAL MARKETS INC., https://www.key.com/businesses-institutions/solutions/capital-markets/institutional-equities/equity-research.jsp (last visited Jan. 15, 2021).
[63] What We Deliver, JEFFERIES FINANCIAL GROUP INC., https://www.jefferies.com/InvestmentBanking/Restructuring-Advisors/2/284 (last visited Jan. 15, 2021).

- Best position our clients' credit profile to achieve the lowest yield on their debt offerings
- Demonstrate the most in-depth knowledge of potential buyers to maximize sale value for our clients

**Senior-Level Attention on Transactions**

- Senior-level commitment to our clients' transactions that enables us to:
  - Bring extensive experience in structuring our clients' transactions
  - Bring extensive experience to the advice we give our clients
  - Maximize the likelihood that transactions are completed flawlessly

281.    Further, Defendant Jefferies boasts about its abilities in investment banking research stating, in relevant part, "[s]ince the beginning of 2016, Jefferies has executed over 620 non-U.S. book-run financings and advisory transactions for clients based in 50 countries. Each region has its own unique mix of developed and emerging markets and Jefferies has built long-standing relationships with partners throughout the Americas, EMEA and Asia-Pacific."[64]

282.    Defendants UBS, CLSA, China Merchants, Haitong, and Lighthouse claim a special expertise with respect to offerings of this nature, which would cause an investor to reasonably believe that based on such expertise a due diligence investigation of Qutoutiao was conducted and full disclosure of all material information was made in the Offering Documents.

283.    Defendant UBS prides itself as "the first foreign invested securities firm in China with full licenses to conduct businesses including securities brokerage, securities investment consultancy, financial advisory related to securities trading and securities investment activities, securities underwriting and sponsoring, securities proprietary trading, securities asset management and distributing financial products."[65] UBS addresses its key focus as an investment bank and the

---

[64] Global Reach, JEFFERIES FINANCIAL GROUP INC., https://www.jefferies.com/InvestmentBanking/Investment-Banking-Global/2/942 (last visited Jan. 15, 2021).
[65] Media, UBS SECURITIES CO., LTD., https://www.ubs.com/global/en/media/archive/news-archive-ndp/en-20140217-b.html (last visited Jan. 15, 2021).

quality of its services, stating in relevant part:

> [W]e work with our clients to understand their business needs and provide ideas that help power growth. We recognize that our clients have an intimate understanding of their own business. We complement their insights by offering them access to some of the best minds in capital markets, financing and restructuring, as well as transactional expertise.

> [W]e apply the right research instruments for new evidence to deliver clear insights. Our team of economists, strategists and analysts provide the breadth, depth and originality of investment thinking.[66]

284.    Defendant CLSA pointedly claims to be "a leading provider of corporate finance and capital markets services in Asia." For example, CLSA's website states:

> Leveraging its unrivalled Asian network and direct links to China, CLSA's corporate finance and capital markets team…support the ambitions of Chinese corporates looking for offshore financing or acquisitions and global corporates seeking access to capital or assets in Asia.

> CLSA helps public and private corporations, financial institutions and government agencies strengthen their balance sheets and fund future growth while maximizing value for investors.[67]

285.    Defendant China Merchants tout their relevant achievements, stating:

> [It] has achieved stunning progress in capital markets []. In terms of IPO underwriting amount from 2016 to 2018, [China Merchants] ranked top 3 among Chinese securities firms and top 5 overall in the market, and furthermore, [it] has established the first-mover advantage and dominant position in the "New-Economy" companies' [Hong Kong] IPO market.[68]

286.    Defendant Haitong "boasting its well-established businesses" states:

> Haitong International is capable of providing great potentialities and a better platform for the development of equity research. Starting from 2019, the equity research of Haitong International has been fully interlinked with that of Haitong Securities and the research reports are published bilingually. The research coverage comprises nearly 200 Chinese concept stocks, 800 A stocks and 200 Taiwanese, Japanese, Indian and South Korean stocks. Its team is committed to providing

---

[66] Our business, UBS SECURITIES CO., LTD., https://www.ubs.com/global/en/investment-bank/about-us/business-areas.html (last visited Jan. 15, 2021).

[67] Corporate Finance & Capital Markets, CLSA, https://www.clsa.com/services/corporate-finance/ (last visited Jan. 15, 2021).

[68] Company Profile, CHINA MERCHANTS SECURITIES INTERNATIONAL COMPANY LIMITED, http://www.cmschina.com.hk/en/AboutUs/Info (last visited Jan. 15, 2021).

services catering to clients' needs as practicable as possible and excelling in terms of coverage, responsiveness and depth of contents. Based in China, Haitong International has invited 10 and 20 local analysts on board in Tokyo and Mumbai respectively who possess full knowledge of the local regulations, sectors and backgrounds of enterprises. In this way, Haitong International is strong to serve the local investors in the overseas markets and, through its engagement in Chinese, Japanese and Indian markets, it can provide better cross-border investment services in China.

Haitong International's analysts have been being granted awards from time to time by a number of authoritative institutions at home and abroad including Institutional Investor, Asiamoney and New Fortune. With its content-focus philosophy, the equity research team strives to provide timeliness and hands-on research to clients.[69]

287.    Defendant Lighthouse claims to be "China's leading new economy boutique investment bank, focusing on the new economy field, and is committed to becoming a partner of the top 1% new economy entrepreneurs' strategy and capital."[70] Lighthouse also touts its innovative abilities stating, in relevant part, "[i]t is neither afraid of complex competitive situations nor adheres to the usual universal understanding. Instead, through research in the spirit of disruptive innovation, it obtains an understanding of the nature of the business, market trends, key success factors and competition patterns, supplemented by strong execution, thus helping Customers break through the competitive situation and achieve leaps and bounds." Lighthouse's website provides transaction successes, boasting it provided "exclusive financial advisory services" leading to "Qutoutiao successful[] IPO."[71]

288.    As alleged herein, the Underwriter Defendants acted with scienter in that they either

---

[69]    Business    Overview,   HAITONG   INTERNATIONAL   SECURITIES   GROUP   LIMITED, https://www.htisec.com/en-us/global-equities (last visited Jan. 15, 2021).

[70] Company Profile, LIGHTHOUSE CAPITAL RECORD, http://lighthouse.hfsxw.cn/index.php?m=content&c=index&a=lists&catid=2 (last visited Jan. 15, 2021).

[71] *Qu Toutiao successfully IPO, Light Source Capital provides exclusive financial advisory services*, LIGHTHOUSE CAPITAL RECORD (Sept. 15, 2018), http://lighthouse.hfsxw.cn/index.php?m=content&c=index&a=show&catid=147&id=302.

knew or recklessly disregarded the fact that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, that such statements or documents would be issued or disseminated to the investing public, and the Underwriter Defendants substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Underwriter Defendants, by virtue of their receipt of information reflecting the true facts regarding Qutoutiao, their control over, and/or receipt and/or modification of Qutoutiao's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Qutoutiao, participated in the fraudulent scheme alleged herein.

289.    Additionally, the Underwriter Defendants knew or recklessly disregarded that QTT ran false or misleading advertising specifically targeting lower tier cities because regulators were more lenient in those cities, and as result would face increasing regulatory scrutiny and reputational harm. As discussed in ¶¶ [263-264], the Underwriter Defendants (who served as an underwriter for the IPO) were on notice and had a duty to conduct a due diligence investigation on the ads QTT was running. Likewise, as discussed in ¶¶ [263-265], the Underwriter Defendants (who served as an underwriter for the SPO) were on notice and had a duty to conduct a due diligence investigation on the ads QTT was running.

### C.    Loss Causation

290.    The five declines in Qutoutiao's share price during the Class Period as alleged herein are actionable. The timing and magnitude of the Company's share price declines on each of those days negates any inference that the losses suffered by Lead Plaintiff and the Class was caused by changed market conditions, macroeconomic or industry factors or Qutoutiao-specific facts unrelated to Qutoutiao, the Insider Defendants and the Underwriter Defendants' fraudulent

conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Qutoutiao and the Insider Defendants' fraudulent statements and the corresponding artificial inflation in Qutoutiao's securities prices and the subsequent significant decline in the value of Qutoutiao's securities when Qutoutiao and the Insider Defendants' prior acts of misconduct were revealed.

