**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re QUTOUTIAO, INC. SECURITIES LITIGATION | Master File No.: 1:20-cv-06707 (SHS)<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| This Document Relates To:<br><br>ALL ACTIONS. |  |

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ..................................................................... 1

II.     JURISDICTION AND VENUE ................................................................... 8

III.    PARTIES ..................................................................................................... 9

        A.      Lead Plaintiff ............................................................................... 9

        B.      Defendants ................................................................................... 9

                1.  Qutoutiao .......................................................................... 9

                2.  The Individual Defendants ................................................ 9

                3.  The Underwriter Defendants ............................................ 11

IV.     THE OFFERING DOCUMENTS VIOLATED GAAP AND MISLED INVESTORS .... 16

        A.      Accounting Policies and Principles Applicable to QTT ...................... 16

        B.      Dianguan Should Have Been Disclosed as Controlled by or Affiliated
                with Defendant Tan Because its Founder Had a Special Relationship with
                Him ................................................................................................. 19

        C.      Transactions with Mengtui, Fangce, and Shihui Miao Should Have Been
                Disclosed as Related to and Benefitting Defendant Tan. .................... 20

V.      THE 1933 ACT CLAIMS ........................................................................... 22

        A.      Materially False and Misleading Statements and Omissions in the IPO
                Documents. ...................................................................................... 35

        B.      Materially False and Misleading Statements and Omissions in the SPO
                Documents. ...................................................................................... 43

VI.     CLASS ALLEGATIONS ............................................................................. 49

VII.    CLAIMS FOR RELIEF ............................................................................... 51

        COUNT I, Violations of § 11 of the 1933 Act (Against All Defendants) ........... 51

        COUNT II, Violations of § 12(a)(2) of the 1933 Act (Against Qutoutiao and the
                Underwriter Defendants) ................................................................ 53

        COUNT III, Violations of § 15 of the 1933 Act (Against the Individual
                Defendants) ................................................................................... 55

VIII.   PRAYER FOR RELIEF ................................................................................................. 57

IX.    JURY TRIAL DEMANDED ........................................................................................... 57

Lead Plaintiff James Pappas ("Lead Plaintiff" or "Mr. Pappas"), by his attorneys, brings this class action alleging violations of the federal securities laws on behalf of himself and all other similarly situated investors against Qutoutiao, Inc. ("Qutoutiao," "QTT", or the "Company"), various Individual Defendants (as defined below) currently or formerly with the Company, and the Company's Underwriters (as defined below) (collectively, "Defendants"). Lead Plaintiff alleges the following based upon personal knowledge as to his own acts and on information and belief as to all other matters based on his counsel's investigation, which included, *inter alia*, a review and analysis of: U.S. Securities and Exchange Commission ("SEC") filings by QTT; State Administration for Market Regulation ("SAMR"), the successor of SAIC ("State Administration for Industry and Commerce in China") and the State Food and Drug Administration, filings by QTT's subsidiaries and other entities in China; press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning QTT in the U.S. and in China; independent interviews with former QTT employees in China conducted by investigators on behalf of Plaintiff; a consultant regarding the accounting of publicly traded companies; and other publicly available information. Counsel's investigation is ongoing and many relevant facts are known only to Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.        This is a federal securities class action on behalf of all persons or entities who purchased or otherwise acquired QTT American Depositary Shares ("ADSs") pursuant or traceable to the Registration Statement and Prospectus issued in connection with the Company's September 2018 initial public offering ("IPO") (collectively, "IPO Documents") and/or April 2019 secondary public offering ("SPO") (collectively, "SPO Documents") (together with the IPO

Documents, "Offering Documents"), alleging strict liability-based claims under the Securities Act of 1933 ("1933 Act") (15 U.S.C. §§ 77k, 77l, and 77o).

2.      Qutoutiao means "fun headlines" in Chinese. Yet for investors who purchased in QTT's IPO and SPO ("Offerings"), headlines generated by the Company's crashing share price have been anything but fun. Shares in the IPO were priced at $7 each, ultimately raising approximately $85.8 million for the Company. When QTT announced its SPO just seven months later, it priced 3.3 million additional shares at $10 per share. Unbeknownst to investors, the Offering prices were artificially inflated from the outset due to the materially false and/or misleading statements described below. Consequently, when the truth about those statements was revealed to the market (detailed below), QTT's share price declined precipitously – dropping to less than $2/share by the end of 2020. At the commencement of this action, QTT ADSs closed at $2.42 per share on September 17, 2020, a fraction of the artificially inflated Offering prices. As a result, the Class lost hundreds of millions of dollars.

3.      QTT's collapse is hardly surprising given the facts unearthed by Lead Plaintiff's investigation. QTT touts itself as the "No. 2 mobile content aggregator in China." The smartphone application Qutoutiao ("QTT App") aggregates "articles and short videos from professional media and freelancers" and presents those "customized feeds to users." QTT makes money "by providing advertising services" and pushing those advertisements to individuals consuming the aggregated content.

4.      In the Offering Documents, Defendants painted a rosy picture of QTT's business model, which featured fast-growing revenue derived almost entirely from advertising sales. Those representations were materially false and misleading, so investors who purchased QTT shares reasonably relying on those misrepresentations did so to their detriment.

5.      The Offering Documents described QTT as having "rapidly" increasing net revenues. Specifically, the Company's revenues had increased from $8.8 million in 2016 to $78.1 million in 2017 to $439.6 million in 2018. In short, QTT was a company on the move, with revenue-generating "success" attributable to numerous "key competitive strengths."

6.      According to the Offering Documents, the secret sauce for QTT's success was its strategic targeting of consumers who lived in "tier-3 and below cities in China because of the enormous opportunities in the underserved market."[1] These users were key to the Company's success because they "have a slower pace of life and spend more time on the Internet," while at the same time "enjoy[ing] fast increasing disposable income and lower financial pressures thanks to lower housing prices." The Offering Documents claimed that QTT was able to capture this lucrative and growing market because the QTT App's "light entertainment-oriented and easily digestible content is designed to resonate with such users and provides us with a significant advantage to capture this underserved market."

7.      The proprietary business model being touted and the resulting revenue growth were vital to QTT's future. At the time of the IPO and thereafter, the Company was spending significant sums of money. Indeed, it conducted a secondary follow-on offering (the SPO) to raise capital just seven months later. Nonetheless, its lucrative advertising model was generating substantial revenue growth, demonstrating its ability to expend capital effectively and reach long-term, sustainable profitability.

8.      But the Offering Documents' statements were materially false and/or misleading. QTT's momentous year-over-year revenue growth did not arise solely from a strategy of aggregating content that uniquely appealed to an underserved but growing user base living in

---

[1] Third- and fourth-tier cities are typically smaller, provincial cities in China.

lower-tier Chinese cities. Rather, the Company's revenue growth was fueled by the high number of unqualified advertisers who wanted to run ads in those cities because regulators were more lenient and users were less aware of their rights as consumers. Because those advertisers' advertisements were illegal under Chinese laws, they were an untenable revenue source. The meteoric revenue growth being touted to investors was unsustainable. The prospect of long-term profitability, as signaled by the revenue growth, was illusory. And Defendants would have learned the truth if they had simply conducted an adequate and reasonable investigation before making the alleged misstatements in the IPO and SPO Documents, but they did not.

9. In July 2020, China's state TV called attention to QTT's illegal advertisements on an annual television broadcast, and regulators forced the Company to improve its oversight of advertisements to eliminate illegal ones. The effects were drastic. QTT's revenue immediately fell for the first time ever – plummeting more than 18% from $204 million in the second quarter of 2020 to just $166.5 million in the third quarter of 2020.

10. Thus, as described herein, the Offering Documents misled investors into believing that QTT had come up with a genius business model that was driving remarkable revenue growth. In truth, the Company's success arose largely from advertisements which skirted Chinese government-imposed regulations regarding permissible advertisements. QTT had not just tapped into an underserved market of consumers who lived in lower-tier cities. It had also tapped into an underserved market of illegal ad placements.

11. As the Offering Documents made clear, compliance with Chinese advertising laws was critical: "Under PRC [People's Republic of China] advertising laws and regulations, we are obligated to monitor the advertising content shown on our mobile applications to ensure that such content is true, accurate and in full compliance with applicable laws and regulations." The

4

Offering Documents even noted that violating Chinese advertising law could subject QTT to "penalties, including fines, confiscation of our advertising income, orders to cease dissemination of the advertisements and orders to eliminate the effect of illegal advertisement." But the Offering Documents described the placement of uncompliant advertising content on QTT's platform as a risk factor it was working to mitigate.

12.     In reality, at the time of its Offerings, what QTT was doing was ineffective as its employees were able to actively place non-compliant advertising content on the QTT App, thereby having the accompanying revenue streams flow into the Company's financials:

- QTT initially used Baidu (China's version of Google) as its advertising agent to place advertisements on its platform. Baidu was an unrelated third-party that provided oversight of the content and quality of advertisements to ensure compliance with Chinese law. In February 2018, just months before the IPO, QTT replaced Baidu with a 4-month-old in-house "advertising agent" called Shanghai Dianguan Internet Technology Co. Ltd. ("Dianguan"). Dianguan employees did not provide the same level of oversight of the content, quality, and legal compliance of the advertisements as Baidu had provided. As a result, more advertisements that did not comply with Chinese government regulations appeared on QTT's platform.

- Dianguan employed two different teams to manage the advertising content that could be placed on the QTT App and served to consumers. One team dealt with established and compliant advertisers (*i.e.*, legal advertisements) such as Tencent, Alibaba, and Jinri. The second team dealt with unqualified advertisers whose advertisements skirted or violated Chinese regulations (*i.e.*, illegal advertisements).

- As acknowledged in the Offering Documents, QTT targeted consumers from third and fourth-tier Chinese cities (smaller, provincial cities). But in addition to targeting these consumers because they spent more "time on the Internet" or enjoyed "fast increasing disposable income," QTT targeted these consumers because advertisements in third- and fourth-tier cities were not subject to the same regulatory scrutiny as in the larger cities. This lack of regulatory scrutiny allowed mobile users in lower-tier cities to be bombarded with non-compliant and illegal advertisements, significantly adding to the Company's revenue stream.

13.     The Offering Documents did not explain or otherwise reveal the increased placement of nonconforming advertisements. Rather, the Offering Documents were larded with

materially false and/or misleading statements:

- The Offering Documents stated that QTT targeted mobile users in third- and fourth-tier Chinese cities because they spent more time on the Internet and had increasing amounts of disposable income. This was materially misleading because these users were also targeted due to the lack of regulatory scrutiny in those cities, allowing QTT employees to push more nonconforming and illegal advertisements onto its platform.

- The Offering Documents stated that QTT's use of Dianguan (as opposed to Baidu) would allow it to "enhance [its] platform's monetization capabilities." In reality, the "enhanced" monetization depended on Dianguan, as an internal ad placement service controlled by QTT, to allow the placement of the illegal and nonconforming advertisements that Baidu had restricted.

- As part of the risk factor analysis, the Offering Documents told investors that QTT could be subject to penalties and "other administrative actions" through the placement of illegal or nonconforming advertisements. But Defendants assured investors that the Company's proprietary "artificial intelligence" could "monitor and identify objectionable visual content with a high degree of accuracy" and flag "suspicious content for manual review." This assurance was highly misleading because the employees who were responsible for flagging suspicious ads had the ability to and did manually place such ads on the QTT App.[2]

14.      On July 15, 2020, China's state-controlled broadcaster, CCTV, aired a television show highlighting the use of improper ads on QTT's platform (the "CCTV Exposé").[3] On this revelation, the price of QTT's ADSs fell more than 24%. The CCTV Exposé also resulted in the temporary suspension of the QTT App from Chinese app stores for two weeks until July 31, 2020. Although the QTT App was temporarily removed from the app stores during that time, on information and belief based on the mechanisms of app store delisting in China, it was still available to users who had already downloaded the QTT App, just not available for new users to

---

[2] Beyond screening out illegal advertisements, QTT's Offering Documents misled investors as to the source of its revenue growth and certain transactions which in reality, involved related parties. These issues are discussed below.

