USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/5/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE QUTOUTIAO, INC. SECURITIES
LITIGATION

---

THIS DOCUMENT RELATES TO ALL ACTIONS

---

20 Cv. 6707 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Lead Plaintiff James Pappas[1] ("Plaintiff" or "Lead Plaintiff") brought this consolidated class action against Qutoutiao, Inc. ("QTT" or the "Company"), its officers and directors[2] (the "Individual Defendants," and together with QTT, the "Company Defendants"), and its underwriters[3] (the

---

[1] The Court notes that on July 8, 2025, Lead Counsel for the Class filed a suggestion of death providing notice that Lead Plaintiff James Pappas had died. (See Dkt. No. 129.). Following this notice, the Parties exchanged pre-motion letters regarding Lead Counsel's anticipated motion to substitute Rosemary Korines pursuant to Federal Rule of Civil Procedure 25(a) (Dkt. Nos. 130-134). On August 18, 2025, the Court issued a Joint Stipulation and Order pursuant to which the Parties stipulated that Defendants would withdraw their letter opposition to the pre-motion letter seeking the substitution of Rosemary Korines, the executor of James Pappas' estate, as Lead Plaintiff. (Dkt. No. 142.) Courts in this Circuit have allowed the "substitution of a deceased shareholder-plaintiff by the executors of his estate in a derivative action, holding that the executors would possess 'shareholder' standing as long as the decedent did because any shares owned by the decedent 'passed into [his] estate by operation of law.'" Roe v. City of New York, No. 00-CV-9062, 2003 WL 22715832, at *3 (S.D.N.Y. Nov. 19, 2003) (quoting Saylor v. Bastedo, 623 F.2d 230, 237-38 (2d Cir. 1980)).

[2] The Individual Defendants are Eric Tan ("Tan"), Lei Li ("L. Li"), Jingbo Wang ("Wang"), Shaoqing Jiang ("Jiang"), Jianfei Dong ("Dong"), Oliver Yucheng Chen ("Chen"), Yongbo Dai ("Dai"), James Jun Peng ("Peng"), and Feng Li ("F. Li").

[3] The Underwriter Defendants are Citigroup Global Markets Inc. ("Citigroup"), Deutsche Bank Securities Inc. ("Deutsche Bank"), China Merchants Securities (HK) Co., Ltd. ("China Merchants"), UBS Securities

1

"Underwriter Defendants," and together with the Company Defendants, the "Defendants"). Plaintiff, an investor in QTT, asserts claims under the Securities Act of 1933 (the "Securities Act") for alleged misstatements and omissions in connection with QTT's initial public offering ("IPO") in September 2018 and its secondary public offering ("SPO," and together with the IPO the "Offerings") in April 2019. (See Dkt. No. 118 [hereafter "Second Amended Complaint" or "SAC"].)

Defendants QTT, the Individual Defendants, and Citigroup, Deutsche Bank, China Merchants, UBS, Keybanc, and Jefferies now move to dismiss the Second Amended Complaint in its entirety for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (See Dkt. No. 122 [hereafter the "Motion" or "Mot."].)[4] For the reasons discussed below, Defendants' Motion is **GRANTED**.

---

LLC ("UBS"), Keybanc Capital Markets, Inc. ("Keybanc"), CLSA Limited ("CLSA"), Haitong International Securities Company Limited ("Haitong"), Jefferies Group LLC ("Jefferies"), and Lighthouse Capital International Inc. ("Lighthouse").

[4] Three of the Underwriter Defendants, specifically, CLSA, Haitong, and Lighthouse, entered into stipulations with Plaintiff preserving their right to move to dismiss on other grounds if the Court denies this Motion in whole or in part. (See Dkt. No. 121.) They did not join this Motion.

## I.   BACKGROUND[5]

### A.   FACTUAL BACKGROUND

QTT operates mobile content platforms that distribute and share entertainment content in China. The QTT smartphone application ("QTT App") aggregates articles and short videos from professional media and freelancers and presents this content in a customized feed for users. QTT generates the majority of its revenue by selling advertisements on its mobile platforms. QTT's business model targeted consumers who lived in smaller, provincial cities in China – known as lower tier cities – purportedly because this underserved but growing market had increasing disposable income and spent more time on the internet.

Initially, QTT's advertising business relied primarily on third-party advertising platforms to sell QTT's advertising spaces. For example, Baidu, another Chinese internet company, helped QTT sell a large volume of advertisements in 2016 and 2017. In February 2018, QTT acquired Dianguan, an advertising agent, for approximately

---

[5] The following facts are taken from Plaintiff's Second Amended Complaint, which the Court must take as true for the purpose of resolving Defendants' motion to dismiss. See Safka Holdings LLC v. iPlay, Inc., 42 F. Supp. 3d 488, 491 (S.D.N.Y. 2013). Where indicated, the Complaint's factual allegations are supplemented by facts and information drawn from documents appended to the Complaint, which are properly before the Court. See Tannerite Sports, LLC v. NBCUniversal Media LLC, 135 F. Supp. 3d 219, 225 n.1 (S.D.N.Y. 2015).

$2.3 million. QTT subsequently combined Dianguan's existing technology and its own resources into an in-house advertising platform and reduced its reliance on third-party platforms like Baidu.

On September 14, 2018, QTT announced its IPO of 12 million American Depository Shares ("ADS") at a price of $7.00 per share. On September 11, 2018, QTT filed its final amendment to the IPO Registration Statement with the SEC on Form F-1/A, which was declared effective on September 13, 2018. On September 14, 2018, QTT filed its prospectus on Form 424B ("IPO Prospectus" and together with IPO Registration Statement, the "IPO Offering Documents"). QTT closed its IPO in September 2018.

On March 29, 2019, QTT announced an SPO of 10 million QTT ADSs at a price of $10.00 per share. On April 1, 2019, QTT filed its first and final amendment to its SPO Registration Statement on Form F-1/A ("SPO Registration Statement"), which was declared effective shortly thereafter. On April 3, 2019, QTT filed its SPO Prospectus on Form 424B4 with the SEC. The SPO closed in April 2019 ("SPO Prospectus," and together with the SPO Registration Statement, the "SPO Offering Documents").

On July 15, 2020, China Central Television ("CCTV"), China's state-controlled broadcaster, reported that certain

4

advertisements placed by third-party advertising agents on QTT's platform were improper (the "CCTV Report"). As a result of the CCTV Report, the price of the QTT's ADSs fell by more than 24 percent and the QTT App was temporarily removed from several major app stores in China for two weeks, although the QTT App was still available to existing users. In response, QTT enacted several remedial measures to identify and remove problematic advertisements. On December 16, 2020, QTT reported a revenue decline for the third quarter of 2020, with a 19.7 percent decline in year-over-year revenue and a 23.1 percent decline in advertising revenue. These third quarter 2020 financials allegedly triggered a significant share price decline.

B.    THE PARTIES

Plaintiff purchased ADSs in September 2018 pursuant or traceable to QTT's IPO and alleges he suffered damages arising from federal securities law violations.

The SAC names three types of defendants. The first is the company QTT. The second are the Individual Defendants, who are current or former employees of QTT. The third are the Underwriter Defendants who underwrote either QTT's IPO or SPO, or both.