291.    At all relevant times, Qutoutiao, the Insider Defendants, and the Underwriter Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and the putative Class. Those statements were materially false and misleading by their failure to disclose a true and accurate picture of Qutoutiao's ability to monetize user traffic and sell compliant advertisements. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Qutoutiao securities to be artificially inflated. Plaintiff and other Class members purchased and/or acquired Qutoutiao securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

292.    Qutoutiao, the Insider Defendants, and the Underwriter Defendants were deliberately reckless in not knowing or turning a blind eye to the fact that the Company's business model was not sustainable as it was struggling to compete for advertisers. Nonetheless, Qutoutiao, the Insider Defendants, and the Underwriter Defendants made materially false and misleading public statements that provided false information to investors about the Company's capabilities and success. Thus, shares of the Company's ADSs continued to trade at levels artificially inflated by Qutoutiao, the Insider Defendants, and the Underwriter Defendants' misleading justifications for the negative information was revealed on March 29, 2019, April 3, 2019, December 10, 2019,

March 18, 2020 and July 15, 2020 which maintained the artificial inflation in the Company's share price until it was finally fully removed on December 16, 2020.

### 1.    Qutoutiao's March 29 and April 3, 2019 Partial Disclosures

293.    After the stock market closed on March 29, 2019, and just months after the IPO, the Company announced a follow-on SPO to sell new shares and raise additional capital. On April 3, 2019, the Company announced the pricing of the SPO. As the market absorbed the Company's need for a cash infusion so soon after its IPO, the Company's share price fell over 17% to close at $9.50 per share on April 4, 2019, on unusually heavy trading volume.

294.    According to Keith Noonan of The Motley Fool in an article entitled "Why Qutoutiao Stock Plummeted 42.8% in April" on May 10, 2019, the Company's "stock fell early in April following news that the Chinese internet company would raise money through a new share offering, and continued to trend lower as the month progressed."[72] Mr. Noonan explained that "'[r]aising funds through another share offering is dilutive, meaning it will reduce the earning power of the shares that had previously been on the market because there are more components among which to split profits." But he also noted that "[e]ntertainment content consumption continues to rise in China and around the globe, and there's considerable growth potential for product categories like curated news feeds and short-video platforms" which explains why "Qutoutiao has been posting some strong growth, nearly quadrupling its monthly active users to reach 93.8 million in the third quarter and boosting sales by 426% to hit $193 million."

### 2.    The December 10, 2019 Wolfpack Report Partial Disclosure

295.    The truth was further revealed on December 10, 2019 through a report published

---

[72] Keith Noonan, *Why Qutoutiao Stock Plummeted 42.8% in April*, THE MOTLEY FOOL (May 10, 2019, 9:13 AM), https://www.fool.com/investing/2019/05/10/why-qutoutiao-stock-plummeted-428-in-april.aspx.

by Wolfpack Research entitled "QTT: Fake Revenue, Non-Existent Cash, Undisclosed Related Parties." The Wolfpack Report alleged, among other things, that (1) Qutoutiao's "revenue is generated solely by the accounting department" so only RMB 798 million of its RMB 3.02 billion reported revenue is actual revenue and (2) the Company "exists to enrich its Founder and CEO, Eric Tan, and promote his VC fund's other ventures by creating its own in-house 'advertising agent' in order to direct significant amounts of ad traffic to undisclosed related parties owned by Tan" and remove restrictions that had been preventing the Company from doing so, thereby "perpetrat[ing] the unmitigated ad fraud that [Wolfpack] observed in [its] sample." On this news, the Company's share price fell 4% to close at $2.86 per share on December 11, 2019, on heavy trading volume.

296.    Qutoutiao responded to the Wolfpack Report on December 27, 2019, assuring investors that, among other things, the "statements in the Report are based on numerous factual errors and an overall misunderstanding of the Company's business" and "arrived at false conclusions after misquoting by a wide margin our publicly disclosed financial figures and making a series of unsubstantiated claims some of which can easily be proven to be fabrications" ("QTT Response").[73]

297.    Wolfpack Research published another report on January 17, 2020 to take into account certain claims in the QTT Response, recalculating the Company's actual revenue to be RMB 2.09 billion of the RMB 3.02 billion reported revenue.[74]

### 3.    Qutoutiao's March 18, 2020 Partial Disclosure

298.    The façade of a sustainable business model continued to crumble with the release

---

[73] *Qutoutiao Inc. Responds to the False and Misleading Report by Wolfpack Research*, QUTOUTIAO INC. (Dec. 27, 2019, 7:30 ET), http://www.globenewswire.com/news-release/2019/12/27/1964629/0/en/Qutoutiao-Inc-Responds-to-the-False-and-Misleading-Report-by-Wolfpack-Research.html.
[74] *QTT's Top 12 Lies and Omissions for the New Year*, WOLFPACK RESEARCH (Jan. 17, 2020), https://wolfpackresearch.com/qtts-top-12-lies-and-omissions-for-the-new-year/.

of the Company's financial reports for the fourth quarter and fiscal year ended December 31, 2019 ("4Q19") before the market opened on March 18, 2020 which revealed 40% higher net losses for the quarter ($79.2 million) than the fourth quarter of the prior year ($56.47 million). Investors at least found solace in the Company's revenue increasing to $238.2 million, up 25% YOY, driven by its advertising revenue of $228.2 million, up 27% YOY. Defendants claimed this revenue growth was due to its customer base improving, allowing the Company to monetize user traffic. On this news, the Company's share price fell nearly 23% to close at $3.29 per share on March 20, 2020, after two days of heavy trading.

### 4.    The July 15, 2020 CCTV Exposé Partial Disclosure

299.    However, the truth about the Company's revenue was revealed on July 15, 2020 when CCTV, China's state-controlled broadcaster, aired its high-profile annual show aimed at protecting consumers. That evening, the hosts of the CCTV Exposé stated that Qutoutiao had allowed unqualified institutions to push medical advertisements that exaggerated treatment effects, including, for example, an advertisement offering free weight-loss products valued at $14,300 that would help users lose more than 30 pounds a month. In addition, links in some of the Company's advertisements directed users to illegal online gambling platforms. Major Android app stores in China quickly removed the QTT App following the CCTV Exposé. On this news, Qutoutiao's share price fell over 24% to close at $2.79 per share on July 17, 2020, after two days of unusually heavy trading volume.

300.    As Jeremy Bowman at The Motley Fool pointed out on July 16, 2020, the price of Qutoutiao ADSs "fell after it was accused of running improper ads," including "misleading ads on its site."[75] While the Company immediately apologized and promised to do a better job of

---

[75] Jeremy Bowman, *Why Qutoutiao Stock Tumbled Today*, THE MOTLEY FOOL (July 16, 2020, 2:21 PM), https://www.fool.com/investing/2020/07/16/why-qutoutiao-stock-tumbled-today.aspx.

screening ads on its platform, the damage was done to the Company's reputation and ADS price.