[3] As part of its repertoire, CCTV produces "investigative" programs that are in the public interest. One major instance of these CCTV programs is China's annual consumer rights gala, *i.e.,* the CCTV Exposé. In 2020, the COVID-19 pandemic caused the gala to be delayed from March 15 (World Consumer Rights Day in China) to July 15. Sarah Cook, *China Central Television: A Long-standing Weapon in Beijing's Arsenal of Repression*, THE DIPLOMAT (Sept. 25, 2019), https://thediplomat.com/2019/09/china-central-television-a-long-standing-weapon-in-beijings-arsenal-of-repression/.

download. More importantly, QTT responded to the CCTV Exposé by enacting remedial measures to halt its illegal advertisements, thereby reducing the Company's sales of those advertisements. As a result of those remedial measures, on December 16, 2020, QTT had to report that its revenue for the third quarter of 2020 had *plummeted*, dropping 19.7% year-over-year with a remarkable 23.1% drop in advertising revenue. The year-over-year growth justifying investors' interest was gone, replaced with a revenue decline. As QTT conceded, this significant revenue drop, which caused the ADS price to fall by another 24%, was due to the "**remedial measures undertaken by [QTT] in response to the report by [CCTV] on certain advertisements**." And the stark drop in revenue following the Company's corrective actions unequivocally confirms that—contrary to its Offering Documents statements—the use of nonconforming advertisements had been central to its revenue growth. This revelation of the truth caused a significant decline in the value of QTT securities and resulted in millions of dollars in losses to investors.

15.    Lead Plaintiff now asserts strict liability, non-fraud claims under §§ 11, 12(a)(2) and 15 of the 1933 Act arising out of the negligently made materially false and misleading statements and omissions in the Offering Documents issued in connection with QTT's IPO and SPO. Lead Plaintiff's 1933 Act claims are not based on any allegation of deliberate or intentional misconduct, and Lead Plaintiff expressly disclaims any reference or reliance upon fraud allegations for such claims.

16.    As set forth herein, each Defendant negligently made materially false and misleading public statements and omissions in the Offering Documents that: (i) mischaracterized QTT's targeting of users in Tier-3 and Tier-4 cities as due to them having more time and disposable income to spend on the internet when in fact, unqualified advertisers wanted to run their ads in those cities because regulators were more lenient and users were less aware of their rights in those

cities; (ii) inaccurately described the benefits of, and reasons for, replacing QTT's third-party advertising agent, Baidu, with Dianguan by not disclosing that it was recently founded by a close business associate of QTT's CEO who had no experience in digital marketing and would reduce the amount of oversight over the content of ads which increased the sales of non-compliant ads; (iii) misleadingly touted QTT's advertising revenue without disclosing that a significant number of ads made claims that could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms; (iv) negligently promoted QTT's ability to monetize user traffic without disclosing that such monetization included selling users non-compliant ads; and (v) failed to adequately warn investors that certain "Risk Factors" listed in the Offering Documents had already materialized at the time of the Offerings as QTT was violating the applicable advertising laws and regulations by running non-compliant ads so it would inevitably face increasing regulatory scrutiny and penalties, reputational harm, and decreased revenue when the truth became known.

## II.    JURISDICTION AND VENUE

16.    Counts One, Two, and Three arise under §§ 11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. § 77k(a), 77o(a).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, § 22 of the 1933 Act, 15 U.S.C. § 77v, because this is a civil action arising under U.S. laws.

18.    Venue is proper in this District pursuant to § 22 of the 1933 Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b). Specifically, substantial events giving rise to the claims alleged herein occurred in this District, including (i) many of the false and misleading statements were made in or issued from this District; (ii) many of the acts alleged herein, including the negligent preparation and dissemination of materially false and/or misleading information, were made or

issued from this District; and (iii) QTT contracted with an ADS Depositary with headquarters in this District to effectuate the registration and delivery of QTT ADSs on the NASDAQ.

19.    In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchanges.

### III.    PARTIES

#### A.    Lead Plaintiff

20.    Mr. Pappas purchased Qutoutiao ADSs pursuant or traceable to the Company's false and/or misleading IPO Documents and was damaged thereby.

#### B.    Defendants

##### 1.    Qutoutiao

21.    Defendant Qutoutiao is incorporated under the laws of the Cayman Islands, with its principal executive offices located in Shanghai, China. Qutoutiao ADS shares traded on the NASDAQ exchange under the symbol "QTT." Formerly known as Qtech Ltd., the Company changed its name to Qutoutiao Inc., in July 2018, just months before its IPO.

22.    On July 3, 2023, the Company was delisted from the NASDAQ. By the time it received the delisting determination letter from NASDAQ in March of 2023, "Qutoutiao [had] bec[o]me a collection of garbage, if not outright illegal pornography that no one ever read."[4]

##### 2.    The Individual Defendants

23.    Defendant Eric Tan ("Tan") is the co-founder of Qutoutiao and has served as its Chief Executive Officer ("CEO") since May 20, 2019. On or about February 13, 2019, Tan filed

---

[4] *Qutoutiao to delist from Nasdaq,* TENCENT NEWS (March 22, 2023), https://news.qq.com/rain/a/20230322A0074O0 (last visited Feb. 4, 2025).

a Form 13G with the SEC, indicating that he owned more than 27 million Class B ordinary shares of QTT (approximately 38.1% of the Company's total outstanding ordinary shares). At all relevant times, Tan was the Executive Chairman of Qutoutiao's Board of Directors. He signed and/or had ultimate authority over the Company's IPO Documents filed with the SEC.

24.     Defendant Lei Li ("L. Li") is the co-founder of Qutoutiao and was its CEO and a director until May 2019, when Defendant Tan announced Li's resignation during the Company's May 20, 2019 earnings investor conference call. Li signed and/or had ultimate authority over the Company's IPO Documents and SPO Documents filed with the SEC.

25.     Defendant Jingbo Wang ("Wang") was a director and Qutoutiao's Chief Financial Officer ("CFO") until January 22, 2020, at which time the Company announced Wang would be stepping down for "personal reasons." Wang signed and/or had ultimate authority over the Company's IPO Documents and SPO Documents filed with the SEC.

26.     Defendant Shaoqing Jiang ("Jiang") was a director of Qutoutiao, and a member of its Audit Committee and Compensation Committee until he resigned as of September 13, 2019. Jiang signed or authorized the signing of the Company's Offering Documents filed with the SEC.

27.     Defendant Jianfei Dong ("Dong") was, at all relevant times, a director and Co-President of Qutoutiao. Dong signed or authorized the signing of the Company's Offering Documents filed with the SEC.

28.     Defendant Oliver Yucheng Chen ("Chen") was, at all relevant times, a director of Qutoutiao. Chen also served as its Chief Strategy Officer from August 2018 to February 2020. Chen signed or authorized the signing of the Company's Offering Documents filed with the SEC.

29.     Defendant Yongbo Dai ("Dai") was a director of Qutoutiao beginning in November 2018. Dai signed or authorized the signing of its SPO Documents filed with the SEC.

30.     Defendant James Jun Peng ("Peng") was, at all relevant times, a director of Qutoutiao. Peng was a member of its Audit Committee and Nominating and Corporate Governance Committee, and Chair of the Compensation Committee. Peng signed or authorized the signing of the Company's SPO Documents filed with the SEC.

31.     Defendant Feng Li ("F. Li") was, at all relevant times, a director of Qutoutiao. F. Li was a member of its Compensation Committee and Nominating and Corporate Governance Committee and Chair of the Audit Committee. F. Li signed or authorized the signing of the Company's SPO Documents filed with the SEC.

32.     The Defendants named in this section (collectively, the "Individual Defendants"), each participated in the preparation of, and signed and/or authorized the signing of, the Company's IPO and/or SPO Documents. Defendant Qutoutiao and the Individual Defendants (collectively, the "Company Defendants") are strictly liable for the materially false and/or misleading statements and/or omissions in or incorporated into the Offering Documents. They each failed to investigate whether the omitted information alleged herein would be considered material and thus required to be disclosed pursuant to the 1933 Act and otherwise conducted a negligent investigation.

3.     The Underwriter Defendants

33.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a multinational investment bank and financial services corporation that provides a broad range of financial services to consumers and corporate customers. Citigroup is incorporated under the laws of Delaware and maintains its principal executive offices at 388 Greenwich Street, New York, NY 10013. Citigroup served as an underwriter for Qutoutiao's IPO and SPO.

34.     Defendant Deutsche Bank Securities Inc. ("Deutsche") is a financial services

institution which provides a wide array of commercial and investment banking services to corporate and institutional clients along with private and business clients. Services include sales, trading, and origination of debt and equity; mergers and acquisitions; risk management products, such as derivatives; corporate finance, wealth management, retail banking, brokerage and research, fund management, and transaction banking. Deutsche is incorporated under the laws of Germany and maintains its U.S. corporate headquarters at 60 Wall Street, New York, NY 10005. Deutsche served as an underwriter for Qutoutiao's IPO and SPO.

35.     Defendant China Merchants Securities (HK) Co., Ltd. ("China Merchants") is a China-based financial services company offering securities brokerage, securities investment consulting, securities underwriting, and other services, including investment management. China Merchants maintains its principal executive offices at 48/F, One Exchange Square, Central, Hong Kong. China Merchants served as an underwriter for Qutoutiao's IPO.

36.     Defendant UBS Securities LLC ("UBS") provides investment banking services worldwide, including equities sales and trading, fixed-income products, and treasury products; UBS offers financial services to individual and institutional investors. UBS is incorporated under the laws of Delaware and maintains its principal executive offices at 1285 Avenue of the Americas, New York, NY 10019. UBS served as an underwriter for Qutoutiao's IPO.

37.     Defendant Keybanc Capital Markets, Inc. ("Keybanc") provides investment advisory services, including investment advice, portfolio management, securities, and other financial services. KeyBanc is incorporated under the laws of Ohio and maintains its principal executive offices at 127 Public Square, 4th Floor Cleveland, OH 44114. KeyBanc served as an underwriter for Qutoutiao's IPO.

38.     Defendant CLSA Limited ("CLSA") is a capital markets and investment group

focused on alternative investment, asset management, corporate finance and capital markets, securities and wealth management for corporate and institutional clients around the world. CLSA was founded in Hong Kong and maintains its principal executive offices at 18/F, One Pacific Place, 88 Queensway, Hong Kong. CLSA served as an underwriter for Qutoutiao's SPO. CLSA claims that its "award-winning research, extensive Asia network, direct links to China and highly experienced financial professionals set [it] apart from global investment banks and regional players."[5] CLSA flaunts itself as the number one ECM bookrunner and the number one underwriter among Chinese securities.[6]

39.     Defendant Haitong International Securities Company Limited ("Haitong") is an international financial institution providing a full spectrum of financial products and services as corporate finance, wealth management, asset management, institutional client services and investment business for corporate, institutional retail and high-net-worth clients worldwide. Haitong was founded in Hong Kong and maintains its principal executive offices at 22/F Li Po Chun Chambers, 189 Des Voeux Road Central, Hong Kong. Defendant Haitong served as an underwriter for Qutoutiao's SPO.

40.     Defendant Jefferies Group LLC ("Jefferies") is an investment banking firm, providing equity capital markets, debt capital markets, mergers and acquisitions, restructuring and recapitalization, and other strategic advisory services to customers worldwide. Jefferies is incorporated under the laws of Delaware and maintains its principal executive offices at 520 Madison Avenue, New York, NY 10022. Jefferies served as an underwriter for Qutoutiao's SPO. Jefferies' technology group, Broadview, touts itself as a leader in investment banking services

---

[5] About – CITIC SECURITIES CLSA, https://www.clsa.com/about/ (last visited Feb. 4, 2025).

[6] Corporate Finance & Capital Markets – CITIC SECURITIES CLSA , https://www.clsa.com/services/corporate-finance/ (last visited Feb. 4, 2025).

for technology companies and in technology IPOs. Specifically, Jefferies put forward that:

> Jefferies Broadview has emerged as a leader in technology IPOs having acted as a bookrunner on many of the leading IPOs for technology companies. Additionally, the team has consistently been ranked as one of the top M&A sell-side advisor for technology transactions up to $1 billion. Coupled with a burgeoning practice in leveraged finance, Jefferies Broadview offers tremendous value to financial sponsors focused on the technology LBO market.[7]

41.     Defendant Lighthouse Capital International Inc. ("Lighthouse"), also known as Guangyuan Capital or Guangyuan Ziben, operates as a boutique investment bank. Lighthouse is a China-based company that maintains its principal executive offices at Room 3801, China Life Finance Centre, No. 88 Yincheng Rd., Shanghai, 200120. Lighthouse served as an underwriter for Qutoutiao's SPO.

42.     Each Underwriter Defendant agreed to purchase Qutoutiao securities (*see infra*) and was given the option to purchase up to an aggregate of 1,800,000 additional ADSs in the IPO and 1,500,000 ADSs in the SPO. The Underwriter Defendants each served as a financial advisor for and assisted in the preparation and dissemination of the Company's materially false and/or misleading Offering Documents.