The SAC names nine Individual Defendants, each of whom allegedly participated in the preparation of, signed and/or

5

authorized the signing of QTT's IPO and/or SPO documents. Specifically, the SAC names: (1) Tan, QTT's co-founder and its Chief Executive Officer ("CEO") since May 20, 2019; (2) L. Li, QTT's co-founder and CEO until May 2019 when he resigned from the Company; (3) Wang, a director at QTT and the Company's Chief Financial Officer ("CFO") until January 22, 2020; (4) Jiang, a director of QTT and a member of its Audit Committee and Compensation Committee until September 13, 2019; (5) Dong, a director of QTT and Co-President of QTT; (6) Chen, a director of QTT and QTT's Chief Strategy Officer from August 2018 to February 2020; (7) Dai, a director of QTT beginning in November 2018; (8) Peng, a director of QTT, a member of its Audit Committee and Nominating and Corporate Governance Committee, and Chair of the Compensation Committee; and (9) F. Li, a director of QTT.

Lastly, the SAC names nine Underwriter Defendants, specifically: (1) Citigroup, a multinational investment bank and financial services corporation who served as underwriter for QTT's IPO and SPO; (2) Deutsche Bank, a financial services institution that served as underwriter to QTT's IPO and SPO; (3) China Merchants, a China-based financial services company that served as underwriter for QTT's IPO; (4) UBS, which provides investment banking and financial services, and served as an underwriter for QTT's IPO; (5) Keybanc, which

provides investment advisory services, and served as an underwriter for QTT's IPO; (6) CLSA, a capital markets and investment group that served as an underwriter for QTT's SPO; (7) Haitong, an international financial institution that served as an underwriter for QTT's SPO; (8) Jefferies, an investment banking firm that served as underwriter for QTT's SPO; and (9) Lighthouse, a boutique investment bank that served as underwriter for QTT's SPO.

C.    PROCEDURAL HISTORY

On August 20, 2020, Plaintiff initiated this action against QTT and multiple individual and underwriter defendants, bringing claims alleging violations of Sections 11 ("Section 11") and 15 ("Section 15") of the Securities Act, and Sections 10(b) and (20)(a) of the Securities Exchange Act of 1934 (the "Exchange Act").[6] (See Dkt. No. 1.) On November 4, 2020, Judge Sidney Stein, who originally presided over this action, consolidated this case with action No. 20-CV-7717 and named James Pappas as lead plaintiff. (See Dkt. No. 22.) On January 15, 2021, Plaintiff filed an Amended Complaint, which added claims alleging violations of Section

---

[6] Specifically, the individual defendants were Tan, L. Li, Wang, Jiang, Dong, and Chen. The underwriter defendants were China Merchants, Citigroup, Deutsche, KeyBanc, and UBS.

12(a)(2) ("Section 12(a)(2)") of the Securities Act. (See Dkt. No. 41.)

On March 16, 2021, Defendants moved to dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a claim. (See Dkt. Nos. 49, 53.) On August 3, 2023, Judge Stein ruled in favor of Defendants and dismissed the Amended Complaint in its entirety. (See Dkt. No. 108.) Judge Stein concluded that Plaintiff had not adequately pleaded that Defendants had made misstatements or omissions of material fact in violation of the Exchange Act. (See id.) Judge Stein also found that Plaintiff's Securities Act claims sounded in fraud and thus were subject to a heightened pleading standard under Federal Rule of Civil Procedure Rule 9(b) ("Rule 9(b)"). (See id.) Applying the Rule 9(b) standard, Judge Stein dismissed the Securities Act claims because Plaintiff's allegations were not pleaded with sufficient particularity as to each Defendant. (See id.)

Plaintiff appealed only the dismissal of the Securities Act claims, arguing that Judge Stein erred in applying the Rule 9(b) pleading standard. The Second Circuit agreed and vacated the district court's dismissal of the Securities Act claims. (See Dkt. No. 113.) The Second Circuit explained that Plaintiff's Securities Act claims sounded in negligence rather than fraud and thus were subject to review under the

8

Rule 8(a) notice pleading standard, not Rule 9(b)'s heightened pleading standard. (See id.) The Second Circuit declined to address whether Plaintiff's Securities Act claims were sufficiently pleaded under Rule 8(a) and stated that the parties' other arguments remained available to them on remand. (See id.)

On remand, this action was reassigned to this Court. Plaintiff subsequently filed the Second Amended Complaint, bringing claims under Sections 11, 12(a)(2), and 15 of the Securities Act, and no longer asserting claims under the Exchange Act. Defendants filed their motion to dismiss[7] with an accompanying memorandum of law, ("Defs.' Mem.," Dkt. No. 123), to which Plaintiff filed an opposition, ("Pl.'s Opp'n," Dkt. No. 131) and Defendants filed a reply ("Defs.' Reply," Dkt. No. 143).

---

[7] In support of their motion to dismiss, Defendants filed a declaration with multiple documents included as exhibits, including excerpts of SEC filings and a Wolfpack Research Report. (See Dkt. No. 124.) The Court takes judicial notice of these documents as matters properly considered at the pleading stage. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) ("[W]e may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."); Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.").

## II.  <u>STANDARD OF REVIEW</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is plausible if the complaint states "'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct" — there is not "a probability requirement at the pleading stage." <u>Lynch v. City of New York</u>, 952 F.3d 67, 75 (2d Cir. 2020) (quoting <u>Twombly</u>, 550 U.S. at 556); <u>see</u> <u>Iqbal</u>, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "In other words, a complaint should not be dismissed when the factual allegations sufficiently 'raise a right to relief above the speculative level.'" <u>Liboy v. Russ</u>, No. 22-CV-10334, 2023 WL 6386889, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting <u>Twombly</u>, 550 U.S. at 555).

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."

Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (citation omitted). The Court may also "consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a [Rule] 12(b)(6) motion." Garcia v. Lewis, No. 05-CV-1153, 2005 WL 1423253, *3 (S.D.N.Y. June 16, 2005); see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) ("[W]e may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

## III. **DISCUSSION**

Plaintiff brings Counts I, II, and III under Sections 11, 12(a)(2), and 15 of the Securities Act, respectively. (See SAC ¶¶ 137-65.) Plaintiff argues that QTT's IPO Offering Documents and SPO Offering Documents (collectively the "Offering Documents") contained material misstatements and omissions of fact that caused financial losses to Plaintiff and other investors. Plaintiff's allegations regarding such misstatements and omissions of material fact generally fall into the following categories: (1) QTT misrepresented that it had an effective screening program to prevent the placement

11

of illegal advertisements on the QTT app, including the use of artificial intelligence to screen advertisements (id. ¶¶ 107-08, 122); (2) QTT omitted from the Offering Documents that it was actively placing a material amount of illegal advertisements on the QTT app at the time of the IPO and SPO (id. ¶¶ 109-11, 125-27); (3) a material amount of QTT's revenue growth came from placing illegal advertisements rather than from a strategy of targeting underserved users in lower tier cities (id. ¶¶ 8, 99-101, 116-17); and (4) QTT failed to disclose certain related party transactions (id. ¶¶ 48-66).

In response, Defendants argue that: (1) Plaintiff does not have statutory standing to bring a claim under Section 11 as to the SPO and Section 12(a)(2); and (2) Plaintiff has failed to state a claim under the Securities Act because none of the challenged statements are materially false or misleading. (See Defs.' Mem. at 1-4.)