### 5.    Qutoutiao's December 16, 2020 Class Period Ending Disclosure

301.    The truth was fully revealed after the market closed on December 16, 2020 when Qutoutiao reported disappointing 3Q20 financial results, including a YOY 19.7% drop in revenue and a 23.1% drop in advertising revenue "primarily due to the remedial measures undertaken by us in response to the report by China Central Television on certain advertisements placed by third-party advertising agents on [the QTT App], such as removing misleading or inappropriate advertisements from our applications, and the temporary removal of [the QTT App] from several major Android-based app stores in China from July 16, 2020 to July 31, 2020, which caused decreases in our average MAUs, average DAUs and average daily time spent by DAU." As the market absorbed this news, the Company's share price fell 24% to close at $1.90 per share on December 22, 2020, after four days of unusually heavy trading volume. This was a significant decline from QTT's IPO price of $7 per share and SPO price of $10 per share,

302.    Mr. Bowman at the Motley Fool noted on December 17, 2020 that the Company "has been struggling to recover after [CCTV] accused Qutoutiao of selling suspicious ads with false information at a high-profile consumer rights show back in July" and that the removal of the QTT App "from several major Android app stores for two weeks in July, in the aftermath of CCTV's accusations…led to a sharp downturn in the business during the July through September quarter."[76]

## VIII.    PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

303.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations

---

[76] Jeremy Bowman, *Why Qutoutiao Stock Dipped Today*, THE MOTLEY FOOL (Dec. 17, 2020, 4:47 PM), https://www.fool.com/investing/2020/12/17/why-qutoutiao-stock-dipped-today/.

or failed to disclose material facts; (b) the omissions and misrepresentations were material; (c) the Company's ADSs traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and (e) Lead Plaintiff and the other members of the Class purchased Qutoutiao securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

304.   At all relevant times, the market for Qutoutiao securities was efficient for the following reasons, among others: (a) Qutoutiao's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market; (b) during the Class Period, shares of Qutoutiao's ADSs were actively traded, demonstrating a strong presumption of efficiency; (c) as an SEC regulated issuer, Qutoutiao filed with the SEC periodic public reports; (d) Qutoutiao regularly communicated with public investors, including through regular disseminations of press releases on the major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (e) unexpected material news about Qutoutiao was rapidly reflected in and incorporated into Qutoutiao's ADSs price during the Class Period.

305.   As a result, the market for Qutoutiao securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Qutoutiao's ADSs. Under these circumstances, all purchasers or acquirers of Qutoutiao securities during the Class Period suffered similar injury through their purchase or acquisition of Qutoutiao securities at artificially inflated prices, and a presumption of reliance applies.

306.   In addition, Lead Plaintiff is entitled to a presumption of reliance under *Affiliated*

*Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## IX.    INAPPLICABILITY OF SAFE HARBOR

307.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. All of the specific statements pleaded herein were not identified as, and/or were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Company, the Insider Defendants, and the Underwriter Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Qutoutiao named under the 1934 Act who knew that those statements were materially false and misleading when made.

## X.    CLASS ALLEGATIONS

308.    Lead Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all person and entities that purchased, or otherwise acquired, Qutoutiao securities during the Class Period, and were damaged by the conduct asserted herein. Defendants and their immediate families and legal representatives, heirs, successors or assigns and any entity in which the Defendants named herein have, or had, a controlling interest, are excluded from the Class.

309.    The members of the Class are so numerous that joinder of all members is

impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class member is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands, of members of the proposed Class. Throughout the Class Period, between approximately 71.2 and 72.5 million shares of Qutoutiao securities were outstanding, owned and/or publicly traded on the NASDAQ by hundreds, if not thousands, of persons.

310.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual class members include whether:

(a)    Defendants violated the federal securities laws;

(b)    Defendants omitted and/or misrepresented material facts;

(c)    Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    With respect to Lead Plaintiff's 1934 Act claims, the Company, the Insider Defendants and the Underwriter Defendants, with deliberate recklessness, disregarded or turned a blind eye toward the fact that their Class Period statements were false and misleading;

(e)    The price of Qutoutiao securities was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

311.    Lead Plaintiff's claims are typical of those of the Class members because they each were similarly damaged by Defendants' wrongful conduct in violation of the federal securities laws.

312.     Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced in securities class action litigation. Lead Plaintiff has no interests that conflict with those of the Class.

313.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Lead Plaintiff knows of no difficulties in the management of this action that would preclude its maintenance as a class action.

## XI.     THE 1933 ACT CLAIMS

314.     Lead Plaintiff asserts strict liability claims under §§ 11, 12(a)(2) and 15 of the 1933 Act against Qutoutiao, the Director Defendants, and the Underwriter Defendants (the "1933 Act Defendants"), who signed and/or had authority over the contents of the Offering Documents issued in connection with the Company's Offerings. Lead Plaintiff's 1933 Act claims are not based on any allegation of deliberate or intentional misconduct, and Lead Plaintiff expressly disclaims any reference or reliance upon fraud allegations for such claims and these claims are entirely separate and distinct from the 1934 Act Claims asserted above. The 1933 Act Claims incorporate by reference Sections II (Statement Regarding Plaintiff's Investigation), III (Jurisdiction and Venue), IV (Parties), V (Claims Asserted), VI.C. (Defendants' Class Period Financial Statements Violated GAAP and Obscured Qutoutiao's True Financial Performance and Prospects), and X (Class Allegations) of this omnibus Complaint.

315.     The 1933 Act Claims arise out of Qutoutiao's approximately $85.8 million IPO of 13.8 million ADSs at $7.00 per share and approximately $31.0 million SPO of 3.3 million ADSs at $10 per share.

316.     On September 11, 2018, Qutoutiao filed its final amendment to the IPO Registration Statement with the SEC on Form F-1/A. The Company's IPO Registration Statement was declared effective on September 13, 2018. On September 14, 2018, Qutoutiao issued a press release

announcing the pricing of its IPO and that Defendants Citigroup, Deutsche, China Merchants, and UBS would be acting as "joint bookrunners" for the Offering, and Defendant KeyBanc would be acting as co-manager.[77] That same day, Qutoutiao filed its IPO Prospectus on Form 424B4 with the SEC, (collectively, the "IPO Documents").

317.    On March 29, 2019, Qutoutiao issued a press release announcing its proposed follow-on SPO, and named Defendants Citigroup, Deutsche, CLSA, Jefferies, Haitong and Lighthouse as "joint bookrunners" for the Offering.[78] On April 1, 2019, the Company filed its first and final amendment to its SPO Registration Statement on Form F-1/A. The SPO Registration Statement was declared effective shortly thereafter. On April 3, 2019, Qutoutiao filed its SPO Prospectus on Form 424B4 with the SEC, (collectively, the "SPO Documents").

318.    By the commencement of this action, Qutoutiao's ADSs closed at $2.42 per share on September 17, 2020, representing a 65.43% decline from the $7.00 per share IPO price and a 75.8% decline from the $10.00 per share SPO price. And on January 15, 2021, the QTT ADSs closed at $2.14 per share.

319.    Each of the Offerings was a firm-commitment offering, in which the Underwriter Defendants purchased shares of Qutoutiao and sold them to the investing public.

320.    Under applicable SEC rules and regulations, the Offering Documents were required to disclose known trends, events or uncertainties that they were having, and were reasonably likely to have, and their impact on Qutoutiao's continuing operations. The statements contained in ¶¶

---

[77] News Release, *Qutoutiao Inc. Announces Pricing of Initial Public Offering*, GLOBE NEWSWIRE (Sept. 14, 2018, 6:40 AM EDT), https://ir.qutoutiao.net/news-releases/news-release-details/qutoutiao-inc-announces-pricing-initial-public-offering.

[78] News Release, *Qutoutiao Inc. Announces Proposed Follow-on Public Offering of American Depositary Shares*, GLOBE NEWSWIRE (Mar. 29, 2019, 5:42 PM EDT), https://ir.qutoutiao.net/news-releases/news-release-details/qutoutiao-inc-announces-proposed-follow-public-offering-american.

321, 323, 325, 326, *infra*, were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing its preparation, thereby rendering the 1933 Act Defendants liable pursuant to the federal securities laws.

### A.   Materially False and Misleading Statements and Omissions in the IPO Documents.

321.   The IPO Documents contained multiple material misstatements regarding the Company's strategy of targeting users in lower tier cities in China, stating in relevant part that:

> *Since our inception, we have strategically targeted users from tier-3 and below cities in China because of the enormous opportunities in this underserved market*. As of the end of 2017, tier-3 and below cities had a population of 1,027 million each owning 0.5 mobile device on average (compared to a population of 363 million each owning 1.3 mobile devices on average in tier-1 and 2 cities), suggesting significant potential for further mobile penetration, according to the Analysys [sic] Report. *Mobile users in tier-3 and below cities tend to have a slower pace of life and spend more time on the Internet given limited offline entertainment venues. Moreover, they often enjoy fast increasing disposable income and lower financial pressures thanks to lower housing prices. These factors contribute to a significant need for mobile entertainment content while also create strong monetization potential*.