43.     The below chart sets forth the number of securities the Underwriter Defendants agreed to purchase in the IPO:

| Underwriters | Number of ADSs |
|---|---|
| Citigroup Global Markets Inc. | 3,945,000 |
| Deutsche Bank Securities Inc. | 5,745,000 |
| China Merchants Securities (HK) Co., Ltd. | 525,000 |
| UBS Securities LLC | 1,485,000 |
| KeyBanc Capital Markets Inc. | 300,000 |
| **Total** | **12,000,000** |

44.     The below chart sets forth the number of securities the Underwriter Defendants

---

[7] Jefferies' Broadview Technology Group, JEFFERIES, https://www.jefferies.com/wpcontent/uploads/files/Broadview/JefferiesBroadview.pdf (last visited Feb. 4, 2025)

agreed to purchase in the SPO:

| Underwriters | Number of ADSs |
|---|---|
| Citigroup Global Markets Inc. | 4,000,000 |
| Deutsche Bank Securities Inc. | 4,300,000 |
| CLSA Limited | 600,000 |
| Haitong International Securities Company Limited | 100,000 |
| Jefferies LLC | 900,000 |
| Lighthouse Capital International Inc. | 100,000 |
| **Total** | **10,000,000** |

45.     The Underwriter Defendants are primarily investment banks that specialize, *inter alia*, in underwriting public offerings of securities. As the underwriters of the IPO and/or SPO, the Underwriter Defendants earned lucrative underwriting fees for their participation.

46.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable but materially false and/or misleading information about the Company, its business, products, plans, assets, and financial prospects, or omitted to disclose material information required to be disclosed under the 1933 Act.

47.     The Underwriter Defendants served as financial advisors, assisted the Company Defendants in preparing and disseminating the IPO and/or SPO Documents, and had ultimate authority over the content of the Offering Documents. The Underwriter Defendants' names were prominently displayed on the first page of the IPO and/or SPO prospectus. As a result, the Underwriters were negligent in stating that the Offering Documents were prepared accurately and in accordance with the rules and regulations governing their preparation. They also purported to conduct an adequate and reasonable investigation into the business, operations, products, assets, and plans of the Company, an undertaking known as a "due diligence" investigation. During their due diligence, the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, assets, and growth prospects. A reasonable investigation into the truthfulness and accuracy of the Offering

Documents, including the statements incorporated by reference, would have revealed that the Offering Documents contained false and/or misleading statements and/or omissions, as alleged herein. None of the Underwriter Defendants made a reasonable investigation into the truthfulness and accuracy of the IPO and/or SPO Documents.

## IV. THE OFFERING DOCUMENTS VIOLATED GAAP AND MISLED INVESTORS

### A. Accounting Policies and Principles Applicable to QTT

48. Generally Accepted Accounting Principles ("GAAP") are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured. As the official accounting standard, GAAP has been codified and is primarily promulgated by the Financial Accounting Standards Board ("FASB").

49. The SEC requires that public companies present financial statements in accordance with GAAP. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.

50. As a publicly traded company, SEC Staff Accounting Bulletin No. 99 – Materiality ("SAB 99") guides Qutoutiao's application of materiality. Materiality is based on whether a reasonable person's decision-making process, relying upon Qutoutiao's public statements, would have been changed or influenced by the inclusion or correction of the information at issue. According to SAB 99, qualitative and quantitative factors should be considered in determining materiality.

51. The FASB Amendments to Statements of Financial Accounting Concepts No. 9 ("Concept No. 9") issued in August 2018 clarified the concept of materiality. Concept No. 9 states

that "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

52.     Qutoutiao was required, under GAAP and SEC Regulation S-X, to make specific disclosures pertaining to related-party transactions because they are material.

53.     SEC Regulation S-X requires:

(1) Related party transactions…should be [identified and the amounts] stated on the face of the balance sheet, statement of comprehensive income, or statement of cash flows.

(2) In cases where separate financial statements are presented for the registrant, certain investees, or subsidiaries, any intercompany profits or losses resulting from transactions with related parties and not eliminated and the effects thereof shall be disclosed.

17 C.F.R. § 210.4-08(k).[8]

54.     In addition, FASB Accounting Standards Codification ("ASC") 850 applies to related parties.[9] Related parties cannot be presumed to be acting at arm's length because of the special inherent relationship between them. *See* ASC 850-10-50-5. Because this special relationship can create a conflict of interest that can benefit related parties, withholding

---

[8] Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

[9] According to GAAP, related parties include the following:
- Affiliates of the entity;
- Principal owners of the entity and members of their immediate families;
- Management of the entity and members of their immediate families;
- Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests;
- Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests. (ASC 850-10-20).

information about material related-party transactions makes financial statements unreliable and prevents the true picture of an entity from being represented. Thus, "[i]nformation about transactions with related parties that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their significance." (ASC 850-10-10-1).

55.    FASB ASC 850, requires companies to disclose the following for related party transactions:

- The nature of the relationships involved;

- A description of the transactions, including transactions where no amounts or nominal amounts are involved, for each of the reporting periods where income statements are presented; additionally, other information deemed necessary to gain an understanding of the effects of the transactions on the financial statements should be disclosed;

- The dollar amounts of the transactions for each of the reporting periods where income statements are presented along with the effects of any change in the method of establishing the terms of the transactions when compared to the method used in the preceding reporting period; and

- Amounts due to or from related parties as of each financial statement date and, if not otherwise apparent, the terms and manner of settlement related to those amounts.

56.    Furthermore, when a "reporting entity and one or more other entities are under common ownership or management control and the existence of that control could result in operating results or financial position of the reporting entity significantly different from those that would have been obtained if the entities were autonomous," ASC 850 requires companies to disclose "the nature of the control relationship … even though there are no transactions between the entities." (850-10-50-6).

**B.    Dianguan Should Have Been Disclosed as Controlled by or Affiliated with Defendant Tan Because its Founder had a Special Relationship with Him**

57.    In February 2018, QTT purchased Dianguan for CNY 15 million.[10] QTT's IPO and SPO Prospectuses each had an entire section of "Related Party Transactions," which included "Transactions with Companies Controlled by or Affiliated with Mr. Tan." However, they neglected to also list Dianguan, QTT's advertising agent, as a related party prior to the acquisition.

58.    Xiang "Sean" Liang ("Liang") had founded Dianguan just four months prior its acquisition by QTT, was its director on record from February 13, 2018 through December 29, 2018, and was its legal representative through December 29, 2018. But Liang had no educational or professional experience in digital marketing.[11] His master's degrees were in business administration, and mechanical design and theory, and he had previously only worked in investment management. *Id.*

59.    What Liang did have was a close business relationship with Defendant Tan, the co-founder and executive chairman of QTT. Beginning in 2016, Liang was the investment director of a company which Defendant Tan owned 99% of: Shanghai Taiyun Investment Management Co. Ltd. (branded as "Taiyun Capital").[12] Tan's sister, Tan Siping ("Siping"), owned the remaining 1%, and according to SAMR records, is a legal representative and director of Taiyun Capital. Liang is still listed as an investment assistant on Taiyun Capital's page on ITJuzi, a Chinese website that tracks technology companies. *Id.* And in July 2018, Defendant Tan simultaneously held the

---

[10] Qutoutiao Inc., Annual Report (Form 20-F) (Apr. 11, 2019).

[11] Liang Xiang, Taiyun Capital, Investment Associate, IT ORANGE, https://www.itjuzi.com/person/42044 (last visited Feb. 4, 2025).

[12] *Introduction and Contact Information for Taiyun Capital*, IT ORANGE, https://www.itjuzi.com/investfirm/1938 (last visited Feb. 4, 2025).

positions of business consultant for Taiyun Capital and chairman of QTT.[13]

60.    Within weeks of the Dianguan Acquisition, Defendant Tan invested in a company which was the executive partner of another company at which Liang was the director of domestic investment. Specifically, Liang was the Director of Domestic Investment at Nantong Woofoo Jinxin Investment Management Co. Ltd, whose executive partner was Nantong WooFoo Jinxin Equity Investment Fund Partnership ("Woofoo Equity"). Tan began holding 64.5% of the equity in Woofoo Equity on February 26, 2018.[14]

61.    Accordingly, because Liang and Tan's business relationship was so intertwined that Dianguan would have been prevented from "fully pursuing its own separate interest" such as not selling illegal advertisements and risking regulatory scrutiny and penalties, Dianguan and QTT were related parties. This relationship, which would have shed light on revenues generated from transactions with Dianguan prior to its acquisition and the reasons for acquiring Dianguan and replacing Baidu, required disclosure to the Company's investors, but it was not.

### C.    Transactions with Mengtui, Fangce, and Shihui Miao Should Have Been Disclosed as Related to and Benefitting Defendant Tan.

62.    QTT also failed to disclose that one of its top advertisers, Mengtui ("Meng Push" or "Mengtui App"), is a party related to Tan.[15] Specifically, the copyright and website operating licenses for the Mengtui App are held by Shanghai Tujin Network Technology Co. Ltd. ("Tujin"). Tujin's 80% shareholder is Shanghai Bimeng Information Technology Co. Ltd. ("Bimeng"), of which Tan's sister, Siping, was the legal representative and director until October 23, 2018.

---

[13] *Want to make money from news? You might regret*, SOHU (Jul. 17, 2018), https://www.sohu.com/a/241611324_10 0116800 (last visited Feb. 4, 2025).

[14] Investment Team, WOOFOO CAPITAL, http://www.woofoocapital.com/#page3 (last visited Jan. 11, 2021).

[15] *According to QTT: Fake Revenue, Non-Existent Cash, Undisclosed Related Parties*, WOLFPACK RESEARCH (Dec. 10, 2019) (the "Wolfpack Report"), https://wolfpackresearch.com/research/qttfakerevenues-fakecash-undisclosedrelatedparties, approximately 26.2% of the advertisements on QTT that they analyzed originated with the Mengtui App.

Bimeng is also wholly owned by Shanghai Bige Information Technology Co. Ltd. ("Bige"), of which Tan is the 99% owner and his wife, He Yuning, is the 1% owner.[16] Further, Bige's official company website as listed on Qichacha, www.bigbaser.com, leads to a venture capital website that lists Tan as Bige's founder and Bige's CEO, Liu Hui, holds positions at several other companies controlled by Tan.[17] The website also lists Mengtui, Shihui Miao, and Qujianpan (Qu Keyboard) among QTT's products. Furthermore, other media outlets, including Eastmoney Finance, place Mengtui under the category of QTT's official products.[18]

63.     QTT also failed to disclose that the advertising income it received from Publisher Shanghai Fangce Network Technology Co. Ltd. ("Fangce"), is related-party income from companies related to Tan as it is managed and substantially owned by one of his close business associates, Liu Hiu.[19] Specifically, Liu Hiu is Fangce general manager and owns 65% of Fangce's parent company, Tianjin Yingnuo Asset Management Co. Ltd. ("Yingnuo"). Liu Hui is also a director of Shenzhen Falide Technology Co. Ltd. ("Foodleader"), where Tan serves as chairman and owns a 53.8% stake through Taiyun Capital's ownership of Foodleader.

64.     QTT further failed to disclose that the advertising income it received from Shihui Miao ("Shihui Miao App") is related-party income from companies related to Tan as its licenses and rights are owned by companies that he owns and his sister represents.[20] Specifically, its website operating licenses and software authorship rights are owned by Shanghai Xihu Culture

---

[16] See Wutong Holding Group Co., Ltd.- Brief report on changes in equity, CNINF (Nov. 30, 2018), https://q.stock.sohu.com/newpdf/201833723048.pdf.

[17] *Team Page*, BIGBASER.COM, https://www.bigbaser.com/#/about/team (last visited Jan. 7, 2021).

[18] *Qu Toutiao President Liu Anyi: The value of Qu Toutiao is underestimated*, TIMES FINANCE, (Dec. 4, 2019), http://finance.eastmoney.com/a/201912041312870921.html.

[19] According to the Wolfpack Report, approximately 0.3% of the advertisements on QTT that it analyzed originated with Fangce.

[20] According to the Wolfpack Report, approximately 3.0% of the advertisements on QTT that it analyzed originated with the Shihui Miao App.