Regarding standing, the Court finds that while Plaintiff does have standing to bring his claims against the Defendants involved in the IPO, he does not have Article III standing to bring his claims against the Defendants involved only in the SPO. Additionally, the Court finds that Plaintiff does not have statutory standing to bring a claim under Section 12(a)(2). Addressing the substance of Plaintiff's claims, the

12

Court finds that Plaintiff has failed to state a claim under the Securities Act because none of the challenged statements are materially false or misleading. Accordingly, for the reasons discussed below, the Court will grant Defendants' Motion.

### A.    STANDING

Defendants argue that Plaintiff does not have statutory standing to bring a claim under Section 11 as to the SPO and Section 12(a)(2). (See Defs.' Mem. at 25-27.) Plaintiff argues that he has standing to bring all the claims asserted in this action and that the law of the case doctrine prevents this Court from reconsidering Judge Stein's prior holding that Plaintiff had standing. (See Pl.'s Opp'n at 24-25.)

As an initial matter, the "[l]aw of the case doctrine is prudential and discretionary in character, and courts 'always [have] the power to change a ruling" in light of 'further reflection[.]'" Laurent v. PricewaterhouseCoopers LLP, 963 F. Supp. 2d 310, 314 (S.D.N.Y. 2013) (quoting Corporacion de Mercadeo Agricola v. Mellon Bank Int'l, 608 F.2d 43, 48 (2d Cir.1979) (internal citations omitted); see also American Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co., 611 F. Supp. 2d 373, 379 (S.D.N.Y. 2009), aff'd, 374 F. App'x 71 (2d Cir. 2010) ("[W]hen an appellate court does not address an issue that a trial court decided, the trial court on remand has the

13

discretion to determine whether its prior determination on an issue should be disturbed.").

In this matter, the Second Circuit explicitly stated that it did "not reach the parties' other arguments," including arguments as to standing, "all of which remain available to them on remand." (Dkt. No. 113 at 8.) Given the discretionary nature of the law of the case doctrine and the Second Circuit's implication that the standing argument would remain available on remand, the Court will address Defendants' arguments regarding Plaintiff's standing, beginning with whether Plaintiff has standing to bring the Section 11 claim as to the SPO.

### 1.    Standing for the Section 11 Claim

Regarding standing to assert the Section 11 claim as to the SPO, Defendants argue the Plaintiff lacks statutory standing because he cannot trace his shares to the SPO. (See Defs.' Mem. at 25-27.) Specifically, Defendants contend that because Plaintiff purchased his QTT shares in September 2018, six months before the April 2019 SPO, his shares are not traceable to that SPO, as is required to claim statutory standing under Section 11. (See id.) Plaintiff argues that under Federal Rule of Civil Procedure 23 ("Rule 23"), a plaintiff can litigate injuries on behalf of putative class members. (See Pl.'s Opp'n at 24-25.)

14

In making these arguments, Plaintiff and Defendants appear to be speaking past one another. Defendants' argument concerns whether Plaintiff has statutory standing, while Plaintiff's argument that Rule 23 gives him standing implicates the distinct concept of class action standing. To properly address the standing issue, and before turning to statutory standing, the Court will first analyze whether Plaintiff has sufficiently established Article III standing and the related concept of class standing.

### a. Article III Standing

"The 'threshold question in every federal case' is 'whether the plaintiff has made out a case or controversy between [themselves] and the defendant within the meaning of [Article] III." Won v. Amazon.com Servs. LLC, No. 21-CV-2867, 2025 WL 2962616, at *5 (E.D.N.Y. Oct. 21, 2025) (quoting Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir. 2006)). Article III "[s]tanding in the class action context requires a bifurcated inquiry." Petrosino v. Stearn's Prod., Inc., No. 16-CV-7735, 2018 WL 1614349, at *5 (S.D.N.Y. Mar. 30, 2018). As part of this bifurcated inquiry, courts in this Circuit first examine whether the individual plaintiff has satisfied the minimum requirements of "traditional" Article III standing before determining whether the plaintiff has class

15

standing. See id. ("First, Plaintiff must establish the minimum requirements of Article III standing[.]").

To establish "traditional" Article III standing, an individual plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). "In the context of class actions, Article III standing requires that 'for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant.'" Youngers v. Virtus Inv. Partners Inc., 195 F. Supp. 3d 499, 510 (S.D.N.Y. 2016) (quoting NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 159 (2d Cir. 2012)). If that requirement is satisfied, the inquiry shifts to a class standing analysis. See Point12 Diversified Fund, LP v. TMC The Metals Co., No. 21-CV-5991, 2025 WL 1920340, at *9 (E.D.N.Y. July 11, 2025) ("In putative class actions, the standing analysis does not stop there. After 'traditional' Article III standing has been established, [courts] consider 'class standing' — that is, the named plaintiff['s]

16

ability (and incentive) to press the claims of absent class members.")

Here, the Plaintiff can satisfy "traditional" Article III standing for the Section 11 claim for some, but not all Defendants. Plaintiff plausibly alleges a monetary loss caused by his investment in QTT securities that could be redressed through rights of action for damages under Section 11. However, for causation, his injury is fairly traceable only to the alleged misstatements and omissions by Defendants involved in the IPO. Plaintiff purchased QTT securities related to the IPO only in September 2018. Therefore, his injury can be "fairly traceable" only to the material misstatements and omissions made by the Defendants involved in the IPO. Spokeo, 578 U.S. at 338. Since Plaintiff did not purchase shares of the SPO, which took place months later in April 2019, his injury could not have been caused by the material misstatements and omissions made only by Defendants involved in the SPO.

Therefore, while Plaintiff has Article III standing to pursue claims against Defendants involved in the IPO, he does not have Article III standing to pursue claims against Defendants who were involved only in the SPO. Because "for every named defendant there must be at least one named plaintiff who can assert a claim directly against that

17

defendant," the Section 11 claims must be dismissed as to the Defendants who were involved only in the SPO. See NECA, 693 F.3d at 159 (quoting Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 241 (2d Cir. 2007)). Specifically, Plaintiff does not have standing against the individuals Dai, Peng, and F. Li, and underwriters Haitong, Jefferies, CLSA, and Lighthouse since these defendants were alleged to be involved only in the SPO and had no involvement in the IPO in which Plaintiff actually purchased shares. (See SAC ¶¶ 23-47.) The remaining Defendants are those who had involvement in the IPO, which includes some Defendants who were involved in both the IPO and SPO Offerings. Because this litigation entails a class action, the next step in the bifurcated Article III standing inquiry is to address class standing as to the remaining Defendants.

### b. Class Standing

"After 'traditional' Article III standing has been established, [courts] consider 'class standing' — that is, the named plaintiff['s] ability (and incentive) to press the claims of absent class members." Point12 Diversified Fund, 2025 WL 1920340, at *9. Through class standing a "named plaintiff may bring claims on behalf of unnamed class members for a different violation of the same statute upon which the

18

named plaintiff rests his claims if that plaintiff 'plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants.'" Lozada v. TaskUs, Inc., 710 F. Supp. 3d 283, 312-13 (S.D.N.Y. 2024) (quoting NECA, 693 F.3d at 162). "Conduct 'implicates the same set of concerns' when the conduct that injured the named plaintiff and the conduct that injured the absent class members can be proven in a similar way" against the same defendants. In re Bibox Grp. Holdings Ltd. Sec. Litig., 534 F. Supp. 3d 326, 335 (S.D.N.Y. 2021) (quoting NECA, 693 F.3d at 163).