322.   However, the statements contained in ¶ 321 supra contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading because, the "enormous opportunities" and "strong monetization potential" in Tier-3 and Tier-4 cities had much less to do with the high number of users in those cities having more time and disposable income to spend on the internet and far more to do with the high number of unqualified advertisers who wanted to run non-compliant ads in those cities because regulators were more lenient and users were less aware of their rights as consumers in those cities.

323.   The IPO Documents also stated that the Company's "***net revenues have increased rapidly*** from RMB58.0 million (US$8.8 million) in 2016 to RMB517.1 million (US$78.1 million)

in 2017, and further from RMB107.3 million (US$16.2 million) in the six months ended June 30, 2017 to RMB717.8 million (US$108.5 million) in the same period in 2018." The majority of this revenue was derived from advertising, as the Company explained in the IPO Documents:

> Baidu, which is our largest customer and operates a third-party advertising platform, contributed 69.9%, 43.7%, 75.8% and 12.1% of our net revenues in 2016 and 2017 and the six months ended June 30, 2017 and 2018, respectively. Baidu also accounted for 92.6%, 59.8% and 30.5% of our accounts receivable as of December 31, 2016 and 2017 and June 30, 2018, respectively. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. We expect this system will allow us to reduce our reliance on third-party advertising platforms such as Baidu.*** Prior to our acquisition of this advertising agent in February 2018, we engaged such advertising agent to serve as our sales agent in selling our advertising solutions to other second-tier advertising agents and end advertisers. ***In 2017 and the six months ended June 30, 2018, 26.2% and 78.2% of our net revenues, respectively, were generated through this advertising agent. These second-tier advertising agents and end advertisers are our customers as they select our mobile applications to place their advertisement and our performance obligation is to provide the underlying advertising display services to them.***

324.    The statements contained in ¶ 323 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading by: (i) touting the Company's "rapidly" increased revenues without disclosing that a significant number of the advertisements that contributed to this revenue growth could not be substantiated and thus were considered false advertisements under applicable Chinese regulations or provided links to illegal online gambling platforms; (ii) noting the "programmatic advertising system" of Dianguan as a benefit of, and reason for, replacing the Company's third-party advertising agent, Baidu, without disclosing that the Company was seeking to avoid the oversight Baidu had been providing which had prevented non-compliant ads from running; (iii) explaining the Company's ability to monetize user traffic, as enhanced by its programmatic advertising system, without disclosing that any enhancement was actually primarily related to its increased ability to sell non-compliant ads;

and (iv) describing the Company's "performance obligation" to its end advertiser customers without disclosing that it set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to sell non-compliant and illegal ads.

325.   In addition, the IPO Documents note that the Company "currently generate[s] most of [its] revenue from advertising," so to "Enhance [the Company's] Monetization Capabilities":

> **We intend to enhance our advertising solutions by strengthening the performance of our proprietary programmatic advertising system**. We believe our strategic move to reduce the utilization of third-party advertising platforms and focus on expanding our advertising customer base and advertising agents directly will further boost our advertising revenue.

326.   With regard to "Monetization," the IPO Documents specifically stated that:

> **Our advertising technology aims to maximize our revenue potential by rewarding the more relevant advertisement with a more prominent position, despite the potentially lower price bid of such advertisement.** We actively monitor the advertisements placed to help ensure their relevance.
>
> Customers for our programmatic advertising system are comprised of advertising agents and end advertisers. **We have our own sales personnel who are responsible to support and monitor the performances of advertising agents and to attract advertising customers to use our programmatic advertising system directly.** We enter into standard agreements with advertising agents generally for a term of one year. **Our advertising agents are responsible for identifying end advertisers, confirming payments and setting up accounts on our programmatic advertising system for advertising customers. We provide ongoing training to advertising agents to familiarize them with the functionalities and capabilities of our programmatic advertising system. These advertising agents are responsible for collecting and submitting the relevant documentation and licenses from advertising customers for our approval to open an account on our programmatic advertising system, and are also liable for any infringement of third-party rights or violation of regulatory requirements caused by advertisements placed by their end advertisers.**

327.   The statements contained in ¶¶ 325-326 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading by: (i) detailing how the Company was enhancing or maximizing its ability to monetize user traffic, without disclosing that any enhancement was actually primarily related to its increased

ability to sell non-compliant ads after replacing Baidu with Dianguan in February 2018; (ii) describing the Company's sales personnel's responsibilities versus those of the third-party advertising agents without disclosing that it set up separate teams within QTT with different processes and procedures for qualified versus unqualified advertisers in order to be able to sell non-compliant ads; and (iii) claiming that the third-party advertising agents are liable for any ads that violate Chinese regulatory requirements without disclosing that the Company would also face increasing regulatory scrutiny and reputational harm.

328.   The IPO Documents specifically tout Qutoutiao's mission "to deliver quality and relevant content to users, and content sourcing, management and recommendation" as "core focuses of [its] operations," including with regard to advertising and content screening technology:

- **Advertising.** ***Our advertising technology enables advertising customers to bid for audience and automatically deliver relevant, targeted promotional links to users.*** Our system rewards more relevant advertisements with more prominent positions, despite the potentially lower priced bids of such advertisements. Our audience segmentation technology helps ensure the relevance of advertisements shown to users by analyzing their interests through browsing activity, viewed content and commenting history. In addition, we have the ability to predict click-through rates for advertisements using logistic regression, gradient boosting decision tree and linear and nonlinear modeling algorithms. Enhanced precision of these click-through rate projections can help maximize the cost effectiveness of customers' advertising budgets.

- **Content Screening Technology.** Our text screening system screens information based on pre-set keywords. ***We utilize artificial intelligence to identify inappropriate or objectionable content from images, speeches and videos, significantly increasing efficiency over manual review. We also apply deep learning methods to analyze complex visual content. Through big data and continuous training, our system is able to monitor and identify objectionable visual content with a high degree of accuracy. The screening system automatically declines content that did not meet the standards of our platform and flags suspicious content for manual review by our content management team.***

329.   The statements contained in ¶ 328 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading by

touting (i) the Company's advertising technology without disclosing that misleading or illegal ads were being delivered as part of the "relevant, targeted promotional links to users" and (ii) the Company's content screening technology without disclosing that different processes and procedures were being applied to advertising content such that any declined ads could be manually allowed on the QTT App.

330.    Furthermore, while the 1933 Act Defendants list numerous "Risk Factors" in the IPO Documents, they failed to adequately warn investors that certain "Risk Factors" had already materialized at the time of the IPO.

331.    First, the IPO Documents warned that "[a]dvertisements on our mobile applications may be subject us to penalties and other administrative actions":

> Under PRC advertising laws and regulations, we are obligated to monitor the advertising content shown on our mobile applications to ensure that such content is true, accurate and in full compliance with applicable laws and regulations. . . . However, ***for the determination of the truth and accuracy of the advertisements, there are no implementing rules or official interpretations, and such a determination is at the sole discretion of the relevant local branch of the State Administration for Market Regulation, or the SAMR (successor of SAIC and the State Food and Drug Administration), which results in uncertainty in the application of these laws and regulations***. . . .