Communications Co. Ltd. ("Xihu"), which is 100% owned by Bige, which, as noted above, is 100% owned by Tan and his wife. Further, Tan's sister, Siping, is Xihu's legal representative and its current supervisor on record, Xia Biyun ("Xia"), is also the current supervisor on record at Tan's companies Bige and Bimeng. This was partially disclosed in the 2018 F-1 Registration Statement as a 20% equity interest in Shanghai Jifen Culture Communication Co. Ltd ("Jifen"), one of Qutoutiao's Chinese entities. Xihu also developed the Shihui Miao App.[21]

65.    Both the Mengtui App and Shihui Miao App are part of QTT's product matrix and while they "have different relationships with the main [QTT App]" to attract traffic and maintain a high level of user activity, they are both so intertwined with the QTT App that they were not likely to grow at a sustainable rate on their own.[22] Accordingly, the Company's transactions with the Mengtui App and the Shihui Miao App should have been disclosed due to the intertwined nature of their relationship with the QTT App and the financial benefit that Defendant Tan ultimately derived from them.

66.    Specifically, Defendant Tan was able to purchase a $37 million mansion on Harbor Island in Newport Beach, CA in October 2019 – mere months after Principal Shareholders were able to sell their shares in the SPO at artificially inflated prices, pocketing proceeds of nearly $67 million.[23]

## V.    THE 1933 ACT CLAIMS

67.    Lead Plaintiff asserts strict liability claims under §§ 11, 12(a)(2) and 15 of the

---

[21] Ma Cheng, *Giants' "Sinking Anxiety": After Tencent and Ali entered the game, JD.com bought into QuTouTiao*, ALL WEATHER TMT (Apr. 25, 2019), https://awtmt.com/articles/3518477 (last visited Feb. 4, 2025).

[22] Han Zhipeng, *The original funny headline "Life Renewal" game*, SOHU (Oct. 11, 2019), https://www.sohu.com/a/346169737_118788 (last visited Feb. 4, 2025).

[23] James McClain, *Chinese Tech Billionaire Buys $37 Million Newport Harbor Mansion*, VARIETY (Oct. 30, 2019), https://variety.com/2019/dirt/moguls/chinese-tech-billionaire-buys-37-million-newport-harbor-mansion-1203388732/ (last visited Feb. 4, 2025).

1933 Act against Defendants who signed and/or had authority over the contents of the Offering Documents issued in connection with the Company's Offerings. Lead Plaintiff's 1933 Act claims are not based on any allegation of deliberate or intentional misconduct, and Lead Plaintiff expressly disclaims any reference or reliance upon fraud allegations for such claims.

68.       The 1933 Act Claims arise out of Qutoutiao's approximately $85.8 million IPO of 13.8 million ADSs at $7.00 per share and approximately $31.0 million SPO of 3.3 million ADSs at $10 per share.

69.       On September 11, 2018, Qutoutiao filed its final amendment to the IPO Registration Statement with the SEC on Form F-1/A. The Company's IPO Registration Statement was declared effective on September 13, 2018. On September 14, 2018, Qutoutiao issued a press release announcing the pricing of its IPO and that Defendants Citigroup, Deutsche, China Merchants, and UBS would be acting as "joint bookrunners" for the Offering, and Defendant KeyBanc would be acting as co-manager.[24] That same day, Qutoutiao filed its IPO Prospectus on Form 424B4 with the SEC.

70.       On March 29, 2019, Qutoutiao issued a press release announcing its proposed follow-on SPO, and named Defendants Citigroup, Deutsche, CLSA, Jefferies, Haitong and Lighthouse as "joint bookrunners" for the Offering.[25] On April 1, 2019, the Company filed its first and final amendment to its SPO Registration Statement on Form F-1/A. The SPO Registration Statement was declared effective shortly thereafter. On April 3, 2019, Qutoutiao filed its SPO Prospectus on Form 424B4 with the SEC.

---

[24] News Release, Qutoutiao Inc. Announces Pricing of Initial Public Offering, GLOBE NEWSWIRE (Sept. 14, 2018), https://ir.qutoutiao.net/news-releases/news-release-details/qutoutiao-inc-announces-pricing-initial-public-offering (last visited Feb. 4, 2025).

[25] News Release, Qutoutiao Inc. Announces Proposed Follow-on Public Offering of American Depositary Shares, GLOBE NEWSWIRE (Mar. 29, 2019), https://ir.qutoutiao.net/news-releases/news-release-details/qutoutiao-inc-announces-proposed-follow-public-offering-american (last visited Feb. 4, 2025).

71.    The Offering Documents stated that: "[the Company's] visionary and experienced management team has been essential in driving the growth of [its] business. [Qutoutiao's] co-founder and executive chairman, [Defendant Tan], together with [its] co-founder, director and chief executive officer, [Defendant L. Li], are the foundational pillars of [the] company and have delivered strong business results leveraging their over 20 years of combined Internet industry experience. Other members of [the Company's] senior management team are also instrumental in growing [the Company's] business with their proven track record in their areas of expertise. Co-founders and the majority of the senior management team members have worked together previously, further enhancing the stability and consistency of [Qutoutiao's] vision."

72.    Yet the Company's negligent investigation of the accuracy of their statements in the Offering Documents failed to discover that the Company's culture and structure had led employees to place non-compliant ads on the QTT App. For example, according to a channel manager at Dianguan from June 2019 to September 2020 ("Former Channel Manager"), since the Company's inception, the culture under Defendant Tan's leadership was "radical," and had a "wolf spirit culture" (狼性文化) in which employees had aggressive targets and overtime work was considered normal. Similarly, a former Qutoutiao employee who was a sales director of Dianguan from March 2019 to May 2020 (the "Former Sales Director") described Tan's leadership style as "pursuing profits" (要求赚钱) and "radical" (激进) and the Company's performance evaluation system as consisting of "normal goals" (正常指标), which were reachable but still challenging, and "leap goals" (跳一跳指标), which were nearly impossible to reach.

73.    The Former Channel Manager further told investigators that while Qutoutiao used artificial intelligence to first screen advertisements – if an ad containing content that "toed the line" (打擦边球) was screened out, either the advertiser or the employees who were responsible for

24

those ads were able to employ a second manual review, which would allow those non-conforming advertisements to be put onto the platform. The Former Channel Manager explained that ads that "toed the line" included ones containing "softcore pornography" or pictures of people in strapless tops or hotpants as well as online novels that were being used without permission.

74.    This second manual review was done, as explained by the Former Sales Director, by a team that was disbanded after the CCTV Exposé. The Former Sales Director told investigators that the Company employed two different teams to manage its advertising content. These teams operated independently. While one team mainly dealt with well-known and qualified advertisers like Tencent, Alibaba, and Jinri Toutiao, who were largely compliant and provided low-risk advertisements, the other team mainly dealt with unqualified advertisers whose advertisements were "risky" (有一定风险). While the Former Sales Director did not deal with unqualified advertisers, the Former Sales Director learned about how the Company dealt with those advertisers from co-workers while still working for the Company. Most of the time, the team dealing with unqualified advertisers did not screen or scrutinize the content of advertisements before they were published, and instead outsourced that due diligence to outside contractors. The Former Sales Director explained that Qutoutiao outsourced riskier advertisements to approximately 40–50 other contractors, who often immediately opened accounts for any advertiser without conducting the proper due diligence.

75.    The Former Sales Director stated that the risky advertisements included gambling and fraudulent investment scheme advertisements, whereby users were led to WeChat groups that directly defrauded its victims – commonly known as a "pig slaughter" (杀猪局) scam in China. Another type of risky advertisement was for "three no" products (三无产品), which refer to products, such as health supplements, whose packaging does not include the name of the

manufacturer, the production date, or a quality certification. Other types of illicit products that were advertised on QTT include games without proper copyright.

76.    The Underwriter Defendants also conducted a negligent investigation, despite claiming to have special expertise relevant to the underwriting of the Company's Offerings. Investors including Lead Plaintiff reasonably relied upon their expertise to ensure that a thorough due diligence investigation of Qutoutiao was conducted and full disclosure of all material information was made in the Offering Documents.

77.    Specifically, the information the Underwriter Defendants provided to the public emphasizes their purported high standards and generally assures investors about the quality of their work. For example, Defendant Citigroup's website touts:

> We provide world-class solutions that are as diverse as the needs of the corporates, institutions, governments, and individual investors we serve in 160 countries and territories. The breadth, depth, and strength of our underwriting, sales and trading, and distribution capabilities span asset classes and currencies, sectors and industries, covering a vast array of products.

> On trading floors located in over 80 countries, we work around the clock to enrich the relationships, products, liquidity, and technology that define our market-making presence in North America, Asia, Europe, the Middle East, Africa and Latin America.

> Our research and analysis offer the highest-quality corporate, sector, economic, and geographical insights - from equity and fixed income research to market and product analysis — helping individual and institutional clients navigate a complex global marketplace.[26]

78.    Similarly, Defendant Deutsche addresses its researching responsibilities claiming its "mission is to deliver high-quality, independent analysis that helps investors understand markets."[27] Defendant Keybanc also touted its successes as an investment bank, highlighting Keybanc's "highly regard[ed] research" and "IPO specialization." Further discussing Keybanc's

---

[26] Markets, CITIGROUP, https://www.citigroup.com/global/businesses/markets (last visited Feb. 4, 2025).

[27] Our Mission, DB RESEARCH, https://www.dbresearch.com/PROD/RPS_EN-PROD/Our mission/RPSMISSION.alias (last visited Feb. 4, 2025).

researching strengths, its website states:

> Keybanc [], one of the nation's leading providers of investment research, combines deep domain expertise with an interconnected research approach to identify dynamic companies capitalizing on opportunities in changing industries. By bringing multiple points of view to a company, industry and thematic shift, clients benefit through early identification, deeper insights and better investment decisions. Additionally, we go beyond traditional fundamental equity research, and augment our differentiated channel checks and industry contacts with deep quantitative analysis.[28]

79.     Defendant Jefferies likewise touts its relevant success stating that, "[s]ince 2016, Jefferies acted as bookrunner in one in every five IPOs priced in the U.S." and "[s]ince 2016, Jefferies has book-run over 175 IPOs raising over $55 billion in proceeds."[29] Its website goes on to highlight its expertise, commitment and capabilities related to investment banking:

**Sector Expertise**

- Deep sector knowledge in investment banking that enables us to:
  - Best position our clients' investment thesis to achieve the optimal valuation on their equity offerings
  - Best position our clients' credit profile to achieve the lowest yield on their debt offerings
  - Demonstrate the most in-depth knowledge of potential buyers to maximize sale value for our clients

**Senior-Level Attention on Transactions**

- Senior-level commitment to our clients' transactions that enables us to:
  - Bring extensive experience in structuring our clients' transactions
  - Bring extensive experience to the advice we give our clients
  - Maximize the likelihood that transactions are completed flawlessly

Further, Defendant Jefferies boasts its abilities in investment banking research stating, in relevant part, "[s]ince the beginning of 2016, Jefferies has executed over 620 non-U.S. book-run financings

---

[28] Equity Research, KEYBANC, https://www.key.com/businesses-institutions/solutions/capital-markets/institutional-equities/equity-research.jsp (last visited Feb. 4, 2025).

[29] Investment Banking, JEFFERIES, https://www.jefferies.com/InvestmentBanking/Restructuring-Advisors/2/284 (last visited Feb. 4, 2025).

and advisory transactions for clients based in 50 countries. Each region has its own unique mix of developed and emerging markets and Jefferies has built long-standing relationships with partners throughout the Americas, EMEA and Asia-Pacific."[30]

80.     Defendants UBS, CLSA, China Merchants, Haitong, and Lighthouse claim a special expertise with respect to offerings of this nature, which would have caused investors like Lead Plaintiff to reasonably believe that based on such expertise a due diligence investigation of Qutoutiao was conducted and full disclosure of all material information was made in the Offering Documents.

81.     Defendant UBS prides itself as "the first foreign invested securities firm in China with full licenses to conduct businesses including securities brokerage, securities investment consultancy, financial advisory related to securities trading and securities investment activities, securities underwriting and sponsoring, securities proprietary trading, securities asset management and distributing financial products."[31] UBS addresses its key focus as an investment bank and the quality of its services, stating in relevant part:

> …we work with our clients to understand their business needs and provide ideas that help power growth. We recognize that our clients have an intimate understanding of their own business. We complement their insights by offering them access to some of the best minds in capital markets, financing and restructuring, as well as transactional expertise.
>
> …we apply the right research instruments for new evidence to deliver clear insights. Our team of economists, strategists and analysts provide the breadth, depth and originality of investment thinking.[32]

---

[30] Investment Banking Global, JEFFERIES, https://www.jefferies.com/InvestmentBanking/Investment-Banking-Global/2/942 (last visited Feb. 4, 2025).