Here, as discussed above, it has already been established that Plaintiff has Article III standing as to a Section 11 claim for the defendants involved in the IPO, but not for those involved in the SPO. However, some of these Defendants involved in the IPO were also involved in the SPO. Specifically, Defendants QTT, L. Li, Wang, Jaing, Dong, Chen, Citigroup, and Deutsche Bank were involved in both the IPO and SPO Offerings. The question then is whether Plaintiff, having the necessary individual standing to bring a Section 11 claim as to the Defendants involved in the IPO, can bring

19

claims on behalf of the unnamed putative class members relating to the SPO against the Defendants involved in both Offerings.

The misstatements and omissions made in the IPO and SPO are sufficiently similar to plead class standing for the Section 11 claim as to the SPO for Defendants involved in both Offerings. While there are slight differences in wording between the alleged misstatements in the IPO and SPO Offering Documents, they raise the "same set of concerns[.]" NECA, 693 F.3d at 162; see also Langan v. Johnson & Johnson Consumer Companies, Inc., 897 F.3d 88, 94 (2d Cir. 2018)("[N]on-identical injuries of the same general character can support standing."). Plaintiff would need to rely on substantially similar evidence to show that the misstatements and omissions contained in both the IPO and SPO relating to QTT's corporate strategy and business decisions, financial results, and its alleged failure to disclose related party transactions were materially misleading. Because Plaintiff has plausibly alleged that he "(1) personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant," and (2) the conduct "implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants," class standing as to the Section 11 SPO claims relating to the

Defendants involved both Offerings is proper. NECA, 693 F.3d at 162 (internal citations and ellipsis omitted).

### c. Statutory Standing

Distinct from "traditional" Article III standing and the related "class standing" inquiry is statutory standing, which asks whether the plaintiff's claims fall within the scope of a statute. See Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118, 128 n.4 (2014). Statutory standing arguments are more "about the scope of the cause of action because they do not, as standing does, go to [the] Court's subject matter jurisdiction." Lozada, 710 F. Supp. 3d at 311 n.19.

Here, the Defendants challenge Plaintiff's statutory standing to bring certain claims under the Securities Act. Specifically, the Defendants allege that because the Plaintiff did not purchase shares from the SPO, his claims are not traceable to that offering as is required under Section 11. "To bring a claim under [Section] 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." Slack Techs., LLC v. Pirani, 598 U.S. 759, 768 (2023). While Defendants' analysis is correct in the context of individual standing, the Plaintiff here has class standing as to certain Defendants.

21

As discussed above, Plaintiff has class standing to bring a Section 11 claim as to the SPO on behalf of the unnamed putative class members against Defendants QTT, L. Li, Wang, Jaing, Dong, Chen, Citigroup, and Deutsche Bank, who were all involved in both the IPO and SPO offerings. While Plaintiff does not have individual statutory standing against these defendants to make a Section 11 claim as to the SPO, this circumstance does not constitute a material issue, as class standing allows him to pursue claims on behalf of the unnamed putative class members who can satisfy Section 11 statutory standing by tracing their securities to the statements in the SPO Offering Documents. Thus, the fact that Plaintiff does not individually have statutory standing for the SPO claim is remedied by class standing, which allows the Plaintiff to pursue the Section claim on behalf of unnamed putative class members as to the SPO. See NECA 693 F.3d at 158 (finding class standing applied even where plaintiff did not individually have statutory standing to pursue certain claims).

### 2.   Section 12(a)(2) Statutory Standing

Section 12(a)(2) of the Securities Act grants purchasers of securities an express cause of action against sellers who make material misstatements or omissions "by means of a prospectus." 15 U.S.C. § 77l(a)(2). In the context of Section

12(a)(2), the word "'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder." Gustafson v. Alloyd Co., 513 U.S. 561, 584 (1995). Thus, to have statutory standing under Section 12(a)(2), "plaintiffs must have purchased securities directly from the defendants" in a "public offering[]." Freidus v. Barclays Bank PLC, 734 F.3d 132, 141 (2d Cir. 2013); see In re Smart Techs. Inc. S'holder Litig., 295 F.R.D. 50, 57 (S.D.N.Y. 2013) ("It is well-settled that a plaintiff may maintain a section 12(a)(2) claim only where the plaintiff purchased securities directly in the initial public offering.").

Moreover, courts in this Circuit routinely find that "[p]laintiffs who purchased securities in a secondary market or aftermarket lack standing" to bring a Section 12(a)(2) claim. Garnett v. RLX Tech. Inc., 632 F. Supp. 3d 574, 614 (S.D.N.Y. 2022); see also In re Sterling Foster & Co., Inc., Sec. Litig., 222 F. Supp. 2d 216, 244 (E.D.N.Y. 2002) (collecting cases finding that "purchasers in private or secondary market offerings are precluded from bringing actions under Section 12(a)(2)"). Here, Plaintiff concedes that he did not purchase QTT shares in the IPO or the SPO directly from Defendants. (See SAC n.47.) Accordingly, Plaintiff lacks statutory standing to bring a claim under

23

Section 12(a)(2). See In re HEXO Corp. Sec. Litig., 524 F. Supp. 3d 283, 305 (S.D.N.Y. 2021) (dismissing Section 12(a)(2) claim for lack of standing because the named plaintiffs did not purchase the company's shares during the IPO); In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) ("[B]ecause the plaintiffs have not alleged that they have purchased their shares in the IPO, they have failed to allege that they have standing to bring a claim under [Section] 12(a)(2).").

Plaintiff relies on Langan v. Johnson & Johnson Consumer Companies, Inc., 897 F.3d 88 (2d Cir. 2018), to establish he has class standing for his Section 12(a)(2) claims because he has standing for his Section 11 claims as to certain defendants. To that extent his reliance on Langan is misplaced. In Langan, the Second Circuit discussed how NECA stood for the proposition that "non-identical injuries of the same general character can support standing." 897 F.3d at 94. It also reaffirmed, as NECA did, that "'with respect to each asserted claim' against each defendant, 'a plaintiff must always have suffered a distinct and palpable injury to herself.'" Id. at 92. Class standing, as described in Langan and NECA, "does not stand for the sweeping proposition that an individual may represent absent class members with regard to claims as to which he or she has no individual standing[.]"!

24

Yi Xiang v. Inovalon Holdings, Inc., 327 F.R.D. 510, 520 (S.D.N.Y. 2018) (quoting Stadnick v. Vivint Solar, Inc., No. 14-CV-9283, 2015 WL 8492757, at *17 (S.D.N.Y. Dec. 10, 2015), aff'd, 861 F.3d 31 (2d Cir. 2017)).

"In NECA-IBEW Health & Welfare Fund, the Second Circuit allowed a plaintiff to bring claims on behalf of a class under the same statutes regarding different prospectuses and registration statements." Lozada, 710 F. Supp. 3d at 313. "[I]t did not, however, allow the ability to bring class claims that stretch across different statutes." Id.; see also Stadnick, 2015 WL 8492757, at *18 ("[P]laintiff here does not have statutory standing on his own right to pursue a claim under § 12(a)(2). Rather than expanding from his own statutory standing to represent a class of people with the same set of concerns, plaintiff instead asserts merely that the similarity between claims under § 11 and claims under § 12(a)(2) is enough. It is not, and plaintiff's lack of statutory standing for a § 12(a)(2) claim is dispositive.").