> We cannot assure you that all the advertisements shown on our mobile applications are true, accurate, appropriate and in full compliance with applicable laws and regulations. ***For example, advertisers on our mobile applications, or their agents, may use measures that are designed to evade our monitoring, such as providing inauthentic material that does not match the actual advertisement, or supplying advertising which is superficially compliant but nevertheless is linked to one or more webpages that feature noncompliant advertising content. In addition, our employees responsible for reviewing advertisements may not fully understand the relevant laws and regulations or may be inappropriately influenced by the advertisers. In each case, we may still be held responsible for noncompliant advertising content.*** We include clauses in most of our advertising contracts requiring that all advertising content provided by advertising customers must comply with relevant laws and regulations. ***Pursuant to the contracts between us and the relevant advertising agents or advertising customers, they are liable for all damages to us caused by their breach of such representations. However, there***

*can be no assurance that we will be able to successfully enforce our contractual rights.*

*Violation of these laws and regulations may subject us to penalties, including fines, confiscation of our advertising income, orders to cease dissemination of the advertisements and orders to eliminate the effect of illegal advertisement. If an illegal advertisement featured on our mobile applications were to have excessive negative effects, our brand and reputation may be harmed, and PRC governmental authorities may pursue more severe penalties and administrative actions against us. PRC governmental authorities may even force us to terminate our advertising operation or revoke our licenses in circumstances involving serious violations. Such penalties may have a material and adverse effect on our business, results of operations and financial condition.*

332.    The statements contained in ¶ 331 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading: (i) declaring that how advertising laws and regulations are applied to ads is uncertain without disclosing that the Company was capitalizing on that uncertainty and relying on regulators not paying attention to non-compliant ads in Tier-3 and Tier-4 cities; (ii) explaining how advertisers could evade the Company's monitoring or how the Company's employees could unwittingly overlook a non-compliant ad without disclosing that it set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to be able to sell non-compliant ads; and (iii) warning of the possible ramifications of violating the applicable advertising laws and regulations without disclosing that the Company was already violating them and thus the ramifications were not a matter of if, but when.

333.    Second, the IPO Documents warned that because "[w]e generate a substantial majority of our revenues from advertising[,] [a] decline in our advertising revenue could harm our business:"

We generated almost all of our revenues from advertising services in 2016, 2017, and the six months ended June 30, 2018. When we first commenced our business, we collaborated with various third-party advertising platforms to place advertisements on our mobile applications. ***To enhance our platform's***

*monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. This system will serve to power our advertising solutions while reducing the use of third-party advertising platforms. In 2017 and the six months ended June 30, 2018, 26.2% and 78.2%, respectively, of our net revenues were generated through this advertising agent.* We have limited experience in operating the programmatic advertising system and in acquiring our own advertising agents and advertising customers. We may not be able to establish our own sales personnel to effectively and efficiently acquire and retain advertising agents and advertising customers. The effectiveness of our programmatic advertising system may not perform as expected and achieve widespread acceptance by advertising customers.

Our advertising customers for our programmatic advertising system are comprised of advertising agents and end advertisers. . . . *If we fail to retain existing advertising customers or ensure that their advertising spend with us remains at similar or increased levels or attract new advertising customers to advertise on our platform, our business, results of operations and financial condition may be materially and adversely affected.*

334.    The statements contained in ¶ 333 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading: (i) noting the "programmatic advertising system" of the advertising agent that the Company acquired as a benefit of, and reason for, replacing its third-party advertising platforms without disclosing that it was seeking to avoid the oversight third-parties like Baidu had been providing which had prevented non-compliant ads from running; (ii) explaining the Company's ability to monetize user traffic, as enhanced by its programmatic advertising system, without disclosing that any enhancement was actually primarily related to its increased ability to sell non-compliant ads; and (iii) warning of material and adverse effects on the Company if existing customers are lost or their advertising spend decreases without disclosing that many of its customers were unqualified advertisers who were purchasing non-compliant ads and thus the revenue generated from those customers inevitably would decrease when the non-compliant ads became public.

335.    Lastly, with regard to the "Transactions with Companies Controlled by or Affiliated with Mr. Tan," the IPO Documents disclosed that:

*In 2016, we paid RMB5.0 million (US$0.8 million) to Youxuan Information Technology (Shanghai) Co., Ltd., a company controlled by Mr. Eric Siliang Tan, our co-founder and executive chairman, to cooperate on a potential business project.* Such project was subsequently canceled and the entire amount was refunded back to us in 2017.

*We paid Shanghai Yinnuo Management Consulting Co., Ltd., or Yinuo Management, a company controlled by Mr. Eric Siliang Tan, service fees in the amount of RMB3.0 million (US$0.5 million), RMB16.8 million (US$2.5 million) and RMB6.9 million (US$1.0 million) in 2016, 2017 and the six months ended June 30, 2017, respectively.* Such service fees relate to costs charged by Yinuo Management to provide us with financial accounting support, office space and certain other administrative support. Amounts due to Yinuo Management in connection with these service fees as of December 31, 2016 was RMB3.0 million (US$0.5 million). No amount was due to Yinuo Management in connection with these service fees as of December 31, 2017. We have since developed all relevant functions internally and leased office space for our operations that were previously provided by Yinnuo Management and we currently do not expect to pay service fees to Yinuo Management for such functions or office space in the future.

*We received RMB5.3 million (US$0.8 million) in service fees from AdIn Media (Shanghai) Co., Ltd., or AdIn Media, a company in which Mr. Eric Siliang Tan indirectly owns a minority interest and in which he is a key management personnel, in the six months ended June 30, 2018.* Such fees related to agent and platform service provided to AdIn Media by facilitating advertising customers to display advertisements with AdIn Media. As of June 30, 2018, an amount of RMB6.7 million (US$1.0 million) was due to AdIn Media in connection with such services provided, which represent the service fee collected from advertising customers but not yet paid to AdIn Media.

*We also received RMB1.2 million (US$0.2 million) in service fees from AdIn Media in the six months ended June 30, 2018 relating to advertising serviced provided by us to AdIn Media.* As of June 30, 2018, the remaining balance of such service fees was RMB0.9 million (US$0.1 million).

336.    The statements contained in ¶ 335 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading: (i) the transactions with companies controlled by or affiliated with Tan also include transactions involving the Mengtui App, Fangce and the Shihui Miao App based on Tan's ownership stakes in Taiyun Capital, and Bige and (ii) the Dianguan Acquisition should have been listed as a related party transaction based on Liang's special relationship with Tan through companies in which Tan

is a majority investor or owner, including Woofoo Equity and Taiyun Capital.

    **B.**    **Materially False and Misleading Statements and Omissions in the SPO Documents.**

    337.    The SPO Documents contained multiple material misstatements regarding the Company's strategy of targeting users in lower tier cities in China, stating in relevant part:

> ***Since our inception, we have strategically targeted users from lower tier cities in China because of the enormous opportunities in this underserved market.*** As of the end of 2017, lower tier cities had a population of 1,027 million each owning 0.5 mobile device on average (compared to a population of 363 million each owning 1.3 mobile devices on average in tier-1 and 2 cities), suggesting significant potential for further mobile penetration, according to the Analysys Report. ***Mobile users in lower tier cities tend to have a slower pace of life and spend more time on the Internet given limited offline entertainment venues. Moreover, they often enjoy fast increasing disposable income and lower financial pressures due to lower housing prices. These factors have given rise to a significant need for mobile entertainment content while also creating high monetization potentials.*** Users from lower tier cities tend to have different interests and preferences in comparison to users from tier-1 and tier-2 cities. Qutoutiao's light entertainment-oriented and easily digestible content is designed to resonate with such users and provides us with a significant advantage to capture this underserved market.

    338.    However, the statements contained in ¶ 337 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading because, the "enormous opportunities" and "high monetization potentials" in lower tier cities had much less to do with the high number of users in those cities having more time and disposable income to spend on the internet and far more to do with the high number of unqualified advertisers who wanted to run non-compliant ads in those cities because regulators were more lenient and users were less aware of their rights as consumers in those cities.