[31] UBS Futures Co. Launches Financial Futures Brokerage Service in China, UBS INVESTMENT BANK, https://www.ubs.com/global/en/media/display-page-ndp/en-20160523-ubs-futures-co-launches-financial-futures-brokerage-service-in.html (last visited Feb. 4, 2025)

[32] About Us, UBS INVESTMENT BANK, https://www.ubs.com/global/en/investment-bank/about-us.html (last visited Feb. 4, 2025).

82.     Defendant CLSA pointedly claims to be "a leading provider of corporate finance and capital markets services in Asia." For example, CLSA's website states:

> Leveraging its unrivalled Asian network and direct links to China, CLSA's corporate finance and capital markets team… support the ambitions of Chinese corporates looking for offshore financing or acquisitions and global corporates seeking access to capital or assets in Asia.

> CLSA helps public and private corporations, financial institutions and government agencies strengthen their balance sheets and fund future growth while maximizing value for investors.[33]

83.     Defendant China Merchants tout their relevant achievements, stating:

> [it] has achieved stunning progress in capital markets []. In terms of IPO underwriting amount from 2016 to 2018, [China Merchants] ranked top 3 among Chinese securities firms and top 5 overall in the market, and furthermore, [it] has established the first-mover advantage and dominant position in the "New-Economy" companies' [Hong Kong] IPO market.[34]

84.     Defendant Haitong "boasting its well-established businesses" states:

> Haitong International is capable of providing great potentialities and a better platform for the development of equity research. Starting from 2019, the equity research of Haitong International has been fully interlinked with that of Haitong Securities and the research reports are published bilingually. The research coverage comprises nearly 200 Chinese concept stocks, 800 A stocks and 200 Taiwanese, Japanese, Indian and South Korean stocks. Its team is committed to providing services catering to clients' needs as practicable as possible and excelling in terms of coverage, responsiveness and depth of contents. Based in China, Haitong International has invited 10 and 20 local analysts on board in Tokyo and Mumbai respectively who possess full knowledge of the local regulations, sectors and backgrounds of enterprises. In this way, Haitong International is strong to serve the local investors in the overseas markets and, through its engagement in Chinese, Japanese and Indian markets, it can provide better cross-border investment services in China.

> Haitong International's analysts have been being granted awards from time to time by a number of authoritative institutions at home and abroad including Institutional Investor, Asiamoney and New Fortune. With its content-focus philosophy, the equity research team strives to provide timeliness and hands-on research to

---

[33] Corporate Finance, CLSA, *supra* note 6.

[34] Company Introduction, CHINA MERCHANTS SECURITIES, http://www.cmschina.com.hk/en/AboutUs/Info (last visited Feb. 4, 2025).

clients.[35]

85.     Defendant Lighthouse claims to be "China's leading new economy boutique investment bank, focusing on the new economy field and is committed to becoming a partner of 1% of the top new economy entrepreneurs' strategy and capital."[36] Lighthouse also touts its innovative abilities stating, in relevant part, "[i]t is neither afraid of complex competitive situations nor adheres to the usual universal understanding. Instead, through research in the spirit of disruptive innovation, it obtains an understanding of the nature of the business, market trends, key success factors and competition patterns, supplemented by strong execution, thus helping Customers break through the competitive situation and achieve leaps and bounds." Lighthouse's website provides transaction successes, specifically boasting that it provided "exclusive financial advisory services" leading to "Qutoutiao successful[] IPO."[37]

86.     While having a role (and duty) being to ensure that all material information was included in the Offering Documents and that no material information was omitted that was needed to make the information provided therein not misleading, the Underwriter Defendants conducted a negligent investigation. The Underwriter Defendants had an express duty to perform an independent and reasonable due diligence investigation of Qutoutiao because they were selling its securities, and to verify the accuracy of disclosure concerning its Offerings.

87.     Moreover, the Underwriter Defendants had control over the contents and dissemination of the IPO prospectus and/or the SPO prospectus. Their names are prominently

---

[35] Global Equities, HAITONG INTERNATIONAL, https://www.htisec.com/en-us/global-equities (last visited Feb. 4, 2025).

[36] Company Profile, LIGHTHOUSE CAPITAL RECORD, http://lighthouse.hfsxw.cn/index.php?m=content&c=index&a=lists&catid=2 (last visited Jan. 15, 2021).

[37] Qu Toutiao Successfully IPO, *Light Source Capital Provides Exclusive Financial Advisory Services*, LIGHTHOUSE CAPITAL RECORD (Sept. 15, 2018), http://lighthouse.hfsxw.cn/index.php?m=content&c=index&a=show&catid=147&id=302.

featured on the cover of the prospectus. The co-managing underwriters actively participated in creating the prospectus, and reasonable investors including Lead Plaintiff and other Class Members expected that the Underwriter Defendants ensured that the prospectus provided appropriate disclosure of all material information.

88.     Even a simple public record search by Defendants of the market that Qutoutiao was in at the time of the Offerings would have uncovered public articles as early as March 2018 in the People's Daily, the Chinese Communist Party's leading newspaper, reporting that a whistleblower had accused aggregator Jinri Toutiao (a competitor of QTT) of "false advertising" that would "specifically target" second and third-tier cities because regulators there were more lenient.[38]

89.     A simple investigation at the time of the Offerings would have revealed, as reported by a citizen to Fengyu Network Technology ("Fengyu") on September 14, 2018, that Black Five advertisements containing vulgar content were on the QTT App – "mostly placed in third-tier cities and below."[39] A CCTV reporter similarly found and reported on November 28, 2018, that Qutoutiao was encouraging users to "surf the news and earn coins" while showing numerous advertisements containing vulgar content.[40] Instead, Defendants' negligent investigation failed to discover that Qutoutiao was not strictly adhering to the guidelines regarding advertiser quality and content in the 2016 "Interim Measures for the Administration of Internet Advertising," which states that certain special products and services may not be published without review, and that internet advertisements should be easily identifiable and clearly labeled so as not to trick users.[41]

---

[38] See *"Today's Toutiao" is finally on "Toutiao"! Ignoring the supervision and starting this "black business"! 240 million users*, CCTV FINANCE (Mar. 29, 2018), http://finance.people.com.cn/n1/2018/0329/c1004-29897407.html.

[39] Flower Zijian, *Iqiyi has a large number of black five types of ads: visible to users in cities below the third tier*, PHOENIX TECHNOLOGIES (Sept. 14, 2018, 12:04 PM), https://www.ithome.com/html/it/383152.htm.

[40] Xibei, *What's the crux of the stubborn disease and cancerous "five black" advertising headlines?*, SOHU (July 19, 2020, 11:37 PM), https://www.sohu.com/a/408546792_99986883.

[41] *Platform to make money by brushing news: interesting headlines articles with vulgar content and eyeballs,* SOHU (Nov. 29, 2018, 4:31 PM), https://www.sohu.com/a/278591460_223764.

Subsequently, the Internet Society of China, a non-governmental organization that is supported by several Chinese government ministries and functions as a self-regulatory organization for internet firms, reprimanded Qutoutiao and urged it to make rectifications.

90.     In addition, a simple investigation would have revealed, as a lawsuit filed by Yang Bin ("Yang") in January 2019 against Qutoutiao's Chinese entity Jifen showed, the Company had begun inserting gambling advertisements on the QTT App at least two years prior.[42] Yang alleged that from clicking on a link found on the QTT App, he spent CNY 1.15 million after entering a gambling website. The case was ultimately dismissed by the Chengdu Intermediate People's Court after Jifen successfully argued that, while it was Qutoutiao's network service provider, advertisements were automatically pushed out based on big data analyses, and due to the volume of advertisements, it could not review all advertisements before they were released.[43]

91.     A simple investigation also would have revealed, as a preliminary investigation by the Shanghai Municipal Market Supervision Bureau ("Shanghai Regulator") found and "sternly warned" Qutoutiao about after summoning it "for a talk" on June 18, 2019, there were "severely illegal advertisements" on their platforms.[44] Specifically, the Shanghai Regulator found multiple instances of "seductive headlines" such as "Lose 90 jin [45 kilograms]! Watch oils drain away before your eyes! Try for free," that led to landing pages with much more modest claims as well as of the unauthorized use of famous brand names in China, such as the names of Alipay or

---

[42] Jiang Yuqing, *The funny headline that relies on "poisonous blood" to continue life is different from Pinduoduo. Why is the fate different?*, BT FINANCE (July 20, 2020), https://tech.sina.com.cn/i/2020-07-20/doc-iivhuipn4001538.shtml.

[43] Civil Judgment of the First Instance of the Internet Infringement Liability Dispute between Yang Bin and Shanghai Jifen, *Yang Bin v. Shanghai Jifen Culture Commc'n Co., Ltd.* Chuan 0107 Minchu No. 6651 (Aug. 15, 2019), https://www.qixin.com/lawsuit/d27a20dd-8114-420d-924e-bdd1e083ee2e/5e170b10ebf5516c5400f411.

[44] *Shanghai Municipal Market Supervision Bureau interviewed Qutoutiao, Huitoutiao and related advertising alliances*, CHINA CONSUMER NETWORK (June 24, 2019), https://www.ncnews.com.cn/xfzpt/zhyw/201906/t20190624_1446925.html.

WeChat, or the use of celebrities' names, which would lend credibility to advertisements. The Shanghai Regulator demanded a stricter pre-advertisement review process to better prevent false and illegal advertisements on its platform, requiring Qutoutiao to strengthen its examination and regulation of advertisements before they were published and to work to "earnestly safeguard the legitimate rights and interests of consumers."

92.    And a simple investigation would have revealed, as a Yishi Finance reporter had figured out and disclosed on July 19, 2020, since Qutoutiao's advertising revenue consistently accounted for over 90% of its total revenue in 2017 and 2018, "it's not hard to see that advertisements are the main way [for the Company] to generate profits."[45] Instead, Defendants negligently failed to discover that potentially due to its user base (the majority of whom hail from third- and fourth-tier cities that make up China's "sinking market"), the QTT App had a high volume of advertisements concerning pharmaceuticals, medical devices, breast enhancement products, weight loss products, and height enhancement products. According to Article 19 of the Advertising Law of China, it is illegal for radio stations, television stations, newspapers, audiovisual publishing units, and internet information service providers to run advertisements for pharmaceuticals, medical devices, breast enhancement products, weight loss products, and height enhancement products that represent them as health information.[46]

93.    Next, a simple investigation would have revealed that, as discovered by Wolfpack in its investigation, far from a sophisticated "proprietary programming advertising system," the QTT App's ad-serving tools lacked sophistication. This investigation, which analyzed network traffic from the QTT App, found that it contained rudimentary systems that could be replicated by

---

[45] Xibei, *What's the crux of the stubborn disease and cancerous "five black" advertising headlines?*, Sοηυ (July 19, 2020), https://www.sohu.com/a/408546792_99986883.

[46] *Advertising Law of the People's Republic of China*, Chinese Government Network (Apr. 25, 2015), http://www.gov.cn/zhengce/2015-04/25/content_2853642.htm.

basic software solutions, undermining the statements in the Prospectus about the Company's competitive edge in its advertising system. In particular, the investigation revealed internal Qutoutiao source code comments reflecting instructional materials resembling introductory-level tutorials for ad-serving processes. The simplicity of the ad-serving tools and training processes contradict the Company's portrayal of a robust technological infrastructure, raising significant doubts about the credibility of its stated "proprietary programmatic advertising system."

94.     This type of third-party investigation, which relied on straightforward network traffic analysis and publicly available data, exemplifies the basic due diligence a reasonable investor would expect the Underwriter Defendants to perform before signing off on the Offering Documents. A reasonably diligent investigation into the QTT App's technical operations would have uncovered these discrepancies and revealed that the Company's technology was far less advanced than described. That the Underwriter Defendants negligently failed to identify and disclose these issues to investors underscores a lack of reasonable care and diligence in evaluating the accuracy of the Company's public statements about its technological capabilities.

95.     As a result of Defendants' negligent investigation, they failed to ensure that the statements in the Offering Documents were true and accurate.

96.     By the commencement of this action, QTT ADSs closed at $2.42 per share on September 17, 2020, representing a 65.43% decline from the $7.00 per share IPO price and a 75.8% decline from the $10.00 per share SPO price. And on January 15, 2021, the QTT ADSs closed at $2.14 per share.

97.     Each of the Offerings was a firm-commitment offering, in which the Underwriter Defendants purchased shares of Qutoutiao and sold them to the investing public.