Here, Plaintiff "does not have statutory standing in his own right to pursue a claim under Section 12(a)(2)." Stadnick, 2015 WL 8492757, at *18. Though Plaintiff does have class standing to pursue his Section 11 claim as to the SPO against certain Defendants, this class standing does not "stretch across different statutes" to Plaintiff's Section 12(a)(2)

25

claims. Lozada, 710 F. Supp. 3d at 313. Therefore, "plaintiff's lack of statutory standing for a § 12(a)(2) claim is dispositive." Stadnick, 2015 WL 8492757, at *18. Because there is not a named plaintiff who has statutory standing to bring the Section 12(a)(2) claim, this action must be dismissed. Having addressed standing, the Court now turns to the Plaintiff's remaining claims, beginning with his Section 11 claim.

    B.   SECTION 11

"Section 11 establishes liability on the part of issuers of registration statements if 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 182 (2d Cir. 2014) (quoting 15 U.S.C. § 77k(a)). "A misstatement or omission is material if 'there is a substantial likelihood that a reasonable person would consider the stated or omitted facts important in deciding whether to buy or sell shares of stock.'" In re Hut 8 Corp. Sec. Litig., No. 24-CV-904, 2025 WL 2636150, at *12 (S.D.N.Y. Sept. 12, 2025) (quoting Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 92-93 (2d

Cir. 2010) (internal quotation marks omitted)). "To state a claim under Section 11, the plaintiff must allege that: (1) [they] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358–59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)). "Plaintiffs need not allege scienter, reliance, or causation." City of Pontiac, 752 F.3d at 182.

Typically, "in assessing [Section] 11 claims, we 'conduct a preliminary inquiry into whether plaintiffs' allegations are premised on fraud,' or merely on negligence, to determine the appropriate pleading standard." Id. at 183 (quoting In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167, 174 (2d Cir. 2011)). Here, however, the Second Circuit has already determined that Plaintiff's allegations sound in negligence rather than fraud, making Rule 8 notice pleading the appropriate standard. (See Dkt. No. 113.) As discussed previously, Rule 8 requires that a complaint

includes "enough facts to state a claim for relief 'that is plausible on its face.'" Laguerre v. Related Mgmt. Co., No. 25-CV-5594, 2025 WL 2998053, at *1 (S.D.N.Y. Oct. 24, 2025) (quoting Twombly, 550 U.S. at 570). To prevail, plaintiff must have alleged "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 120-21 (2d Cir. 2013) (quoting Iqbal, 556 U.S. at 678). "[F]actual content that is 'merely consistent with,' rather than suggestive of, a finding of liability will not support a reasonable inference." Id. at 121 (quoting Twombly, 550 U.S. at 556). "Although not subject to Rule 9(b)'s heightened pleading standard, 'the complaint must still allege a false or misleading statement or omission in more than conclusory terms.'" In re Hut 8, No. 24-CV-904, 2025 WL 2636150, at *11 (quoting Harris v. AmTrust Fin. Servs., Inc., 135 F. Supp. 3d 155, 170 (S.D.N.Y. 2015), aff'd, 649 F. App'x 7 (2d Cir. 2016)).

The SAC alleges multiple misstatements and omissions of material fact made in the Offering Documents. Specifically, the SAC alleges that (1) QTT misrepresented that it had an effective screening program to prevent the placement of illegal advertisements on the QTT app, including the use of

28

artificial intelligence to screen advertisements (SAC ¶¶ 107-08, 122); (2) QTT omitted from stating in the Offering Documents that it was actively placing a material amount of illegal advertisements on the QTT app at the time of the IPO and SPO (id. ¶¶ 109-11, 125-27); (3) a material amount of QTT's revenue growth came from placing illegal advertisements rather than from a strategy of targeting underserved users in lower tier cities (id. ¶¶ 8, 99-101, 116-17); and (4) QTT failed to disclose certain related party transactions (id. ¶¶ 48-66). The Court will address each of these alleged misstatements and omissions in turn.

> 1. QTT's Statements Regarding the Screening of Illegal Advertisements

The SAC alleges that QTT misled investors by stating in its IPO Offering Documents that QTT used "artificial intelligence" and "deep learning methods" to "monitor and identify objectionable visual content with a high degree of accuracy" and flag "suspicious content for manual review." (Id. ¶ 107). According to Plaintiff, these claims were misleading because they highlighted the effectiveness of QTT's content screening technology without disclosing that the Company placed ads declined by the screening technology on the QTT app after a second manual review by QTT employees. (See id. ¶¶ 73, 108).

Defendants argue that references to screening technology using "artificial intelligence" and "deep learning methods" referred not to the screening of advertisements, but to the screening of user content on the QTT app. (Defs.' Mem. at 16-17.)

Here, the Court agrees with Defendants that the references to "artificial intelligence" referred not to the screening of advertisements, but to the screening of QTT's core content for consumers. The IPO Offering Documents contained a section titled "Advertising," that was immediately followed by a separate section titled "Content Screening Technology." (SAC ¶ 107.) The "Advertising" section discussed QTT's use of technology to deliver targeted ads to users, making no mention of artificial intelligence and its implications for screening illegal ads. (Id.) In the very next section labeled "Content Screening Technology," QTT described its use of "artificial intelligence" and "deep learning" to decline and flag certain objectionable "content." (Id.) This context indicates that the artificial intelligence technology was being used to screen user content, like news articles, rather than advertisements.

While Plaintiff claims that QTT itself referred to "advertising content" in the Offering Documents, those same documents also referred to "content and advertising"

separately in other locations, indicating that QTT viewed content and advertising as distinct concepts. (Id.; Dkt. No. 124-12 at 16, 124-13 at 18.) Given that the statements regarding the use of artificial intelligence came in the "Content Screening Technology" section, rather than the immediately preceding "Advertising" section, no reasonable investor could have plausibly interpreted Defendant's statements to mean that QTT's screening technology was used to screen advertisements.

2.   QTT Did Not Disclose That It Was Placing Illegal Advertisements On the QTT App

The SAC alleges that the Offering Documents were materially false and misleading because they did not disclose to investors that QTT was actively violating People's Republic of China ("PRC") advertising laws and regulations at the time those documents became effective. (See SAC ¶¶ 101, 105, 109-11, 118, 121, 126-27.) To support that illegal ads were being placed on the platform at the time the Offering Documents became effective, Plaintiff points to confidential witness allegations regarding the placement of "non-conforming" ads on the QTT App, public reporting of illegal ads, a lawsuit filed against QTT regarding gambling ads, and a talk between QTT and a Chinese regulator. (Id. ¶¶ 72-75, 88-95.) Plaintiff also argues that QTT's risk disclosures

31

regarding illegal advertisements on the QTT App do not protect Defendants from liability because at the time the risk disclosures were made QTT "was actively violating [advertising] regulations." (Pl.'s Opp'n at 11.) Defendants respond that QTT fully disclosed its illegal advertisement risks, including the risk that the Company could be currently violating PRC advertising laws and regulations at the time the disclosures were made. (Defs.' Mem. at 12-15.)