    339.    The SPO Documents also touted that the Company's "***net revenues have increased rapidly*** from RMB58.0 million (US$8.8 million) in 2016 to RMB517.1 million (US$78.1 million) in 2017, and further to RMB3,022.1 million (US$439.6 million) in 2018." The majority of the Company's revenue came from advertising, as the SPO Documents stated, in relevant part:

Baidu, which used to be our largest customer and operates a third-party advertising platform, contributed 69.9%, 43.7% and 4.2% of our net revenues in 2016, 2017 and 2018, respectively. Baidu also accounted for 59.8% and 8.8% of our accounts receivable as of December 31, 2017 and 2018, respectively. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. We expect this system will allow us to reduce our reliance on third-party advertising platforms such as Baidu.*** Prior to our acquisition of this advertising agent in February 2018, we engaged such advertising agent to serve as our sales agent in selling our advertising and marketing solutions to other second-tier advertising agents and end advertisers. ***These second-tier advertising agents and end advertisers are our customers as they select our mobile applications to place their advertisement and our performance obligation is to provide the underlying advertising display services to them.***

340. The statements contained in ¶ 339 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading by: (i) touting the Company's "rapidly" increased revenues without disclosing that a significant number of ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (ii) noting the "programmatic advertising system" of Dianguan as a benefit of, and reason for, replacing the Company's third-party advertising agent, Baidu, without disclosing that the Company was seeking to avoid the oversight Baidu had been providing which had prevented non-compliant ads from running; (iii) explaining the Company's ability to monetize user traffic, as enhanced by its programmatic advertising system, without disclosing that any enhancement was actually primarily related to its increased ability to sell non-compliant ads; and (iv) describing the Company's "performance obligation" to its end advertiser customers without disclosing that it had to set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to sell non-compliant ads.

341. The SPO Documents contained substantially the same statements as the IPO Documents about the Company's abilities to "Enhance [its] Monetization Capabilities" and how

Qutoutiao plans to achieve such improved "Monetization" through advertising, which are quoted more fully in ¶ 333. These statements remained materially false or misleading for the reasons discussed in ¶ 334.

342.    The SPO Documents also contained substantially the same statements as the IPO Documents about Qutoutiao's mission "to deliver quality and relevant content to users, and content sourcing, management and recommendation" as "core focuses of [its] operations," as related to advertising and content screening technology, which are quoted more fully in ¶ 328. These statements remained materially false or misleading for the reasons discussed in ¶ 329.

343.    Furthermore, while the 1933 Act Defendants list numerous "Risk Factors" in the SPO Documents, they failed to adequately warn investors that certain "Risk Factors" had already materialized at the time of the SPO.

344.    First, the SPO Documents warned that because "[w]e generate a substantial majority of our revenues from advertising and marketing[,] [a] decline in our advertising and marketing revenues could harm our business:"

> We generated a substantial majority of our revenues from advertising and marketing services in 2016, 2017 and 2018. When we first commenced our business, we collaborated with various third-party advertising platforms to place advertisements on our mobile applications. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. This system will serve to power our advertising and marketing solutions while reducing the use of third-party advertising platforms.*** We have limited experience in operating the programmatic advertising system and in acquiring our own advertising agents and advertising customers. We may not be able to establish our own sales personnel to effectively and efficiently acquire and retain advertising agents and advertising customers. The effectiveness of our programmatic advertising system may not perform as expected and achieve widespread acceptance by advertising customers.
>
> Our advertising customers for our programmatic advertising system are comprised of advertising agents and end advertisers. . . . ***If we fail to retain existing advertising customers or ensure that their advertising spend with us remains at similar or increased levels or attract new advertising customers to advertise on our platform, our business, results of operations and financial condition may be***

***materially and adversely affected***.

345.     The statements contained in ¶ 344 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading: (i) noting the "programmatic advertising system" of the advertising agent that the Company acquired as a benefit of, and reason for, replacing its third-party advertising platforms without disclosing that it was seeking to avoid the oversight third-parties like Baidu had been providing which had prevented non-compliant ads from running; (ii) explaining the Company's ability to monetize user traffic, as enhanced by its programmatic advertising system, without disclosing that any enhancement was actually primarily related to its increased ability to sell non-compliant ads; and (iii) warning of material and adverse effects on the Company if existing customers are lost or their advertising spend decreases without disclosing that many of its customers were unqualified advertisers who were purchasing non-compliant ads and thus the revenue generated from those customers inevitably would decrease when the non-compliant ads became public.

346.     Second, the SPO Documents contained substantially the same statement as the IPO Documents regarding the Company's warning that "[a]dvertisements on [the Company's] mobile applications may subject us to penalties and other administrative actions," which is quoted more fully in ¶ 331. This statement remained materially false or misleading for the reasons discussed in ¶ 332.

347.     Third, the SPO Documents warned that "[n]on-compliance with law on the part of third parties with which we conduct business could disrupt our business and adversely affect results of our operation and financial condition:"

> Third parties with which we conduct business, such as content providers, advertising agents, advertising customers and merchandise suppliers, may be subject to regulatory penalties or punishments because of their regulatory compliance failures or may be infringing upon other parties' legal rights, which

may, directly or indirectly, disrupt our business. ***Although we conduct review of legal formalities and certifications before entering into contractual relationships with third parties, and take measures to reduce the risks that we may be exposed to in case of any non-compliance by third parties, we cannot be certain whether such third party has violated any regulatory requirements or infringed or will infringe any other parties' legal rights.*** For example, content providers may submit copyrighted content that they have no right to distribute. While our content management system screens content for potential copyright infringements, we may not be able to identify all instances of copyright infringement. In the event we deliver content that violates the copyrights of a third party, we may be required to pay damages to compensate such third party. Even though we have the contractual right to seek indemnification from the relevant content provider for such payment, there can be no assurance that we will be able to enforce such right. As a result, our business, results of operations and financial condition could be materially and adversely affected. Similarly, advertising content of advertising customers may also not be in full compliance with applicable laws and regulations that may have an adverse effect as to our business, results of operations and financial condition. See "— Advertisements on our mobile applications may subject us to penalties and other administrative actions."

348.    The statement contained in ¶ 347 *supra* was materially false and misleading because: (i) the measures the Company had taken to reduce its risk included setting up separate teams with different processes and procedures for qualified versus unqualified advertisers and placing riskier ads in lower tier cities where there was less regulatory scrutiny; (ii) even though the Company had measures in place to decline non-compliant ads, the advertiser or the employees who were responsible for those ads could contact the reviewing department for a second manual review and allow the ads on the QTT App manually; and (iii) the Company was already aware or recklessly disregarded that certain advertisers had already violated regulatory requirements or infringed other parties' legal rights. Until July 2020, investors were in the dark about a substantial amount of Qutoutiao's revenue was being generated from ads by unqualified advertisers which were not compliant with the applicable Chinese regulations or that they were managing the risk of losing that revenue by reducing the chance that they would get caught by state regulators, rather than by simply not putting risky advertisements on the QTT App.

349.    Lastly, when acknowledging the Company's related party transactions, the SPO Documents disclosed with regard to "Transactions with Companies Controlled by or Affiliated with Mr. Tan:"

> *In 2016, we paid RMB5.0 million (US$0.8 million) to Youxuan Information Technology (Shanghai) Co., Ltd., a company controlled by Mr. Eric Siliang Tan, our co-founder and executive chairman, to cooperate on a potential business project.* Such project was subsequently canceled and the entire amount was refunded back to us in 2017.
>
> *We paid Shanghai Yinnuo Management Consulting Co., Ltd., or Yinnuo Management, a company controlled by Mr. Eric Siliang Tan, service fees in the amount of RMB3.0 million and RMB16.8 million in 2016 and 2017, respectively.* Such service fees relate to costs charged by Yinnuo Management to provide us with financial accounting support, office space and certain other administrative support. Amounts due to Yinnuo Management in connection with these service fees as of December 31, 2016 was RMB3.0 million. No amount was due to Yinnuo Management in connection with these service fees as of December 31, 2017. We have since developed all relevant functions internally and leased office space for our operations that were previously provided by Yinnuo Management and we currently do not expect to pay service fees to Yinnuo Management for such functions or office space in the future.
>
> *We received RMB29.6 million (US$4.3 million) in service fees from AdIn Media (Shanghai) Co., Ltd., or AdIn Media, a company in which Mr. Eric Siliang Tan indirectly owns a minority interest and in which he is a key management personnel, in 2018.* Such fees related to agent and platform service provided to AdIn Media by facilitating advertising customers to display advertisements with AdIn Media. We also received fees in the amount of RMB4.5 million (US$0.6 million) for providing advertising services to AdIn Media in 2018. As of December 31, 2018, Mr. Tan was no longer a key management personnel of AdIn Media, and thus AdIn Media ceased to be our related party.