98.     Under applicable SEC rules and regulations, including Item 303 of SEC

Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303"), the Offering Documents were required to disclose known trends, events, or uncertainties that Qutoutiao was having, and was reasonably likely to have, and their impact on its continuing operations. The Offering Documents did not do so. For this and other reasons, the statements contained in ¶¶ 99, 101, 103-05, 107, 110, 112, 114, 116, 118, 121-22, 124, 126-27, and 129 *infra*, were materially false and misleading. Because Defendants' negligent preparation of the Offering Documents caused them to contain untrue statements of material fact and omit other facts necessary to make the statements made not misleading, and not be prepared in accordance with the rules and regulations governing their preparation, Defendants are liable under the 1933 Act.

A. **Materially False and Misleading Statements and Omissions in the IPO Documents.**

99.     The IPO Documents contained multiple material misstatements regarding the Company's strategy of targeting users in lower-tier cities in China, stating in relevant part that:

> ***Since our inception, we have strategically targeted users from tier-3 and below cities in China because of the enormous opportunities in this underserved market***. As of the end of 2017, tier-3 and below cities had a population of 1,027 million each owning 0.5 mobile device on average (compared to a population of 363 million each owning 1.3 mobile devices on average in tier-1 and 2 cities), suggesting significant potential for further mobile penetration, according to the Analysys [sic] Report. ***Mobile users in tier-3 and below cities tend to have a slower pace of life and spend more time on the Internet given limited offline entertainment venues. Moreover, they often enjoy fast increasing disposable income and lower financial pressures thanks to lower housing prices. These factors contribute to a significant need for mobile entertainment content while also create strong monetization potential***.

100.    However, the statements contained in ¶ 99 supra contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading because, the "enormous opportunities" and "strong monetization potential" in Tier-3 and Tier-4 cities also had to do with the high number of unqualified advertisers who wanted to run

non-compliant ads in those cities as regulators were more lenient and users were less aware of their

rights as consumers in those cities.

101.    The IPO Documents also stated that Qutoutiao's "***net revenues have increased***

***rapidly*** from RMB58.0 million (US$8.8 million) in 2016 to RMB517.1 million (US$78.1 million)

in 2017, and further from RMB107.3 million (US$16.2 million) in the six months ended June 30,

2017 to RMB717.8 million (US$108.5 million) in the same period in 2018." Most of this revenue

was derived from advertising, as the Company explained in the IPO Documents:

> Baidu, which is our largest customer and operates a third-party advertising
> platform, contributed 69.9%, 43.7%, 75.8% and 12.1% of our net revenues in 2016
> and 2017 and the six months ended June 30, 2017 and 2018, respectively. Baidu
> also accounted for 92.6%, 59.8% and 30.5% of our accounts receivable as of
> December 31, 2016 and 2017 and June 30, 2018, respectively. ***To enhance our***
> ***platform's monetization capabilities, we acquired an advertising agent in***
> ***February 2018 that operates a programmatic advertising system. We expect this***
> ***system will allow us to reduce our reliance on third-party advertising platforms***
> ***such as Baidu.*** Prior to our acquisition of this advertising agent in February 2018,
> we engaged such advertising agent to serve as our sales agent in selling our
> advertising solutions to other second-tier advertising agents and end advertisers. In
> 2017 and the six months ended June 30, 2018, 26.2% and 78.2% of our net
> revenues, respectively, were generated through this advertising agent. ***These***
> ***second-tier advertising agents and end advertisers are our customers as they***
> ***select our mobile applications to place their advertisements and our performance***
> ***obligation is to provide the underlying advertising display services to them.***

102.    The statements contained in ¶ 101 *supra* contained untrue statements of material

facts and omitted material facts necessary to make the statements made therein not misleading by:

(i) touting the Company's "rapidly" increased revenues without disclosing that a significant

number of the advertisements that contributed to this revenue growth (a) could not be substantiated

and thus were considered false advertisements under applicable Chinese regulations, or (b)

provided links to illegal online gambling platforms; (ii) noting the "programmatic advertising

system" of Dianguan as a benefit of, and reason for, replacing the Company's established third-

party advertising agent, Baidu, without disclosing that it was recently founded by a close business

associate of QTT's CEO who had no experience in digital marketing and would reduce the amount of oversight over the content of ads to increase ad sales; (iii) explaining the Company's ability to monetize user traffic, as enhanced by its programmatic advertising system, without disclosing that the enhancement also related to its increased ability to sell non-compliant ads; and (iv) describing the Company's "performance obligation" to its end-advertiser customers without disclosing that that obligation included displaying more non-compliant and illegal ads resulting from its now separate teams with different processes and procedures for qualified versus unqualified advertisers.

103.    In addition, Item 303 required the IPO Documents to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose the full impact of replacing Baidu with Dianguan on QTT's sales violated Item 303 because there were known trends and uncertainties related to Dianguan being a start-up and related party that were likely to, and did, have a material unfavorable impact on the Company's revenues.

104.    Next, the IPO Documents note that the Company "currently generate[s] most of [its] revenue from advertising," so to "Enhance [the Company's] Monetization Capabilities":

> **We intend to enhance our advertising solutions by strengthening the performance of our proprietary programmatic advertising system**. We believe our strategic move to reduce the utilization of third-party advertising platforms and focus on expanding our advertising customer base and advertising agents directly will further boost our advertising revenue.

105.    Regarding "Monetization," the IPO Documents specifically stated that:

> **Our advertising technology aims to maximize our revenue potential by rewarding the more relevant advertisement with a more prominent position, despite the potentially lower price bid of such advertisement.** We actively monitor the advertisements placed to help ensure their relevance.
>
> Customers for our programmatic advertising system are comprised of advertising agents and end advertisers. **We have our own sales personnel who are responsible**

***to support and monitor the performances of advertising agents and to attract advertising customers to use our programmatic advertising system directly.*** We enter into standard agreements with advertising agents generally for a term of one year. Our advertising agents are responsible for identifying end advertisers, confirming payments and setting up accounts on our programmatic advertising system for advertising customers. We provide ongoing training to advertising agents to familiarize them with the functionalities and capabilities of our programmatic advertising system. ***These advertising agents are responsible for collecting and submitting the relevant documentation and licenses from advertising customers for our approval to open an account on our programmatic advertising system, and are also liable for any infringement of third-party rights or violation of regulatory requirements caused by advertisements placed by their end advertisers.***

106.    The statements contained in ¶¶ 104-05 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading by: (i) detailing how the Company was enhancing or maximizing its ability to monetize user traffic, without disclosing that the enhancement also related to its increased ability to sell non-compliant ads after replacing Baidu with related-party Dianguan in February 2018 and that the technology was based on simple ad-serving tools and training processes; (ii) describing the Company's sales personnel's responsibilities versus those of the third-party advertising agents without disclosing that it had set up separate teams within QTT with different processes and procedures for qualified versus unqualified advertisers which led to more sales of non-compliant ads; and (iii) claiming that third-party advertising agents are liable for any ads that violate Chinese regulatory requirements without disclosing that the Company would also face increasing regulatory scrutiny and reputational harm.

107.    The IPO Documents specifically tout Qutoutiao's mission "to deliver quality and relevant content to users, and content sourcing, management and recommendation" as "core focuses of [its] operations," including with regard to advertising and content screening technology:

- **Advertising. *Our advertising technology enables advertising customers to bid for audience and automatically deliver relevant, targeted promotional links to users.*** Our system rewards more relevant advertisements with more prominent positions, despite the

potentially lower priced bids of such advertisements. Our audience segmentation technology helps ensure the relevance of advertisements shown to users by analyzing their interests through browsing activity, viewed content and commenting history. In addition, we have the ability to predict click-through rates for advertisements using logistic regression, gradient boosting decision tree and linear and nonlinear modeling algorithms. Enhanced precision of these click-through rate projections can help maximize the cost effectiveness of customers' advertising budgets.

- **Content Screening Technology.** Our text screening system screens information based on pre-set keywords. *We utilize artificial intelligence to identify inappropriate or objectionable content from images, speeches and videos, significantly increasing efficiency over manual review. We also apply deep learning methods to analyze complex visual content. Through big data and continuous training, our system is able to monitor and identify objectionable visual content with a high degree of accuracy. The screening system automatically declines content that did not meet the standards of our platform and flags suspicious content for manual review by our content management team.*

108.    The statements contained in ¶ 107 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading by touting the Company's (i) advertising technology without disclosing that misleading or illegal ads were being delivered as part of the "relevant, targeted promotional links to users" and (ii) content screening technology without disclosing that different processes and procedures were being applied to advertising content and that any declined ads could be manually allowed on the QTT App. Moreover, the technology supporting the QTT App utilized simple ad-serving tools and training processes. What investors understood, as a September 5, 2019 statement by Defendant Tan confirmed, was that "[w]e have one of the best track records in compliance among all the sizeable newsfeed players in the space as **we have put in significant efforts from the very beginning in building our content compliance teams and capabilities**."

109.    Furthermore, while Defendants list numerous "Risk Factors" in the IPO Documents, they failed to adequately warn investors that certain "Risk Factors" had already materialized at the time of the IPO.

110.    First, the IPO Documents warned that "[a]dvertisements on our mobile

applications may subject us to penalties and other administrative actions":

> Under PRC advertising laws and regulations, we are obligated to monitor the advertising content shown on our mobile applications to ensure that such content is true, accurate and in full compliance with applicable laws and regulations. . . . However, ***for the determination of the truth and accuracy of the advertisements, there are no implementing rules or official interpretations, and such a determination is at the sole discretion of the relevant local branch of the State Administration for Market Regulation, or the SAMR (successor of SAIC and the State Food and Drug Administration), which results in uncertainty in the application of these laws and regulations***. . . .

> We cannot assure you that all the advertisements shown on our mobile applications are true, accurate, appropriate and in full compliance with applicable laws and regulations. For example, ***advertisers on our mobile applications, or their agents, may use measures that are designed to evade our monitoring, such as providing inauthentic material that does not match the actual advertisement, or supplying advertising which is superficially compliant but nevertheless is linked to one or more webpages that feature noncompliant advertising content. In addition, our employees responsible for reviewing advertisements may not fully understand the relevant laws and regulations or may be inappropriately influenced by the advertisers. In each case, we may still be held responsible for noncompliant advertising content.*** We include clauses in most of our advertising contracts requiring that all advertising content provided by advertising customers must comply with relevant laws and regulations. Pursuant to the contracts between us and the relevant advertising agents or advertising customers, they are liable for all damages to us caused by their breach of such representations. However, there can be no assurance that we will be able to successfully enforce our contractual rights.

> ***Violation of these laws and regulations may subject us to penalties, including fines, confiscation of our advertising income, orders to cease dissemination of the advertisements and orders to eliminate the effect of illegal advertisement. If an illegal advertisement featured on our mobile applications were to have excessive negative effects, our brand and reputation may be harmed, and PRC governmental authorities may pursue more severe penalties and administrative actions against us. PRC governmental authorities may even force us to terminate our advertising operation or revoke our licenses in circumstances involving serious violations. Such penalties may have a material and adverse effect on our business, results of operations and financial condition.***

111.    The statements contained in ¶ 110 *supra* contained untrue statements of material

facts and omitted material facts necessary to make the statements made therein not misleading by:

(i) declaring that how advertising laws and regulations are applied to ads is uncertain without

disclosing that advertisers were capitalizing on that uncertainty and relying on regulators to not

pay attention to non-compliant ads in Tier-3 and Tier-4 cities; (ii) explaining how advertisers could evade the Company's monitoring or how the Company's employees could unwittingly overlook a non-compliant ad without disclosing that it had set up separate teams with different processes and procedures for qualified versus unqualified advertisers which led to more sales of non-compliant ads; and (iii) warning of the possible ramifications of violating the applicable advertising laws and regulations without disclosing that the Company was already violating them and thus the ramifications were not a matter of if, but when.

112.     Second, the IPO Documents warned that because "[w]e generate a substantial majority of our revenues from advertising[,] [a] decline in our advertising revenue could harm our business":

> We generated almost all of our revenues from advertising services in 2016, 2017, and the six months ended June 30, 2018. When we first commenced our business, we collaborated with various third-party advertising platforms to place advertisements on our mobile applications. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. This system will serve to power our advertising solutions while reducing the use of third-party advertising platforms.*** In 2017 and the six months ended June 30, 2018, 26.2% and 78.2%, respectively, of our net revenues were generated through this advertising agent. We have limited experience in operating the programmatic advertising system and in acquiring our own advertising agents and advertising customers. We may not be able to establish our own sales personnel to effectively and efficiently acquire and retain advertising agents and advertising customers. The effectiveness of our programmatic advertising system may not perform as expected and achieve widespread acceptance by advertising customers.