The Court finds that the SAC fails to allege that the Offering Documents contained materially false and misleading statements regarding the existence of illegal advertisements at the time the statements became effective because QTT fully disclosed the risk of illegal advertisements on the QTT App.

In its Offering Documents, QTT disclosed the risk that illegal advertisements could appear on its platform. In the Offering Documents QTT expressly warned investors that it "cannot assure [investors] that all the advertisements shown on [its] mobile applications are true, accurate, appropriate and in full compliance with applicable laws and regulations." (SAC ¶ 110.) This disclosure of risk is in the present tense. It tells investors that at the time the statements were made, QTT "cannot assure" that "all the advertisements" on the platform fully complied with PRC laws and regulations. (Id.) Though "cautionary words about future risk" are not

sufficient to protect against risks that have occurred already and are likely to occur again, the words used by QTT indicate that at the time of the disclosures, QTT could have been in active violation of PRC advertising laws and regulations. Van v. Bright Health Grp., Inc., No. 24-3132-CV, 2025 WL 3171688, at *3 (2d Cir. Nov. 13, 2025) (quoting Set Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 85 (2d Cir. 2021)).

Plaintiff states that the disclosures in this case are similar to the disclosures that the Second Circuit found inadequate in Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 250 (2d Cir. 2014). In that case, the Second Circuit found that the "failure to disclose then-ongoing and serious pollution violations" was actionable despite investors being "warned of a financial risk to the company from environmental violations." Jinkosolar, 761 F.3d at 251. However, in that case, the defendant had submitted a report to Chinese Regulators about existing problems regarding pollution violations. Id. The Court found that given the known existence of problems at the time the offering documents were published, the company's "generic warning" of a risk that that non-compliance with environmental regulations may be costly would "not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of

probability." Id. Here, Plaintiff does not identify any such self-disclosure or knowledge of ongoing violations by QTT.

This case is more similar to Jiajia Luo v. Sogou, Inc., 465 F. Supp. 3d 393, 409-10 (S.D.N.Y. 2020), where the court found that the company's disclosures properly warned investors that the company could not assure or guarantee that they were currently complying with the law. In Sogou, the offering documents included a statement that "[a]lthough we are committed to complying with . . . PRC laws and regulations applicable to Internet-related service . . . activities, we cannot guarantee that *we are now* or will in the future be in full compliance with any such laws and regulations that apply to our services and activities." 465 F. Supp. 3d at 410. The court in that case found that because of the company's risk disclosure, "no reasonable investor could infer that [the company's] compliance efforts were particularly effective." Id. Here, QTT similarly acknowledged the current and ongoing risk that it "cannot assure [investors] that all the advertisements shown on [QTT's] mobile applications are true, accurate, appropriate and in full compliance with applicable laws and regulations." (SAC ¶ 110.) Based on QTT's risk disclosures, no reasonable investor could infer that QTT's compliance efforts were currently effective.

Additionally, Plaintiff fails to allege any omission by Defendants of a violation of PRC advertising laws and regulations at the time of the IPO and SPO that would render QTT's risk disclosure ineffective or misleading. Plaintiff attempts to support his argument that QTT knew it was placing illegal ads on its platform at the time the Offering Documents became effective in several ways. First, Plaintiff argues that allegations by confidential witnesses support a plausible inference that QTT placed illegal ads on the platform at the time of the Offerings. (See SAC ¶¶ 72-75.) Second, Plaintiff points to public reporting indicating that QTT had illegal advertisements on its platform. (See id. ¶¶ 88-89.) Third, Plaintiff claims there was a lawsuit filed against QTT's Chinese entity Jifen in January 2019 regarding illegal gambling advertisements on the QTT app. (See id. ¶ 90.) Fourth, Plaintiff asserts that QTT was summoned for a talk regarding illegal advertisements on June 18, 2019, with the Shanghai Municipal Market Supervision Bureau, a Chinese regulator. (See id. ¶ 91.) The Court will address each of these allegations in turn.

Plaintiff alleges that confidential witnesses support a plausible inference that QTT placed illegal advertisements on the QTT App at the time of the Offerings. Plaintiff identifies two confidential witnesses. The first is a channel manager at

35

Dianguan from June 2019 to September 2020 ("Former Channel Manager"). (See id. ¶¶ 72-73.) The Former Channel Manager claimed that while QTT used technology to screen advertisements, if an advertisement that "toed the line" was screened out, the ads could be subject to a second manual review that would allow those "non-conforming" ads to be put on the platform. (Id. ¶¶ 71, 73.) The second confidential witness was a former sales director ("Former Sales Director") of Dianguan from March 2019 to May 2020 who explained that the second manual review was conducted by two teams, one team that dealt with well-known and qualified advertisers and a second team that dealt with riskier, unqualified advertisers. (Id. ¶¶ 72, 74-75.) The Former Sales Director alleged that the second team dealing with the unqualified advertisers outsourced due diligence to outside contractors who often opened accounts for any advertiser without conducting the proper due diligence. (Id. ¶ 74.)

"[T]he Court may properly take account of the alleged testimony of [a confidential witness] even though some of [their] testimony is based on hearsay and indirect knowledge." City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc., 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020). "For a complaint to rely on information provided by confidential sources", the source must be described in the

complaint with sufficient detail to "support the probability that a person in the position occupied by the source would possess the information alleged." Id. (quoting Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)). The question here is whether it is probable that the two confidential witnesses were in a position to possess information regarding the screening and placement of illegal advertisements by QTT at the time of the Offerings.

The Court finds that the confidential witnesses are not described in the SAC in a manner sufficient to support the probability that they were in a position to possess the information alleged. First, the Former Channel Manager was hired after the April 2019 SPO and is not alleged to have worked on advertising at QTT. (SAC ¶ 72.) Given that the Former Channel Manager was not working at QTT at the time of either offering and did not work in advertising at QTT, they are not someone who "would possess the information alleged." City of Warren, 477 F. Supp. 3d at 132. For the Former Sales Director, the SAC itself acknowledges that they "did not deal with unqualified advertisers," and only learned "about how the Company dealt with those advertisers from co-workers." (Id. ¶ 74.) These confidential witnesses' allegations are based not on direct observations, but instead on "second-hand information, obtained only through intermediaries." Janbay v.

37

Canadian Solar, Inc., 2013 WL 1287326, at *8 (S.D.N.Y. Mar. 28, 2013). Such second-hand information undermines "the likelihood that [the confidential witness] had personal knowledge of the allegations." Id. Given these issues, the SAC does not "support the probability that a person in the position[s] occupied by the [confidential witnesses] would possess the information alleged." City of Warren, 477 F. Supp. 3d at 132.

Even if the SAC properly described the confidential witnesses as occupying positions that would possess the information alleged, the witnesses would still not allege that illegal advertisements were placed on the QTT App. The confidential witnesses speak of "risky," advertisements that "toed the line." (SAC ¶¶ 72-75.) However, nowhere does the SAC explicitly state that the confidential witnesses alleged that illegal advertisements were being placed on the QTT App. Given the fact that neither confidential witness explicitly stated that illegal ads were being placed on the QTT App at the time of the Offerings, neither witness supports a plausible inference that QTT placed illegal ads during the IPO and SPO.