350.    The statements contained in ¶ 349 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading: (i) the transactions with companies controlled by or affiliated with Tan also include transactions involving the Mengtui App, Fangce and the Shihui Miao App based on Tan's ownership stakes in Taiyun Capital, and Bige; and (ii) the Dianguan Acquisition should have been listed as a related party transaction based on Liang's special relationship with Tan through companies in which Tan

is a majority investor or owner, including Woofoo Equity and Taiyun Capital.

**XII.  CLAIMS FOR RELIEF**

<u>COUNT I</u>
**Violations of § 10(b) of the 1934 Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against Qutoutiao, the Insider Defendants, and the Underwriter Defendants)**

351.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is brought pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Qutoutiao, the Insider Defendants, and the Underwriter Defendants.

352.    The Defendants in this Count, carried out a plan, scheme, and course of conduct which was intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; and (b) cause Lead Plaintiff and the other members of the Class to purchase Qutoutiao securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Qutoutiao, the Insider Defendants, and the Underwriter Defendants took the actions set forth herein.

353.    During the Class Period, Qutoutiao, the Insider Defendants, and the Underwriter Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew, or deliberately disregarded as or turned a blind eye to being misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

354.    The Defendants in this Count: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statement made, in light of the circumstances under which they were made, not

misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers or acquirers of Qutoutiao securities in an effort to maintain artificially high market prices for Qutoutiao securities in violation of § 10(b) of the 1934 Act and Rule 10b-5, promulgated thereunder.

355.    Qutoutiao, the Insider Defendants, and the Underwriter Defendants, individually and together, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operation, and future prospects of Qutoutiao as specified herein.

356.    Qutoutiao, the Insider Defendants, and the Underwriter Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Qutoutiao's value and performance and continued substantial growth, which included the preparation of and/or dissemination or approval of untrue statements of material facts and/or omitting to state material facts necessary in order to make statements made about Qutoutiao and its business operations and further prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and course of business which operated as a fraud and deceit upon the purchasers and acquirers of Qutoutiao securities during the Class Period.

357.    Qutoutiao, the Insider Defendants, and the Underwriter Defendants had motive and opportunity to perpetrate the fraudulent scheme and course of conduct described herein. Qutoutiao and the Underwriter Defendants prepared and disseminated the fraudulent Offering Documents. The Underwriter Defendants delivered the Offering Documents to investors. Representatives of

the Underwriter Defendants had ultimate authority and provided final approval for the contents of the Offering Documents before they were filed with the SEC and issued to the public.

358.    The Insider Defendants were the most high-level executives and/or directors at Qutoutiao and members of the Company's management team or had control thereof. By virtue of their responsibilities and activities as a senior officer, the Individual Defendants were: (i) privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, and/or reports; (ii) engaged in significant personal conduct and familiarity with the other defendants and were advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iii) aware of and/or participated in the issuing of statements and press releases on behalf of the Company, and each made false statements concerning the Company's abilities and had the opportunity to commit the fraud alleged.

359.    Qutoutiao, the Insider Defendants, and the Underwriter Defendants had actual knowledge of the misrepresentations and/or omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether the statements alleged herein, were false and/or misleading, or turned a blind eye toward the true facts that were available to them. The material misrepresentations and/or omissions of the Defendants in this Count were done knowingly or recklessly and for the purpose and effect of concealing the Company's true prospects from the investing public and supporting the artificially inflated price of Qutoutiao securities.

360.    As demonstrated by Qutoutiao's, the Insider Defendants', and the Underwriter Defendants' misstatements and/or omissions of the Company's business, operations, financial well-being, and prospects throughout the Class Period, these defendants, if they did not have actual

knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading, or turning a blind eye toward the true facts that were available to them.

361.    As a result of the dissemination of the materially false and/or misleading information and failure to disclose material facts, as set forth herein, the market price of Qutoutiao securities was artificially inflated. In ignorance of the fact that market prices of Qutoutiao securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, but these Defendants, but not disclosed in public statements by Defendants, Lead Plaintiff and the other Class members acquired Qutoutiao securities at artificially high prices and were, or will be, damaged thereby.

362.    At the time of said misrepresentation and omissions, Lead Plaintiff and the other Class members were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Lead Plaintiff and the other member of the Class would not have purchased or acquired Qutoutiao securities, or if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

363.    By virtue of the foregoing, the Defendants in this Count have violated § 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

364.    As a direct and proximate result of Qutoutiao's, the Insider Defendants', and the Underwriter Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class

suffered damages in connection with their purchase or acquisition of Qutoutiao securities during the Class Period.

365.    This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchase of securities giving rise to the cause of action.

<u>**COUNT II**</u>
**Violations of § 20(a) of the 1934 Act**
**(Against the Insider Defendants)**

366.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. As members of Qutoutiao's executive team and/or the Company's Board of Directors, the Insider Defendants acted as controlling persons of Qutoutiao within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

367.    By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Qutoutiao's operations and/or intimate knowledge of the false information and disseminated to the investing public, the Insider Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Qutoutiao, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. The Insider Defendants were provided with, or had unlimited access to Qutoutiao's reports, press releases, public filings and other statements, alleged by Lead Plaintiff to have been misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

368.    In particular, each of the Insider Defendants had direct and supervisory involvement in the day-to-day operation of the Company and, therefore, are presumed to have had the power to control and/or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

369.     As set forth above, Qutoutiao and the Insider Defendants each violated § 10(b) and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint and the Class was damaged thereby. By virtue of their positions as controlling persons, the Insider Defendants are liable pursuant to § 20(a) of the 1934 Act.

370.     As a direct and proximate result of the Insider Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Qutoutiao securities during the Class Period.

371.     This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchase of securities giving rise to the cause of action.

**COUNT III**
**Violations of § 11 of the 1933 Act**
**(Against Qutoutiao, the Director Defendants and the Underwriter Defendants)**

372.     Lead Plaintiff repeats and realleges every allegation contained in Sections II through V, X and XI above as if fully alleged in this Count, only to the extent, however, that the allegation does not allege fraud, scienter, or the intent of the Defendants to defraud Lead Plaintiff or the other members of the Class.

373.     This claim is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, against Qutoutiao, the Director Defendants (with respect to Offering Documents signed, or approved the signing of, by them), and the Underwriter Defendants (with respect to Offering Documents underwritten by them), on behalf of all persons and entities who purchased or acquired Qutoutiao securities pursuant or traceable to the IPO and/or SPO Documents and were damaged by the conduct alleged herein. Lead Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct. This Count does not sound in fraud. Lead Plaintiff does not allege liability under this Count arises from any scienter or fraudulent

intent, which are not elements of a § 11 claim. All of the proceeding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

374.    As part of the Offering Documents, Qutoutiao registered and sold approximately 15.3 million securities in the closing of the IPO and SPO, collectively. Qutoutiao was the issuer of its securities pursuant to the Offering Documents within the meaning of § 11 of the 1933 Act.

375.    The Defendants named in this Count had ultimate control and/or authority over the contents and dissemination of the IPO and/or SPO Documents. Further, the Director Defendants each signed the IPO and/or SPO Documents.

376.    Qutoutiao securities were issued and sold pursuant to the Offering Documents. All purchases or acquisitions of Qutoutiao securities by shareholders in the IPO or SPO were a result of the issuance of the Offering Documents and the shares registered thereunder. Each security sold to investors by Qutoutiao and the Underwriter Defendants at the time of the closing of the IPO and/or SPO are traceable to the Offering Documents.

377.    As alleged in this Complaint, the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The facts misstated and omitted in the Offering Documents were material.