> Our advertising customers for our programmatic advertising system are comprised of advertising agents and end advertisers. ... ***If we fail to retain existing advertising customers or ensure that their advertising spend with us remains at similar or increased levels or attract new advertising customers to advertise on our platform, our business, results of operations and financial condition may be materially and adversely affected.***

113.     The statements contained in ¶ 112 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading: (i)

noting the "programmatic advertising system" of the Company's acquired advertising agent as a benefit of, and reason for, replacing its third-party advertising platforms without disclosing that the change to the start-up reduced the amount of oversight over the content of ads and increased the sales of non-compliant ads; (ii) explaining the Company's ability to "enhance" its monetization capabilities without disclosing that the enhancement was also related to its increased ability to sell non-compliant ads; and (iii) warning of material and adverse effects on the Company if existing customers are lost or their advertising spend decreases without disclosing that many of its customers were unqualified advertisers who were purchasing non-compliant ads and thus the revenue generated from them inevitably would decrease when regulators cracked down on them.

114.    Lastly, regarding the "Transactions with Companies Controlled by or Affiliated with Mr. Tan," the IPO Documents disclosed that:

> ***In 2016, we paid RMB5.0 million (US$0.8 million) to Youxuan Information Technology (Shanghai) Co., Ltd., a company controlled by Mr. Eric Siliang Tan, our co-founder and executive chairman, to cooperate on a potential business project.*** Such project was subsequently canceled and the entire amount was refunded back to us in 2017.
>
> ***We paid Shanghai Yinnuo Management Consulting Co., Ltd., or Yinuo Management, a company controlled by Mr. Eric Siliang Tan, service fees in the amount of RMB3.0 million (US$0.5 million), RMB16.8 million (US$2.5 million) and RMB6.9 million (US$1.0 million) in 2016, 2017 and the six months ended June 30, 2017, respectively.*** Such service fees relate to costs charged by Yinuo Management to provide us with financial accounting support, office space and certain other administrative support. Amounts due to Yinuo Management in connection with these service fees as of December 31, 2016 was RMB3.0 million (US$0.5 million). No amount was due to Yinuo Management in connection with these service fees as of December 31, 2017. We have since developed all relevant functions internally and leased office space for our operations that were previously provided by Yinnuo Management and we currently do not expect to pay service fees to Yinuo Management for such functions or office space in the future.
>
> ***We received RMB5.3 million (US$0.8 million) in service fees from AdIn Media (Shanghai) Co., Ltd., or AdIn Media, a company in which Mr. Eric Siliang Tan indirectly owns a minority interest and in which he is a key management personnel, in the six months ended June 30, 2018.*** Such fees related to agent and platform service provided to AdIn Media by facilitating advertising customers to

display advertisements with AdIn Media. As of June 30, 2018, an amount of RMB6.7 million (US$1.0 million) was due to AdIn Media in connection with such services provided, which represent the service fee collected from advertising customers but not yet paid to AdIn Media.

***We also received RMB1.2 million (US$0.2 million) in service fees from AdIn Media in the six months ended June 30, 2018 relating to advertising serviced provided by us to AdIn Media.*** As of June 30, 2018, the remaining balance of such service fees was RMB0.9 million (US$0.1 million).

115.    The statements contained in ¶ 114 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading: (i) the transactions with companies controlled by or affiliated with Tan also include transactions involving the Mengtui App, Fangce and the Shihui Miao App based on Tan's ownership stakes in Taiyun Capital and Bige and (ii) the Dianguan Acquisition should have been listed as a related-party transaction based on Tan's special relationship with Dianguan's founder, Liang through Taiyun Capital, in which Tan is a majority investor or owner.

## B.    Materially False and Misleading Statements and Omissions in the SPO Documents.

116.    The SPO Documents contained multiple material misstatements regarding the Company's strategy of targeting users in lower-tier cities in China, stating in relevant part:

***Since our inception, we have strategically targeted users from lower tier cities in China because of the enormous opportunities in this underserved market.*** As of the end of 2017, lower tier cities had a population of 1,027 million each owning 0.5 mobile device on average (compared to a population of 363 million each owning 1.3 mobile devices on average in tier-1 and 2 cities), suggesting significant potential for further mobile penetration, according to the Analysys Report. ***Mobile users in lower tier cities tend to have a slower pace of life and spend more time on the Internet given limited offline entertainment venues. Moreover, they often enjoy fast increasing disposable income and lower financial pressures due to lower housing prices. These factors have given rise to a significant need for mobile entertainment content while also creating high monetization potentials.*** Users from lower tier cities tend to have different interests and preferences in comparison to users from tier-1 and tier-2 cities. Qutoutiao's light entertainment-oriented and easily digestible content is designed to resonate with such users and provides us with a significant advantage to capture this

underserved market.

117.    However, the statements contained in ¶ 116 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading because, the "enormous opportunities" and "high monetization potentials" in lower-tier cities also had to do with the high number of unqualified advertisers who wanted to run non-compliant ads in those cities as regulators were more lenient and users were less aware of their rights as consumers in those cities.

118.    The SPO Documents also touted that the Company's "***net revenues have increased rapidly*** from RMB58.0 million (US$8.8 million) in 2016 to RMB517.1 million (US$78.1 million) in 2017, and further to RMB3,022.1 million (US$439.6 million) in 2018." The majority of the Company's revenue came from advertising, as the SPO Documents stated, in relevant part:

> Baidu, which used to be our largest customer and operates a third-party advertising platform, contributed 69.9%, 43.7% and 4.2% of our net revenues in 2016, 2017 and 2018, respectively. Baidu also accounted for 59.8% and 8.8% of our accounts receivable as of December 31, 2017 and 2018, respectively. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. We expect this system will allow us to reduce our reliance on third-party advertising platforms such as Baidu.*** Prior to our acquisition of this advertising agent in February 2018, we engaged such advertising agent to serve as our sales agent in selling our advertising and marketing solutions to other second-tier advertising agents and end advertisers. ***These second-tier advertising agents and end advertisers are our customers as they select our mobile applications to place their advertisements and our performance obligation is to provide the underlying advertising display services to them.***

119.    The statements contained in ¶ 118 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading by: (i) touting the Company's "rapidly" increased revenues without disclosing that (a) a significant

number of ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations, or (b) provided links to illegal online gambling platforms; (ii) noting the "programmatic advertising system" of Dianguan as a benefit of, and reason for, replacing the Company's third-party established advertising agent, Baidu, without disclosing that it was recently founded by a close business associate of QTT's CEO who had no experience in digital marketing and would change reduced the amount of oversight over the content of ads to increase ad sales; (iii) explaining the Company's ability to monetize user traffic, as enhanced by its programmatic advertising system, without disclosing that the enhancement was also related to its increased ability to sell non-compliant ads; and (iv) describing the Company's "performance obligation" to its end advertiser customers without disclosing that that obligation included displaying more non-compliant and illegal ads resulting from its now separate teams with different processes and procedures for qualified versus unqualified advertisers.

120.    In addition, Defendants' continued failure to disclose the full impact of replacing Baidu with Dianguan on QTT's sales violated Item 303 because there were known trends and uncertainties related to Dianguan being a start-up and related party that were likely to, and did, have material unfavorable impact on the Company's revenues.

121.    The SPO Documents contained substantially the same statements as the IPO Documents about the Company's abilities to "Enhance [its] Monetization Capabilities" and plans to achieve such improved "Monetization" through advertising, which are quoted more fully in ¶¶ 104-05. These statements remained materially false or misleading for the reasons discussed in ¶ 106.

122.    The SPO Documents also contained substantially the same statements as the IPO Documents about Qutoutiao's mission "to deliver quality and relevant content to users, and content

45

sourcing, management and recommendation" as "core focuses of [its] operations," as related to advertising and content screening technology, which are quoted more fully in ¶ 107. These statements remained materially false or misleading for the reasons discussed in ¶ 108.

123.    Furthermore, while Defendants again list numerous "Risk Factors" in the SPO Documents, they continued to fail to adequately warn investors that certain "Risk Factors" had already materialized at the time of the SPO.

124.    First, the SPO Documents warned that because "[w]e generate a substantial majority of our revenues from advertising and marketing[,] [a] decline in our advertising and marketing revenues could harm our business":

> We generated a substantial majority of our revenues from advertising and marketing services in 2016, 2017 and 2018. When we first commenced our business, we collaborated with various third-party advertising platforms to place advertisements on our mobile applications. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. This system will serve to power our advertising and marketing solutions while reducing the use of third-party advertising platforms.*** We have limited experience in operating the programmatic advertising system and in acquiring our own advertising agents and advertising customers. We may not be able to establish our own sales personnel to effectively and efficiently acquire and retain advertising agents and advertising customers. The effectiveness of our programmatic advertising system may not perform as expected and achieve widespread acceptance by advertising customers.
>
> Our advertising customers for our programmatic advertising system are comprised of advertising agents and end advertisers. ... ***If we fail to retain existing advertising customers or ensure that their advertising spend with us remains at similar or increased levels or attract new advertising customers to advertise on our platform, our business, results of operations and financial condition may be materially and adversely affected.***

125.    The statements contained in ¶ 124 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading: (i) noting the "programmatic advertising system" of the Company's acquired advertising agent as a benefit of, and reason for, replacing its third-party advertising platforms without disclosing that

the change to the start-up reduced the amount of oversight over the content of ads and increased

the sales of non-compliant ads; (ii) explaining the Company's ability to monetize user traffic, as

enhanced by its programmatic advertising system, without disclosing that the enhancement also

related to its increased ability to sell non-compliant ads; and (iii) warning of material and adverse

effects on the Company if existing customers are lost or their advertising spend decreases without

disclosing that many of its customers were unqualified advertisers who were purchasing non-

compliant ads and thus the revenue generated from those customers inevitably would decrease

when the non-compliant ads became public.

126.    Second, the SPO Documents contained substantially the same statement as the

IPO Documents regarding Qutoutiao's warning that "[a]dvertisements on [its] mobile applications

may subject us to penalties and other administrative actions," which is quoted more fully in ¶ 110.

This statement remained materially false or misleading for the reasons discussed in ¶ 111.

127.    Third, the SPO Documents warned that "[n]on-compliance with law on the part

of third parties with which we conduct business could disrupt our business and adversely affect

results of our operation and financial condition":

> Third parties with which we conduct business, such as content providers,
> advertising agents, advertising customers and merchandise suppliers, may be
> subject to regulatory penalties or punishments because of their regulatory
> compliance failures or may be infringing upon other parties' legal rights, which
> may, directly or indirectly, disrupt our business. ***Although we conduct review of
> legal formalities and certifications before entering into contractual relationships
> with third parties, and take measures to reduce the risks that we may be exposed
> to in case of any non-compliance by third parties, we cannot be certain whether
> such third party has violated any regulatory requirements*** or infringed or will
> infringe any other parties' legal rights. For example, content providers may submit
> copyrighted content that they have no right to distribute. While our content
> management system screens content for potential copyright infringements, we may
> not be able to identify all instances of copyright infringement. In the event we
> deliver content that violates the copyrights of a third party, we may be required to
> pay damages to compensate such third party. Even though we have the contractual
> right to seek indemnification from the relevant content provider for such payment,

there can be no assurance that we will be able to enforce such right. As a result, our business, results of operations and financial condition could be materially and adversely affected. Similarly, ***advertising content of advertising customers may also not be in full compliance with applicable laws and regulations that may have an adverse effect as to our business, results of operations and financial condition.*** See "— Advertisements on our mobile applications may subject us to penalties and other administrative actions."

128.    The statements contained in ¶ 127 *supra* were materially false and misleading because: (i) the measures the Company had taken to reduce its risk also included setting up separate teams with different processes and procedures for qualified versus unqualified advertisers and placing riskier ads in lower tier cities where there was less regulatory scrutiny; (ii) even though the Company had measures in place to decline non-compliant ads, the advertiser or QTT employees who were responsible for those ads could contact the reviewing department for a second manual review and allow them on the QTT App manually; and (iii) the Company failed to adequately vet unqualified advertisers and screen out non-compliant or illegal ads, and thus failed to discover if they had or were violating regulatory requirements. Until July 2020, investors were in the dark about the substantial amount of QTT's revenue being generated from ads by unqualified advertisers which did not comply with the applicable Chinese regulations or that QTT employees were managing the risk of losing that revenue by reducing the chance that they would get caught by state regulators, rather than by simply not putting risky advertisements on the QTT App.