Next, Plaintiff's allegations that public reporting revealed that QTT was placing illegal advertisements on the QTT App represent claims of "uncharged, unadjudicated

38

wrongdoing or mismanagement" that Defendants were not obligated to disclose in the Offerings. Ciresi v. Citicorp, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), aff'd, 956 F.2d 1161 (2d Cir. 1992). Further, any such reporting regarding illegal advertisements on the QTT app would be entirely consistent with QTT's risk disclosure that it could not assure investors that all advertisements on the platform complied with PRC laws and regulations.

Addressing Plaintiff's allegations that a January 2019 lawsuit against QTT's Chinese entity Jifen showed that QTT placed gambling ads on the QTT app, the Chinese court in that matter dismissed the case without making any findings regarding ads. (See SAC ¶ 90.) Accordingly, there was no finding regarding a violation of PRC advertising laws or regulations for QTT to disclose in the Offering Documents.

Lastly, Plaintiff alleges that on June 18, 2019, QTT was summoned for a talk and sternly warned by the Shanghai Municipal Market Supervision Bureau, a Shanghai regulator, regarding QTT's illegal advertising practices. (See id. ¶ 91.) First, this discussion took place two months after the April 2019 SPO. As Defendants point out, this discussion with a regulator cannot "retroactively render the offering documents materially false or misleading." (Defs.' Mem. at 14); see Sogou, 465 F. Supp. 3d at 406 ("It is not sufficient

that, at some point after the registration statement became effective, some subsequent event made it no longer accurate."); see also In re Hut 8, 2025 WL 2636150, at *12 ("[A]n actionable misstatement is one that 'was false *at the time it was made*.'" (quoting In re Lululemon Sec. Litig., 14 F.Supp.3d 553, 571 (S.D.N.Y. 2014))).

Given QTT's risk disclosures and the fact that the SAC fails to properly plead any undisclosed advertising law violations by QTT, the Court does not find there to be any actionable misrepresentations or omissions by Defendants regarding the placement of illegal advertisements on the QTT App at the time of the IPO and SPO.

### 3.   QTT's Failure to Disclose Knowledge of Illicit Advertising as a Key Driver of Revenue Growth

It is well established that "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." City of Pontiac, 752 F.3d at 184 (internal quotation marks omitted). However, "the duty to disclose uncharged wrongdoing may arise in three scenarios: (1) 'when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices'; (2) 'when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring'; or (3) 'when

40

a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief.'" In re Teva Sec. Litig., 671 F. Supp. 3d 147, 211–12 (D. Conn. 2023) (quoting Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016)). "When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred." Menaldi, 164 F. Supp. 3d at 578. Because Plaintiff alleges that Defendants provided reasons for the Company's growth in revenue but "fail[ed] to disclose that a material source of its success" was the placement of illegal advertisements on the QTT App, they must state a "plausible claim that the underlying conduct occurred." Id.

Plaintiff alleges that investors were misled about what drove QTT's revenue growth because Defendants "failed to disclose that illicit advertising was also a key driver." (Pl.'s Opp'n at 16.) Specifically, the SAC alleges that statements in the Offering Documents that increases in revenue were caused by QTT's strategy of targeting users in lower tier cities were materially false and misleading because they did not "disclose that a substantial portion of QTT's 'rapidly' increasing revenue was derived from illegal ads." (Id.) Plaintiff also alleges that QTT's statements

regarding revenue growth were misleading in that they omitted that "reduc[ing] [QTT's] reliance" on Baidu in favor of a new "advertising agent" Dianguan "increased the likelihood of illegal ads" being placed on the QTT platform. (Id. at 16-17.) Plaintiff argues that under Rule 8 they have "adequately pled that illegal ads materially contributed to QTT's revenue growth, as evidenced by its first ever year-over-year revenue decrease after enacting remedial measures to halt illegal ads[.]" (Id. at 18.) Plaintiff further alleges that the omission was material to investors "as evidenced by QTT's ADSs' falling 24 [percent] after investors learned the truth." (Id.)

Defendants argue that Plaintiff does not support his claim regarding illegal advertisements being a key driver of revenue for QTT with "well-plead factual allegations." (Defs.' Reply at 1.) Specifically, Defendants argue that the "SAC includes no allegation regarding the volume of allegedly illegal advertisements" and that the "circumstantial allegations on which Plaintiff relies . . . are either unreliable, speculative, or conclusory." (Id.)

Plaintiff has not adequately pled that illegal advertisements materially contributed to QTT's revenue growth. As evidence that illegal advertisements were so "substantial" that they constituted a material contribution

to QTT's revenue growth, Plaintiff points to QTT's first ever year-over-year revenue decrease after QTT enacted remedial measures to prevent illegal ads. (Pl.'s Opp'n at 18.)

The Court is not persuaded that this evidence is sufficient to support a plausible inference that QTT failed to disclose that a material number of illegal advertisements existed on the QTT App at the time of the Offerings. First, the drop in revenue took place in 2020, after both the September 2018 IPO and the April 2019 SPO were filed. This does not demonstrate that prior to 2020, QTT knew that a substantial portion of advertisements were illegal. Plaintiff must demonstrate that Defendants knew the statements were misleading at the time of the registration statements became effective, rather than later in time. See In re Tufin Software Techs. Ltd. Sec. Litig., No. 20-CV-5646, 2022 WL 596861, at *5 (S.D.N.Y. Feb. 25, 2022) ("The veracity of a registration statement which may give rise to liability under [Section 11] is determined by assessing the facts as they existed when the statement became effective.") (quoting Ladmen Partners, Inc. v. Globalstar, Inc., No. 07-CV-0976, 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008)); Scott v. Gen. Motors Co., 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014), aff'd, 605 F. App'x 52 (2d Cir. 2015) ("Plaintiffs must, 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and

43

were known or knowable, at the time of the offering.'") (quoting <u>Lin v. Interactive Brokers Grp., Inc.</u>, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008)); <u>In re Coty Inc. Sec. Litig.</u>, No. 14-CV-919, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) (decline in operating income after IPO "offer little guidance as to the information that was available at the time of the IPO"). Plaintiff therefore fails to allege that QTT knew that there were a substantial number of illegal advertisements on its platform at the time the Offerings.

Additionally, a certain drop in QTT's revenue does not equate to the equivalent drop in the number of illegal advertisements on the QTT App. While a substantial number of advertisements being illegal is a possible explanation for why revenue decreased in 2020 after QTT took remedial measures, without more this explanation is not brought into the realm of plausible, as there are a myriad of reasons why revenue can decrease from year-to-year. Plaintiff cannot allege any evidence regarding the high prevalence of illegal advertisements at the time the Offering Documents were filed, let alone that QTT knew that there was a substantial number of illegal advertisements on the QTT App at that time.

Regarding Plaintiff's allegation that Defendants misled investors by omitting that the acquisition of Dianguan as QTT's "advertising agent" "increased the likelihood of

44

illegal ads," Plaintiff has not pled non-conclusory facts that taken as true would support such a claim. (Pl.'s Opp'n at 16.) Plaintiff provides no support for any such allegation, which runs counter to QTT's statements in Offering Documents that they acquired Dianguan as their advertising agent to "enhance [its] platform's monetization capabilities." (SAC ¶¶ 101, 112, 118, 124.) While Plaintiff alleges that Dianguan's founder lacked experience in digital marketing, that circumstance has little bearing on whether the acquisition would increase the likelihood of illegal ads being placed on the QTT App compared to the previous advertising agent Baidu.