378.    As the issuer and registrant, Qutoutiao is strictly liable for the untrue statements of material fact. The Defendants named in this Count owed to Lead Plaintiff and the other Class members, the duty to make reasonable and diligent investigation of the statements contained in the IPO and/or SPO Documents, to ensure that the statements contained or incorporated by reference therein were true, and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named

under this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO and/or SPO Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

379.    Lead Plaintiff and the Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified herein not misleading when they purchased or acquired Qutoutiao securities pursuant or traceable to the IPO and/or SPO Documents.

380.    As a direct and proximate results of the conduct and omissions of the Defendants named in this Count, Lead Plaintiff and the other Class members suffered substantial damages in connection with their purchase of Qutoutiao securities pursuant or traceable to the IPO and/or SPO Documents.

381.    This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Documents and within three years of their effective dates. By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff and the Class under § 11 of the 1933 Act.

**COUNT IV**[79]
**Violations of § 12(a)(2) of the 1933 Act**
**(Against Qutoutiao and the Underwriter Defendants)**

382.    Lead Plaintiff repeats and realleges every allegation contained in Sections II through V, X and XI above as if fully alleged in this Count, only to the extent, however, that the allegation does not allege fraud, scienter, or the intent of the Defendants to defraud Lead Plaintiff or the other members of the Class.

383.    This claim is brought against Qutoutiao and the Underwriter Defendants (with respect to Offering Documents underwritten by them), pursuant to § 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2), on behalf of all persons who purchased or acquired Qutoutiao securities pursuant to the IPO and/or SPO Documents and were damaged by the conduct alleged herein. Lead Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct. This Count does not sound in fraud. Lead Plaintiff does not allege liability under this Count arises from any scienter or fraudulent intent, which are not elements of a § 12(a)(2) claim. All of the proceeding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

384.    The Defendants in this Count solicited, offered and/or sold Qutoutiao securities using means or instruments of transportation or communication in interstate commerce or the

---

[79] Lead Plaintiff did not buy in the IPO or SPO directly from Defendants, but he asserts claims in this section on behalf of class members who did. Lead Plaintiff has brought these claims because his own personal claims mean that he "possess[es] the same interest and suffered the same injury" as those class members who bought directly from Defendants, he therefore has "the same necessary stake in litigating" the falsity of Defendants statements, and this therefore "gives the named plaintiff a sufficient stake in the outcome of her putative class members' cases" to assert these claims. *See Langan v. Johnson & Johnson Consumer Companies, Inc*., 897 F.3d 88, 94 (2d. Cir. 2018) (internal quotations and modification omitted); *but see Yi Xiang v. Inovalon Holdings, Inc*., No. 16-CV-4923-VM, 327 F.R.D. 510, 519-21 (S.D.N.Y. 2018)

mails.

385.    Qutoutiao and the Underwriter Defendants were sellers, offerors, or solicitors of purchasers of the shares offered pursuant to the IPO and/or SPO Documents.

386.    As alleged herein, the Offering Documents contained untrue statements and/or omissions of material fact or facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

387.    Qutoutiao securities were issued and sold pursuant to the Offering Documents. All purchases or acquisitions of Qutoutiao securities by shareholders in the IPO or SPO were a result of the issuance of the Offering Documents and the shares registered thereunder. Each security sold to investors by Qutoutiao and the Underwriter Defendants at the time of the closing of the IPO and/or SPO are traceable to the Offering Documents.

388.    As the issuer of the registered securities, Qutoutiao is strictly liable for the materially false and misleading statements and/or omissions of material facts, as described herein. Qutoutiao never made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the prospectuses were accurate and complete in all material respects.

389.    Nor did any of the Underwriter Defendants conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, the Underwriter Defendants would have known of the material misstatements and/or omissions, as alleged herein.

390.    Investors were solicited, offered and sold Qutoutiao securities in the IPO and/or SPO pursuant to the Offering Documents that, as alleged herein, contained materially false and

misleading statements and/or omissions of material facts therein and were damaged thereby. Moreover, these investors did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Offering Documents when they purchased or acquired their Qutoutiao securities.

391.    The Class members who purchased or otherwise acquired Qutoutiao securities pursuant to the IPO and/or SPO from Qutoutiao or the Underwriter Defendants have sustained damages as a result of the materially false and misleading statements and/or omissions in the Offering Documents.

392.    This Count is brought within one year of the discovery of, or reasonably could have discovered, the facts upon which this Count is based and within three years of the date that the securities upon which this Count is brought were sold to the public.

393.    By reason of the foregoing, Qutoutiao and the Underwriter Defendants are liable for violation of § 12(a)(2) of the 1933 Act to Class members who purchased securities sold pursuant to the IPO and/or SPO Documents. These Class members also have the right to rescind and recover the consideration paid for these securities upon tender of their ADSs to the Underwriter Defendants, and to recover rescissory damages to the extent they have already sold the securities.

### COUNT V
**Violations of § 15 of the 1933 Act**
**(Against the Director Defendants)**

394.    Lead Plaintiff repeats and realleges every allegation contained in Sections II through V, X and XI above as if fully alleged in this Count, only to the extent, however, that the allegation does not allege fraud, scienter, or the intent of the Defendants to defraud Lead Plaintiff or the other members of the Class.

395.     This claim is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o, against the Director Defendants (with respect to Offering Documents signed, or approved the signing of, by them), on behalf of all persons and entities who purchased or acquired Qutoutiao securities pursuant or traceable to the IPO and/or SPO Documents. For purposes of this claim, Lead Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct. This Count does not sound in fraud. All of the proceeding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of this Count, Lead Plaintiff does not allege that liability under this Count arises from any scienter or fraudulent intent, which are not elements of a § 15 claim.

396.     At all relevant times, the Director Defendants were "controlling persons" of Qutoutiao within the meaning of § 15 of the 1933 Act.

397.     Qutoutiao is strictly liable under §§ 11 and 12(a)(2) for the materially false and misleading statements and/or omissions in the Offering Documents.

398.     The Director Defendants violated § 11 by issuing the IPO and/or SPO Documents, which included materially untrue statements of fact and omitted to state material facts requires to be stated therein or necessary to make the statements therein not misleading. Each of the Defendants in this Count were controlling persons of Qutoutiao when the IPO and/or SPO Documents were filed and became effective due to their: (i) senior executive positions; (ii) positions on Qutoutiao's Board of Directors; (iii) direct involvement in Qutoutiao's day-to-day operations and in the review and approval of the IPO and/or SPO Documents; (iv) solicitation of Qutoutiao's stockholders' votes in favor of the issuance of Qutoutiao securities; and (v) participation in and preparation of the IPO and/or SPO Documents.

399.     By virtue of their exercise of control over Qutoutiao, the Director Defendants had

the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of Qutoutiao's IPO and/or SPO Documents and did not make a reasonable investigation or possess reasonable grounds for the belief that the IPO and/or SPO Documents were accurate and complete in all material respects. Had the Defendants in this Count exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

400.    This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Documents and within three years of their effective dates. By reason of the foregoing, under § 15 of the 1933 Act, the Director Defendants are liable to all persons and entities who purchased or acquired Qutoutiao securities pursuant or traceable to the IPO and/or SPO Documents.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff's pray for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Lead Plaintiff and the members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' conduct, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.    Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## XIV.    JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: January 15, 2021               Respectfully Submitted,

**ROCHE CYRULNIK FREEDMAN LLP**

*/s/ Constantine P. Economides*
Constantine P. Economides
Ivy T. Ngo (*pro hac vice*)
Velvel (Devin) Freedman (*pro hac vice*)
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Email: ceconomides@rcfllp.com
Email: ingo@rcfllp.com
Email: vel@rcfllp.com

Eric Rosen
Kyle Roche
Jason Cyrulnik
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Email: erosen@rcfllp.com
Email: kyle@rcfllp.com
Email: jcyrulnik@rcfllp.com

*Counsel for Lead Plaintiff James Pappas and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac forthcoming*)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff James Pappas*

158

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on January 15, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ Constantine P. Economides*
Constantine P. Economides