129.    Lastly, when acknowledging the Company's related party transactions, the SPO Documents disclosed with regard to "Transactions with Companies Controlled by or Affiliated with Mr. Tan":

> ***In 2016, we paid RMB5.0 million (US$0.8 million) to Youxuan Information Technology (Shanghai) Co., Ltd., a company controlled by Mr. Eric Siliang Tan, our co-founder and executive chairman, to cooperate on a potential business project.*** Such project was subsequently canceled and the entire amount was refunded back to us in 2017.
>
> ***We paid Shanghai Yinnuo Management Consulting Co., Ltd., or Yinnuo***

***Management, a company controlled by Mr. Eric Siliang Tan, service fees in the amount of RMB3.0 million and RMB16.8 million in 2016 and 2017, respectively.*** Such service fees relate to costs charged by Yinnuo Management to provide us with financial accounting support, office space and certain other administrative support. Amounts due to Yinnuo Management in connection with these service fees as of December 31, 2016 was RMB3.0 million. No amount was due to Yinnuo Management in connection with these service fees as of December 31, 2017. We have since developed all relevant functions internally and leased office space for our operations that were previously provided by Yinnuo Management and we currently do not expect to pay service fees to Yinnuo Management for such functions or office space in the future.

***We received RMB29.6 million (US$4.3 million) in service fees from AdIn Media (Shanghai) Co., Ltd., or AdIn Media, a company in which Mr. Eric Siliang Tan indirectly owns a minority interest and in which he is a key management personnel, in 2018.*** Such fees related to agent and platform service provided to AdIn Media by facilitating advertising customers to display advertisements with AdIn Media. We also received fees in the amount of RMB4.5 million (US$0.6 million) for providing advertising services to AdIn Media in 2018. As of December 31, 2018, Mr. Tan was no longer a key management personnel of AdIn Media, and thus AdIn Media ceased to be our related party.

130.    The statements contained in ¶ 129 *supra* contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading: (i) the transactions with companies controlled by or affiliated with Tan also include transactions involving the Mengtui App, Fangce and the Shihui Miao App based on Tan's ownership stakes in Taiyun Capital and Bige; and (ii) the Dianguan Acquisition should have been listed as a related party transaction based on Tan's special relationship with Dianguan's founder, Liang, through Taiyan Capital, in which Tan is a majority investor or owner.

## VI.    CLASS ALLEGATIONS

131.    Lead Plaintiff brings this action as a class action, pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and 23(b)(3), on behalf of a class consisting of all person and entities that purchased, or otherwise acquired, Qutoutiao securities, pursuant or traceable to the IPO and/or SPO and were damaged by the conduct asserted herein. Defendants and their

immediate families and legal representatives, heirs, successors or assigns and any entity in which the Defendants named herein have, or had, a controlling interest, are excluded from the Class.

132.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class.

133.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual class members include whether:

(a)    Defendants violated the 1933 Act;

(b)    Defendants omitted and/or misrepresented material facts;

(c)    Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    The price of Qutoutiao securities was artificially inflated; and

(e)    The extent of damage sustained by Class members and the appropriate measure of damages.

134.    Lead Plaintiff's claims are typical of those of other Class members because he was similarly damaged by Defendants' wrongful conduct in violation of the 1933 Act.

135.    Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who is experienced in securities class action litigation. Lead Plaintiff has no interests that conflict with those of the Class.

136.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy. Lead Plaintiff knows of no difficulties in the management of this action that would preclude its maintenance as a class action.

## VII.    CLAIMS FOR RELIEF

**COUNT I**
**Violations of § 11 of the 1933 Act**
**(Against All Defendants)**

137.    Lead Plaintiff repeats and realleges every allegation contained above as if fully alleged in this Count.

138.    This claim is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, against Qutoutiao, the Individual Defendants (with respect to Offering Documents they signed, or approved the signing of), and the Underwriter Defendants (with respect to Offering Documents they underwrote), on behalf of all persons and entities who purchased or acquired Qutoutiao securities pursuant or traceable to the IPO and/or SPO Documents and were damaged by the conduct alleged herein. Lead Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct. This Count does not sound in fraud. Lead Plaintiff does not allege liability arises from any scienter or fraudulent intent, which are not elements of a § 11 claim. Any inferences of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

139.    As part of the Offering Documents, Qutoutiao registered and sold approximately 15.3 million securities in the closing of the IPO and SPO, collectively. Qutoutiao was the issuer of its securities pursuant to the Offering Documents within the meaning of § 11 of the 1933 Act.

140.    The Defendants named in this Count had ultimate control and/or authority over the contents and dissemination of the IPO and/or SPO Documents. Further, the Individual Defendants each signed the IPO and/or SPO Documents.

141.    Qutoutiao securities were issued and sold pursuant to the Offering Documents.

All purchases or acquisitions of Qutoutiao securities by shareholders in the IPO or SPO were a result of the issuance of the Offering Documents and the shares registered thereunder. Each security sold to investors by Qutoutiao and the Underwriter Defendants at the time of the closing of the IPO and/or SPO is traceable to the Offering Documents.

142.    As alleged in this Complaint, the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The facts misstated and omitted in the Offering Documents were material.

143.    As the issuer and registrant, Qutoutiao is strictly liable for the untrue statements of material fact. The Defendants named in this Count owed to Lead Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the IPO and/or SPO Documents, to ensure that the statements contained or incorporated by reference therein were true, and that there was no omission to state a material fact required to be stated to make the statements contained therein not misleading. No Defendant named under this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO and/or SPO Documents were accurate and complete in all material respects. Had Defendants exercised reasonable care, they would have known of the material misstatements and omissions which were required to be disclosed, as alleged herein.

144.    Lead Plaintiff and the other Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified herein not misleading when they purchased or acquired Qutoutiao securities pursuant or traceable to the IPO and/or SPO Documents.

145.    As a direct and proximate result of the conduct and omissions of the Defendants named in this Count, Lead Plaintiff and the other Class members suffered substantial damages in connection with their purchase(s) of Qutoutiao securities pursuant or traceable to the IPO and/or SPO Documents.

146.    This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Documents and within three years of their effective dates. By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff and the Class under § 11 of the 1933 Act.

### COUNT II[47]
### Violations of § 12(a)(2) of the 1933 Act
### (Against Qutoutiao and the Underwriter Defendants)

147.    Lead Plaintiff repeats and realleges every allegation contained in ¶¶1-136 as if fully alleged in this Count.

148.    This claim is brought against Qutoutiao and the Underwriter Defendants (with respect to Offering Documents they underwrote), pursuant to § 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2), on behalf of all persons who purchased or acquired Qutoutiao securities pursuant to the IPO and/or SPO Documents and were damaged by the conduct alleged herein. Lead Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct. This Count does not sound in fraud. Lead Plaintiff does not allege liability arises from any scienter or fraudulent intent, which are not elements of a § 12(a)(2) claim. Any

---

[47] Lead Plaintiff did not buy in the IPO or SPO directly from Defendants, but he asserts claims in this section on behalf of class members who did. Lead Plaintiff has brought these claims because his own personal claims mean that he "possess[es] the same interest and suffered the same injury" as those class members who bought directly from Defendants, he therefore has "the same necessary stake in litigating" the falsity of Defendants statements, and this therefore "gives the named plaintiff a sufficient stake in the outcome of her putative class members' cases" to assert these claims. *See Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 94 (2d Cir. 2018) (internal quotations and modification omitted); *but see Yi Xiang v. Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 519–21 (S.D.N.Y. 2018).

inferences of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

149.    The Defendants in this Count solicited, offered and/or sold Qutoutiao securities using means or instruments of transportation or communication in interstate commerce or the mail.

150.    Qutoutiao and the Underwriter Defendants were sellers, offerors, or solicitors of purchasers of the shares offered pursuant to the IPO and/or SPO Documents.

151.    As alleged herein, the Offering Documents contained untrue statements and/or omissions of material fact or facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.

152.    Qutoutiao securities were issued and sold pursuant to the Offering Documents. All purchases or acquisitions of Qutoutiao securities by shareholders in the IPO or SPO were a result of the issuance of the Offering Documents and the shares registered thereunder. Each security sold to investors by Qutoutiao and the Underwriter Defendants at the time of the closing of the IPO and/or SPO is traceable to the Offering Documents.

153.    As the issuer of the registered securities, Qutoutiao is strictly liable for the materially false and misleading statements and/or omissions of material facts, as described herein. Qutoutiao never made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the prospectuses were accurate and complete in all material respects.

154.    Nor did any of the Underwriter Defendants conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, the Underwriter Defendants would have known of the material misstatements and/or omissions which were required to be disclosed, as alleged herein.

155.    Investors were solicited, offered, and sold Qutoutiao securities in the IPO and/or SPO pursuant to the Offering Documents that, as alleged herein, contained materially false and misleading statements and/or omissions of material facts therein and were damaged thereby. Moreover, these investors did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Offering Documents when they purchased or acquired their Qutoutiao securities.

156.    The Class members who purchased or otherwise acquired Qutoutiao securities pursuant to the IPO and/or SPO from Qutoutiao or the Underwriter Defendants have sustained damages as a result of the materially false and misleading statements and/or omissions in the Offering Documents.

157.    This Count is brought within one year of the discovery of, or reasonably could have discovered, the facts upon which this Count is based and within three years of the date that the securities upon which this Count is brought were sold to the public.

158.    By reason of the foregoing, Qutoutiao and the Underwriter Defendants are liable for violation of § 12(a)(2) of the 1933 Act to Class members who purchased securities sold pursuant to the IPO and/or SPO Documents. These Class members also have the right to rescind and recover the consideration paid for these securities upon tender of their ADSs to the Underwriter Defendants, and to recover rescissory damages to the extent they have already sold the securities.

**COUNT III**
**Violations of § 15 of the 1933 Act**
**(Against the Individual Defendants)**

159.    Lead Plaintiff repeats and realleges every allegation contained in ¶¶1-136 as if fully alleged in this Count.

160.    This claim is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o ,

against the Individual Defendants (with respect to Offering Documents they signed or approved the signing of), on behalf of all persons and entities who purchased or acquired Qutoutiao securities pursuant or traceable to the IPO and/or SPO Documents. Lead Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct. This Count does not sound in fraud. All inferences of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Lead Plaintiff does not allege that liability arises from any scienter or fraudulent intent, which are not elements of a § 15 claim.

161.    At all relevant times, the Individual Defendants were "controlling persons" of Qutoutiao within the meaning of § 15 of the 1933 Act.

162.    Qutoutiao is strictly liable under §§ 11 and 12(a)(2) for the materially false and misleading statements and/or omissions in the Offering Documents.

163.    The Individual Defendants violated § 11 by issuing the IPO and/or SPO Documents, which included materially untrue statements of fact and omitted to state material facts requires to be stated therein or necessary to make the statements therein not misleading. Each of the Defendants in this Count was controlling persons of Qutoutiao when the IPO and/or SPO Documents were filed and became effective due to their: (i) senior executive positions; (ii) positions on Qutoutiao's Board of Directors; (iii) direct involvement in Qutoutiao's day-to-day operations and in the review and approval of the IPO and/or SPO Documents; (iv) solicitation of Qutoutiao's stockholders' votes in favor of the issuance of Qutoutiao securities; and (v) participation in and preparation of the IPO and/or SPO Documents.

164.    By virtue of their exercise of control over Qutoutiao, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of Qutoutiao's IPO and/or SPO

Documents and did not make a reasonable investigation or possess reasonable grounds for the belief that the IPO and/or SPO Documents were accurate and complete in all material respects. Had the Defendants in this Count exercised reasonable care, they would have known of the material misstatements and omissions which were required to be disclosed, as alleged herein.

165.     This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Documents and within three years of their effective dates. By reason of the foregoing, under § 15 of the 1933 Act, the Individual Defendants are liable to all persons and entities who purchased or acquired Qutoutiao securities pursuant or traceable to the IPO and/or SPO Documents.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.     Declaring this action to be a proper class action pursuant to Rules 23(a) and 23(b)(3) on behalf of the Class defined herein;

B.     Awarding Lead Plaintiff and the other Class members compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' conduct, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class pre- and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs; and

D.     Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## IX.   JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: February 5, 2025                    Respectfully Submitted,

**FREEDMAN NORMAND FRIEDLAND LLP**

<u>s/ Ivy T. Ngo</u>
Ivy T. Ngo (*pro hac vice*)
Velvel (Devin) Freedman
Richard Cipolla
155 E. 44th Street, Suite 915
New York, New York 10017
(T): (646) 494-2900
(F): (646) 392-8842
Email: ingo@fnf.law
       vel@fnf.law
       rcipolla@fnf.law

*Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (290685)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff James
Pappas*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on February 5, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*<u>s/ Ivy T. Ngo</u>*
Ivy T. Ngo