### 4.    QTT Failed to Disclose Related Party Transactions

Plaintiff alleges that Defendants failed to disclose related party transactions as required under Generally Accepted Accounting Principles ("GAAP"), SEC Regulation S-X (SAC ¶¶ 52-53), and Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ACS") 850 (SAC ¶ 54). Related parties under FASB ASC 850 include: (1) "Affiliates of the entity" (ASC 850-10-20); (2) "Principal owners of the entity and members of their immediate families" (id.); (3) "[m]anagement of the entity and members of their immediate families" (id.); (4) "[o]ther parties with which the entity may deal if one party controls or can significantly

45

influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests" (id.); and (5) "[o]ther parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests" (id.).

Plaintiff alleges that QTT omitted material facts in the Offering Documents by not disclosing certain related party transactions. (See SAC ¶¶ 48-66.) First, Plaintiff alleges that QTT's acquisition of Dianguan should have been disclosed as a related party transaction, because QTT's co-founder and CEO Tan had a "close business relationship" with Dianguan's founder, Xiang "Sean" Liang ("Liang"). (Id. ¶¶ 57-61.) Second, Plaintiff alleges that QTT also failed to disclose that transactions with advertisers Mengtui, Fangce, and Shihui Miao were related party transactions because these entities were related parties benefitting Tan. (See id. ¶¶ 62-66.)

The analysis below first considers Plaintiff's claim regarding Dianguan, and then turns to the claims regarding Mengtui, Fangce, and Shihui Miao.

### a. Dianguan

According to the SAC, Liang founded Dianguan four months prior to its acquisition by QTT in February 2018. (Id. ¶ 57-58.) Liang was Dianguan's director and legal representative at the time of the acquisition. (Id. ¶ 58.) The SAC argues that "Liang and Tan's business relationship was so intertwined that Dianguan would have been prevented from fully pursing its own separate interest[.]" (Id. ¶ 61 (internal quotations omitted).)

The SAC provides two factual assertions to support its contention that Liang had a special relationship with Tan at the time QTT acquired Dianguan. First, before founding Dianguan, Liang was an investment director of a company called Shanghai Taiyun Investment Management Co. Ltd. ("Taiyun Capital"), in which Tan had 99 percent ownership. (Id. ¶ 58.) Second, Plaintiff alleges that "within weeks of the Dianguan Acquisition, [] Tan invested in a company [called Nantong WooFoo Jinxin Equity Investment Fund Partnership ("Woofoo Equity")] which was the executive partner of another company at which Liang was the director of domestic investment." (Id. ¶ 60.) Plaintiff alleges that, because of these connections,

47

"Liang and Tan's business relationship was so intertwined that Dianguan would have been prevented from fully pursing its own separate interest." (Id. ¶ 61 (internal quotation marks omitted).)

While Plaintiff describes a close business relationship between Liang and Tan, he fails to adequately plead that this relationship was so intertwined that Dianguan might have been prevented from fully pursuing its own interests. First, because Tan's involvement with Woofoo Equity came after QTT's acquisition of Dianguan, it has no bearing on whether Liang and Tan were related parties at the time of the transaction between QTT and Dianguan, which is the "pertinent point." In re Hebron Tech. Co., Ltd. Sec. Litig., No. 20-CV-4420, 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021) (rejecting plaintiff's claim that defendant failed to disclose a related party transaction where the SAC did not allege a relationship at the time of the relevant transactions). That Liang served as an investment director at Taiyun Capital, a company 99 percent owned by Tan, also does not sufficiently allege that Tan had control over Liang so as to make the Dianguan acquisition a related party transaction. The existence of business relationship between Tang and Liang did not trigger a duty to disclose. "[T]he fact of a separate association between [] two men" does not mean that one individual had

control over another so as to make the transaction a "related party transaction." In re Hebron, 2021 WL 4341500, at *15. Here, Liang's role at a third company primarily owned by Tan, Taiyun Capital, does not meet the related party standard because Plaintiff does not plausibly allege how Liang's business relationship with Tan would have "prevented [Liang] from fully pursuing [his] own separate interest." Id. at *11.

### b. *Mengtui, Fangce, and Shihui Mioa*

Plaintiff also fails to allege any undisclosed related party transactions at the time of the Offerings with advertisers Mengtui, Fangce, and Shihui Mioa. Plaintiff alleges that QTT's transactions with its advertisers Mengtui, Fangce, and Shihui Miao should have been disclosed in the Offering Documents as related party transactions. (SAC ¶¶ 62-65.) While the Defendants' do not dispute that these are related party transactions, they state that these transactions were properly disclosed in QTT's 2019 annual report. (Defs.' Mem. at 24-25.) Defendants argue that the "SAC persists in pleading no facts regarding [QTT's] transactions with these entities at the time of the September 2018 IPO or April 2019 SPO, defeating this claim." (Id. at 25.) Because the SAC does not allege that the transactions began before the IPO and SPO and because they were disclosed as part of QTT's annual review, the SAC fails to adequately

49

plead that QTT did not disclose related party transactions at the appropriate time. See Sogou, 465 F. Supp. 3d at 406 ("It is not sufficient that, at some point after the registration statement became effective, some subsequent event made it no longer accurate.")

C.    SECTION 15

Section 15 of the Securities Act creates liability for individuals or entities that "control[ ] any person liable" under Sections 11 or 12. 15 U.S.C. § 77o(a). To state a claim for control person liability under Section 15, "a plaintiff must allege 'a primary violation by a controlled person, and control by the defendant of the primary violator'" Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc., 715 F. Supp. 3d 483, 505 (S.D.N.Y. 2024), aff'd, No. 24-646-CV, 2024 WL 4647131 (2d Cir. Nov. 1, 2024) (quoting In re Global Crossing, Ltd. Secs. Litig., 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004)) (cleaned up). "If the plaintiff has not adequately alleged a primary violation – i.e. a viable claim under another provision of the Securities Act – the Section 15 claim must be dismissed." In re Hut 8, No. 24-CV-904, 2025 WL 2636150, at *6. Here, the Court has found that there are no viable claims under Section 11 or Section 12. Therefore, Plaintiff does not have a viable Section 15 claim.

## IV.  ORDER

For the preceding reasons, it is hereby

**ORDERED** that the motion (the "Motion") (Dkt. No. 122) of Defendants Oliver Yucheng Chen, China Merchants Securities (HK) Co., Ltd., Citigroup Global Markets Inc., Yongbo Dai, Deutsche Bank Securities Inc., Jianfei Dong, Jefferies Group LLC, Shaoqing Jiang, KeyBanc Capital Markets Inc., Feng Li, Lei Li, James Jun Peng, Qutoutiao Inc., Eric Siliang Tan, UBS Securities LLC, Jingbo Wang, and Xiaolu Zhu to dismiss the Second Amended Consolidated Class Action Complaint (Dkt. No. 118) is **GRANTED.**

The Clerk of Court is respectfully directed to close Dkt. No. 118.

**SO ORDERED.**

Dated:   5 February 2026
         New York, New York

_____
Victor Marrero
U.S.D.J.

51